William M. Audet (CA 117456)
Adel A. Nadji (CA 232599)
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco, CA 94105
Telephone: 415.568.2555
Facsimile: 415.568.2556

T. Joseph Snodgrass, Pro Hac Vice
Shawn M. Raiter, Pro Hac Vice
Kelly A. Swanson, Pro Hac Vice
LARSON KING, LLP
30 E. 7th Street, Suite 2800
Saint Paul, MN 55101
Telephone: 651-312-6500
Facsimile: 651-312-6618

*Attorneys for Plaintiffs and
The Class Members*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| MONTE RUSSELL, on behalf of himself and others similarly situated,<br><br>            Plaintiff,<br><br>    v.<br><br>WELLS FARGO AND COMPANY,<br><br>            Defendant. | Case No. C–07-3993-CW<br><br>**DECLARATION OF T. JOSEPH SNODGRASS IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION UNDER FLSA, 29 U.S.C. §216(b), AND FOR COURT-APPROVED NOTICE OF FLSA CLAIMS** |

1    I, T. Joseph Snodgrass, declare:

2    1.    I am a partner with the firm Larson · King, LLP, counsel for the Plaintiff, Monte

3    Russell, and others similarly situated.  I am an attorney licensed to practice in the State of

4    Minnesota and my admission to practice in the Northern District of California on a pro hac vice

5    basis was granted on August 17, 2007.  I have personal knowledge of the matters stated herein

6    and if called as a witness, I could and would competently testify to the following:

7    2.    Attached hereto as Exhibit A is a true and correct copy of the Declaration of

8    Monte Russell.

9    3.    Attached hereto as Exhibit B is a true and correct copy of the Declaration of Greg

10    Weir.

11    4.    Attached hereto as Exhibit C is a true and correct copy of the Declaration of

12    Richard Chow.

13    5.    Attached hereto as Exhibit D is a true and correct copy of Declaration of Patrick

14    Kennedy.

15    6.    Attached hereto as Exhibit E is a true and correct copy of Declaration of Daniel

16    Friedman.

17    7.    Attached hereto as Exhibit F is a true and correct copy of Declaration of Greg

18    Diersing.

19    8.    Attached hereto as Exhibit G is a true and correct copy of the April 25, 2007 letter

20    to Christine Meuers from Anne T. Regan.

21    9.    Attached hereto as Exhibit H is a true and correct copy of the May 1, 2007 letter

22    to Christine Meuers from Anne T. Regan.

23    10.    Attached hereto as Exhibit I is a true and correct copy of the July 7, 2007 Tolling

24    Agreement

25    11.    Attached hereto as Exhibit J is a true and correct copy of the July 11, 2007 TIG

26    Compensation e-mail (WF R 0117).

27    12.    Attached hereto as Exhibit K is a true and correct copy of the "Team Member

28    Hours Survey" (WF R 0114-0116).

DECLARATION OF T. JOSEPH SNODGRASS IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION UNDER FLSA, 29 U.S.C. §216(b), AND FOR
COURT-APPROVED NOTICE OF FLSA CLAIMS

13.     Attached hereto as Exhibit L is a true and correct copy of the August 2, 2007 Corporation Compensation e-mail (WF R 0118).

14.     Attached hereto as Exhibit M is a true and correct copy of the July 17, 2007 letter to Timothy N. Grubb from Anne T. Regan.

15.     Attached hereto as Exhibit N is a true and correct copy of the August 2, 2007 Corporation Compensation e-mail (California) (WF R 0119).

16.     Attached hereto as Exhibit O is a true and correct copy of the "Payment Advice and Resolution" and "Release of All Claims for Wages" forms (WF R 0120-121).

17.     Attached hereto as Exhibit P is a true and correct copy of the Plaintiffs' proposed collective action notice.

18.     Attached hereto as Exhibit Q is a true and correct copy of the following unpublished cases:

> *Gerlach v. Wells Fargo & Co*, No. C 05-0585, 2006 WL 824652 (N.D. Cal. Mar. 28, 2006);
>
> *Stanfield v. First NLC Fin. Servs., LLC*, No. C 06-392, 2006 WL 3190527  (N.D. Cal. Nov. 1, 2006);
>
> *Aguayo v. Oldenkamp Trucking*, No. CV F 04-6279, 2005 WL 2436477 (E.D. Cal. Oct. 3, 2005);
>
> *Beauperthuy v. 24 Hour Fitness USA, Inc.*, No. 06-0715, 2007 WL 707475 (N.D. Cal. Mar. 6, 2007);
>
> *Castle v. Wells Fargo Financial, Inc.*, No. C 06-4347, 2008 WL 495705 (N.D. Cal. Feb. 20, 2008);
>
> *Doe v. Texaco, Inc.*, No. C06-02820 WHA, 2006 WL 2850035 (N.D. Cal. Oct. 5, 2006);
>
> *Ballaris v. Wacker Silttronic Corp.*, No. 00-1627, 2001 WL 1335809 (D. Or. Aug. 24, 2001).

DECLARATION OF T. JOSEPH SNODGRASS IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION UNDER FLSA, 29 U.S.C. §216(b), AND FOR COURT-APPROVED NOTICE OF FLSA CLAIMS

Audet & Partners, LLP
www.audetlaw.com

1    I declare under penalty of perjury of the laws of the United States of America and the

2    State of California that the foregoing is true and correct to the best of my knowledge.

3    Executed this 25th day of July 2008, at Saint Paul, Minnesota.

4
     Dated: July 25, 2008                    /s/ *T. Joseph Snodgrass*
5                                            T. Joseph Snodgrass

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF T. JOSEPH SNODGRASS IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION UNDER FLSA, 29 U.S.C. §216(b), AND FOR COURT-APPROVED NOTICE OF FLSA CLAIMS

Audet & Partners, LLP
www.audetlaw.com

# EXHIBIT A

EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MONTE RUSSELL, on behalf of himself and others similarly situated,<br><br>       Plaintiff,<br><br>       v.<br><br>WELLS FARGO AND COMPANY,<br><br>       Defendant. | Case No.: CASE NO: C 07 3993<br><br>**DECLARATION OF MONTE RUSSELL IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CONDITIONAL CERTIFICATION AND NOTICE** |

I, Monte Russell, declare:

    1.      My name is Monte Russell. I reside at 13232 North 55th Avenue, Glendale, Arizona 85304. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would testify completely as to these matters.

    2.      Employment with Wells Fargo: I worked for Wells Fargo Bank, N.A. ("Wells Fargo") at its Phoenix, Arizona location from 1998 to September 2006 as a "PC/LAN Engineer 3." As a PC/LAN Engineer, I was an employee in the Wells Fargo's Technology Information Group.

    3.      Hours Worked Each Workweek: Throughout my employment as a PC/LAN Engineer 3 for Wells Fargo, I regularly worked over forty (40) hours per workweek.

    4.      Compensation for Overtime: Although I regularly worked over forty hours per workweek, Wells Fargo did not pay me any overtime compensation.

    5.      Wells Fargo's Classification of PC/LAN Engineers 3 as "Exempt": During my tenure as a PC/LAN Engineer 3 in Wells Fargo's Technology Information Group, I learned that

Wells Fargo had classified my position and other similar Technology Information Group positions as "exempt" from entitlement to overtime compensation. I knew many other employees who held the position title PC/LAN Engineer 3 during my employment with Wells Fargo and none of them were paid overtime during the time I was employed by Wells Fargo. During my tenure, Wells Fargo's management employees represented to me, in meetings and discussions, that PC/LAN Engineers should regularly work 50 hours per week.

6.      I knew of and had discussions with other PC/LAN Engineers 3 at Wells Fargo's other locations, including Minnesota, California, and Texas. Based upon my training, experience, and discussions with other employees, I can attest that the work of PC/LAN Engineers 3 was functionally the same and did not vary significantly from location to location.

7.      As a PC/LAN Engineer 3, I provided computer support services to Wells Fargo by following and implementing well-established company instructions and procedures. I did not supervise other employees. My primary job responsibility was server support involving patching, updating, and repairing. My duties included fixing or troubleshooting computer hardware and installing software according to predetermined instructions or specifications established by others in the Technology Information Group. Additionally, my duties included implementing changes to computer hardware according to predetermined instructions or specifications established by others in the Technology Information Group. As a PC/LAN Engineer 3, the primary work I performed was highly structured and constrained by Wells Fargo's predetermined instructions, specifications, policies, and procedures, and did not normally require the consistent exercise of discretion and independent judgment.

8.      During my employment with Wells Fargo, I came to know other employees with position titles PC/LAN Engineer 3, 4, and 5 located at Wells Fargo's various locations in the

2

attest that the work of PC/LAN Engineers 3, 4, and 5 was functionally the same and did not vary significantly from location to location. PC/LAN Engineers 4 and 5 had primary duties similar to the duties of a PC/LAN Engineer 3, as set forth above. The primary work of PC/LAN Engineers 4 and 5 was also highly structured and constrained by Wells Fargo's predetermined instructions, specifications, policies, and procedures, and did not normally require consistent exercise of discretion and independent judgment.

9.    When I was hired as a PC/LAN Engineer 3, it was my understanding that Wells Fargo classified my position as exempt from overtime pay requirements. At no point in time during my employment with Wells Fargo did I have a clear understanding that I would be paid based on a so-called "fluctuating workweek" method of calculating overtime compensation.

10.    Wells Fargo did not require that I maintain timesheets or records reflecting all of my hours worked as a PC/LAN Engineer 3. Although I kept track of some time I worked on certain projects through Wells Fargo's STAMP system, the time I recorded in Wells Fargo's STAMP system was not a comprehensive time record of all the hours I worked for Wells Fargo.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __18__ day of July 2008.

Monte Russell

1234947

3

# EXHIBIT B

EXHIBIT B

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| MONTE RUSSELL, on behalf of himself and others similarly situated,<br><br>         Plaintiff,<br><br>     v.<br><br>WELLS FARGO AND COMPANY,<br><br>         Defendant. | Case No.: CASE NO: C 07 3993<br><br>**DECLARATION OF GREG WEIR IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CONDITIONAL CERTIFICATION AND NOTICE** |

I, Greg Weir, declare:

1.　My name is Greg Weir. I reside at 12334 Blackberry Road, Balton, TX 76513. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would testify completely as to these matters.

2.　Employment with Wells Fargo: I worked for Wells Fargo Bank, N.A. ("Wells Fargo") as a "PC/LAN Engineer 4" at its Roseville, California location from 2002 to 2004 and its Tempe, Arizona location from 2004 to 2006. As a PC/LAN Engineer, I was an employee in the Wells Fargo's Technology Information Group.

3.　Hours Worked Each Workweek: Throughout my employment as a PC/LAN Engineer 4 for Wells Fargo, I regularly worked over forty (40) hours per workweek.

4.　Compensation for Overtime: Although I regularly worked over forty hours per workweek, Wells Fargo did not pay me any overtime compensation.

5.　Wells Fargo's Classification of PC/LAN Engineers 4 as "Exempt": During my tenure as a PC/LAN Engineer 4 in Wells Fargo's Technology Information Group, I learned that

Wells Fargo had classified my position and other similar Technology Information Group positions as "exempt" from entitlement to overtime compensation. I knew many other employees who held the position title PC/LAN Engineer 4 during my employment with Wells Fargo and none of them were paid overtime during the time I was employed by Wells Fargo.

6.    I knew of and had discussions with other PC/LAN Engineers 4 at Wells Fargo's other locations, including Minnesota, California, and Arizona. Based upon my training, experience, and discussions with other employees, I can attest that the primary work of PC/LAN Engineers 4 was functionally the same and did not vary significantly from location to location.

7.    As a PC/LAN Engineer 4, I provided computer support services to Wells Fargo by following and implementing well-established company instructions and procedures. I did not supervise other employees.    My primary job responsibility was server support involving patching, updating, and repairing.    My duties included fixing or troubleshooting computer hardware and installing software according to predetermined instructions or specifications established by others in the Technology Information Group. Additionally, my duties included implementing changes to computer hardware according to predetermined instructions or specifications established by others in the Technology Information Group. As a PC/LAN Engineer 4, the primary work I performed was highly structured and constrained by Wells Fargo's predetermined instructions, specifications, policies, and procedures, and did not normally require the consistent exercise of discretion and independent judgment.

8.    During my time working for Wells Fargo, I came to know other employees with position titles PC/LAN Engineer 3, 4, and 5 located at Wells Fargo's various locations in the United States. Based upon my training, experience, and discussions with other employees, I can attest that the work of PC/LAN Engineers 3, 4, and 5 was functionally the same and did not vary

2

significantly from location to location. PC/LAN Engineers 3 and 5 had primary duties similar to the duties of a PC/LAN Engineer 4, as set forth above. The primary work of PC/LAN Engineers 3 and 5 was also highly structured and constrained by Wells Fargo's predetermined instructions, specifications, policies, and procedures, and did not normally require consistent exercise of discretion and independent judgment.

9.     When I was hired as a PC/LAN Engineer 4, it was my understanding that Wells Fargo classified my position as exempt from overtime pay requirements. At no point in time during my employment with Wells Fargo did I have a clear understanding that I would be paid based on a so-called "fluctuating workweek" method of calculating overtime compensation.

10.    Wells Fargo did not require or expect me to maintain accurate records reflecting all of my hours worked as a PC/LAN Engineer 4. Although I kept track of some time I worked on certain projects in Wells Fargo's STAMP system, the time I recorded in Wells Fargo's STAMP system did not reflect all my hours worked. In fact, these records failed to reflect substantial additional hours worked.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __19__ day of July 2008.

Greg Weir

1234953

3

# EXHIBIT C

EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

MONTE RUSSELL, on behalf of himself and
others similarly situated,

        Plaintiff,

v.

WELLS FARGO AND COMPANY,

        Defendant.

Case No.: CASE NO: C 07 3993

**DECLARATION OF RICHARD
CHOW IN SUPPORT OF
PLAINTIFF'S MEMORANDUM OF
LAW IN SUPPORT OF MOTION
FOR CONDITIONAL
CERTIFICATION AND NOTICE**

I, Richard Chow, declare:

1.    My name is Richard Chow. I reside at 2351 32nd Avenue, San Francisco, CA

94116. I have personal knowledge of the facts set forth in this declaration, and if called as a

witness, could and would testify completely as to these matters.

2.    Employment with Wells Fargo: I worked for Wells Fargo Bank, N.A. ("Wells

Fargo"), at its San Francisco, California location from September 2005 to December 2006. I was

employed by Wells Fargo as a "PC/LAN Engineer 3." As a PC/LAN Engineer, I was an

employee in Wells Fargo's Technology Information Group.

3.    Hours Worked Each Workweek: Throughout my employment as a PC/LAN

Engineer 3 for Wells Fargo, I regularly worked over forty (40) hours per workweek.

4.    Compensation for Overtime: Although I regularly worked over forty hours per

workweek, Wells Fargo did not pay me any overtime compensation.

5.    Wells Fargo's Classification of PC/LAN Engineers 3 as "Exempt": During my

tenure as a PC/LAN Engineer 3 in Wells Fargo's Technology Information Group, I learned that

Wells Fargo had classified my position and other similar Technology Information Group positions as "exempt" from entitlement to overtime compensation. I knew many other employees who held the position title PC/LAN Engineer 3 during my employment with Wells Fargo and none of them were paid overtime during the time I was employed by Wells Fargo.

6.     I knew of and had discussions with other PC/LAN Engineers 3 at Wells Fargo's other locations, including Minnesota and Wisconsin. Based upon my training, experience, and discussions with other employees, I can attest that the work of PC/LAN Engineers 3 was functionally the same and did not vary significantly from location to location.

7.     As a PC/LAN Engineer 3, I provided computer support services to Wells Fargo by following and implementing well-established company instructions and procedures. Although I was the contact employee for my manager who was remotely located, I did not supervise other employees. My primary job responsibility was server support involving patching, updating, and repairing. My duties included fixing or troubleshooting computer hardware and installing software according to predetermined instructions or specifications established by others in the Technology Information Group. Additionally, my duties included implementing changes to computer hardware according to predetermined instructions or specifications established by others in the Technology Information Group. As a PC/LAN Engineer 3, the primary work I performed was highly structured and constrained by Wells Fargo's predetermined instructions, specifications, policies, and procedures, and did not normally require the consistent exercise of discretion and independent judgment.

8.     During my employment with Wells Fargo, I came to know other employees with position titles PC/LAN Engineer 3, 4, and 5 located at Wells Fargo's various locations in the United States. Based upon my training, experience, and discussions with other employees, I can

2

attest that the work of PC/LAN Engineers 3, 4, and 5 was functionally the same and did not vary significantly from location to location. PC/LAN Engineers 4 and 5 had primary duties similar to the duties of a PC/LAN Engineer 3, as set forth above. The primary work of PC/LAN Engineers 4 and 5 was also highly structured and constrained by Wells Fargo's predetermined instructions, specifications, policies, and procedures, and did not normally require consistent exercise of discretion and independent judgment.

9.     When I was hired as a PC/LAN Engineer 3, it was my understanding that Wells Fargo classified my position as exempt from overtime pay requirements. At no point in time during my employment with Wells Fargo did I have a clear understanding that I would be paid based on a so-called "fluctuating workweek" method of calculating overtime compensation.

10.    Wells Fargo did not require or expect me to maintain accurate records reflecting all of my hours worked as a PC/LAN Engineer 3. Although I kept track of some time I worked on certain projects in Wells Fargo's STAMP system, the time I recorded in Wells Fargo's STAMP system did not reflect all my hours worked. In fact, these records failed to reflect substantial additional hours worked.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___20___ day of July 2008.

Richard Chow
Richard Chow

1234951

3

# EXHIBIT D

EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MONTE RUSSELL, on behalf of himself and others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>WELLS FARGO AND COMPANY,<br><br>    Defendant. | Case No.: CASE NO: C 07 3993<br><br>**DECLARATION OF PETER KENNEDY IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CONDITIONAL CERTIFICATION AND NOTICE** |

I, Peter Kennedy, declare:

1.    My name is Peter Kennedy. I reside at 2446 Ackerman Avenue, Cherlack, Missouri, 63114. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would testify completely as to these matters.

2.    Employment with Wells Fargo: I worked for Wells Fargo Bank, N.A. ("Wells Fargo") from the time it merged with Norwest in 1990's until May 2005. I was employed by Wells Fargo as a "PC/LAN Engineer 3" at its Clayton, Missouri location. As a PC/LAN Engineer, I was an employee in the Wells Fargo's Technology Information Group.

3.    Hours Worked Each Workweek: Throughout my employment as a PC/LAN Engineer 3 for Wells Fargo, I regularly worked over forty (40) hours per workweek.

4.    Compensation for Overtime: Although I regularly worked over forty hours per workweek, Wells Fargo did not pay me any overtime compensation.

5.    Wells Fargo's Classification of PC/LAN Engineers 3 as "Exempt": During my tenure as a PC/LAN Engineer 3 in Wells Fargo's Technology Information Group, I learned that

Wells Fargo had classified my position and other similar Technology Information Group positions as "exempt" from entitlement to overtime compensation. I knew many other employees who held the position title PC/LAN Engineer 3 and none of them were paid overtime during the time I was employed by Wells Fargo. My supervisor represented to me that I would typically work overtime hours every night, even though I would not receive overtime compensation because I was purportedly properly classified as "exempt."

6.      I knew of and had discussions with other PC/LAN Engineers 3 at Wells Fargo's other locations, including Iowa, Maryland, and South Carolina. Based upon my training, experience, and discussions with other employees, I can attest that the work of PC/LAN Engineers 3 was functionally the same and did not vary significantly from location to location.

7.      As a PC/LAN Engineer 3, I provided computer support services to Wells Fargo by following and implementing well-established company instructions and procedures. I did not supervise other employees. My primary job responsibility was server support involving patching, updating, and repairing. My duties included fixing or troubleshooting computer hardware and installing software according to predetermined instructions or specifications established by others in the Technology Information Group. Additionally, my duties included implementing changes to computer hardware according to predetermined instructions or specifications established by others in the Technology Information Group. As a PC/LAN Engineer 3, the primary work I performed was highly structured and constrained by Wells Fargo's predetermined instructions, specifications, policies, and procedures, and did not normally require the consistent exercise of discretion and independent judgment.

8.      During my time working for Wells Fargo, I came to know of other employees with position titles PC/LAN Engineer 3, 4, and 5 located at Wells Fargo's various locations in

2

the United States. Based upon my training, experience, and discussions with other employees, I can attest that the work of PC/LAN Engineers 3, 4, and 5 was functionally the same and did not vary significantly from location to location. PC/LAN Engineers 4 and 5 had primary duties similar to the duties of a PC/LAN Engineer 3, as set forth above. The primary work of PC/LAN Engineers 4 and 5 was also highly structured and constrained by Wells Fargo's predetermined instructions, specifications, policies, and procedures, and did not normally require consistent exercise of discretion and independent judgment.

9.     When I was hired as a PC/LAN Engineer 3, it was my understanding that Wells Fargo had classified my position as exempt from overtime pay requirements. At no point in time during my employment with Wells Fargo did I have a clear understanding that I would be paid based on a so-called "fluctuating workweek" method of calculating overtime compensation.

10.     Wells Fargo did not require that I maintain accurate records reflecting all of my hours worked as a PC/LAN Engineer 3. Although I kept track of some time I worked on certain projects in Wells Fargo's STAMP system, the time I recorded in Wells Fargo's STAMP system did not reflect all my hours worked. In fact, these records failed to reflect substantial additional hours worked.

Pursuant to 28 U.S.C. s. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 1̲7̲ day of July 2008.

Peter Kennedy

1234948

3

# EXHIBIT E

EXHIBIT E

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

MONTE RUSSELL, on behalf of himself and
others similarly situated,

       Plaintiff,

    v.

WELLS FARGO AND COMPANY,

       Defendant.

Case No.: CASE NO: C 07 3993

**DECLARATION OF DANIEL FRIEDMAN IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CONDITIONAL CERTIFICATION AND NOTICE**

I, Daniel Friedman, declare:

    1.    My name is Daniel Friedman. I reside at 222 Turf View Drive, Solana Beach, CA 92075. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would testify completely as to these matters.

    2.    Employment with Wells Fargo: I worked for Defendant Wells Fargo Bank, N.A. ("Wells Fargo") in Carlsbad, California from December 2001 to January 2007. I was employed as a "PC/LAN Engineer 4" from June 2004 to January 2007. As a PC/LAN Engineer, I was an employee in Wells Fargo's Technology Information Group.

    3.    Hours Worked Each Workweek: Throughout my employment as a PC/LAN Engineer 4 for Wells Fargo, I regularly worked over forty (40) hours per workweek.

    4.    Compensation for Overtime: Although I regularly worked over forty hours per workweek, Wells Fargo did not pay me any overtime compensation.

    5.    Wells Fargo's Classification of PC/LAN Engineers 4 as "Exempt": During my tenure as a PC/LAN Engineer 4 in Wells Fargo's Technology Information Group, I learned that

Wells Fargo had classified my position and other similar Technology Information Group positions as "exempt" from entitlement to overtime compensation. I knew many other employees who held the position title PC/LAN Engineer 4 during my employment with Wells Fargo and none of them were paid overtime during the time I was employed by Wells Fargo.

6.    I knew of and had discussions with other PC/LAN Engineers 4 at Wells Fargo's other locations, including Colorado, Arizona, and Iowa. Based upon my training, experience, and discussions with other employees, I can attest that the primary work of PC/LAN Engineers 4 was functionally the same and did not vary significantly from location to location.

7.    As a PC/LAN Engineer 4, I provided computer support services to Wells Fargo by following and implementing well-established company instructions and procedures. Although I was the contact or "liaison" employee for my manager who was remotely located, I did not supervise other employees. I did not hire, fire, discipline, promote, or conduct reviews of other employees.    My primary job responsibility was server support involving patching, updating, and repairing. My duties included fixing or troubleshooting computer hardware and installing software according to predetermined instructions or specifications established by others in the Technology Information Group. Additionally, my duties included implementing changes to computer hardware according to predetermined instructions or specifications established by others in the Technology Information Group. As a PC/LAN Engineer 4, the primary work I performed was highly structured and constrained by Wells Fargo's predetermined instructions, specifications, policies, and procedures, and did not normally require the consistent exercise of discretion and independent judgment.

8.    During my employment with Wells Fargo, I came to know other employees with position titles PC/LAN Engineer 3, 4, and 5 located at Wells Fargo's various locations in the

2

United States. Based upon my training, experience, and discussions with other employees, I can attest that the work of PC/LAN Engineers 3, 4, and 5 was functionally the same and did not vary significantly from location to location. PC/LAN Engineers 3 and 5 had primary duties similar to the duties of a PC/LAN Engineer 4, as set forth above. The primary work of PC/LAN Engineers 3 and 5 was also highly structured and constrained by Wells Fargo's predetermined instructions, specifications, policies, and procedures, and did not normally require consistent exercise of discretion and independent judgment.

9.    When I was hired as a PC/LAN Engineer 4, it was my understanding that Wells Fargo classified my position as exempt from overtime pay requirements. At no point in time during my employment with Wells Fargo did I have a clear understanding that I would be paid based on a so-called "fluctuating workweek" method of calculating overtime compensation.

10.    Wells Fargo did not require or expect me to maintain accurate records reflecting all of my hours worked as a PC/LAN Engineer 4. Although I kept track of some time I worked on certain projects in Wells Fargo's STAMP system, the time I recorded in Well Fargo's STAMP system did not reflect all my hours worked. In fact, these records failed to reflect substantial additional hours worked.

11.    In approximately August 2007, after I had already left Wells Fargo, I learned from a former co-worker that Wells Fargo had paid back wages to certain PC/LAN Engineers.

12.    Shortly thereafter, I contacted Jennifer Antes Sivertson, a Compensation Consultant at Wells Fargo, and inquired about back wages/payments to PC/LAN Engineers.

13.    Towards the end of August 2007, Ms. Antes Sivertson sent me materials relating to my inquiry about back wages/payments. The materials included a survey and a purported calculation of the back wages owed to me by Wells Fargo resulting from its misclassification of

3

the PC/LAN Engineer position as "exempt" from overtime pay requirements.

14.    In approximately September 2007, I contacted Ms. Antes Sivertson and informed her that Wells Fargo's calculation of my back wages was inaccurate and failed to adequately compensate me for substantial amounts of additional overtime hours that I had worked as a PC/LAN Engineer 4.

15.    Ultimately, Wells Fargo never provided me with any back wages/payment. Although I had a few more conversations with Ms. Antes Sivertson, Wells Fargo never offered an adequate back wages/payment for all the overtime hours that I had worked for the company. In addition, Wells Fargo never offered to pay me any liquidated damages.

Pursuant to 28 U.S.C. s. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  23rd  day of July 2008.

_____
Daniel Friedman

1234949

4

# EXHIBIT F

EXHIBIT F

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

MONTE RUSSELL, on behalf of himself and
others similarly situated,

        Plaintiff,

v.

WELLS FARGO AND COMPANY,

        Defendant.

Case No.: CASE NO: C 07 3993

**DECLARATION OF GREG
DIERSING IN SUPPORT OF
PLAINTIFF'S MEMORANDUM OF
LAW IN SUPPORT OF MOTION
FOR CONDITIONAL
CERTIFICATION AND NOTICE**

I, Greg Diersing, declare:

    1.    My name is Greg Diersing. I reside at 9976 Waterside Drive, Noblesville, IN

46060. I have personal knowledge of the facts set forth in this declaration, and if called as a

witness, could and would testify completely as to these matters.

    2.    Employment with Wells Fargo: I worked for Wells Fargo Bank, N.A. ("Wells

Fargo"), at its Indianapolis, Indiana location since June 2004. I worked for Wells Fargo as a

"PC/LAN Engineer 3" until January 2006. From January 2006 to August 2006, I worked for

Wells Fargo as a "Tech Manager 2." Thereafter, I left Wells Fargo's employ but returned to

work for Wells Fargo as a "PC/LAN Engineer 3" from November 2007 to present. As a

PC/LAN Engineer, I was an employee in the Wells Fargo's Technology Information Group.

    3.    Hours Worked Each Workweek: Throughout my employment as a PC/LAN

Engineer 3 for Wells Fargo, I have regularly worked over forty (40) hours per workweek.

    4.    Compensation for Overtime: During my first period of employment as a PC/LAN

Engineer 3, Wells Fargo did not pay me any overtime compensation. When I returned to work

for Wells Fargo in November 2007 as a PC/LAN Engineer 3, I learned that Wells Fargo had re-classified the PC/LAN Engineer 3 position as "nonexempt," and paid PC/LAN Engineers an hourly wage and overtime at a rate of 1.5 times the hourly wage. Although Wells Fargo re-classified my position as nonexempt, my primary duties as a PC/LAN Engineer 3 did not change at all.

5.     Wells Fargo's Classification of PC/LAN Engineers 3 as "Exempt": During my first period of employment as a PC/LAN Engineer 3 in Wells Fargo's Technology Information Group, I learned that Wells Fargo had classified my position and similar Technology Information Group positions as "exempt" from entitlement to overtime compensation. During this time, I came to know several other employees who held the position title PC/LAN Engineer 3 and none of them were paid overtime as PC/LAN Engineers 3.

6.     During my first period of employment as a PC/LAN Engineer 3, I knew of and had discussions with other PC/LAN Engineers 3 at Wells Fargo's other locations, including West Virginia, Minnesota, and California. Based upon my training, experience, and discussions with other employees, I can attest that the work of PC/LAN Engineers 3 is, has been, and continues to be, functionally the same and does not vary significantly from location to location.

7.     As a PC/LAN Engineer 3, I provide computer support services to Wells Fargo by following and implementing well-established company instructions and procedures. I do not supervise other employees. My primary job responsibility is server support involving patching, updating, and repairing. My duties include fixing or troubleshooting computer hardware and installing software according to predetermined instructions or specifications established by others in the Technology Information Group. Additionally, my duties include implementing changes to computer hardware according to predetermined instructions or specifications

2

established by others in the Technology Information Group. As a PC/LAN Engineer 3, the primary work I perform has been, and continues to be highly structured and constrained by Wells Fargo's predetermined instructions, specifications, policies, and procedures, and does not normally require the consistent exercise of discretion and independent judgment.

8.      When I was initially hired as a PC/LAN Engineer 3, it was my understanding that Wells Fargo classified my positions as exempt from overtime pay requirements. At no point in time during my employment with Wells Fargo did I have a clear understanding that I would be paid based on a so-called "fluctuating workweek" method of calculating of overtime compensation.

9.      When I returned to work for my second period of employment as a PC/LAN Engineer 3 in November 2007, Wells Fargo paid me an hourly rate and an overtime rate of one-and-one half times my regular hourly rate.

10.     During my first period of employment as a PC/LAN Engineer 3, Wells Fargo did not require that I maintain time records reflecting all of my working time, nor did Wells Fargo instruct me to record all my hours worked.

11.     During my second period of employment as a PC/LAN Engineer 3, Wells Fargo required me to keep track of all of my hours worked, including overtime hours. Now, I keep track of my working hours through an online timekeeping system called "Webtime." On a daily basis, I enter my hours worked into Webtime. On a weekly basis, I submit my hours worked to my manager.

12.     Since my second period of employment as a PC/LAN Engineer 3, I have learned from discussions with other PC/LAN Engineers and Technology Information Group employees that certain PC/LAN Engineers received from Wells Fargo some sort of backpay payment for

3

unpaid overtime. I never received any backpay payment from Wells Fargo.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this $\underline{24th}$ day of July 2008.

Greg Diersing

1234952

4

# EXHIBIT G

EXHIBIT G



**ZIMMERMAN REED**
ATTORNEYS AT LAW

April 25, 2007

ANNE T. REGAN
ADMITTED IN MINNESOTA AND ILLINOIS
atr@zimmreed.com

REPLY TO MINNEAPOLIS

*Via Hand Delivery*

Christine Meuers, Esq.
Wells Fargo Legal Department
150 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

RE:     *Monte Russell*

Dear Ms. Meuers:

Helen Leslie suggested I contact you. We represent Monte Russell, who we believe has a Fair Labor Standards Act claim against Wells Fargo & Company. We would like to discuss informal resolution of his case and any other individuals similarly treated.

Ms. Leslie conveyed that you would like to have an understanding of Mr. Russell's claim. Mr. Russell worked for Wells Fargo's Technology Information Group (formerly known as the Wells Fargo Service Company) from 1998 until September 2006, with the job titles of "PC/LAN Analyst" and "PC/LAN Engineer." He was based in Phoenix, Arizona, but serviced "EFO Region 5." He worked numerous overtime hours but did not receive overtime compensation. Based upon the review of his primary job duties, we do not believe he was exempt, either as a computer professional or as a professional, administrative, or managerial employee, from FLSA's maximum hour provisions. I have also attached a copy of a proposed complaint, which sets forth Mr. Russell's situation and his legal claims.

If you need additional information, please let me know. As part of the informal resolution process, we require a tolling agreement for Mr. Russell, effective as of the date of this letter. If you are amenable to this, please sign the attached tolling agreement and fax it back to our office at (612) 341-0844.

We would appreciate hearing from your promptly. Thank you in advance for your consideration of this matter.

Very truly yours,

ZIMMERMAN REED, P.L.L.P.

Anne T. Regan

ATR:kmh

Enclosure

## AGREEMENT CONCERNING STATUTE OF LIMITATIONS

### DEFINITIONS

"Defendant Party" means Wells Fargo & Company.

"Claimant" means Mr. Monte Russell in his pending case against the Defendant Party involving his Fair Labor Standards Act claim for overtime compensation. Additional claimants may be added by separate written agreement.

"Claim" means a Claimant's right or cause of action against the Defendant Party under the Fair Labor Standards Act.

"Effective Date" means April 25, 2007, unless otherwise specified herein. The effective date for additional claimants shall be agreed upon at such time as additional claimants are added.

### AGREEMENT

In order to permit the Defendant Parties and Claimants to pursue an informal resolution of the Claimants' respective Claims without need for litigation, it is agreed as follows:

### 1. Statute of Limitations

Claimant will not commence any action or proceeding against Defendant Party during the period commencing on the Effective Date and continuing through and including the date which is fifteen (15) days after any party hereto sends written notice to the other party stating its intention to terminate this Agreement (the "Tolled Period")

Claimant and the Defendant Party hereby agree, through their counsel, to toll the statute of limitations for the filing of each Claim by the respective Claimant against the Defendant Party. The parties intend that all applicable statute of limitations will be tolled from the Effective Date until fifteen (15) days after receipt by either party of a written notice mailed to the addresses noted below, by facsimile and US Mail, that the informal attempts to resolve any or all of the Claim(s) are concluded. The period of time that the statutes are so tolled (including the 15 day period following notice of termination) shall be added to the time for bringing an action for Claimant's respective Claim, pursuant to any United States law, or state law (statutory or common law), including any applicable state or federal Code(s) of Civil Procedures or Statute of Limitations or Civil Practices & Remedies Code(s) that are applicable or may be applicable to each Claim.

It is specifically understood that the Defendant Party does not waive or release any statute of limitations defense which could have been asserted prior to the Effective Date.

It is expressly understood and agreed that by entering into this Tolling Agreement, neither party intends or should be deemed, during or after the duration of the Agreement, to have waived any rights, arguments or positions except those specifically set forth herein. This Tolling

Agreement is not intended and shall not be deemed to constitute an admission of wrongdoing or liability by either party. Further, the facts and terms of this Tolling Agreement shall not be admissible evidence for any purpose in any litigation or proceeding, except to enforce its terms.

In the event that Claimant deems it necessary to file suit for any reason, including, without limitation, to toll limitations for another party with whom Claimant has no tolling agreement, this agreement will remain in effect as to all remaining cases, Claims and Claimants, unless and until terminated pursuant to the notice provision detailed above. Likewise, either the settlement of any case or Claim or the failure to settle any case or Claim will not affect the remaining cases, Claims and Claimants, unless and until terminated pursuant to the notice provision detailed above.

Counsel signing this Agreement represent that they have the authority to enter into this Agreement. The addresses for Notice to the parties are as set forth below:

Agreed to:                                                    Agreed to:

Claimant(s) through his Counsel:                             Defendant Party through its Counsel:

Barry G. Reed, Esq.                                          Christine Meuers, Esq.
J. Gordon Rudd, Esq.                                         Wells Fargo Legal Department
Anne T. Regan, Esq.                                          150 Wells Fargo Center
Zimmerman Reed, PLLP                                         90 South Seventh Street
651 Nicollet Mall, Suite 501                                 Minneapolis, MN 55402
Minneapolis, MN 55402


Accepted, Minneapolis, MN                                    Accepted, Minneapolis, Minnesota
this 25 day of April, 2007                                   this ____ day of _____, 2007


_____                               _____
Counsel for Claimant(s)                                      Counsel for Defendant Party

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Monte Russell | Civil No. |
|     Plaintiff, | |
| -v- | **COMPLAINT** |
| Wells Fargo & Company. | **(DEMAND FOR JURY TRIAL)** |
|     Defendant. | |

Plaintiff Monte Russell, by and through his attorneys Zimmerman Reed, P.L.L.P., on behalf of himself and a class similarly situated, states and alleges as follows:

## PARTIES

1.    Individual and representative Plaintiff Monte Russell resides in Glendale, Arizona. Plaintiff is a former employee of Wells Fargo & Company. He was employed by Defendant from 1998 until September 2006. Mr. Russell worked in excess of forty (40) hours per week. without receiving overtime compensation.

2.    Defendant Wells Fargo & Company is a corporation providing financial services throughout the United States and the world, including Minnesota.

## JURISDICTION AND VENUE

3.    Jurisdiction over Plaintiffs' federal claims is based upon: (a) Section 16(b) of the Fair Labor Standards Act of 1938, as amended ("FLSA"), 29 U.S.C. § 216(b), which authorizes employees to bring civil actions in state or federal court to recover damages for an employer's failure to pay overtime wages as required by the FLSA; and (b) 29 U.S.C. §§ 1331 and 1337.

4.    Personal jurisdiction over Defendant is proper because Defendant is licensed to do business in this state and is doing business in Minnesota.

5.    Venue is proper because this a venue in which Defendant resides and this is a venue in which a substantial part of the events or omissions giving rise to the claims occurred.

### FACTUAL ALLEGATIONS

6.    Plaintiff brings this action against Wells Fargo. Plaintiff is a former Wells Fargo Technology Information Group (upon information and belief, formerly known as Wells Fargo Service Company) employee, with the job titles "PC/LAN Engineer" and "PC/LAN Analyst," whose primary duties were to provide computer support to Wells Fargo. Mr. Russell did not supervise any employees. Wells Fargo classified Plaintiff's position as exempt from the overtime provisions of FLSA, as described below. Plaintiff's primary duties, however, make him a nonexempt employee.

7.    Plaintiff brings this action on behalf of himself and all persons (hereinafter "FLSA Employees") who were, are, or will be employed by Wells Fargo nationwide as Technology Information Group employees with the primary job duties of providing computer support, including persons with the job titles "PC/LAN Engineers" or "PC/LAN Analysts," at any time within the three years prior to this action's filing date through the date of the final disposition of this action (the "FLSA Period").

8.    Plaintiff alleges that Wells Fargo unlawfully classified Plaintiff and the FLSA employees as exempt from overtime pay provisions under FLSA. Plaintiff and the FLSA employees worked overtime or on-call hours, as defined by FLSA, and are and have been entitled to premium compensation at one and one-half times the regular hourly rate ("overtime compensation") for those hours. Wells Fargo has willfully refused to pay Plaintiff and the

2

FLSA Employees the required overtime compensation for overtime hours worked and has failed to keep time records as required by the FLSA.

9.      The primary duties of Plaintiff and the FLSA Employees were or are to provide computer support services to Wells Fargo by following and implementing well-established company instructions and procedures. A PC/LAN Engineer or PC/LAN Analyst's primary duties include fixing or troubleshooting computer hardware and installing software according to instructions or specifications established by others in the Technology Information Group, or implementing changes to computer hardware according to instructions or specifications established by others in the Technology Information Group. Although the job titles given to the FLSA Employees and ERISA employees suggest that their jobs require exceptional expertise, they are really technicians, not "engineers" or "analysts."

COLLECTIVE ACTION ALLEGATIONS

10.     Plaintiff brings the First Cause of Action for violation of FLSA as a collective action pursuant to Section 16(b) of FLSA, 29 U.S.C. § 216(b), on behalf of all FLSA Employees, as defined in paragraph 6 and 7.

11.     Plaintiff and the FLSA Employees are similarly situated, have substantially similar job requirements and pay provisions, and are subject to Defendant Wells Fargo's common practice, policy, or plan of refusing to pay overtime in violation of FLSA and unlawfully characterizing FLSA Employees as exempt employees.

12.     The First Cause of Action may be brought and maintained as an "opt-in" collective action under Section 16(b) of FLSA, 29 U.S.C. § 216(b), for all claims asserted by Plaintiff under FLSA, since Plaintiff's claims are similar to the claims of the FLSA Employees.

13.    The names and addresses of the FLSA Employees are available from Defendant. Notice will be provided to the FLSA Employees via first class mail to the last known address of their employer, and will be published in national publications.

## FIRST CAUSE OF ACTION
## VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938

14.    Plaintiffs reassert and reallege the allegations set forth in the preceding paragraphs.

15.    The FLSA regulates, among other things, the payment of all hours worked, including overtime pay by employers whose employees are engaged in commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 207(a)(1).  At all relevant times, Defendant has been, and continues to be, an "employer" engaging in interstate commerce or in the production of goods for commerce, within the meaning of FLSA. 29 U.S.C. § 203. Defendant has employed and continues to employ employees, including Plaintiff and the putative class.

16.    The FLSA requires each covered employer, such as Defendant Wells Fargo, to compensate all nonexempt employees at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty (40) hours in a week.

17.    The FLSA Employees are entitled to be paid overtime compensation for all overtime hours worked.

18.    At all relevant times, Wells Fargo had a policy and practice of failing and refusing to pay overtime pay to the FLSA Employees for their hours worked in excess of forty (40) hours per week.

19.    By failing to compensate Plaintiff and the FLSA Employees at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty (40)

4

hours in a workweek, Wells Fargo has violated, and continues to violate, the FLSA, 29 U.S.C. §§ 201 et seq., including 29 U.S.C. § 207(a)(1) and § 215(a).

20.    By failing to record, report, or compensate Plaintiff and the FLSA Employees, Wells Fargo has failed to make, keep, and preserve records with respect to each of its employees sufficient to determine their wages, hours, and other conditions and practice of employment, in violation of 29 U.S.C. §§ 201 et seq., including 29 U.S.C. § 211(c) and § 216(b).

21.    The FLSA Employees are entitled to damages equal to the amount of all uncompensated time, including overtime premium pay within the three years preceding the filing of this complaint, plus periods of equitable tolling. Wells Fargo's failure to pay overtime to Plaintiff and the FLSA Employees was "willful" within the meaning of Section 6(a) of the Portal-to-Portal Pay Act, as amended, 29 U.S.C. § 255(a), because Wells Fargo did not act in good faith in failing to pay proper overtime pay, and had no reason to believe that its failure to do so was not a violation of the FLSA, within the meaning of Section 11 of the Portal-to-Portal Pay Act, as amended, 29 U.S.C. § 260. Accordingly, the FLSA Employees are entitled to an award of liquidated damages in an amount equal to the amount of unpaid overtime pay described above, pursuant to Section 16(b) of the FLSA. Alternatively, should the Court find that Gold 'n Plump did not act willfully in failing to pay overtime pay, the FLSA employees are entitled to an award of prejudgment interest at the applicable legal rate. Reasonable attorneys' fees and costs, pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), should also be awarded.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Monte Russell, on behalf of himself and others similarly situated, prays for judgment as follows:

1. Designation of this action as a collective action on behalf of the proposed FLSA Employee Class and prompt issuance of notice pursuant to 29 U.S.C. § 216(b);

2. Designation of Plaintiff as a Representative of the FLSA Employees;

3. An award of damages, including liquidated damages, to be paid by Wells Fargo;

4. Costs of action incurred herein, including expert fees;

5. Attorneys' fees, including fees pursuant to 29 U.S.C. § 216;

6. Pre- and post-judgment interest, as provided by law; and

7. Such injunctive and equitable relief as the Court may deem just and proper.


Dated: April 25, 2007

Respectfully Submitted,

**ZIMMERMAN REED, P.L.L.P.**


By:_____

Barry G. Reed (#020906)
J. Gordon Rudd, Jr. (#222082)
Anne T. Regan (#333852)
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400

*ATTORNEYS FOR PLAINTIFF*

# EXHIBIT H

EXHIBIT H



**ZIMMERMAN REED**
ATTORNEYS AT LAW

May 1, 2007

ANNE T. REGAN
ADMITTED IN MINNESOTA AND ILLINOIS
atr@zimmreed.com

REPLY TO MINNEAPOLIS

*Via Hand Delivery*

Christine Meuers, Esq.
Wells Fargo Legal Department
90 South Seventh Street, 17th Floor
Minneapolis, MN 55402

    *RE:*    *Monte Russell*

Dear Ms. Meuers:

I write to determine whether you are amenable to signing the tolling agreement I sent to you on April 25, 2006. As stated in my letter of that date, we would like to discuss informal resolution of Mr. Russell's case, and others similarly situated.

I am sure you can appreciate that we need to hear from you promptly with regard to your position on this issue. If I do not hear from you by the close of business on May 2, 2007, I assume you are not willing to consider tolling Mr. Russell's claims, and we will have no choice but to file his complaint. We would not intend to foreclose conversation concerning settlement or informal resolution after that point, however.

Thank you for your professional courtesy. Please do not hesitate to contact me. I can be reached at (612) 341-0400.

Very truly yours,

ZIMMERMAN REED, P.L.L.P.

Anne T. Regan

ATR:kmh

MINNEAPOLIS | 651 NICOLLET MALL, SUITE 501  MINNEAPOLIS, MINNESOTA 55402  TEL 612.341.0400  FAX 612.341.0844  ZIMMREED.COM

SCOTTSDALE | 14646 NORTH KIERLAND BLVD, SUITE 145  SCOTTSDALE, ARIZONA 85254  TEL 480.348.6400  FAX 480.348.6415  ZIMMREED.COM

# EXHIBIT I

EXHIBIT I

# WELLS FARGO & COMPANY
## LAW DEPARTMENT

TIMOTHY N. GRUBB
Senior Counsel
Law Department

333 South Grand Avenue, Suite 1040
Los Angeles, California 90071
(213) 253-7121  Business
(213) 617-8340  Fax

## FACSIMILE TRANSMISSION

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

**TO:**  Anne T. Regan

**FAX:**  (612) 341-0844

**FROM:**  Timothy N. Grubb, Senior Counsel
Wells Fargo & Company
Law Department
333 South Grand Avenue, Suite 1040
Los Angeles, California 90071

**DATE:**  May 7, 2007

This transmission includes this cover page and ___2___ pages to follow:

# MESSAGE: RE: MONTE RUSSELL

# TOLLING AGREEMENT – ORIGINAL TO FOLLOW

Please contact Linda Howard at (213) 253-3905 in the event of any difficulty with this transmission.

Q:\Timothy.N.Grubb\WINWORD\Faxes\Regan.Anne.fax.doc 13:38 PM



## AGREEMENT CONCERNING STATUTE OF LIMITATIONS

### DEFINITIONS

"Defendant Party" means Wells Fargo & Company.

"Claimant" means Mr. Monte Russell in his pending case against the Defendant Party involving his Fair Labor Standards Act claim for overtime compensation. Additional claimants may be added by separate written agreement.

"Claim" means a Claimant's right or cause of action against the Defendant Party under the Fair Labor Standards Act.

"Effective Date" means April 25, 2007, unless otherwise specified herein. The effective date for additional claimants shall be agreed upon at such time as additional claimants are added.

### AGREEMENT

In order to permit the Defendant Parties and Claimants to pursue an informal resolution of the Claimants' respective Claims without need for litigation, it is agreed as follows:

#### 1. Statute of Limitations

Claimant will not commence any action or proceeding against Defendant Party during the period commencing on the Effective Date and continuing through and including the date which is fifteen (15) days after any party hereto sends written notice to the other party stating its intention to terminate this Agreement (the "Tolled Period")

Claimant and the Defendant Party hereby agree, through their counsel, to toll the statute of limitations for the filing of each Claim by the respective Claimant against the Defendant Party. The parties intend that all applicable statute of limitations will be tolled from the Effective Date until fifteen (15) days after receipt by either party of a written notice mailed to the addresses noted below, by facsimile and US Mail, that the informal attempts to resolve any or all of the Claim(s) are concluded. The period of time that the statutes are so tolled (including the 15 day period following notice of termination) shall be added to the time for bringing an action for Claimant's respective Claim, pursuant to any United States law, or state law (statutory or common law), including any applicable state or federal Code(s) of Civil Procedures or Statute of Limitations or Civil Practices & Remedies Code(s) that are applicable or may be applicable to each Claim.

It is specifically understood that the Defendant Party does not waive or release any statute of limitations defense which could have been asserted prior to the Effective Date.

It is expressly understood and agreed that by entering into this Tolling Agreement, neither party intends or should be deemed, during or after the duration of the Agreement, to have waived any rights, arguments or positions except those specifically set forth herein. This Tolling

Agreement is not intended and shall not be deemed to constitute an admission of wrongdoing or liability by either party. Further, the facts and terms of this Tolling Agreement shall not be admissible evidence for any purpose in any litigation or proceeding, except to enforce its terms.

In the event that Claimant deems it necessary to file suit for any reason, including, without limitation, to toll limitations for another party with whom Claimant has no tolling agreement, this agreement will remain in effect as to all remaining cases, Claims and Claimants, unless and until terminated pursuant to the notice provision detailed above. Likewise, either the settlement of any case or Claim or the failure to settle any case or Claim will not affect the remaining cases, Claims and Claimants, unless and until terminated pursuant to the notice provision detailed above.

Counsel signing this Agreement represent that they have the authority to enter into this Agreement. The addresses for Notice to the parties are as set forth below:

Agreed to:

Claimant(s) through his Counsel:

Barry G. Reed, Esq.
J. Gordon Rudd, Esq.
Anne T. Regan, Esq.
Zimmerman Reed, PLLP
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402

Agreed to:

Defendant Party through its Counsel:

Timothy N. Cruss
Christine Meders, Esq.
Wells Fargo Legal Department
150 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

Accepted, Minneapolis, MN
this 25 day of April, 2007

Counsel for Claimant(s)

Accepted, Minneapolis, Minnesota
this 7 day of May, 2007

Counsel for Defendant Party

# EXHIBIT J

EXHIBIT J

| | |
|---|---|
| From: | TIG COMPENSATION |
| Sent: | Wednesday, July 11, 2007 3:52 PM |
| To: | NAMES REDACTED |
| Cc: | |
| Subject: | ACTION REQUESTED> Complete and Submit Hours Survey by 7/13 |
| | |
| Sensitivity: | Confidential |
| | |
| Follow Up Flag: | Review |
| Due By: | Thursday, July 12, 2007 11:00 PM |
| Flag Status: | Flagged |

\*\*\* CONFIDENTIAL \*\*\*

Your former job as a PC/LAN ENGINEER 4 has been determined to be non-exempt and will be reclassified effective July 22, 2007. As you have moved on to a new role, this decision will <u>not</u> impact your current job title or exemption status. However, we do need you to complete the attached hours survey to determine the average number of hours you worked on a weekly basis during your tenure in the reclassified position.

ACTION ITEM > Please complete the attached Hours Survey, **sign the bottom, and MAC mail the signed original** to TIG Compensation at A0783-011 NO LATER THAN THIS <u>FRIDAY, JULY 13</u>.

Even though there is space for a manager signature at the bottom, you do not need to have your current manager sign the document since the survey is based on your prior role. We will be in contact with prior manager to review the survey and validate the reported hours.

If you have any questions, please reply to this e-mail or contact your HR Consultant for assistance.

Thank you,
TIG Compensation



1

WF R 0117

# EXHIBIT K

EXHIBIT K

## Team Member Hours Survey

Wells Fargo has evaluated your duties as a PC/LAN ENGINEER 4 and has determined that your position is not exempt from the federal Wage and Hour laws. We need you to complete the survey below to determine whether you worked overtime during the specified period. Please answer the following questions honestly, accurately and completely and return this form to your manager as soon as possible. If you have any questions regarding this survey, please contact your manager or your Human Resources Consultant (HRC), ¡NAME REDACTED

Name: REDACTED            Employee ID: REDACTED

Location: California            Current Manager: REDACTED

Business Line: TIG

Line Comp Representative: REDACTED

1.    On what date were you hired into the position of PC/LAN ENGINEER 4? _____

2.    If you are scheduled to work less than 40 hours per week, what are your standard scheduled weekly hours? _____

3.    During the period from 7/22/2004 to 3/5/2006 please indicate the average number of weekly hours you regularly worked in this position. Do not include non-working lunch breaks as hours worked. Please provide one single number (e.g., 40); do not provide a range of hours (e.g., 42-44).

Average weekly hours worked: _____

If there were periods when the hours you worked were **significantly** more or less than the weekly average you indicated above, please provide the dates and hours below. Again, please indicate a single number of hours rather than a range. For example, if on average you worked 42 hours per week, but for a 6 week period you worked 65 hours per week to implement a project, enter the 6 week period here).

| Period Start Date | Period End Date | Average # of Weekly Hours Worked |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

4.    While in this position, have you worked an "alternative work schedule" -- other than the standard 5-day, 40-hour schedule (4 10-hour shifts, 3 12-hour shifts, e.g.)?

( ) Yes, I have worked an alternative work schedule

## If you worked an alternative work schedule, please complete the form on page 2.

By signing below, I am representing that, based on my recollection, the above information correctly reflects the hours I worked.

_____            _____
SIGNATURE                    DATE

Manager Review Signature            _____    Date Reviewed _____

Business HR Review Signature        _____    Date Reviewed _____

WF R 0114

Team Member Hours Survey – Page 2

## Alternative Work Schedule Information

**Complete this page ONLY if you worked an Alternative Work Schedule during this period.**

- **What is considered an Alternative Work Schedule?**
  - If you are a regular team member (30 hours or more a week) and you had a schedule that was different than the standard 5-day, 8-hour per day, and/or 40-hour per week schedule.
  - If you are a part-time team member who was regularly scheduled for more than 8 hours on any day.

- **Examples of Alternative Work Schedules**
  - 4 10-hour days per week
  - 3 12-hour days per week
  - 5 9-hour days one week, then 4 9-hour days the next week (9-80 schedule)

Please provide the time period on which you worked an alternative schedule:

Dates on Alternative Work Schedule – from _____ to: _____

Please complete the chart below by entering the average hours you actually worked in this position during the time stated above:

| | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday | Total Hours |
|---|---|---|---|---|---|---|---|---|
| Example | 0 | 10.0 | 10.0 | 10.0 | 10.0 | 0 | 0 | 40.0 |
| Week 1 | | | | | | | | |
| Week 2 | | | | | | | | |
| Week 3 | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

*If different from Week 1

ATTACHMENT F

## SURVEY REVISION ACKNOWLEDGEMENT FORM

Team Member Name (Please print): _____

Team Member ID:  _____

Location worked: _____

Manager Name: _____

Date of Meeting with Team Member   _____


Agreement reached regarding average hours worked each week?  Yes ( )   Pending ( )

Agreed upon number of average weekly hours: _____

Any additional/revised periods where the average hours worked is different than reported on original survey

| Period Start Date | Period End Date | Average # of Weekly Hours Worked |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |


Team Member Signature: _____

Date Signed: _____

# EXHIBIT L

EXHIBIT L

| From: | Jennings, Karla H. |
|---|---|
| Sent: | Thursday, August 02, 2007 3:25 PM |
| To: | NAME REDACTED |
| Subject: | Team Member Survey |

This message is being sent on behalf of Corporate Compensation. Please do not reply directly to this e-mail. For questions, please contact your HR Consultant.

You were recently asked to complete an Hours survey relating to an FLSA review of a position you are (or had been) in during any time since July 22, 2005.

Your completed survey indicated the number of work hours you averaged each week during the period in question. If you reported an average number of hours worked in excess of 40 hours, and your survey results were reviewed and approved by your manager, you will receive a back wage payment based upon the agreed upon hours worked.

*IMPORTANT NOTE*

This message is being sent to all team members who received a survey. If you did not report working in excess of 40 hours in a work week -- either regularly or during a specific time period - you will not receive a back wage payment.

Back wage payment will be made for hours worked over 40 in a week and will be calculated at .5 (½) your hourly rate times the number of hours worked over 40. This payment is calculated according to a "fluctuating work week" formula set forth in the regulations of the U.S. Department of Labor, using the following steps:

1. Your annual salary (which takes into account any salary changes in this job during the reporting period) is divided by 52 to arrive at your weekly salary.
2. Your weekly salary is divided by *the hours you reported on your survey* to determine your hourly rate, also called your regular rate of pay.
3. Your hourly rate is multiplied by .5 to determine the premium rate you'll receive on any hours worked over 40.
4. The premium rate (.5 x your hourly rate) is multiplied by the total number of hours reported in excess of 40 for the period. This is the gross back wage amount.
5. The gross back wage amount is multiplied by a standard factor of .88 to account for PTO and any other untracked time not worked during the period. This is the adjusted gross back wage payment amount.
6. All applicable payroll deductions will be made from your adjusted gross back wage payment.

We hope that this information answers your questions regarding your upcoming back wages, if applicable. Please contact your HR Consultant with any questions.

1

WF R 0118

# EXHIBIT M

EXHIBIT M



ZIMMERMAN REED
ATTORNEYS AT LAW

July 17, 2007

**ANNE T. REGAN**
ADMITTED IN MINNESOTA AND ILLINOIS
atr@zimmreed.com

REPLY TO MINNEAPOLIS

*Via Facsimile and US Mail*

Timothy N. Grubb, Esq.
Wells Fargo Legal Department
333 South Grand Avenue, Suite 1040
Los Angeles, CA 90071

RE:    *Monte Russell*

Dear Mr. Grubb:

Today we became aware that Wells Fargo has begun reclassifying its PC/LAN Engineers, and is asking its employees to calculate their overtime hours for the past two years. This letter thus serves as notice that Mr. Russell wishes to terminate his agreement of April 25, 2007, concerning the statute of limitations.

Thank you for your consideration.

Very truly yours,

ZIMMERMAN REED, P.L.L.P.

Anne T. Regan

ATR:kmh

Enclosure

MINNEAPOLIS | 651 NICOLLET MALL, SUITE 501  MINNEAPOLIS, MINNESOTA 55402  TEL 612.341.0400  FAX 612.341.0844  ZIMMREED.COM
SCOTTSDALE | 14646 NORTH KIERLAND BLVD, SUITE 145  SCOTTSDALE, ARIZONA 85254  TEL 480.348.6400  FAX 480.348.6415  ZIMMREED.COM

## AGREEMENT CONCERNING STATUTE OF LIMITATIONS

### DEFINITIONS

"Defendant Party" means Wells Fargo & Company.

"Claimant" means Mr. Monte Russell in his pending case against the Defendant Party involving his Fair Labor Standards Act claim for overtime compensation. Additional claimants may be added by separate written agreement.

"Claim" means a Claimant's right or cause of action against the Defendant Party under the Fair Labor Standards Act.

"Effective Date" means April 25, 2007, unless otherwise specified herein. The effective date for additional claimants shall be agreed upon at such time as additional claimants are added.

### AGREEMENT

In order to permit the Defendant Parties and Claimants to pursue an informal resolution of the Claimants' respective Claims without need for litigation, it is agreed as follows:

#### 1. Statute of Limitations

Claimant will not commence any action or proceeding against Defendant Party during the period commencing on the Effective Date and continuing through and including the date which is fifteen (15) days after any party hereto sends written notice to the other party stating its intention to terminate this Agreement (the "Tolled Period")

Claimant and the Defendant Party hereby agree, through their counsel, to toll the statute of limitations for the filing of each Claim by the respective Claimant against the Defendant Party. The parties intend that all applicable statute of limitations will be tolled from the Effective Date until fifteen (15) days after receipt by either party of a written notice mailed to the addresses noted below, by facsimile and US Mail, that the informal attempts to resolve any or all of the Claim(s) are concluded. The period of time that the statutes are so tolled (including the 15 day period following notice of termination) shall be added to the time for bringing an action for Claimant's respective Claim, pursuant to any United States law, or state law (statutory or common law), including any applicable state or federal Code(s) of Civil Procedures or Statute of Limitations or Civil Practices & Remedies Code(s) that are applicable or may be applicable to each Claim.

It is specifically understood that the Defendant Party does not waive or release any statute of limitations defense which could have been asserted prior to the Effective Date.

It is expressly understood and agreed that by entering into this Tolling Agreement, neither party intends or should be deemed, during or after the duration of the Agreement, to have waived any rights, arguments or positions except those specifically set forth herein. This Tolling

Agreement is not intended and shall not be deemed to constitute an admission of wrongdoing or liability by either party. Further, the facts and terms of this Tolling Agreement shall not be admissible evidence for any purpose in any litigation or proceeding, except to enforce its terms.

In the event that Claimant deems it necessary to file suit for any reason, including, without limitation, to toll limitations for another party with whom Claimant has no tolling agreement, this agreement will remain in effect as to all remaining cases, Claims and Claimants, unless and until terminated pursuant to the notice provision detailed above. Likewise, either the settlement of any case or Claim or the failure to settle any case or Claim will not affect the remaining cases, Claims and Claimants, unless and until terminated pursuant to the notice provision detailed above.

Counsel signing this Agreement represent that they have the authority to enter into this Agreement. The addresses for Notice to the parties are as set forth below:

Agreed to:

Claimant(s) through his Counsel:

Barry G. Reed, Esq.
J. Gordon Rudd, Esq.
Anne T. Regan, Esq.
Zimmerman Reed, PLLP
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402

Agreed to:

Defendant Party through its Counsel:

*Timothy N. Gruss*
~~Christine Meders, Esq.~~
Wells Fargo Legal Department
150 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402

Accepted, Minneapolis, MN
this 25 day of April, 2007

_____
Counsel for Claimant(s)

Accepted, Minneapolis, Minnesota
this 7 day of May, 2007

_____
Counsel for Defendant Party

# EXHIBIT N

EXHIBIT N

From: Jennings, Karla H.
Sent: Thursday, August 02, 2007 2:49 PM
To: REDACTED
Subject: Team Member Survey

This message is being sent on behalf of Corporate Compensation. Please do not reply directly to this e-mail. For questions, please contact your HR Consultant.

You were recently asked to complete an Hours survey relating to an FLSA review of a position you are (or had been) in during any time since July 22, 2004.

Your completed survey indicated the number of work hours you averaged each week during the period in question. If you reported working in excess of 40 hours in any week during the period and your survey results were reviewed and approved by your manager, you will receive a back wage payment based upon the agreed upon hours worked. If you worked 40 hours per week or less, but regularly worked either more than 8 hours per day or over your scheduled hours, a different calculation method may apply.

### IMPORTANT NOTE

This message is being sent to all team members who received a survey. If you did not report working in excess of 40 hours in a work week (or 8 hours per day) or over your scheduled hours – either regularly or during a specific time period – you will not receive a back wage payment.

Back wage payment will be made for hours worked over 40 in a week and will be calculated at 1.5 times your hourly rate times the number of hours reported worked over 40, using the following steps:

1. Your annual salary (which takes into account any salary changes in this job during the reporting period) is divided by 52 to arrive at your weekly salary.
2. Your weekly salary is divided by 40 hours to determine your hourly rate, also called your regular rate of pay.
3. Your hourly rate is multiplied by 1.5 to determine the premium rate you'll receive for any hours worked over 40.
4. The premium rate (1.5 x your hourly rate) is multiplied by the number of reported hours over 40 for the period. This is the gross back wage amount.
5. The gross back wage amount is multiplied by a standard factor of .88 to account for PTO and any other untracked time not worked during the period. This is the adjusted gross back wage payment that you'll receive.
6. All applicable payroll deductions will be made from your adjusted gross back wage payment.

We hope that this information answers your questions regarding your upcoming back wages, if applicable. Please contact your HR Consultant with any questions.

**WF R 0119**

# EXHIBIT O

EXHIBIT O

Name:  RE DAC TED

## Payment Advice and Resolution

On 8/24/2007, Wells Fargo paid you for all overtime hours that you reported working as a PC/LAN Engineer 3 during the period from 7/22/2005 to 7/22/2007.

Your signature below acknowledges the receipt of this payment in the amount of $REDACTED less all regular payroll deductions, and your release of any and all claims related to unpaid wages or other compensation that you now have against WELLS FARGO BANK N A up through the date of your signature below.

DATED: _____8-29-07_____

_____REDACTED_____
Signature of Employee

_____REDACTED_____
Print Name

_____REDACTED_____
Employee ID

Please return this document to Corporate Compensation at A0149-045.

WF R 0120

## RELEASE OF ALL CLAIMS FOR WAGES

FOR AND IN CONSIDERATION of the gross sum of $ REDACTED, less required payroll deductions, payment of which is hereby acknowledged, REDACTED hereby releases and forever discharges WELLS FARGO BANK N A and all related entities, officers, employees and agents (collectively referred to as "Wells Fargo"), from any and all claims, demands, damages, actions and causes of action arising out of or in any way connected with payment of, REDACTED compensation, salary, wages, incentive or bonus pay by Wells Fargo as a PC/LAN Engineer 4 up to the date of the signature below.

IN FURTHER CONSIDERATION of the payment identified above, REDACTED agrees as follows:

1. This release shall apply to and cover all of the claims, demands and causes of action identified above, whether the same are known or unknown or hereafter ascertained. It is understood that the provisions of Section 1542 of the California Civil Code are specifically waived as to this Release. Said Section 1542 states as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

2. This release is the result of a compromise of a disputed claim for payment of compensation, salary, wages, incentive and/or bonus pay, and shall never at any time for any purpose be considered as an admission of liability or responsibility on the part of the parties herein released.

3. This release sets forth the entire agreement between the Parties, and fully supersedes any and all prior agreements or understandings between the Parties, pertaining to the payment of compensation as described above. Any modifications to this release shall be in writing and signed by both Parties.

DATED: _____August 22, 2007_____

REDACTED

_____
Signature of Employee

REDACTED

_____
Print Name    REDACTED

_____
Employee ID

WF R 0121

# EXHIBIT P

EXHIBIT P

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

MONTE RUSSELL and DANIEL
FRIEDMAN, on behalf of themselves and
others similarly situated,

          Plaintiffs,

     v.

WELLS FARGO AND COMPANY and
WELLS FARGO BANK, N.A.,

          Defendants.

Case No.: C 07 3993 CW

[PROPOSED] NOTIFICATION OF
COLLECTIVE ACTION

---

## IMPORTANT NOTIFICATION TO POTENTIAL MEMBERS OF COLLECTIVE ACTION

### THIS IS NOT A LAWSUIT AGAINST YOU.

### PLEASE READ THIS NOTICE CAREFULLY.
### YOUR LEGAL RIGHTS MAY BE AFFECTED.

TO:      Current and former employees of Wells Fargo & Company and Wells Fargo Bank, N.A. ("Wells Fargo"), who held the position of **PC/LAN Engineer 3, PC/LAN Engineer 4, or PC/LAN Engineer 5**.

         THIS NOTICE INCLUDES CURRENT AND FORMER EMPLOYEES WHO HAVE RECEIVED A PAYMENT OF PAST WAGES DUE FROM WELLS FARGO. FOR THESE INDIVIDUALS, THE AMOUNT YOU WERE PAID MAY NOT REPRESENT THE FULL AMOUNT OWED.

RE:      YOUR RIGHT TO JOIN A CURRENTLY PENDING LAWSUIT TO RECOVER UNPAID WAGES

DATE:      _____, 2008

## I.     PURPOSE OF NOTICE

The purpose of this Notice is to:

(1)     inform you of the **existence of a collective action lawsuit in which you are potentially eligible to participate** because you may be "similarly situated" to the former Wells Fargo employees who brought the lawsuit,

(2)     advise you of **how your rights may be affected** by this lawsuit,

(3)     instruct you on **the procedure for participating** in this lawsuit if you so desire, and

(4)     provide corrective notice that **you may still participate in this lawsuit even if you previously accepted a payment of back wages from Wells Fargo** and that you may be entitled to additional back wages from Wells Fargo.

As described more fully below, if you are eligible and wish to participate in the collective action, you must complete and submit the Consent to Join form attached to this Notice.

## II.     DESCRIPTION OF THE LAWSUIT

### A.     THE ALLEGATIONS

Plaintiffs Monte Russell and Daniel Friedman ("Named Plaintiffs") brought this lawsuit in the United States District Court for the Northern District of California, Oakland Division, against Wells Fargo on August 2, 2007.  The Named Plaintiffs contend that Wells Fargo incorrectly classified PC/LAN Engineers 3, PC/LAN Engineers 4, and PC/LAN Engineers 5 as "exempt" from federal overtime laws.  The Named Plaintiffs, former Wells Fargo employees, bring their claims under the Fair Labor Standards Act ("FLSA").

### B.     THE DAMAGES YOU MIGHT RECEIVE

The Named Plaintiffs seek monetary damages for themselves and other similarly situated Wells Fargo employees, including you, should you decide to join this lawsuit.  In particular, they seek:

(1)     unpaid overtime compensation at a rate of one and one-half (1.5) the regular rate of pay for all hours worked over 40 during the time Wells Fargo incorrectly classified PC/LAN Engineers 3, 4, and 5 as "exempt";

(2)     liquidated or "doubled" damages as allowed by law;

(3)     attorneys' fees to be paid by Wells Fargo as allowed by law; and

(4)     costs to be paid by Wells Fargo as allowed by law.

### C.    WELLS FARGO'S POSITION

Wells Fargo generally denies all of the Named Plaintiffs' claims and does not admit any liability. Wells Fargo generally claims that PC/LAN Engineers 3, 4, and 5 were exempt from overtime. Wells Fargo also contends that, to the extent there was any violation of the FLSA, it was an innocent error, that all actions were taken in good faith, and that reasonable minds could differ as to the proper classification of PC/LAN Engineers 3, 4, and 5 as either exempt or non-exempt from the laws requiring payment of overtime such that there is no basis to award liquidated damages.

### D.    THE CURRENT STAGE OF THE LAWSUIT

This lawsuit is currently in the early pretrial stage. On _____, the Court authorized this Notice to be sent to you so that you might have the option to join this lawsuit.

## III.    BACKGROUND ON THE FAIR LABOR STANDARDS ACT CLAIM

### A.    COMPOSITION OF THE FLSA COLLECTIVE ACTION

The Named Plaintiffs seek to sue on behalf of themselves and all other similarly situated persons who are/were employed by Wells Fargo as a PC/LAN Engineer 3, PC/LAN Engineer 4, or PC/LAN Engineer 5, and who were paid a salary and treated as exempt from the laws requiring overtime at any time after November 1, 2004.

If you never worked over 40 hours in any one week while you were employed by Wells Fargo as PC/LAN Engineer 3, 4 and/or 5, you are not eligible to join this lawsuit. However, if you have a good faith belief that you worked over 40 hours in any one week or are unsure whether you worked over 40 hours in any one week while you were employed by Wells Fargo as PC/LAN Engineer 3, 4, and/or 5, you are eligible to join this lawsuit. **You are eligible to join if you fit in the definition above <u>even if you received a payment of back wages from Wells Fargo</u>.**

### B.    YOUR RIGHT TO PARTICIPATE IN THE FLSA COLLECTIVE ACTION

If you fit the definition in Paragraph III.A. above, you may join in the FLSA claim raised in this lawsuit by completing and mailing a signed copy of the "Consent to Join" form (attached to this Notice) to Class Counsel in the enclosed envelope. **Your Consent to Join form must be postmarked by no later than _____, 2008.** Class Counsel will file with the Court all Consent to Join forms that have been filled out, signed, and postmarked on or before _____, 2008. Having a Consent to Join form filed does not guarantee that you will be able to participate in a mediation or trial of this lawsuit as your ability to participate might ultimately depend upon a final ruling from the Court that you and the Named Plaintiffs are "similarly situated" under federal law. **If you fail to complete and mail a Consent to Join form postmarked on or before the deadline, you cannot participate in any monetary settlement or judgment resulting from this lawsuit.**

**C.    CORRECTIVE NOTICE: YOU HAVE A RIGHT TO PARTICIPATE IN THE FLSA COLLECTIVE ACTION EVEN IF WELLS FARGO PREVIOUSLY PAID YOU BACK WAGES**

IF YOU RECEIVED A PAYMENT FROM WELLS FARGO FOR PAST OVERTIME HOURS WORKED OR OTHER UNPAID WAGES, YOU STILL MAY STILL PARTICIPATE IN THIS FLSA COLLECTIVE ACTION.  Wells Fargo has paid sums of money to certain PC/LAN Engineers who reported that they worked overtime hours during the time their positions were classified as "exempt."  These PC/LAN Engineers may be entitled to additional sums of money under the FLSA.

Some of the PC/LAN Engineers who received sums of money signed a form entitled "Payment Advice and Resolution" or other similar release.  These forms suggests that the person signing it agrees to release any and all legal claims related to unpaid wages or other compensation.  **A release of an employee's rights under the FLSA is not valid.**  You may still participate in this lawsuit if you received a sum of money from Wells Fargo and/or signed a purported release.  CONTACT CLASS COUNSEL IF YOU HAVE ANY QUESTIONS RELATED TO A PAYMENT OF, OR OFFER TO PAY, BACK WAGES BY WELLS FARGO.

**D.    EFFECT OF JOINING THE FLSA COLLECTIVE ACTION**

If you submit a Consent to Join form and the Court permits the Named Plaintiffs to represent your claims at trial as part of a collective action, you will be bound by any judgment regarding the claims in the lawsuit, whether favorable or unfavorable to the Named Plaintiffs and the class.  By returning the Consent to Join form, you are agreeing to designate the Named Plaintiffs as your agents to make decisions on your behalf concerning this lawsuit, including decisions as to the method and manner of conducting this lawsuit.  While this lawsuit is pending, you might be required to provide information, appear for a deposition in your hometown, or otherwise participate in the action.

If you submit a Consent to Join form and "opt-in" to this lawsuit, **you will not be required to pay attorneys' fees or expenses**.  If the Named Plaintiffs prevail at trial, the FLSA, the statute under which this lawsuit is brought, provides for the recovery of attorneys' fees, and attorneys' fees will be paid either by Wells Fargo or as a percentage of any monetary judgment in favor of the Named Plaintiffs as ordered by the Court.  If the lawsuit settles by mutual agreement of the parties, the Named Plaintiffs' counsel will receive attorneys' fees paid either by Wells Fargo or as a percentage of the settlement obtained.  Any settlement will be approved by the Court.

**E.    NO LEGAL EFFECT UNDER THE FLSA IN NOT JOINING THE FLSA LAWSUIT**

If you choose not to join in this FLSA lawsuit, you will not be affected by any judgment on the FLSA claim, whether it is favorable or unfavorable to the Named Plaintiffs and the class.  If you choose not to file a Consent to Join this FLSA lawsuit, you are free to file your own lawsuit.

## IV.    NO RETALIATION PERMITTED

FEDERAL LAW PROHIBITS WELLS FARGO FROM TAKING ANY ACTION AGAINST YOU BECAUSE YOU ELECT TO JOIN THIS ACTION BY FILLING OUT AND RETURNING THE CONSENT TO JOIN FORM, OR OTHERWISE EXERCISING YOUR RIGHTS UNDER THE FLSA.

## V.    CLASS COUNSEL: THE ATTORNEYS REPRESENTING THE EMPLOYEES OF WELLS FARGO (THE NAMED PLAINTIFFS AND THE CLASS)

| | |
|---|---|
| T. Joseph Snodgrass<br>Kelly A. Swanson<br>Larson King, LLP<br>2800 Wells Fargo Place<br>30 East Seventh Street<br>St. Paul, MN 55101<br>1-877-373-5501<br>(651) 312-6500<br>kswanson@larsonking.com | William M. Audet<br>Adel Nadji<br>Audet & Partners, LLP<br>221 Main Street, Suite 1460<br>San Francisco, California 94105 |

## VI.    THE ATTORNEYS REPRESENTING WELLS FARGO

Glenn L. Briggs
Theresa A. Kading
Hodel Briggs Winter, LLP
8105 Irvine Center Drive, Suite 1400
Irvine, CA 92618
Telephone: (949) 450-8040

## VII.    FURTHER INFORMATION

To obtain further information about this Notice, the deadline for filing a Consent to Join form, or other information about this lawsuit, please contact the Named Plaintiffs' attorneys, toll free, at 1-877-373-5501, and ask for Pat Nally.

PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE FOR INFORMATION. THIS NOTICE AND ITS CONTENTS HAVE BEEN AUTHORIZED BY THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION. ALTHOUGH THE COURT HAS AUTHORIZED THE SENDING OF THIS NOTICE, THIS DOES NOT MEAN THAT THE COURT WILL FIND IN FAVOR OF ANY PLAINTIFF OR GRANT ANY RELIEF.

Dated: _____, 2008

_____
The Honorable Claudia Wilken
United States District Judge

# FILING INSTRUCTIONS

**Consent to Join**
If you choose to join in the FLSA claim, your Consent to Join form must be completed, signed and returned in the Business Reply Envelope included with this packet.

\* \* \* <u>**Your Consent to Join form must be postmarked by no later than**</u>          <u>**, 2008.**</u> \* \* \*

## 1.    <u>CHANGE OF ADDRESS</u>

If you move or change your address, please advise class counsel:

T. Joseph Snodgrass
Kelly A. Swanson
Attn: Pat Nally
Larson King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
1-877-373-5501
(651) 312-6500
pnally@larsonking.com

## 2.    <u>FURTHER INFORMATION</u>

To obtain further information about this lawsuit including your right to "opt-in," please contact class counsel:

T. Joseph Snodgrass
Attn: Kelly Swanson
Larson King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
1-877-373-5501
(651) 312-6500
kswanson@larsonking.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

MONTE RUSSELL and DANIEL
FRIEDMAN, on behalf of themselves and
others similarly situated,

              **Case No.: C 07 3993 CW**

        **Plaintiffs,**

    v.                        **CONSENT TO JOIN FORM**

WELLS FARGO AND COMPANY and
WELLS FARGO BANK, N.A.,

        **Defendants.**

---

**IF YOU WISH TO JOIN THE FLSA COLLECTIVE ACTION, THIS FORM MUST BE
COMPLETED, SIGNED AND RETURNED WITH A POSTMARK ON OR BEFORE
_____, 2008**

*Please type or print in ink the following:*

| Name:* |  |  |
|---|---|---|
| **Street and Apartment Number, if any:*** |  |  |
| **City:*** | **State:*** | **Zip Code:*** |
| **Home Telephone:*** | **Work Telephone:** | **Cell Telephone** |
| **E-Mail:** |  |  |
| **Name and Phone Number of Alternative Contact Person:** |  |  |
| **Social Security Number (this information will be kept confidential; contact Class Counsel if you have any questions or concerns):** |  |  |

\* Denotes required field.  Information obtained will be filed with the Court.  Class counsel will use the
   information obtained solely for the purposes of prosecuting this lawsuit.  Social Security Numbers will
   be kept confidential.  Contact Class counsel if you have any questions or concerns.

1.      I understand that this lawsuit includes a claim under the federal Fair Labor Standards Act. I have read and I understand the Notice of Collective Action that accompanied my copy of this Consent. I hereby consent to become a member of this collective action and consent to be bound by any adjudication by the Court regarding the Fair Labor Standards Act in this lawsuit.

2.      I hereby authorize class counsel to file this Consent on my behalf with the Clerk of the United States District Court for the Northern District of California, Oakland Division.

3.      By my signature below, I represent to the Court that I have been employed by Wells Fargo & Company and/or Wells Fargo Bank, N.A., as a PC/LAN Engineer 3, PC/LAN Engineer 4, and/or PC/LAN Engineer 5, at some time after November 1, 2004.  I further represent that I have a good faith belief that I worked over 40 hours in any one workweek, or that I am unsure whether I worked over 40 hours in any one workweek, while I was employed by Wells Fargo as PC/LAN Engineer 3, PC/LAN Engineer 4, and/or PC/LAN Engineer 5.  My signature below further indicates that I want to become a member of this collective action:

Signature: _____    Date: _____

---

**COMPLETE AND RETURN THIS FORM IN THE BUSINESS REPLY ENVELOPE INCLUDED WITH THIS PACKET TO:**

LARSON · KING, LLP
ATTN: PAT NALLY
2800 WELLS FARGO PLACE
30 E. 7TH STREET
ST.PAUL, MINNESOTA 55101-4922
(651) 312-6500
pnally@larsonking.com

# EXHIBIT Q

EXHIBIT Q

Not Reported in F.Supp.2d                                                                                                      Page 1
Not Reported in F.Supp.2d, 2006 WL 824652 (N.D.Cal.)
**2006 WL 824652 (N.D.Cal.)**

▷
Gerlach v. Wells Fargo & Co.
N.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Jasmin GERLACH and Reggie Place, on behalf of
themselves and all others similarly situated,
Plaintiffs,
v.
WELLS FARGO & CO.; Wells Fargo Bank, N.A.;
and Wells Fargo Services Company, Defendants.
Wells Fargo Bank, N.A., Counterclaimant,
v.
Jasmin Gerlach, Counterdefendant.
**No. C 05-0585 CW.**

March 28, 2006.

James M. Finberg, Jahan C. Sagafi, Lieff Cabraser
Heimann & Bernstein, LLP, David A. Lowe, Kenneth John Sugarman, Patrice L. Goldman, Steven
Gary Zieff, Rudy Exelrod & Zieff, LLP, Peter S.
Rukin, Rukin Hyland & Doria LLP, San Francisco,
CA, Claire Kennedy-Wilkins, Michelle Lee
Roberts, Todd Jackson, Lewis, Feinberg, Renaker
& Jackson, P.C., Oakland, CA, Robert Ira Spiro,
Spiro Moss Barness Harrison & Barge LLP, Los
Angeles, CA, for Jasmin Gerlach and Reggie Place.
Krista A. Stevenson, Nancy E. Pritikin, R. Brian
Dixon, Littler, Mendelson, P.C., San Francisco,
CA, for Wells Fargo & Co., Wells Fargo Bank,
N.A., and Wells Fargo Services Company.

ORDER GRANTING IN PART AND DENYING
IN PART PLAINTIFFS' MOTION FOR APPROVAL OF *HOFFMAN-LA ROCHE* NOTICE AND
DENYING PLAINTIFFS' MOTION FOR COR-
RECTIVE NOTICE

CLAUDIA WILKEN, District Judge.
**\*1** Plaintiffs move the Court to certify conditionally
this action as a representative collective action and
to authorize and facilitate notice of this action to
prospective collective action members. Defendants

oppose this motion and object to the notice and opt-
in form that Plaintiffs have prepared. In a separate
motion, Plaintiffs move the Court to order Defendants to issue a corrective written notice to all potential collective action members concerning Defendants' allegedly misleading and coercive communications to them and to prohibit Defendants and their
counsel from communicating with them concerning
this action. Defendants also oppose that motion.

The matters were heard on February 10, 2006. Having considered all of the papers filed by the parties
and oral argument on the motions, the Court grants
in part Plaintiffs' motion for approval of a *Hoffman-LaRoche* notice and denies it in part, and denies
Plaintiffs' motion for a corrective notice.

BACKGROUND

Plaintiffs contend that they are owed overtime pay
under the Fair Labor Standards Act (FLSA). The
FLSA authorizes workers to sue for unpaid overtime wages on their own behalf and on behalf of
"other employees similarly situated." 29 U.S.C. §
216(b). Plaintiffs bring this action on behalf of
themselves and other similarly situated
employees.FN1Unlike class actions brought under
Federal Rule of Procedure 23, however, collective
actions brought under the FLSA require that each
individual member "opt in" by filing a written consent. *See*29 U.S.C.A. § 216(b) ("No employee shall
be a party plaintiff to any such action unless he
gives his consent in writing to become such a party
and such consent is filed in the court in which such
action is brought.").

> FN1. In addition, Plaintiffs bring State
> wage law and ERISA claims.

In *Hoffmann-La Roche Inc. v. Sperling,* 493 U.S.
165 (1989), the Supreme Court held that, "in appropriate cases," district courts should exercise their
discretion to authorize and facilitate notice of a collective action to similarly situated potential

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

plaintiffs.[FN2]Plaintiffs contend that this is an appropriate case. They request leave to send a *Hoffman-La Roche* notice to similarly situated Business Systems Employees (BSEs) [FN3] who are, or have been, employed throughout the country by Defendants Well Fargo & Co., Wells Fargo Bank, N.A., Wells Fargo Services Company, and any other subsidiaries of Wells Fargo & Co., at any time since February 9, 2002. According to Plaintiffs, this notice will alert potentially aggrieved individuals that, if they want to pursue a similar claim in this pending lawsuit, they must opt in, and will further the broad remedial goals of the FLSA.

> FN2. As Plaintiffs note, although *Hoffmann-La Roche* involved claims brought under the Age Discrimination in Employment Act (ADEA), because ADEA incorporates § 16(b) of the Fair Labor Standards Act into its enforcement scheme, the same rules govern judicial management of collective actions under both statutes. *See, e.g., Shaffer v. Farm Fresh, Inc.,* 966 F.2d 142, 147 (4th Cir.1992).

> FN3. Plaintiffs define BSEs to include Business Systems Consultants levels 2 through 6; e-Business Systems Consultants levels 2 through 6 and Business Systems Analysts. According to Defendants, there has been no job title in the relevant time period called Business Systems Analysts. Defendants also note that BSE is a job classification invented by Plaintiffs, which does not exist.

### DISCUSSION

I. *Hoffmann-La Roche* Notice

As noted above, the FLSA provides for a collective action where the complaining employees are "similarly situated." 29 U.S.C. § 216(b). But the FLSA does not define "similarly situated," nor has the Ninth Circuit defined it. As noted by the Tenth

Circuit, there is little circuit law defining "similarly situated." *Thiessen v. General Electric Capital Corp.,* 267 F.3d 1095, 1102 (10th Cir.2001).

*2 Although various approaches have been taken to determine whether plaintiffs are "similarly situated," district courts in this circuit have used the *ad hoc,* two-tiered approach. *See Wynn v. National Broadcasting Co., Inc.,* 234 F.Supp.2d 1067, 1082 (C.D.Cal.2002) (noting that the majority of courts prefer this approach); *see also Thiessen,* 267 F.3d at 1102-03 (discussing three different approaches district courts have used to determine whether potential plaintiffs are "similarly situated" and finding that the *ad hoc* approach is arguably the best of the three approaches); *Hipp v. Liberty Nat. Life Ins. Co.,* 252 F.3d 1208, 1219 (11th Cir.2001) (finding the two-tiered approach to certification of § 216(b) opt-in classes to be an effective tool for district courts to use). Under this approach, the district court makes two determinations, on an *ad hoc,* case-by-case basis. The court first makes an initial "notice stage" determination of whether plaintiffs are similarly situated, determining whether a collective action should be certified for the purpose of sending notice of the action to potential class members. *See, e.g., Thiessen,* 267 F.3d at 1102. For conditional certification at this notice stage, the court requires little more than substantial allegations, supported by declarations or discovery, that "the putative class members were together the victims of a single decision, policy, or plan."*Id.* a t 1102.The standard for certification at this stage is a lenient one that typically results in certification. *Wynn,* 234 F.Supp.2d at 1082.

The second determination is made at the conclusion of discovery, usually on a motion for decertification by the defendant, utilizing a stricter standard for "similarly situated." *Thiessen,* 267 F .3d at 1102. During this second stage analysis, the court reviews several factors, including the disparate factual and employment settings of the individual plaintiffs; the various defenses available to the defendant which appear to be individual to each plaintiff; fairness

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

and procedural considerations; and whether the plaintiffs made any required filings before instituting suit. *Id.* at 1103.

Although Defendants acknowledge that some courts have applied this two-stage analysis, they argue that the Court should consider Rule 23 requirements for commonality. Plaintiffs' claim, however, is brought as a collective action under the FLSA, not as a class action under Rule 23. As noted in *Thiessen,* Congress chose not to apply the Rule 23 standards to collective actions under the ADEA and FLSA, and "instead adopted the 'similarly situated' standard. To now interpret this 'similarly situated' standard by simply incorporating the requirements of Rule 23 ... would effectively ignore Congress' directive."267 F.3d at 1105. *See also W ertheim v. Arizona,* 1993 WL 603552, *1 (D.Ariz. Sept. 30, 1993) ("The requisite showing of similarity of claims under the FLSA is considerably less stringent than the requisite showing under Rule 23 of the Federal Rules of Civil Procedure. All that need be shown by the plaintiff is that some identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA.") (citations omitted). To determine whether potential plaintiffs are similarly situated and whether notice is appropriate, the Court will apply the two-tiered approach.

*3 As noted above, the standard for certification at the notice stage is a lenient one. Plaintiffs meet their burden of showing that all BSEs are similarly situated with respect to their FLSA claim: all BSEs share a job description, were uniformly classified as exempt from overtime pay by Defendants and perform similar job duties. Defendants do not dispute that Plaintiffs meet their burden under this lenient standard.

Instead, Defendants argue that this motion should be decided under the stricter second stage analysis. According to Defendants, extensive discovery has been conducted: Plaintiffs have received over 40,000 pages of documents in response to 116 requests and have deposed sixteen witnesses. Defendants contend that the evidence [FN4] shows that BSEs are not similarly situated: they are more than 2,500 white-collar employees who work in widely varying jobs in thirty-eight States and in multiple lines of businesses. Business Systems Consultants levels two and three are overtime-exempt, have salaries starting at $43,1000, and are not bonus-eligible; Business Systems Consultants levels four through six have salaries ranging up to $112,500 and are bonus-eligible; level 6 even includes a Corporate Vice President. Defendants further argue that the employees at issue are subject to every permutation of the executive, administrative, professional and computer professional exemptions, and therefore a conditional class will not promote judicial efficiency.

> FN4. Part of the evidence Defendants rely upon is thirty-nine declarations from its employees, all of whom are potential collective action members. Plaintiffs move to strike these declarations, arguing that they were obtained improperly and in violation of the California Rules of Professional Conduct; in addition, Plaintiffs argue that the declarations should be excluded because Defendants failed to disclose them in their discovery responses. Plaintiffs' motion to strike is denied as moot. Plaintiffs meet their burden at the notice stage, and thus the Court need not consider the declarations at this time.

Defendants cite *Pfohl v. Farmers Ins. Group,* 2004 WL 554834, *3 (C.D.Cal. Mar. 1, 2004), to support their argument that the Court can, and should, proceed to the second stage of the two-tiered analysis. In *Pfohl,* the court proceeded directly to the second stage and weighed relevant factors to determine whether the plaintiffs there were similarly situated. But, before proceeding to the second stage, the court noted that "the parties did not dispute that discovery has been undertaken relating to the issues of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 824652 (N.D.Cal.)
Not Reported in F.Supp.2d, 2006 WL 824652 (N.D.Cal.)
**2006 WL 824652 (N.D.Cal.)**

Case 4:07-cv-03993-CW    Document 36    Filed 07/25/2008    Page 78 of 125    Page 4

certification of this action as a collective action."*Id.* Here, although volumes of paper have been produced and over a dozen witnesses deposed, Plaintiffs state that discovery is nowhere near complete. After filing their reply, Plaintiffs submitted additional relevant information, which Defendants had only recently produced. Even Defendants do not contend that discovery on the issue of certification is complete; Defendants only contend that discovery has been extensive and that additional discovery will not change the facts or analysis that BSEs are not similarly situated.

To apply the second-tier heightened review at this stage would be contrary to the broad remedial policies underlying the FLSA. In *Thiessen,* the district court conditionally certified the class "during the course of discovery"; it was only at the conclusion of discovery that the court applied the heightened second-tier review. 267 F.3d at 1103. This Court, too, will conditionally certify the collective action for the purpose of sending notice of the action to potentially similarly situated employees. After discovery is complete, Defendants can move for decertification, and the Court will then apply the heightened second-tier review.

A. Proposed Notice and Opt-in Form

**\*4** Although the Court conditionally certifies the collective action, it does not approve the notice and opt-in form Plaintiffs prepared. Nor does the Court approve the notice and opt-in form Defendants prepared.

Defendants' proposed "Responsibility For Costs and Fees" section could be misleading; potential plaintiffs could believe that, if Defendants prevail, plaintiffs will have to pay Defendants' attorneys' fees. Any language in the notice regarding Defendants obtaining "an award of costs to be paid by the individual Plaintiffs" must define those costs and be clear that potential plaintiffs will not bear the burden of paying Defendants' attorneys' fees should Defendants prevail.

Defendants' description of the lawsuit, consisting of four sentences, is not adequate. As Plaintiffs note, potential collective action members are entitled to receive "accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate."*Hoffman-La Roche,* 493 U.S. at 170. It would be difficult to make an informed decision on the limited information Defendants provide. Plaintiffs' description of the lawsuit, however, is one-sided and argumentative. Although Plaintiffs do use the word "allege," they use it only once in the beginning of each paragraph. The description fails to note that Defendants deny they have violated the law.

The Supreme Court has instructed, "In exercising the discretionary authority to oversee the notice-giving process, courts must be scrupulous to respect judicial neutrality. To that end, trial courts must take care to avoid even the appearance of judicial endorsement of the merits of the action."*Id.* at 174.Defendants' notice and form, though inadequate, are neutral. Plaintiffs note that the Court has taken no position on the case, but they do so in a single sentence seemingly tacked onto the end of the notice. Plaintiffs' form has a Court caption, which as Defendants note could be perceived as a judicial endorsement of this action; the caption should be omitted.

Plaintiffs' proposed 120 day deadline for potential class members to file their consents is too long; Defendants' proposed thirty day deadline is too short. In *Reab v. Electronic Arts, Inc.,* 214 F.R.D. 623, 632 (D.Colo.2002), the court approved a sixty day opt-in period. The Court sets a seventy-five day deadline. The "Further Information" section approved in *Reab* is preferable to either party's proposed "Further Information" section.[FN5]Defendants are aware of their ethical duties, as well as the California Rules of Professional Conduct, which they must obey if they are contacted by potential plaintiffs seeking further information.

FN5. The approved section in *Reab* is as

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 824652 (N.D.Cal.)
Not Reported in F.Supp.2d, 2006 WL 824652 (N.D.Cal.)
**2006 WL 824652 (N.D.Cal.)**

Case 4:07-cv-03993-CW    Document 36    Filed 07/25/2008    Page 79 of 125Page 5

follows:

> Further information about this Notice,
> the deadline for filing a "Consent to Be-
> come A Party Plaintiff" or questions
> concerning this lawsuit may be obtained
> by writing, phoning or e-mailing
> Plaintiffs' counsel, James Schmehl, at
> Schmehl, Yowell & Mackler, P.C., at:
> [TO BE PROVIDED BY COUNSEL],
> or Defendants' counsel, Victor Schachter
> and Daniel McCoy, at Fenwick & West
> LLP,                      (650)494-0600,
> vschachter@fenwick.com,         dmccoy
> @fenwick.com.

*Id.*

The forms should be returned to a third-party
claims administrator, not to the Clerk of the Court.
The form should not contain a space for potential
plaintiffs to check whether they want to be represen-
ted by Plaintiffs' counsel, by their own retained
counsel or by themselves.

## B. Equitable Tolling for Potential Plaintiffs

**\*5** The FLSA statute of limitations runs until a val-
id consent is filed. 29 U.S.C. § 256(b); *Partlow v.
Jewish Orphans' Home of Southern California,
Inc.,* 645 F.2d 757, 760 (9th Cir.1981), abrogated
on other grounds by *Hoffman-La Roche,* 493 U.S.
165. Plaintiffs request that the Court equitably toll
the limitations period on the claims of the FLSA
collective action members from the date that the
Complaint was filed on February 9, 2005, through
the Court-set deadline for receipt of consents. They
argue that equitable tolling is warranted because
similarly situated plaintiffs, through no fault of
their own, have been unable to opt in to, or even
learn of, the lawsuit. Defendants refuse to produce
contact information for potential collective action
members, which, Plaintiffs claim, prevents
Plaintiffs and their counsel from informing simil-
arly situated potential plaintiffs about this case and

their right to opt in.

But, as Defendants note, the two cases Plaintiffs
cite to support equitable tolling are distinguishable.
In *Partlow,* the Ninth Circuit held that the district
court could toll the statute of limitations under the
FLSA for forty-five days to permit the class mem-
bers who had earlier filed invalid consents, due to
Plaintiffs' counsel's error, to execute proper con-
sents. Although this holding was based largely on
the court's finding that "it would simply be improp-
er to deprive the consenting employees of their
right of action," the court also pointed out that the
defendant was notified of the claims of the consent-
ing employees within the statutory period because
they had filed the improper consents. 645 F.2d at
761. In *Owens v. Bethlehem Mines Corp.,* 630
F.Supp. 309, 313 (W.D.Va.1986), the court, relying
on *Partlow,* found that equitable tolling was war-
ranted because it had delayed ruling on the
plaintiffs' certification motion for over a year.

In their reply, Plaintiffs do not address Defendants'
argument that the cases they cited were inapposite.
Instead, Plaintiffs cite a new case where the defend-
ant refused to provide contact information for
former employees and the district court granted
equitable tolling. See *Baldozier v. Am. Family Mut.
Ins. Co.,* 375 F.Supp.2d 1089, 1093 (D.Colo.2005).
Nonetheless, the Court finds that, under the law of
this circuit, equitable relief is not proper in this case.

## II. Corrective Notice

After this action was filed, Defendants instructed
their employees to retain documents relating to
their work. A document pertaining to this litigation
(the Q & A document) was attached to the docu-
ment retention instructions sent to managers and
employees, some of whom were potential plaintiffs.
Defendants state that approximately one hundred
out of 2,600 BSEs received the Q & A document.
Plaintiffs contend that the document was widely
disseminated and that hundreds or thousands of po-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

tential collective action members were exposed to the information contained in the Q & A document. According to Plaintiffs, the Q & A document, which answers such questions as, "Who is being sued," "What does she want," "If I want to participate in the lawsuit, will that affect my job,""Why do I have to save documents," and "Can I trust the lawyers who are suing Wells Fargo," contains misleading, deceptive and coercive statements. See *Belt v. Emcare, Inc.,* 299 F.Supp.2d 664, 668 (2003) (recognizing that statements in a letter, encouraging potential class members not to join a class action, sent from an employer to its employees have heightened potential for coercion based on the employer-employee relationship). Plaintiffs request that the Court allow Plaintiffs to issue a corrective notice containing Plaintiffs' answers to the questions posed by the Q & A document. In addition, Plaintiffs request that the Court prevent Defendants from communicating with potential and actual plaintiffs concerning this litigation and require Defendants to identify each individual who received the Q & A document and describe in detail all communications with any potential collective action member related to the Q & A document.

**\*6** As Plaintiffs acknowledge in their reply, however, pre-certification communications with potential collective action members are generally permitted. *See Gulf Oil v. Bernard,* 452 U .S. 89, 100 (1981). In *Gulf Oil,* the Supreme Court noted that an order preventing counsel from communicating with potential class members "involved serious restraints on expression." 452 U.S. at 104. Thus, an order limiting communications between parties and potential collective action members "should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties."*Id.* at 101.While finding that a district court cannot issue an order prohibiting communication between potential plaintiffs and counsel based on the mere possibility of abuse, the Court recognized that district courts have "both the duty and broad authority to exercise control over a class action and

to enter appropriate orders governing the conduct of counsel and parties."*Id.* at 100.

Plaintiffs cite several cases where district courts have employed their broad authority to remedy improper communications and ordered that corrective notices be sent and prohibited future communication. Plaintiffs contend that this case is directly analogous to *Pollar v. Judson Steel Corp.,* 1984 U.S. Dist. LEXIS 19765 (N.D.Cal. Feb. 3, 1984). After finding that improper pre-certification communications caused confusion concerning potential class members' rights, the court in *Pollar* prohibited the defendants from further communication with any class member on issues related to the litigation, ordered the defendants to turn over to class counsel all written communications from potential class members and ordered the defendants to pay for corrective notice. But, as Defendants point out, the defendants in *Pollar* caused confusion concerning potential members' rights by running advertisements in newspapers regarding an affirmative action program for women, without disclosing the existence of the class action litigation. Here, the Q & A document discloses the litigation, albeit in an allegedly misleading and coercive fashion.

*Mevorah v. Wells Fargo Home Mortgage, Inc.,* 2005 U.S. Dist. LEXIS 28615 (N.D.Cal. Nov. 17, 2005), another case Plaintiffs cite from this district, is also distinguishable.[FN6]In *Mevorah,* the defendants' counsel contacted potential class members, interviewed them and then attempted to obtain depositions from them, without informing them that these depositions might be adverse to their interests. In addition, the defendants' counsel mischaracterized the litigation, giving potential class members the mistaken impression that if the lawsuit were successful they would no longer receive commissions and instead would be paid an hourly wage. Here, although the answer to at least one hypothetical question in Defendants' Q & A document does not actually answer the question, Defendants do not mischaracterize the litigation. Furthermore, as Defendants note, in *Mevorah,* a potential class member

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

submitted a declaration that she agreed to be interviewed by defense counsel because she was misled into believing that she would lose her commissions if the lawsuit was successful. Despite being provided the opportunity to do so, Plaintiffs have not deposed any of the potential collective action members who received the Q & A document to determine whether they were misled or coerced.

> FN6. As Plaintiffs note, Defendants' argument that Plaintiffs cannot rely on this case because a notice of appeal was filed on December 14, 2005, is not supported by the case Defendants cite.

\*7 The Court finds that the Q & A document is not sufficiently misleading or coercive to justify the relief sought. It informs potential collective action members that it is their decision whether to speak to any lawyer that contacts them and that, if they decide to speak to Plaintiffs' attorneys, they will not be retaliated against. It reiterates that their jobs will not be affected by participating in the lawsuit or by speaking to Plaintiffs' counsel. As Defendants note, there is nothing improper about telling potential collective action members, at this point in the litigation, to speak with their manager or an HR representative if they want to learn more about the lawsuit. *See Parks v. Eastwood Ins. Servs., Inc.,* 235 F.Supp.2d 1082, 1085 (C.D.Cal.2002) (finding that sending an internal memorandum to employees, before the employees opted in to the collective action, which discussed the litigation and suggested that employees direct questions to the employer's general counsel, was permissible). And, like the memorandum in *Parks,* the Q & A document does not give legal advice, does not suggest retaliation if employees opt in, and does not undermine any notice given by the Court. *Id.*

The Court finds insufficient justification to prohibit Defendants from contacting potential collective action members; nor does the evidence justify a finding that Defendants violated the California Rules of Professional Conduct or the Business and Professions Code by sending the Q & A document. Be-

cause the Q & A document was not inherently misleading or coercive, and in light of the *Hoffman-La Roche* notice that will be sent to potential collective action members, the Court finds that sending the corrective notice prepared by Plaintiffs is not necessary. Plaintiffs' motion for a corrective notice is denied.

### CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART Plaintiffs' Motion for Approval of *Hoffmann-La Roche* Notice (Docket No. 45) and DENIES it IN PART. The Court conditionally certifies the class of BSEs so that notice may be sent and authorizes Plaintiffs to send notice to prospective collective action members; however, the Court does not approve the notice and form prepared by Plaintiffs or the alternative notice and form prepared by Defendants. The Court has prepared a notice and form for the parties to use, unless they are able to agree on an alternative notice and form within ten days of this order. Defendants will produce to Plaintiffs' counsel the names, addresses, alternative addresses, and all telephone numbers,[FN7] in Microsoft Excel format, of all BSEs, within ten days of this order. The Court will not equitably toll the limitations period on the claims of the FLSA collective action members from the date that the Complaint was filed on February 9, 2005, through the Court-set deadline for receipt of consents. The Court DENIES Plaintiffs' Motion for Corrective Notice (Docket No. 114). Defendants' Motion to strike portions of the Goldman declaration and to strike portions of Plaintiffs' motion for notice (Docket No. 72) and Plaintiffs' Motion to Strike Defendants' Declarations of Potential Class Members (Docket No. 93) are also DENIED.[FN8]

> FN7. Plaintiffs' request for the BSEs' social security numbers is denied.

> FN8. To the extent that the Court relied upon evidence to which there is an objection, the parties' objections are overruled.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

> To the extent that the Court did not rely on such evidence, the parties' objections are overruled as moot.

**\*8** IT IS SO ORDERED.

### Further Information

N.D.Cal.,2006.
Gerlach v. Wells Fargo & Co.
Not Reported in F.Supp.2d, 2006 WL 824652 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 1
Slip Copy, 2006 WL 3190527 (N.D.Cal.)
**2006 WL 3190527 (N.D.Cal.)**

# H

Stanfield v. First NLC Financial Services, LLC
N.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Jeremy STANFIELD, et al., Plaintiffs,
v.
FIRST NLC FINANCIAL SERVICES, LLC, et al.,
Defendants.
**No. C 06-3892 SBA.**

Nov. 1, 2006.

Peter S. Rukin, John F. Hyland, Rukin Hyland &
Doria LLP, San Francisco, CA, Donald H. Nichols,
Paul J. Lukas, Rachhana T. Srey, Nichols Kaster &
Anderson, PLLP, Minneapolis, MN, for Plaintiffs.
Michael D. Weil, Orrick, Herrington & Sutcliffe
LLP, San Francisco, CA, for Defendants.

## ORDER

SAUNDRA BROWN ARMSTRONG, District
Judge.
\*1 This matter comes before the Court on Plaintiffs'
Motion for Conditional Class Certification [Docket
No. 48].

### BACKGROUND

Plaintiffs Jeremy Stanfield, Romonia Persand,
Shabnam Sheila Dehdashtian, Saira Losoya, and
Eva Williams brought an action on their own be-
half, and on behalf of those similarly situated,
claiming that Defendant failed to pay them over-
time compensation as required by the Fair Labor
Standards Act (FLSA) and the California Labor
Code. First Amended Complaint (FAC) at ¶ 1.
Stanfield and Losoya worked as loan officers in
Defendant's Concord, California and Westminister,
Colorado branch offices, respectively. Persand and
Williams worked as loan processors in Defendant's
Anaheim, California and Denver, Colorado branch
offices, respectively. Dehdashtian worked as an ac-

count manager in Defendant's Orange, California
branch office. The proposed class is composed of
all persons who are or have been employed by De-
fendant as loan officers, loan processors, or account
managers in the United States [FN1] at any time in
the three years prior to the filing of the lawsuit. *Id.*
at ¶ 2.

> FN1. This suit was initially filed on behalf
> of employees in California. Pursuant to the
> parties' stipulation, the Court consolidated
> this case with *Losoya, et al v. First NLC
> Financial Services, LLC,* Civil File No.
> 06-CV-00866-REB-MEH, which was a na-
> tionwide collective action filed in the U.S.
> District Court for the District of Colorado
> (Docket No. 29).

First NLC is a nationwide non-prime residential
mortgage lender. It is headquartered in Florida, and
has regional and field offices across the country ori-
ginating loans in 41 states. Raney Decl. at ¶¶ 3, 4.
First NLC has two business divisions, retail and
wholesale. *Id.* at ¶ 3. The retail division offers First
NLC's lending products directly to borrowers. The
wholesale division consults with mortgage brokers.
*Id.* According to Defendant, "[t]he duties of em-
ployees in the account manager/loan processor pos-
itions vary from each other based on a variety of
factors, such as whether they work on the wholesale
or retail side of First NLC, geography, branch man-
ager style and more."*Id.* at ¶ 7.

Plaintiff contends that all loan officers perform the
same job duties. According to Plaintiff, loan of-
ficers make phone calls to potential customers, ob-
tain information from customers to complete loan
applications, collect client documents, and send the
loan package to the loan processor. Loan processors
"are responsible for initiating the loan process such
as ordering title, ordering appraisal, and pulling the
customer's credit history."Loan processors also
compile documents and send the loan file to the un-
derwriting department, and, if the loan is approved,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

place a copy of the loan approval in the loan application file. Account managers perform the same job duties as loan processors. According to Plaintiffs, Defendant treats all members of the putative collective action the same by classifying them as "exempt" from the overtime requirements of the FLSA.

In support of the allegations recited above, Plaintiffs rely on declarations, some of which are from named Plaintiffs. All of the declarations are essentially the same. The employees worked in different offices at different times, but each identifies similar job tasks and states that he or she worked more than 40 hours per week and was not paid overtime. *See, e.g.,* E. Williams Decl.; Dehdashtian Decl.; Stanfield Decl.; Losoya Decl.

**\*2** To date, approximately 164 current and former employees of First NLC have opted in to the proposed collective action.[FN2]

> FN2. Defendant filed a Motion for Protective Order, arguing that Plaintiffs' counsel "misappropriated and misused First NLC's employee contact information to send a misleading and incomplete communication to the putative class members."Opposition at 1. Defendant asks the Court to prohibit Plaintiffs' counsel from communicating with the putative class and to void the consent forms procured by the allegedly inappropriate communications, among other things. The Motion for Protective Order was referred to Magistrate Judge James Larson, who held a hearing on October 18, 2006 and issued an order denying the Motion on October 30, 2006. Much of Defendant's brief in Opposition to Plaintiffs' Motion for Conditional Collective Action Certification is devoted to arguments about the need for a protective order and the impropriety of Plaintiffs' counsel's actions. The Court disregards these arguments.

### *LEGAL STANDARD*

The FLSA allows an employee to bring a collective action [FN3] on behalf of "similarly situated" employees for the employer's failure to pay overtime wages. 29 U.S.C. § 216(b). Potential plaintiffs must "opt in" to the suit by filing a written consent with the court. *Id.*

> FN3. Although Plaintiffs have titled the Motion a "Motion for Conditional Class Certification," it is clearly a Motion for Conditional Collective Action Certification under the FLSA. Federal Rule of Civil Procedure 23, which governs class certification in most instances, is inapplicable here. *Leuthold v. Destination America, Inc.,* 224 F.R.D. 462, 466 (N.D.Cal.2004) (Walker, J.)

Determining whether a collective action is appropriate is within the discretion of the district court. *Leuthold v. Destination America, Inc.,* 224 F.R.D. 462, 466 (N.D.Cal.2004) (Walker, J.). The plaintiff bears the burden of showing that putative collective action members are similarly situated. *Id.* Courts in this district have used a "two-tiered" approach: the court makes an initial determination of whether the plaintiffs are similarly situated based on the pleadings and any affidavits submitted by the parties. The standard is lenient, and conditional collective action certification is usually granted. *Id.* at 467; *Gerlach v. Wells Fargo & Co.,* 2006 WL 824652 at *2 (N.D.Cal. March 28, 2006) (Wilken, J.). The second step occurs when discovery is complete. The party opposing collective action certification may move to decertify, and the Court then determines the propriety and scope of the collective action using a stricter standard. *Id.* At the second step, the Court may consider: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations."*Leuthold,* 224 F.R.D. at 467.

If the Court decides to certify a collective action, the Court may authorize and facilitate notice to po-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

tential plaintiffs, under *Hoffman-La Roche Inc. v. Sperling,* 493 U.S. 165, 171-73 (1989)."Because trial court involvement in the notice process is inevitable in cases with numerous plaintiffs where written consent is required by statute, it lies within the discretion of a district court to begin its involvement early, at the point of the initial notice, rather than at some later time."*Id.* at 171.

## *ANALYSIS*

### A. Collective Action

At this juncture, the Court will only make an initial determination of whether collective action members are similarly situated, as discovery has not yet been conducted.[FN4]To grant conditional certification at this stage, "the court requires little more than substantial allegations, supported by declarations or discovery, that 'the putative class members were together the victims of a single decision, policy, or plan.' " *Gerlach,* 2006 WL 824652 at *2 (quoting *Thiessen v. General Electric Capital Corp .,* 267 F.3d 1095, 1102 (10th Cir.2001)). The named Plaintiffs' duties must be generally comparable to those they seek to represent, and "it is incumbent on Plaintiff to propose a class that is sufficiently defined and manageable from the outset." *Freeman v. W al-Mart Stores, I nc.,* 256 F.Supp.2d 941, 945 (W.D.Ark.2003).

> FN4. According to Plaintiffs, Defendant has refused to engage in discovery until the Court resolves the instant Motion.

*3 Defendant contends that the Court should not certify the collective action if a fact-intensive inquiry into each potential plaintiff's employment situation is required. *See Clausman v . Nortel Net - works, Inc.,* 2003 WL 21314065 (S.D.Ind. May 1, 2003) (denying collective action certification because the court would have had to determine whether every potential plaintiff was correctly classified as an "outside salesman," and thus excluded from the FLSA).*See also Freeman,* 256 F.Supp.2d at 945

(declining to certify collective action at first step because there were material differences in duties and responsibilities of putative members).[FN5]

> FN5. However, in at least one of the cases relied upon by Defendant, *Morisky v. Public Serv. Elec. & Gas Co.,* 111 F.Supp.2d 493, 499 (D.N.J.2000), the court undertook the more rigorous second-stage analysis of substantial similarity, because discovery was complete. That is not the case here.

According to Defendant, there are material differences in the duties of putative collective action members. Defendant agrees that loan officers consult with customers over the telephone. However, Defendant asserts, "[i]n any given branch, there are approximately 20 different loan officers with 20 different personalities and skill sets."Ranck Decl. at ¶ 5. Further, differences in duties arise from branch managers' different expectations: "[f]or example, some branch managers employ their more senior loan officers as 'team leaders.' In addition to their normal job responsibilities, team leaders are tasked with taking on the extra responsibility of training and supervising the branch's more junior loan officers."*Id.* at ¶ 7. In addition, Defendant asserts that loan officers' duties vary depending on whether they work for a wholesale or retail branch. "For example, in the retail side, if there were problems with a loan application file-such as questions about the adequacy of a customer's income documentation-the retail account manager/loan processor had the authority to sign off on and approve that the questionable documents were adequate. On the wholesale side, account managers/loan processors must check with the regional managers before signing off on the adequacy of documents."Raney Decl. at ¶ 9. Defendant also asserts that Plaintiffs' distinction between "loan processors" and "account managers" is incorrect-Plaintiffs claim that the only difference is that the former work on the retail side while the latter work on the wholesale side, but according to Defendant, both titles may handle either type of account. The difference is that the title

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

"loan processor" is used east of the Mississippi, and the title "account manager" is used west of the Mississippi. Loney Decl. at ¶ 4. Defendant contends that employees in the relevant positions are "given tremendous discretion and autonomy to perform their work," and thus the time they spend on various tasks is not consistent. Raney Decl. at ¶ 12.

These alleged differences are not material, and a fact-intensive inquiry is not required at this juncture. Defendant does not appear to dispute that it classifies all loan officers, account managers, and loan processors as exempt and does not pay them overtime. Nor do Defendant's declarations demonstrate any significant differences in their job duties. Defendant did not submit any affidavits from current or former employees in the relevant positions, stating that their tasks were significantly different from those identified by Plaintiffs. Conclusory statements by managers that every employee has different tasks and skills are not sufficient.

*4 Defendant argues that Plaintiffs' declarations are unreliable and should be stricken because they are all substantially the same. However, the only authority Defendant offers to support its argument are two Texas habeas cases, which are not persuasive in this context. A court in this district has held that "plaintiffs' use of identical language is not grounds for striking their declarations."*Doe v. Texaco, Inc.,* 2006 WL 2850035 at *2 (Oct. 5, 2006) (Alsup, J.). Defendant asserts that Plaintiffs' claim that putative class members in each job title perform the same duties "logically [ ] makes no sense." The Court disagrees. It is entirely logical that employees in the same job title perform very similar tasks. Plaintiffs' declarations are sufficient to meet their burden of proving similarity.

Finally, Defendant contends that "the presence of several exemptions that may apply to the putative class members also precludes class certification."Opposition at 20. This presumably means that certain employees are exempt from the FLSA, and Defendant believes that putative class members may fall into one or more of those exempt categor-

ies. However, aside from naming them and citing the relevant regulations, Defendant provides no explanation or argument about these potential exemptions sufficient to demonstrate to the Court that it is a viable concern which detracts from the finding that Plaintiffs are similarly situated. The Court rejects Defendant's argument. Moreover, the Court will not evaluate the merits of Plaintiffs' claims under the FLSA at this point in the litigation. *See Young v. Cooper Cameron Corp.,* 229 F.R.D. 50, 54 (S.D.N.Y.2005) (stating that the focus of the court's inquiry at the initial certification stage is "not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are 'similarly situated' under 29 U.S.C. § 216(b) with respect to their allegations that the law has been violated"). Even if it turns out that Plaintiffs cannot prevail on their FLSA claim because they are subject to exemptions, a collective action should still be certified if they are similarly situ- ated.

Accordingly, Plaintiffs' Motion for Conditional Class Certification is GRANTED.

**B. Notice**

Courts are cautious about approving notice to the putative class lest they "stir up" litigation. *See Severtson v. Phillips Beverage Co.,* 137 F.R.D. 264, 266-67 (D.Minn.1991); *Veliz v. Cintas Corp.,* No. C 03-1180 SBA, Docket No. 121 (citing *Severtson,* but approving collective action and granting motion for facilitated notice). However, Defendant appears to agree that the Court should facilitate notice if the collective action is certified. *See* Opposition at 12-13. Court-approved notice must be "timely, accurate, and informative." *Hofman-La Roche,* 493 U .S. at 172.

Plaintiffs have submitted a proposed notice of collective action as part of their Motion. *See* Srey Decl. Ex. F. The notice gives a brief description of the action: "the action alleges that [First NLC loan officers, loan processors, and account managers] are

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

owed overtime pay under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, for hours worked in excess of forty (40) per week.... First NLC denies Plaintiffs' allegations and maintains that Plaintiffs are exempt from the overtime provisions of the FLSA."*Id.* The notice informs potential plaintiffs of their right to participate in the lawsuit, and describes the effect of joining or not joining the suit. It also explains the statute of limitations, that First NLC is prohibited from retaliating against employees for participating in the suit, and that returning the consent form is an agreement to be represented by Plaintiffs' counsel. In conclusion, the notice states that it is authorized by the Court, but that the Court "has made no decision in this case about the merits of Plaintiffs' claims or of Defendant's defenses."*Id.*

\*5 Defendant lodges several objections to the proposed notice. First, Defendant argues that curative notice should be sent to the class addressing the allegedly misleading statements which are the subject of the Motion for Protective Order. Judge Larson denied the Motion, so curative notice is not warranted. Second, Defendant argues that only individuals who worked for First NLC in the past three years should receive notice, as the maximum statute of limitations is three years. The Court agrees. Plaintiffs' proposed notice leaves the date blank; the date should be filled in to reflect the three-year limitation period.

Next, Defendant argues that the notice should explain the costs that Plaintiffs may incur, relying on *Krueger v. N.Y. Tel. Co.,* 1993 WL 276058 at \*3 (S.D.N.Y. July 21, 1992). The court in *Krueger* did order that the notice state any fees or advances that a plaintiff would be obligated to pay at any stage of the litigation. However, Plaintiffs offer many examples of notices approved by various courts (all drafted by lead counsel, Nichols Kaster & Anderson), which do not explain costs that potential plaintiffs may incur. The court in *Gerlach* noted that language explaining fees and costs plaintiffs may have to pay could be confusing or misleading.

2006 WL 824652 at \*4. The Court concurs with Defendant; potential Plaintiffs should be made aware of any fees or costs for which they may be liable before opting in to the lawsuit. The parties are ordered to meet and confer to draft a mutually acceptable provision explaining potential costs that Plaintiffs may incur.

Defendant next argues that Plaintiffs should bear the costs of notice, citing two Supreme Court cases holding that plaintiffs ordinarily bear the cost of giving notice to the class in a class action. See Opposition at 23. Though these were Rule 23 class actions, they are persuasive here. Plaintiff points out that in *Veliz v. Cintas,* this Court ordered the defendant to bear the cost of notice. However, that appears to have been a sanction for the defendant's failure to provide the plaintiffs with the names and addresses of potential class members. The Court agrees with Defendant that Plaintiffs should bear the costs of notice.

Defendant next argues that a neutral third party should mail the notice, because potential class members have a privacy interest in the nondisclosure of their names and home addresses. Plaintiffs argue that the contact information of potential plaintiffs is relevant and discoverable. Each side cites out-of-circuit district court cases in which the court prohibited or allowed the disclosure of names and addresses, respectively. The only decision cited from this district is *Veliz v . Cintas,* in which this Court ordered the defendants to produce a list of names and addresses of potential class members. Ordering a third-party administrator will add to Plaintiffs' financial burden. Accordingly, the Court rejects Defendant's request. Defendant is ordered to produce the names and addresses of potential class members.

\*6 Defendant also argues that the notice period should be limited to 45 days. Plaintiffs state that this is not enough time for counsel to collect and file consent forms. Plaintiffs assert that in *Veliz,* this Court allowed 60 days. In *Gerlach,* the court set a 75-day deadline. See 2006 WL 824652 at \*4

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

(citing *Reab v. Electronic Arts, Inc.,* 214 F.R.D. 623, 632 (D.Colo.2002), in which the court approved a 60-day opt-in period). Plaintiffs suggest 90 days. The Court approves a 60-day notice peri- od.

Finally, Defendant contends that there are other (unidentified) changes in the notice that should be made to ensure that it does not favor either side. Defendant asks the Court to order the parties to meet and confer on appropriate language. As the parties have already been ordered to meet and con- fer regarding language about potential costs to Plaintiffs, Defendant's request is granted. However, delay will prevent progress on discovery matters. The parties are hereby ordered to meet within 10 days of the issuance of this order, and to promptly draft a mutually acceptable notice or inform the Court that they have been unable to do so.

### *CONCLUSION*

Based on the foregoing, IT IS HEREBY ORDERED THAT Plaintiffs' Motion for Condition- al Collective Action Certification is GRANTED.

IT IS SO ORDERED.

N.D.Cal.,2006.
Stanfield v. First NLC Financial Services, LLC
Slip Copy, 2006 WL 3190527 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2436477 (E.D.Cal.), 151 Lab.Cas. P 35,060
**2005 WL 2436477 (E.D.Cal.)**

**H**

Aguayo v. Oldenkamp Trucking
E.D.Cal.,2005.

United States District Court,E.D. California.
Eduardo AGUAYO, et. al, Plaintiff,
v.
OLDENKAMP TRUCKING, Defendants.
**No. CV F 04-6279 ASI LJO.**

Oct. 3, 2005.

Jerry Budin, Law Office of Jerry Budin, Modesto, CA, for Plaintiff.
David B. Chidlaw, Geoffrey David Deboskey, Sheppard Mullin Richter and Hampton, San Diego, CA, John Ward Beebe, Green And Azevedo, Sacramento, CA, for Defendants.

FINDINGS AND RECOMMENDATIONS ON
PLAINTIFF'S MOTION FOR CLASS CERTIFIC-
ATION (Doc. 18)

ONEILL, Magistrate J.
*1 Pursuant to a notice filed on August 5, 2005, plaintiff Eduardo Aguayo ("plaintiff") seeks to certify two classes in this matter. Defendant Oldenkamp Trucking filed an opposition on September 2, 2005. Plaintiff filed a reply on September 26, 2005. This matter was submitted on the pleadings without oral argument pursuant to Local Rule 78-230(h). Having considered the moving, opposition, and reply papers, as well as the Court's file, the Court issues the following order.

*FACTUAL AND PROCEDURAL BACKGROUND*

Plaintiff Eduardo Aguayo brings this action individually and on behalf of other truck drivers who now work or have worked for defendant Oldenkamp Trucking ("Oldenkamp"). Plaintiff alleges that Oldenkamp has a policy of requiring its truck drivers to work more than forty (40) hours a week without overtime payment. Plaintiff's complaint

contains two claims. The first claim for relief alleges a violation of the Fair Labor Standards Action ("FLSA"), 29 U.S.C. § 210 et seq. The second claim for relief alleges violation of the California Unfair Competition law ("UCL"), Cal.Bus. & Prof.Code § 17200 et seq.

Plaintiff seeks certification of two classes, one for each claim for relief. Plaintiff alleges he is a member of both classes. The first class (Class 1) is based on willful violations of the FLSA and incorporates the 3-year statute of limitations:

"All persons who are employed or have been employed by defendant Oldenkamp Trucking in the State of California who, on or after September 20, 2001, to the time of trial, have worked as a truck driver hauling milk from dairies to creameries and/ or cheese factories solely within the State of California and have worked in excess of forty (40) hours per week without being paid overtime compensation by Oldenkamp Trucking for those excess hours."

Class 1 would be certified under 29 U.S.C. § 216(b) which states in pertinent part:
An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and *other employees similarly situated.*

The FLSA allows one or more employees to pursue an action in a representative capacity for "other employees similarly situated." 29 U.S.C. § 216(b). This type of action, known as a "collective action," allows potential class members who are similarly situated to the named plaintiffs to file a written consent with the court to "opt in" to the case. *Morisky v. Public Serv. Elect. and Gas Co.,* 111 F.Supp.2d 493 (D.N.J.2000).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

The second class (Class 2) plaintiff proposes is based on the second claim for relief under UCL (formerly referred to as the Unfair Practices Act "UPA") and incorporates the 4-year status of limitations for such violations.

"All persons who are employed or have been employed by defendant Oldenkamp Trucking in the State of California who, on or after September 20, 2000, to the time of trial, have worked as a truck driver hauling milk from dairies to creameries and/ or cheese factories solely within the State of California and have worked in excess of forty (40) hours per week without being paid overtime compensation by Oldenkamp Trucking for those excess hours.

**\*2** This class would be certified under Fed.R.Civ.P. 23. The requirements for maintaining a Rule 23 class action are more fully discussed below.

The classes proposed by plaintiff are the same classes as this Court certified in the *Willis v. Cal-Western Transport,* CV-00-5695, *Baganha v. Cal. Milk Tranport,* CV-01-5729 and *Vasquez v. Jim Aartman, Inc.,* CV-02-5624 cases.

### ANALYSIS & DISCUSSION

A. FLSA Claim

1. Similarly Situated

To determine whether to certify the class, the main issue to be decided is whether the named plaintiffs are sufficiently "similarly situated" to the proposed opt-in plaintiffs that this case may proceed as a collective action. The FLSA provides that employees in interstate commerce shall be paid at one and one-half times their regular hourly rate for hours over forty in any work week. 29 U.S.C. § 207(a)(1). The FLSA allows one or more employees to pursue an action in a representative capacity for "other employees similarly situated" and is known as a

"collective action." 29 U.S.C. § 216(b); *Morisky v. Public Serv. Elect. and Gas Co.,* 111 F.Supp.2d 493 (D.N.J.2000).

As noted in the *Willis, B aganha* and *Vasquez* actions, Section 216(b) of the FLSA does not define the term "similarly situated," and there is little circuit law on the subject. As explained in the case of *Thiessen v. GE Capital Corp.,* 267 F.3d 1095, 1102-03 (10th Cir.2001), *cert. denied,*536 U.S. 934, 122 S.Ct. 2614, 153 L.Ed.2d 799 (2002), federal district courts have adopted or discussed at least three approaches to determining whether plaintiffs are "similarly situated" for purposes of § 216(b).*See, e.g., Mooney v. Aramak,* 54 F.3d 1207 at 1213 (5th Cir.1995) (discussing two different approaches adopted by district courts); *Bayles v. American Med. Response of Colo., Inc.,* 950 F.Supp. 1053, 1058 (D.Colo.1996). Under the first approach, a court determines, on an ad hoc case-by-case basis, whether plaintiffs are "similarly situated." *Thiessen v. GE Capital Corp; Mooney,* 267 F.3d at 1102-1103. In utilizing this approach, a court typically makes an initial "notice stage" determination of whether plaintiffs are "similarly situated." *Vaszlavik v. Storage Tech. Corp.,* 175 F.R.D. 672, 678 (D.Colo.1997). In doing so, a court " 'require[s] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." ' *Theissen v. GE Capital Corp; Mooney,* 267 F.3d at 1103. (quoting *Bayles,* 950 F.Supp. at 1066). At the conclusion of discovery (often prompted by a motion to decertify), the court then makes a second determination, utilizing a stricter standard of "similarly situated." *See Theissen v. GE Capital Corp; Mooney,* 267 F.3d at 1103. During this "second stage" analysis, a court reviews several factors, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; (3) fairness and procedural considerations; and (4) whether plaintiffs made the filings required by the ADEA before instituting suit." *Id.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

*3 Under the second approach, district courts have incorporated into § 216(b) the requirements of current Federal Rule of Civil Procedure 23. *See Theissen,* 267 F.3d at 1103;*Bayles,* 950 F.Supp. at 1060-61 (discussing cases adopting this approach). In a third approach, district courts have suggested incorporating into § 216(b) the requirements of the pre-1966 version of Rule 23, which allowed for "spurious" class actions. *See Bayles,* 950 F.Supp. at 1064.

*Wynn v. National Broadcasting Co.,* 234 F.Supp.2d 1067 (C.D.Cal.2002) echoes this two tier analysis. *Wynn* employed the two tier approach and noted the lenient standard for ruling on class certification at the notice stage. The Eleventh Circuit recently endorsed this "two-tiered" approach to certification of § 216(b) opt-in classes. *See Hipp v. Liberty National Life Ins. Co.,* 252 F.3d 1208, 1219 (11th Cir.2001) (two tiered approach is an effective tool).*Accord Brown v. Money Tree Mortg., Inc.,* 222 F.R.D. 676, 680 (D.Kan.2004) (the court will analyze plaintiff's motion under the lenient "notice stage" standard described above and, in doing so, looks to the substantial allegations in plaintiff's first amended complaint and various affidavits filed by plaintiff.) From review of many cases, this two-tier analysis is the most generally accepted. In addition, this is the analysis the Court has employed in prior similar motions.

Here, the case is more at the "notice" stage and not at the second stage. A preliminary scheduling order has been entered setting dates for class certification, but a trial date and the related pretrial dates have not been scheduled. Discovery has been limited to the issue of class certification. Discovery on the merits is not complete and the case is not ready for trial.*Morisky v. Public Serv. Elect. and Gas Co.,* 111 F.Supp.2d 493 (D.N.J.2000) (employing a stricter standard in analysis where case was beyond first stage.) Thus, the case is more at the notice stage due to the limitation in discovery and pretrial preparation.

At the "notice" stage, the representative plaintiffs

bear the burden of demonstrating that they and the class members they seek to represent are similarly situated. *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1097 (11th Cir.1996) (The plaintiffs bear the burden of demonstrating a "reasonable basis" for their claim of class-wide discrimination), *cert. denied,*519 U.S. 982, 117 S.Ct. 435, 136 L.Ed.2d 332 (1996). This burden, which is not "heavy," may be met by detailed allegations supported by affidavits. *Id.* at 1097.According to *Grayson,* under section 216(b), "plaintiffs bear the burden of demonstrating a 'reasonable basis' for their claim of class-wide discrimination, ... [and] plaintiffs may meet this burden, which is not heavy, by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary."*Id.* at 1097 (citations omitted); *Sperling v. Hoffman-La Roche, Inc.,* 118 F.R.D. 392, 406 (D.N.J., 1988), *aff'd in part and appeal dismissed in part,*862 F.2d 439 (3rd Cir.1988), *aff'd and remanded, Hoffman-La Roche, Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) ("Plaintiffs have made detailed allegations in their pleadings, and have supported those allegations with affidavits which successfully engage defendant's affidavits to the contrary. Plaintiffs' allegations, as supported, describe a single decision, policy, or plan of defendant's, infected by a discriminatory aspect which led to the termination and demotion of every member of the class plaintiffs wish to represent, and the reallocation of responsibilities among the remaining, generally younger workers.") Because the court generally has a limited amount of evidence before it, the initial determination is usually made under a fairly lenient standard and typically results in conditional class certification. *Leuthold v. Destination America, Inc.,* 224 F.R.D. 462, 467 (N.D.Cal.,2004)

*4 Here, the allegations in the complaint state the basis for the collective action. The detailed allegations in the complaint state that plaintiffs are truck drivers and former truck drivers who worked for Defendant Oldenkamp and who have not been paid

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

overtime compensation. (Complaint ¶ 1, 18, 20.) The complaint alleges that the members were employed by defendants during the liability period as truck drivers, regularly worked in excess of forty hours per week without overtime compensation and drove in intrastate transportation transporting milk from dairies to creameries. Thus, the allegations are detailed allegations setting out the specific conduct allegedly giving rise to liability. (Complaint ¶ 1 7, 21.)

Plaintiff submits his declaration in support of the motion. In plaintiff's declaration, he states he is a former truck driver for defendant. Plaintiff was employed by defendant for four months, from January 2004 to April 2004. His declaration, which purports to establish that other truck drivers have not been paid overtime, and which is challenged by defendant, states the purported goods and routes that the similar truck drivers:

Based on my personal observations of OLDEN-KAMP's operations that I gained during my employment with OLDENKAMP, I know that (a) none of the truck drivers have been paid overtime for any of the hours that worked in excess of forty and (b) other truck drivers that have worked out of the Ontario and Bakersfield terminals have done the same type of hauling that I have done, i.e. hauling raw milk from dairies to milk processing plants solely within California." (Aguayo Decl. ¶ 7.)

Aguayo estimates that there are approximately 30 other truck drivers who fit the class definition. (Aguayo Decl. para. 8.)

Defendant attacks the declaration on the grounds that the declarations are based on hearsay and lack of personal knowledge that plaintiff was only a four month employee.

The declaration may not be sufficient to carry the burden of proof at trial, but it is sufficient to carry the burden on this motion. A reasonable inference from the evidence submitted is that Aguayo, as an employee of defendant, would learn, during the normal course of his employment, how the employer operates, where the employer operates, what other similar employees are doing, and where they are doing there jobs.

However, the only real concern is that plaintiff Aguayo was a four month employee and it may be questionable that he gained all the knowledge he alleges. The declarant does not lay the foundation upon which his knowledge was based such as driver meetings, schedule reviews, performance reviews, etc. While the declaration does not identify the specific basis for the knowledge, it is reasonable that Aguayo would have spoken to his other co-workers, even during a short period of time, and learned who did what. Thus, the declaration supports the substantial allegations in the complaint.

Thus, the substantial allegations in the complaint supported by the declarations argue in favor of class certification.

2. Motor Carrier Exemption

**\*5** The defendant contends it is exempt from overtime due to the Motor Carrier Safety Exemption. Defendant contends that this defense precludes class certification because it requires a fact-specific inquiry at the class composition stage and at the liability stage of all plaintiffs as to whether the exemption applies to the particular plaintiff. Defendant contends that it is a unique inquiry, from that of *Willis, Baganha,* and *Vasquez* because defendant's operations are different. The difference is that defendant contends the class definition encompasses employees who drove interstate routes because an employee may not have themselves driven milk outside of California, but their route may be interstate by virtue of the ultimate destination of the produce. 29 CFR 782.7(b). Many routes, while driven intrastate, are nonetheless, interstate because the final destination of the product is outside of California. Defendant will need to analyze every employee's entire driving history for the class period.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

The FLSA provides that employees in interstate commerce shall be paid at one and one-half times their regular hourly rate for hours over forty in any work week. 29 U.S.C. § 207(a)(1). Plaintiff alleges that intra-state truck drivers are entitled to overtime compensation pursuant to 29 U.S.C. § 207(a), which provides:

(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

The FLSA provides many exceptions, one of which is the Motor Carrier exemption, 29 U.S.C. § 213(b)(1), which provides that the provisions of 29 U.S.C. § 207 shall not apply to:

(1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49.

Section 31502 of Title 49, in turn, authorizes the Secretary of Transportation, in the interest of safety, to establish "qualifications and maximum hours of service for employees" of motor carriers: The Secretary of Transportation may prescribe requirements for-

(1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and

(2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation.

The FLSA provides for overtime pay for employees generally. Section 213(b)(1) provides, however, that employees whose qualifications and maximum hours of driving are subject to regulation by the Secretary of Transportation under the Motor Carrier Safety Act are exempt from the overtime provisions of § 207(a). The Secretary of Transportation has power to regulate transportation
**\*6** 1) between a place in-

(A) a State and a place in another State;

(B) a State and another place in the same State through another State;

Thus, interstate commerce falls within the jurisdiction of the Secretary of Transportation and is exempt from coverage under FLSA. Moreover, the Secretary of Transportation has jurisdiction to regulate intrastate commerce that "is a practical continuity of movement from the manufacturers or suppliers without the state, through a warehouse and on to customers."*Klitzke v. Steiner,* 110 F.3d 1465, 1469 (9th Cir.1997). Whether such intrastate commerce is exempt is determined on an ad hoc basis: "Whether transportation is interstate or intrastate is determined by the essential character of the commerce, manifested by shipper's fixed and persisting transportation intent at the time of the shipment, and is ascertained from all of the facts and circumstances surrounding the transportation."*Id.* at 1469.

3. Individualized Inquiry

Defendant argues that the class definition at issue in the instant motion is improper because an intensive individualized inquiry will have to be performed to determine whether each potential member has driven outside California.

The Supreme Court has examined the interaction between FLSA and the Motor Carrier Act. The Court has mandated that the critical consideration in determining whether the Motor Carrier Act governs a motor carrier employee and so exempts him from FLSA is whether that employee's *activities* "affect safety of operation." *United States*

*v. American Trucking Assn.,* 310 U.S. 534, 553, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) (emphasis added); see also *Levinson v. Spector Motor Service,* 330 U.S. 649, 671, 67 S.Ct. 931, 91 L.Ed. 1158 (1947) ( "the fundamental test is simply that the employee's activities affect safety of operation."). The Code of Federal Regulations state that an individual's activities are determinative of the interstate nature of the work. In order for the Secretary of Transportation to have power to establish qualifications and maximum hours of service, the employees must have been "... and (2) *engage[d] in activities* of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act."29 C.F.R. § 782.2(a) (emphasis added). Thus, as was noted in the other class certification, the focus of the inquiry is on the individual's activities.

Defendant cites to *Morisky v. Public Serv. Elec. & Gas Co.,* 111 F.Supp.2d 493 (D.N.J.2000), regarding inappropriateness of class treatment, is inapposite. *Morisky* dealt with whether employees were administrative employees such that they were exempt from overtime. Administrative functions are based on subjective criteria. There, the seven named plaintiffs held several different job titles and some with identical titles performed different types of duties. *Id.* at 495-96, 498-99.Although they sought to represent 141 other employees who also were not paid overtime wages, the plaintiffs made no showing that the job responsibilities of the other employees were the same or similar to theirs, and the defendant used employee questionnaires that showed a wide divergence of positions and job duties among the purported class members. In the truck drivers case, there is objective criteria.

*7 Records can be reviewed to eliminate the drivers involved in interstate transportation and if necessary all truck drivers who were involved in the interstate transportation. Moreover, *Morisky* was a stage two case, where plaintiffs have already opted in. *See also Scott v. Aetna Services, Inc.,* 210 F.R.D. 261 (D.Conn.2002) (suit by engineers under the FLSA was certified, and court denied decertification notwithstanding the defense that the engineers were "exempt" requiring individualized inquiry.) *See Watkins v. Ameripride Services,* 375 F.3d 821 (9th Cir.2004) (where uniforms were purchased from out of state and held in a warehouse until later sold, trip from warehouse to customer was intrastate and the drivers were not subject to section 13(b)(1)); *Packard v. Pittsburgh Transp. Co.,* 418 F.3d 246 (3rd Cir.2005) (Motor Carrier Act (MCA) exemption from Fair Labor Standards Act's (FLSA) overtime protection was not applicable to drivers who provided intrastate transportation within a defined service area, which included railroad and bus stations, to elderly and disabled persons pursuant to federally-funded program).

Defendant submitted evidence that it has its terminals in Bakersfield and Ontario. (Oldenkamp ¶ 5.) The drivers engage in interstate hauling including "overnight trips across state lines to Utah and Nevada and intra-state trips and the inter-state routes because the product is dropped off and then taken out of state."(Oldenkamp ¶ 5.) Defendant solicits interstate work. (Oldenkamp ¶ 6.) The defendant's "drivers do not drive the same routes and a given driver's route can change."(Oldenkamp ¶ 7.) Defendant states that at times the route may stay the same, the "interstate character of the route can change from day to day because the ultimate destination of the product may change."(Oldenkamp ¶ 7.)

The evidence submitted by defendant in opposition is fairly conclusory. Implicit in defendant's evidence is that all trips are interstate because the product may go out of state. The evidence does not state whether the product dropped off is processed, but it seems only logical that in some instances, milk dropped off at plants is for processing or for incorporating into another product. The "practical continuity of interstate commerce" can be broken by processing of the product. *Kimball v. Goodyear Tire and Rubber Co.,* 504 F.Supp. 544

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

(E.D.Tex.1980) held there was an interruption in the "practical continuity" when a product clearly came to rest instate and was refined and changed by chemical processing. Thus, the logical inference from the current evidence demonstrates that the "practical continuity" of the intra-state hauls may be broken by processing, and thus, any individualized inquiry is minimized. Exemptions to the FLSA are "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."*Bilyou v. Dutchess Beer Distributors, Inc.,* 300 F.3d 217, 222 (2nd Cir.2002).

**\*8** At this early stage of the class proceeding, all that is required for class certifications is substantial allegations supported by declarations. Plaintiff has satisfied this burden.[FN1]

> FN1. Indeed, plaintiff may show a prima facie case without an individualized inquiry. An employee seeking to recover unpaid minimum wages or overtime under the FLSA "has the burden of proving that he performed work for which he was not properly compensated."*Brock v. Seto,* 790 F.2d 1446 (9th Cir.1986); *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946)."[A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of a just and reasonable inference."*Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515. The burden then shifts to the employer to show the precise number of hours worked or to present evidence sufficient to negate "the reasonableness of the inference to be drawn from the employee's evidence."*Id.* at 688, 66 S.Ct. at 1192. The employer bears the bur-

den of proof that an exemption applies. "Employers who claim an exemption applies to their employees must show that the employees fit plainly and unmistakably within its terms."*Worthington v. Icicle Seafoods, Inc.,* 774 F.2d 349, 352 (9th Cir.1984). In this case, plaintiff's could prove a prima facie case as a collective action because there are no individualized inquiries in the prima facie case.

4. Involvement by the Department of Labor

Defendant argues that DOL has contacted it to resolve the same overtime issues. Defendant says that it would be more economical, efficient and productive for the class members to have the issues resolved by DOL.

Section 29 USC § 216(b) provides that:

No employee shall be a party plaintiff to any ... action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.... The right provided by this subsection to bring an action by or on behalf of any employee, and the right of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the Secretary of Labor in an action under section 217 of this title. (Emphasis added.)

The evidence submitted by defendant in support of its contention that the DOL is involved and will be resolving the issues is highly conclusory. The evidence consists of a single statement by the attorney that defendant has been "contacted" by DOL and DOL is "investigating" the same allegations.

This evidence is insufficient to establish that the DOL is involved and will be prosecuting an action against defendant. There is no evidence that DOL filed a complaint pursuant to 28 USC §§ 216(b), 217. Should the DOL institute an action or if a consent decree is entered, defendant may bring a motion to decertify the class.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

B. Second Claim for Relief under UCL

Defendant argues that the UCL claim is preempted and also that plaintiff has not carried his burden of satisfying the Rule 23 class requirements.

1. Pre-Emption

Defendant argues that the second class under UCL, based on the opt-out provision of Fed.R.Civ.P. 23, is preempted by the Portal to Portal Act, as a means of enforcement of FLSA violations. Defendant argues that the Portal to Portal act represents an expansive scheme that was designed by Congress to be the exclusive vehicle for the vindication of FLSA rights enacted to limit the coverage of the FLSA. *Ballou v. General Elec.*, 433 F.2d 109, 112 (1st Cir.1970). Defendant says that it does not contend that the FLSA preempts state wage law, but instead defendant contends that by creating a detailed enforcement scheme that was designed expressly to avoid varied and expansive interpretations of the FLSA, Congress occupied the field of the vindication of the FLSA. Defendant contends that the Portal to Portal Act is the only means by which FLSA rights can be vindicated. 29 USC § 218. *Zombro v. Baltimore City Police Dept.*, 868 F.2d 1364, 1369 (4th Cir.1989), 498 U.S. 850 (1989).

a. Portal to Portal

In 1938, Congress enacted the Fair Labor Standards Act to govern the maintenance of standard hour and wage practices. The FLSA requires employers to pay their employees at least a specified minimum hourly wage for work performed, 29 U.S.C. § 206, and to pay one and one-half times the employee's regular rate of pay for hours worked in excess of forty hours per week, 29 U.S.C. § 207. The legislation propelled thousands of portal-to-portal lawsuits. The term "portal to portal" represents an employee's work day from starting time to quitting time. *Jewell Ridge Coal Corp. v. United Mine Workers*, 325 U.S. 161, 188, 65 S.Ct. 1063, 89 L.Ed. 1534 (1945) (Jackson, J., dissenting); *Con-*

*nors v. Beth Energy Mines, Inc.*, 920 F.2d 205, 208 (3d Cir.1990) (work day was eight hours from portal-to-portal including thirty minutes for lunch). Responding to this increase in litigation, Congress sought "to define and limit the jurisdiction of the courts" through the Portal-to-Portal Act, Pub.L. No. 80-49, ch. 52, § 1(b)(3), 61 Stat. 85 (1947).93 Cong. Rec. 2,087 (1947) ( "[T]he attention of the Senate is called to a dramatic influx of litigation, involving vast alleged liability, which has suddenly entered the Federal courts of the Nation."). Noting the "immensity of the [litigation] problem," *id.* at 2,082, Congress attempted to strike a balance to maintain employees' rights but curb the number of lawsuits. Under the Portal-to-Portal Act, an FLSA action for overtime pay could be maintained by "one or more employees for and in behalf of himself or themselves and other employees similarly situated."29 U.S.C. § 216(b). But the statute contained an express opt-in provision: "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."*Id.* Because the Portal-to-Portal Act amendment changed participation in an FLSA class from "opt-out" to "opt-in," FLSA plaintiffs could not certify a class under Fed.R.Civ.P. 23, even though federal subject matter jurisdiction obtained. *E.g., Lusardi v. Lechner*, 855 F.2d 1062, 1068 n. 8 (3d Cir.1988) ("Courts have generally recognized that Rule 23 class actions may not be used under FLSA § 16(b).")

b. The District Court Judge's Order

*9 In the *Willis* case, the District Court Judge assigned to the case, Judge Ishii ("Judge Ishii") considered nearly the identical argument by the defendant in that case, Cal-Western Transport ("CWT"). In *Willis*, CWT also argued that the FLSA was the exclusive means for enforcement of their claim. As Judge Ishii summarized the argument:

"Plaintiffs' attempt to pursue the alleged failure to pay overtime ... as [an UPA claim] contravenes the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

specific remedial procedures that Congress has declared to be the exclusive means for remedying violations of the FLSA."(*Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p. 7.)

In *Willis,* CWT argued that UPA's more favorable remedies, such as the longer statute of limitations, different rules governing injunctive relief, and a potentially easier class certification process, were preempted, citing congressional findings, as does defendant in this motion.

Judge Ishii extensively analyzed the issue of preemption.[FN2]Judge Ishii analyzed *Williamson v. General Dynamics Corp.,* 208 F.3d 1144, 1149-1150 (9th Cir.2000), *cert. denied,*531 U.S. 929, 121 S.Ct. 309, 148 L.Ed.2d 247 (2000) for the three types of preemption: (1) express preemption; (2) filed preemption, and (3) conflict preemption. (*Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p. 16.) Judge Ishii found neither express preemption nor field preemption applied. (*Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p. 16, 17.) Defendant argues the FLSA contains a "detailed enforcement scheme" and "expansive interpretations." (opposition papers p. 16.) Judge Ishii held that field preemption did not apply:

> FN2. In *Vasquez v. Aartman,* Judge Ishii also relied upon the *Willis* order. (*Vasquez v. Jim Aartman, Inc.,* CV-02-5624, Doc. 55, p.8.)

" 'Field preemption' occurs 'where state law attempts to regulate conduct in a field that Congress intended the federal law exclusively to occupy.'Field preemption is a 'potent' species of preemption, because under field preemption, any state regulation is preempted even if it does not actually conflict with the federal law.

"CWT does not specifically argue that the FLSA preempts the field in this case, although its

'structure and purpose' argument could possibly be construed as such a contention. If this is CWT's argument, it must be rejected. The Ninth Circuit has already ruled in *Williamson,* a case in which no FLSA claim was pled but the defendant argued that the FLSA nevertheless preempted the plaintiffs' state common law fraud claims, that '[a]lthough this lawsuit does not invoke California's wage and hour laws, the FLSA's 'savings clause' is evidence that Congress did not intend to preempt the entire field.'(*Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p. 17.) (Citations omitted)

Judge Ishii found that due to the presence of the savings clause, "field preemption" did not apply.

As to conflict preemption, Judge Ishii noted the two kinds: (1) impossibility to comply with both state and federal requirement, or (2) state law stands as an obstacle to accomplishment of the congressional objectives. (*Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p.17-18.) Judge Ishii said that impossibility of compliance with both state and federal standards does not apply. On the issue of the second kind of conflict preemption, Judge Ishii held:

**\*10** "Whether state law 'stands as an obstacle to the accomplishment' of congressional objectives is a more difficult question. To the extent that by passing the statute of limitations found in section § 255(a), Congress intended to reduce the 'varying and extended periods of time for which, under the laws of the several States, potential retroactive liability may be imposed upon employers,'29 U.S.C. section 251, imposition of the UPA's four-year limitations period would arguably be an obstacle. However, the obstacle imposed would appear relatively minor-in some cases the difference between three years and four, and in others between two and four. Moreover, as also stated above, the FLSA's limitations period by its terms only applies to actions 'under the Fair Labor Standards Act of 1938.'29 U.S.C. § 255. It does not purport to apply

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

to state law wage claims, whether brought in federal court as supplemental claims or filed separately in state court. Congress was presumably free at any time to enact a statutory provision eliminating the savings clause or stating that the FLSA was intended to have preemptive force, but it has not yet done so. On the other hand, as the Ninth Circuit specifically found in *Williamson,* 'the *principal purpose* of the FLSA is to protect all covered workers from substandard wages and oppressive working hours.'208 F.3d at 1150 (quotation and citations omitted; emphasis added).'In contrast to the Labor Management Relations Act, which was designed to minimize industrial strife and to improve working conditions by encouraging workers to promote their interests collectively, the FLSA was designed to give specific minimum protections to individual workers....'*Id.*(citations and quotations omitted). If the goal of the FLSA is generally to protect workers and their right to minimum wages and overtime, no real threat to accomplishment of that goal is posed by the UPA. This seems particularly true in this case, where the result will be not to raise the minimum wage or shorten the workweek but (assuming that the FLSA does indeed supply the correct standard) merely to look back longer in time, and thereby consider a greater number of violations of the *federal* law.

Neither of the first two types of preemption-"express preemption" and "conflict preemption"-applies in this case. In light of the Ninth Circuit's statement that the FLSA's "principal purpose" is to "protect all covered workers from substandard wages and oppressive working hours," combined with the fact that the UPA if applied here will at most permit Plaintiffs to recover for a greater number of violations of federal law, the UPA appears to pose no obstacle to the objectives of the FLSA, and "conflict preemption" is therefore inapplicable. *(Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p.17-18) (citations and footnotes omitted)

Accordingly, Judge Ishii has carefully considered

the preemption arguments made herein and fully rejected it.[FN3]There is no justification for this Court to overrule Judge Ishii.

> FN3. Indeed, Judge Ishii considered the argument in *Willis,* in one form or another, on multiple occasions and rejected it each time. See Order on Motion for Reconsideration, Doc. 54, filed May 10, 2001; Order Denying motion for Summary Judgment, Doc. 97 filed Jan. 24, 2002.

2. Savings Clause

*11 The FLSA savings clause provides:

"No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minium wage higher than the minimum age established under this chapter or maximum work week lower than the maximum workweek established under this chapter, and no provision of this chapter relating to the employment of child labor shall justify noncompliance with any Federal or State law or municipal ordinance establishing a higher standard than the standard established under this chapter."29 U.S.C. § 218(a).

Defendant argues that the FLSA's savings clause does not change the result that the FLSA is the sole mechanism for the vindication of rights based on the FLSA. Defendant argues that California may institute and enforce its own minimum wage and overtime laws, but may not devise a different mechanism for the vindication of the FLSA rights.

Judge Ishii has also considered this argument and rejected it in the *Willis* case.

"Section 218(a) permits states to, in essence, set higher substantive standards than the federal government regarding wages and hours.... [T]he UPA is not being used here as a statute that requires a 'minimum wage higher than' under the FLSA, or a '[maximum workweek lower than' under the FLSA. It is being used solely to extend the statute of limit-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

ations, and for Plaintiffs to avail themselves of more favorable *remedies.*The 'minimum wage' and 'maximum workweek' according to Plaintiffs' UPA claim is identical to that under the FLSA; the very wrong that Plaintiffs complain of under the UPA is the FLSA violation. Therefore, the literal language of the 'savings clause' does not apply to Plaintiffs' claim under the UPA."*(Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p.14-15.)

Again, the District Court Judge fully considered this argument and rejected it.

3. Requirements of Rule 23

Plaintiff also alleges that the failure to pay overtime compensation as required by 29 U.S.C. § 207(a) is a violation of the California Competition Law ("UCL"). UCL prohibits entities from engaging in unfair competition, including unlawful, unfair or fraudulent business practices. A class for this violation must satisfy Fed.R.Civ.P.23.

All class actions under Rule 23 must meet four prerequisites:

1. Numerosity,

2. Commonality,

3. Typicality,

4. Adequacy of representation.

The burden on the motion is on the party seeking to maintain the class action. In this case, plaintiff must establish a prima facie showing of each of the elements of Rule 23(a) prerequisites and the appropriate 23(b) ground for a class action. *Taylor v. Safeway Stores, Inc.* 524 F.2d 263, 270 (10th Cir.1975). Plaintiffs need only present sufficient proof to allow the court to come to a "reasonable judgment" on each requirement. *Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir.1975), *cert. denied,*429 U.S. 816 (1976).

*12 Numerosity: This element is disputed in that defendant contends the class will consist of at most 34 truck drivers. In his reply brief, plaintiff does not dispute the number claimed by defendant, but contends that smaller classes under Rule 23 have been certified.

Numerosity is not a requirement for certification of the collective action under the FLSA.

For a Rule 23 class, the class must be so numerous that joinder of all members individually is "impracticable." Fed. R.Civ.P. 23(a)(1). No specific numerical threshold is required; each case must be examined. *General Tel.C. v. E.E.O.C.,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) (15 is too small a class). Generally, 40 or more members will presumptively satisfy the numerosity requirement. *Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2nd Cir.1995), *cert. denied,*515 U.S. 1122 (1995). Numerosity may be shown where the number is so large that it would be impossible to join every class member: i.e., 'impracticability' does not mean 'impossibility.' *Robidoux v. Celani,* 987 F.2d 931, 935 (2nd Cir.1993). Other factors considered when determining whether joinder is impracticable are: 'the geographical diversity of class members, the ability of individual claimants to institute separate suits, and whether injunctive or declaratory relief is sought.'*Id.,* at 936.

Defendant cites *Monarch Asphalt Sales Co., Inc. v. Wilshire Oil Co. of Texas,* 511 F.2d 1073, 1077 (C.A.Okl.1975) for the proposition that a class of 37 was not numerous. In *Monarch Asphalt,* the court decided without analysis that joinder of all members was impracticable. More significantly, the court denied certification on other grounds, that the class representative was not a member of the class. In *Moreland v. Rucker Pharmacal Co., Inc.,* 63 F.R.D. 611, 614 (W.D.La.1974), the court stated that although mere numbers alone are not determinative, joinder has been held preferable where the number of prospective members is between thirty and forty. Many other cases have addressed the is-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

sue. *See, e. g., Kelly v. Market USA,* 2002 WL 1334830, 3 (D.Kan.,2002) (three class members); *General Tel. Co. of the Northwest, Inc.,* 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (15 class plaintiffs too small); *Monarch Asphalt Sales Co. v. Wilshire Oil Co., Inc. of Texas,* 511 F.2d 1073, 1077 (10th Cir.1975) (37); *Peterson v. Albert M. Bender Co.,* 75 F.R.D. 661, 667 (N.D.Cal.1977) (too small 35-45); *Murray v. Norberg,* 423 F.Supp. 795, 798 (D.R.I.1976) (fewer than 20); *Chmieleski v. City Products Corp.,* 71 F.R.D. 118, 150-151 (W.D.Mo.1976) (22); *Lopez v. Jackson County Bd. of Supervisors,* 375 F.Supp. 1194, 1196-1197 (S.D.Miss.1974) (16); *Moreland v. Rucker Pharmacal Co.,* 63 F.R.D. 611, 613-614 (W.D.La.1974) (26); *Anderson v. Home Style Stores, Inc.,* 58 F.R.D. 125, 130-131 (E.D.Pa.1972) (18).

For certification of the class under Rule 23, there is no bright line for a potential class of 34. A class of 40 is presumptively numerous and a class of 15 is presumptively too small for certification. A class of 34 is more towards the presumptive "numerous" class. In addition, other factors weigh in favor of "numerosity." Joinder of the plaintiffs, may be possible, but it is most likely impracticable. The plaintiffs are truck drivers who likely live near both of defendant's terminals, Bakersfield, which is within this District, and near Ontario, which is outside this district. It would likely be difficult for individuals to prosecute in this distant forum. Moreover, defendant argues these truck drivers are "motivated" to institute suit as individuals, since they were highly compensated. However, some of the potential class members are still employed with defendant and are unlikely to institute action against their employer. *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir.1999) (fear of retaliation at their jobs is an additional factor to consider in class certification), *cert. denied,* 518 U.S. 620 (1999). Thus, the Court finds that the class is "numerous."

**\*13** Commonality: There must be questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2).

A "common nucleus of operative facts" is usually enough to satisfy the commonality requirement. *Rosario v. Livaditis,* 963 F.2d 1013, 1017-18 (7th Cir.1992), *cert. denied,* 506 U.S. 1051, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993).

Defendant's argument is that an individualized inquiry is necessary as to each class member and therefore their claims are not common.

As shown above, there is commonality of the claims. There is commonality of facts for each truck driver and commonality of the law.

Typicality: The claims or defenses of the class representative must be typical of the claims or defenses of the class. Fed.R.Civ.P. 23(a)(3). The named plaintiff must be a member of the class. *Bailey v. Patterson,* 369 U.S. 31, 32 -33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962).

Defendant argues that the claim of the proposed class representative is not typical because he was employed only from January 2004 through April 2004. However, the time period, while not expansive, is within the limitations period. There is no evidence before the Court that defendant's operations or policy has changed such that the limited duration of plaintiff's employment would make his claims *a* typical.

Adequacy of Representation: The person representing the class must be able "fairly and adequately to protect the interests" of all members in the class.Fed.R.Civ.P. 23(a)(4). The representation is "adequate" if the attorney representing the class is qualified and competent and the class representatives are not disqualified by interests antagonistic to the remainder of the class.*Lerwill v. Inflight Motion Pictures, Inc.* 582 F.2d 597, 512 (9th Cir.1978).

There is not any real dispute as to the adequacy of representation.

Law or Fact Common Predominate

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

In addition to the above, a class action under Rule 23 must have common questions of law or fact that predominate over individuals' questions:

The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

At this stage of the litigation, the common questions of law, the overtime requirements, and the common questions of fact predominate.

*CONCLUSION*

For the reasons stated above, the Court RECOMMENDS that the Motion to Certify Class Action be GRANTED under 29 U.S.C. § 216(b) and Federal Rule of Civil Procedure 23.

The Court RECOMMENDS that the collective and class be certified as follows:

Collective action under the FLSA:

"All persons who are employed or have been employed by defendant Oldenkamp Trucking in the State of California who, on or after September 20, 2001, to the time of trial, have worked as a truck driver hauling milk from dairies to creameries and/ or cheese factories solely within the State of California and have worked in excess of forty (40) hours per week without being paid overtime compensation by Oldenkamp Trucking for those excess hours."

**\*14** Class action under the UCL:

"All persons who are employed or have been employed by defendant Oldenkamp Trucking in the State of California who, on or after September 20, 2000, to the time of trial, have worked as a truck driver hauling milk from dairies to creameries and/ or cheese factories solely within the State of California and have worked in excess of forty (40) hours per week without being paid overtime compensation by Oldenkamp Trucking for those excess hours.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst,* 951 F.2d 1153 (9th Cir.1991).

IT IS SO ORDERED.

E.D.Cal.,2005.
Aguayo v. Oldenkamp Trucking
Not Reported in F.Supp.2d, 2005 WL 2436477 (E.D.Cal.), 151 Lab.Cas. P 35,060

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                     Page 1
Not Reported in F.Supp.2d, 2007 WL 707475 (N.D.Cal.)
**2007 WL 707475 (N.D.Cal.)**

▷
Beauperthuy v. 24 Hour Fitness USA, Inc.
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
    United States District Court,N.D. California.
    Gabe BEAUPERTHUY, et al. on behalf of them-
    selves and all others similarly situated, Plaintiffs,
                        v.
    24 HOUR FITNESS USA, INC., a California cor-
    poration d/b/a 24 Hour Fitness; Sport and Fitness
    Clubs of America, Inc., a California corporation d/
                 b/a 24 Hour Fitness, Defendants.
                   **No. 06-0715 SC.**

                    March 6, 2007.

Thomas G. Foley, Jr., Philip D. Dracht, Foley
Bezek Behle & Curtis, LLP, Santa Barbara, CA,
Richard E. Donahoo, Santa Ana, CA, for Plaintiffs.
Henry D. Lederman, Littler Mendelson, P.C., Wal-
nut Creek, CA, Lisa Chagala, Littler Mendelson,
San Francisco, CA, for Defendants.

*ORDER GRANTING IN PART AND DENYING IN
PART PLAINTIFFS' MOTION FOR FACILITATED
NOTICE PURSUANT TO 29 U.S.C. § 216(b)*

SAMUEL CONTI, United States District Judge.

**I. *INTRODUCTION***

**\*1** Before the Court is a Motion by Plaintiffs Gabe
Beauperthuy *et al.* ("Plaintiffs") for Facilitated No-
tice Pursuant to 29 U.S.C. § 216(b). The Motion
seeks conditional certification of a Fair Labor
Standards Act (FLSA) collective action, a tolling of
the applicable statute of limitations, approval of
their proposed opt-in notice form, and an order
granting them limited related discovery. Defendants
24 Hour Fitness USA, Inc. *et al.* ("24 Hour Fitness"
or "Defendants") have opposed the Motion. For the
following reasons, the Motion is GRANTED in part
and DENIED in part.

**II. *BACKGROUND***

The Court's April 11, 2006 Order Denying Defend-
ants' Motion to Dismiss and Granting Defendants'
Motion for a More Definite Statement discussed the
substance of the underlying dispute between the
parties. Familiarity with it is assumed. The follow-
ing, in part, reiterates the Background section of the
Court's Order Denying Defendants' Motion to Re-
quire Amendment of Pleadings by Plaintiff.

This case first came before the Court on February
1, 2006. *See*Docket No. 1. However, two prior re-
lated actions, one initiated in 2003 and the other in
2004, are relevant to the resolution of the instant
motion.

                *Boyce Federal Action*

The first of the related actions was a case filed on
October 29, 2003 in the Southern District of Cali-
fornia, *Boyce v. Sports and Fitness Clubs of Amer-
ica,* No. 03-CV-2140 (S.D.Cal.), alleging various
violations of California and federal law *("Boyce").
See Boyce* Docket No. 1.[FN1]*Boyce* was brought as
a "class action" under both the FLSA and Federal
Rule of Civil Procedure 23. *Id.* at 3. The caption of
the complaint lists as plaintiffs "Robert L. Boyce,
Jr. and Stephanie Shelter, individuals for them-
selves, on behalf of all others similarly situated and
on behalf of the general public."*Id.* at 1.

> FN1. The Court hereby takes judicial no-
> tice of the filings and orders in the *Boyce*
> action. Citations to these filings and orders
> will be in the following form: "*Boyce*
> Docket No.." According to a declaration
> filed in *Boyce* by counsel for Plaintiffs in
> the instant action, the first filed complaint
> in the consolidated action which became
> *Boyce* was *Levine et al. v. 24 Hour Fitness
> USA, Inc., et al.,* No. 02CC00386 filed in
> the Orange County Superior Court on
> December 31, 2002. *See Boyce* Docket No.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2007 WL 707475 (N.D.Cal.)
Not Reported in F.Supp.2d, 2007 WL 707475 (N.D.Cal.)
**2007 WL 707475 (N.D.Cal.)**

Case 4:07-cv-02993-CW    Document 36    Filed 07/25/2008    Page 103 of 125
Page 2

104, ¶ 29.

On October 13, 2004, the *Boyce* plaintiffs filed a motion for conditional certification of an FLSA collective. *See Boyce* Docket No. 49.The *Boyce* motion for conditional certification contains roughly the same allegations as Plaintiffs' instant Motion and seeks to cover roughly the same persons. *See id.;*Motion. The important difference between the two is that the instant Motion seeks certification of a class limited to qualifying persons employed by 24 Hour Fitness *not* in California, *see Motion,* while the *Boyce* motion contains no such geographic limitation. *See Boyce* Docket No. 49.The *Boyce* court never ruled on the motion for conditional certification because the plaintiffs withdrew the motion before a ruling after reaching settlement with 24 Hour Fitness. *See Boyce* Docket No. 83.Circumstances surrounding the settlement of the *Boyce* action and the terms of the settlement are discussed below.

### Allen Arbitration-Part 1

On July 2, 2004, approximately six months after the complaint in *Boyce* was filed, another group of 24 Hour Fitness employees initiated a "class action" arbitration against 24 Hour Fitness at the American Arbitration Association ("AAA"), titled *Allen et al. v. Sport and Fitness Clubs of America, et al.* (AAA Case No. 11-160-03041-04), alleging violations of the California Labor Code *("Allen"). See* Foley Decl., Ex. 4. According to Plaintiffs' Opposition to Defendants' More Motion for a Definite Statement, the *Allen* claimants are coextensive with Plaintiffs in the instant action, and were represented by the same counsel. *See* Opposition to Defendants' Motion for a Definite Statement.

**\*2** After its initiation, the *Allen* matter bounced between the AAA and the Los Angeles Superior Court for over a year. The AAA initially refused to hear the matter because it has a policy against hearing class actions without a court order appointing them to do so. In response, on November 4, 2004,

24 Hour Fitness filed a petition in Superior Court to compel arbitration with certain putative members of the class, on an individual basis. *See* Defendants' Request for Judicial Notice ("DRJN"), Ex. A. The Superior Court granted the petition on December 17, 2004. *See id.,* Ex. B.

### Boyce Settlement Mediation

Soon after the Superior Court issued its ruling compelling arbitration with certain *Allen* claimants on an individual basis, a mediation was held to settle the *Boyce* matter, to which 24 Hour Fitness invited both the attorneys for the *Boyce* plaintiffs (*"Boyce* Attorneys") and the attorneys for the *Allen* claimants, and now Plaintiffs ("Allen Attorneys").*See Boyce* Docket No. 104.The result appears to have been a situation wherein the *Boyce* Attorneys and the *Allen* Attorneys fought one another for the attentions of 24 Hour Fitness; the *Boyce* Attorneys ultimately prevailed. *See Id.*

According to the *Allen* Attorneys, on December 17, 2004, 24 Hour Fitness invited both sets of attorneys to a settlement mediation scheduled for January 18 and 19, 2005 in San Francisco. *Id.,* ¶ 10.The *Allen* Attorneys agreed to attend only after 24 Hour partially mitigated their initial objection to attending on the grounds that they had inadequate information from which to properly make damages evaluations for settlement. *Id.,* ¶ 12.However, once the *Allen* Attorneys arrived, they were excluded from the mediation sessions, apparently because of opposition to their attendance on the part of the *Boyce* Attorneys. *Id.,* ¶¶ 13.

Undeterred, and apparently with assurances from 24 Hour Fitness that they would be allowed some sort of participation, the *Allen* Attorneys continued to "hang out" at the mediation site for four days, but were never allowed to participate in the mediation. *Id.,* ¶¶ 13-16.At one point on the fourth day, January 21, 2004, the *Allen* Attorneys and *Boyce* Attorneys discussed cooperating but could not reach an agreement, particularly as it related to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

fees. *Id.,* ¶ 17.Finally, at one point that day, counsel for 24 Hour Fitness informed the *Allen* Attorneys he was making progress negotiating a settlement with the *Boyce* Attorneys, and that the *Allen* Attorneys' "presence was no longer necessary." *Id.,* ¶ 20.

### Allen Arbitration Part 2

On January 20, 2005, the *Allen* claimants, in apparent response to their exclusion from the settlement mediation, submitted a Second Amended Statement of Claim to the AAA which added collective claims under the FLSA. *See* Foley Decl., Ex. 9. On March 1, 2005, 24 Hour Fitness responded by filing a motion in Superior Court to stay the *Allen* arbitration. *See Boyce* Docket No. 104, Ex. 9. The motion argued the *Allen* arbitration should be stayed because the pending settlement of the *Boyce* action "would provide a remedy to the very classes [the *Allen* claimants] now purport to represent."*Boyce* Docket No. 104, Ex. 9. On March 9, 2005, the Superior Court denied the motion. *See id.,* Ex. 11.

### Final Settlement of the Boyce Litigation

**\*3** On April 22, 2005, 24 Hour Fitness and the plaintiffs in *Boyce* submitted a joint application for approval of settlement. *See Boyce* Docket No. 84.The application proposed dividing a total of $38 million between four classes of 24 Hour Fitness' current and former employees in the following manner: "$12.4 million to the Managers Class, $4.6 million to the Commission Class, $1.5 million to the Uniform Class, and $19.5 million to the Hourly Class."*Id.* at 8. Membership in all four classes was limited to persons who were working in qualifying positions for 24 Hour Fitness *"in the state of California,"* during designated periods. *Id.* at 9, 10, 11 (emphasis added).[FN2] The designated periods were: for the Managers Class, December 31, 1998 through date of the order approving the settlement, *id.* at 9.; for the Commission class, the same, *id.;* for the Uniform Class, May 11, 2000 through date of the order approving the settlement, *id.* at 10; for

the Hourly Class, October 29, 1999 through date of the order approving the settlement. *Id.* at 11.

> FN2. The proposed settlement agreement also included settlement, on an individual basis, of four non-California employees who had already joined the *Boyce* action. *See Boyce* Docket No. 85 at 26.

On May 19, 2005, the *Allen* claimants made a motion in the *Boyce* action to stay the action pending arbitration or in the alternative to intervene. *See Boyce* Docket No. 103.The motion was based almost entirely on the grounds that approving the proposed settlement would infringe on the *Allen* claimants' right to resolve their claim against 24 Hour Fitness through arbitration. *See id.*

On October 31, 2005, the *Boyce* court denied the *Allen* claimants' motion to stay or intervene, *see Boyce* Docket No. 181, and conditionally approved the proposed settlement as described above. *See Boyce* Docket No. 180.On January 24, 2006, the court issued its final approval of the settlement. *See Boyce* Docket No. 204.

### Allen Arbitration Part 3

During the period in which the *Boyce* settlement made its way towards final approval, the *Allen* arbitration stumbled along.

On April 13, 2005, the AAA ruled that a provision in the Arbitration Agreement purporting to forbid arbitration of class claims was unconscionable. *See* Lederman Decl., Ex. A. 24 Hour Fitness successfully petitioned the Superior Court to vacate this ruling. *See* Defendants' Request for Judicial Notice, Ex. C. In the face of this ruling and 24 Hour Fitness's refusal to consent to arbitration of Plaintiffs' FLSA collective claim, on September 19, 2005, the arbitrator dismissed without prejudice the FLSA portion of Plaintiffs' amended claim. *See* Foley Decl., Ex. 12. The arbitrator did so, specifically, on the grounds that the proceedings before him had been initiated pursuant to an ad hoc agreement

between the parties which had only referred to individual and class action claims by the claimants, not to any collective claim under the FLSA. *Id.*

Following the arbitrator's decision, the attorney for the *Allen* claimants requested that 24 Hour Fitness consent to arbitration of their collective claim. *See* Foley Decl., Ex. 13. 24 Hour Fitness initially responded with requests for additional information. *See id.,* Exs. 14-19. Then, in an email from Defendants' counsel dated January 23, 2006, 24 Hour Fitness refused the request, stating that Plaintiffs' collective claim was a class action claim, which "are impermissible under the arbitration you seek to enforce," and that the provision in the arbitration agreement which so provides "is not unconscionable." *Id.,* Ex. 20.

### *Instant Action*

*4 On February 1, 2006, Plaintiffs filed the instant action. *See*Docket No. 1. The Complaint roughly mimics the complaint in *Boyce,* but its FLSA collective claims specifically exclude from their coverage the claims of any 24 Hour Fitness employee whose claim was subject to the release of claims in *Boyce* or various other related actions which are listed. *Id.* at 19.In light of the settlement terms in *Boyce,* the collective class proposed by the Complaint is one comprised of certain persons who have worked for 24 Hour Fitness in states *other than* California. *See id.; Boyce*Docket No. 84.

24 Hour Fitness filed a motion to dismiss on February 21, 2006, which argued principally that Plaintiffs' FLSA collective claim should be dismissed on the grounds that agreements to arbitrate exist between the parties. *See* Defendants' Motion to Dismiss. Defendants, however, explicitly declined to request the Court to compel arbitration, arguing that if the Court did so, it would be "highly inconvenient for the parties." *Id.* at 22.Rather, Defendants suggested, the Court should dismiss Plaintiffs' FLSA collective claim and Rule 23 class action claim, and each Plaintiff should individually

compel arbitration. *Id.* at 23.

The Court denied Defendants' motion to dismiss but granted Defendants' alternative motion for a more definite statement. *See* Order Denying Defendants' Motion to Dismiss ("Order Denying Defendants' Motion"). In its Order, the Court noted that "Plaintiffs had consistently sought to arbitrate these claims."*Id.* at 5. Thus, it was "puzzling," in light of the law, that 24 Hour Fitness would choose to make a motion to dismiss, which was clearly barred by Plaintiffs' colorable arguments against the enforceability of the Arbitration Agreement, instead of compelling arbitration. *Id.* at 5-6.

On June 16, 2006, a status conference was held before the Court. Following the conference, the Court ordered the "[p]arties to either file a Motion to Compel Arbitration or a Motion to Certify the Class."Docket No. 42.The Order further granted "Plaintiffs' request to proceed with limited discovery for the Class Certification Motion."*Id.*

On November 28, 2006, this Court denied a motion by 24 Hour Fitness for an order requiring Plaintiffs to amend their pleadings. *See*Docket No. 66.In this Order, the Court further held that 24 Hour Fitness had waived any right to make any argument on the basis of the existence of an arbitration agreement between 24 Hour Fitness and any of the Plaintiffs. *See id.*

Plaintiffs filed the instant Motion on December 8, 2006. *See*Docket No. 69.On January 11, 2007, the Court granted 24 Hour Fitness' motion for leave to file a surreply. *See*Docket No. 114.

### III. *DISCUSSION*

#### A. *Conditional Certification*

Plaintiffs have requested that the Court conditionally certify an omnibus class consisting of three subclasses: a "Managers' Class"; a "Commission-Based Class"; and an "Hourly Employees" class. Reply at 5-7. For the following reas-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2007 WL 707475 (N.D.Cal.)
Not Reported in F.Supp.2d, 2007 WL 707475 (N.D.Cal.)
**2007 WL 707475 (N.D.Cal.)**

Case 4:07-cv-03993-CW     Document 36     Filed 07/25/2008     Page 106 of 125     Page 5

ons the Court conditionally certifies only the Managers' Class.

### 1. *Legal Standard*

*5 Section 16(b) of the FLSA provides employees with a private right of action to sue an employer for violations of the Act "for and in behalf of himself or themselves and other employees similarly situated."29 U.S.C. § 216(b). The latter sort of action, often referred to as a "collective action," works somewhat differently than Rule 23 class action: an employee who wishes to join an FLSA collective action must affirmatively opt-in by filing a written consent to join in the court where the action was brought. *Id.*

In *Hoffman-La Roche Inc. v. Sperling,* the Supreme Court recognized the discretion of district courts to facilitate the process by which potential plaintiffs are notified of FLSA collective actions into which they may be able to opt. 493 U.S. 482, 486 (1989).FN3 Building on this, a majority of courts, including district courts in the 9th Circuit, have adopted a two-stage certification procedure. *See, e.g., Leuthold v. Destination America, Inc.,* 224 F.R.D. 462, 466 (N.D.Cal.2004); *Wynn v. National Broadcasting Co.,* 234 F.Supp.2d 1067, 1082-84;*Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1106 (10th Cir.2001). At the first stage, the district court approves conditional certification upon a minimal showing that the members of the proposed class are "similarly situated"; at the second stage, usually initiated by a motion to decertify, the court engages in a more searching review.*Leuthold,* 224 F.R.D. at 467.

> FN3.*Sperling* addressed a collective action brought under the Age Discrimination in Employment Act, which, the Court recognized, incorporates § 16(b) of the FLSA. 493 U.S. at 486.

The FLSA does not define "similarly situated," and the 9th Circuit has not spoken to the issue. The Su-

preme Court, in *Sperling,* also left the term undefined, but indicated that a proper collective action encourages judicial efficiency by addressing in a single proceeding claims of multiple plaintiffs who share "common issues of law and fact arising from the same alleged [prohibited] activity."493 U.S. at 486. This has been distilled by courts into a requirement that a proponent for conditional certification present the court with "nothing more than substantial allegations that a putative class members were together the victims of a single decision, policy, or plan."*Thiesen* 267 F.3d at 1102 (internal quotations omitted); *see also, e.g., Gerlach v. Wells Fargo & Co.,* No. C 05-0585, 2006 WL 824652, *2 (N.D.Cal. March 28, 2006). Given that a motion for conditional certification usually comes before much, if any, discovery, and is made in anticipation of a later more searching review, a movant bears a very light burden in substantiating its allegations at this stage. *See, e.g., Aguayo v . Olden kamp Truck - ing,* No. 04-6279, 2005 WL 2436477 (E.D.Cal. Oct.3, 2005) (disregarding hearsay and foundational challenges to declarations submitted in support of motion for conditional certification); *Ballaris v. Wacker Silttronic Corp.,* No. 00-1627, 2001 WL 1335809 (D.Or. Aug.24, 2001) (granting motion for conditional certification on basis of two affidavits).

### 2. *An Omnibus Class is Not Appropriate*

*6 As noted above, Plaintiffs describe three categories of employees which they argue should be conditionally certified as a single omnibus collective class: "Managers"; "Commission Based Employees"; and "Personal Trainers-Hourly Based Employees." Complaint at 16-18. However, Plaintiffs offer very little argument or evidence which demonstrates "a factual nexus which binds [putative members of the three categories] together as victims of an alleged policy or practice."*Thiebes v. Wal-Mart Stores, Inc.,* No. 98-802, 1999 WL 1081357, *2 (D.Or. Dec.1, 1999) (internal quotation omitted).

Rather, Plaintiffs describe a different set of prac-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

tices correlating to each of the three categories. Employees in the Managers category allegedly were misclassified as exempt and so denied overtime. *See* Motion at 16-17. Employees in the Commission Based Employees category allegedly were not allowed to submit all their hours for payment and were denied certain types of commissions. *See id.* at 17-18; Reply at 6-7. And employees in the Hourly category allegedly were not compensated for "time spent 'working the floor' and performing all of the tasks and duties ancillary to their work training clients."Motion at 19.

The Motion does not articulate what single decision, policy, or plan unifies the putative members of all three categories, *see* Motion, and the Reply all but concedes that none exist. *See, e.g.,* Reply at 5-6 (referring to a "Managers' Class" and "Commission-Based Class"); 10 (identifying "common of questions of law and fact" which are relevant to putative members of the Managers category and other common questions of law and fact relevant to putative members of the other two categories, but making no attempt to identify common questions of law and fact relevant to all three). The Court is similarly incapable of conceiving on its own why judicial efficiency would be facilitated by adjudicating together, in a single proceeding, the claims of employees in all three of these categories, and so declines to do so.

### 3. *A Managers Class is Appropriate for Conditional Certification*

Notwithstanding the Court's finding that it would not be appropriate to adjudicate in a single proceeding the claims of putative members in all three categories, the Court finds that Plaintiffs have met their minimal burden to show that putative members of the Managers class are sufficiently similarly situated to qualify for conditional certification as a collective class. [FN]

> FN4. In making this finding, the Court explicitly declines to address whether the pu-

tative members of the other two categories are similarly situated with other putative members of the same respective category or with putative members of the other category. It thus makes no finding as to whether it may, or may not, be appropriate for a court to conditionally certify a collective action consisting of employees which fall in one or both of these categor- ies.

The FLSA requires employers to pay their employees time and one-half for any work in excess of forty hours in one week. 29 U.S.C. § 207(a)(1). The Act provides an exemption to this requirement for certain types of employees, including those "employed in a bona fide executive, administrative, or professional capacity, ... or in the capacity of outside salesman."29 U.S.C. § 213(a). But "[i] t is the burden of an employer to show entitlement to an exemption from the FLSA," and "FLSA exemptions are to be narrowly construed against employers and are to be withheld except as to persons plainly and unmistakenly within their terms and spirit."*Baldwin v. Trailer Inns, Inc.,* 266 F.3d 1104, 1112 (9th Cir.2001) (internal quotations omitted).

*7 The FLSA explicitly grants the Secretary of Labor the authority to promulgate regulations to define the exemptions listed in Section 13, *id.,* and the Secretary has done so in 29 CFR § 541. Section 541.100 describes four requirements that must be met for an employee to be properly defined as exempt under the Executive Exemption. 29 CFR § 541.1 These requirements include, in addition to a minimum wage, requirements that an employee classified as fitting within this exemption be one:

(2)Whose primary duty is management of the enterprise ...;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2007 WL 707475 (N.D.Cal.)
Not Reported in F.Supp.2d, 2007 WL 707475 (N.D.Cal.)
**2007 WL 707475 (N.D.Cal.)**

Case 4:07-cv-03993-CW    Document 36    Filed 07/25/2008    Page 108 of 125    Page 7

as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

*Id.*

Plaintiffs have submitted the affidavits of eleven former employees of 24 Hour Fitness who worked for the company over a number of years in several different states, outside of California, as General Managers, Operations Managers, and Fitness Managers. *See* Beauperthuy Decl. ¶¶ 10-18; Davidson Decl. ¶¶ 14-20; DeSoto Decl. ¶¶ 19-26; Fennelly Decl. ¶¶ 15-38; Guy Decl. ¶¶ 13-24; Hudson Decl. ¶¶ 25-31; Mathews Decl. ¶¶ 25-35; Newcomb Decl. ¶¶ 14-25; Sherrill Decl. ¶¶ 1 -12; Struble Decl. ¶¶ 3-16.[FN5]These declarations uniformly state: that declarants and others in these positions were designated as exempt and so were denied overtime; that this was done according to company policy; and that, pursuant to company policy, declarants and others in these positions were denied real management authority in a number of ways. *See id.*These qualify as substantial allegations that the policies and practices of 24 Hour Fitness as they relate to designation as exempt persons in these positions violates the FLSA. *See*25 U.S.C. §§ 207, 213; 29 CFR § 541.1. They are therefore sufficient to qualify for conditional certification a class consisting of persons who have worked for 24 Hour Fitness in states other than California in the positions of General Managers, Operations Managers, and Fitness Managers ("Managers Class") during the period described below.

> FN5. Defendants have raised over three hundred objections to the declarations submitted by Plaintiffs, which generally allege hearsay and foundational defects. *See* Defendants' Evidentiary Objections to Plaintiffs' Declarations in Support of Motion for Facilitated Notice Pursuant to 29 U.S.C. § 216(b). As the Court stated above, the Plaintiffs' burden at this stage of the proceedings is quite minimal, thus evidence which "may not be sufficient to

carry the burden of proof at trial, ... [may be] sufficient to carry the burden on this motion."*Aguayo,* 2005 WL 2436477, at *4. Therefore, whatever shortcomings Plaintiffs' declarations have in the way of hearsay and foundation, if any, are not relevant to the Court's determination at this stage.

## B. *Tolling*

Absent any decision by the Court to toll applicable statute of limitations' periods, the limitations period for each putative member of the conditionally approved collective class would be three years from the date he or she opted into the action. *See*29 U.S .C. §§ 255(a), 256. The statute, in other words, contains a look-back provision which limits to three years from opt-in how far back a plaintiff can look to find violations by their employer.

Plaintiffs request the Court toll the statute of limitations periods for all putative class members on both equitable and contractual bases. *See* Motion at 2. For the reasons set forth, the Court equitably tolls the statute of limitations to allow all Plaintiffs to sue for conduct which occurred any time after January 31, 1998.

### 1. *Equitable Tolling*

***8** The Ninth Circuit has implied the doctrine of equitable tolling into the FLSA. *Partlow v. Jewish Orphans Home of Southern Cal., Inc.* 645 F.2d 757, 760 (9th Cir.1981) (abrogated on other grounds by*Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480);*see Bonilla v. Las Vegas Cigar Co.,* 61 F.Supp.2d 1129, 1140 (D.Nev.1999) (recognizing the implication).

Defendants argue that equitable tolling only applies in instances where delay has been caused by a plaintiff's "excusable ignorance of the statute of limitations."Opp'n at 21. This definition is too narrow.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2007 WL 707475 (N.D.Cal.)
Not Reported in F.Supp.2d, 2007 WL 707475 (N.D.Cal.)
**2007 WL 707475 (N.D.Cal.)**

Case 4:07-cv-03993-CW    Document 36    Filed 07/25/2008    Page 109 of 125 Page 8

[E]quitable tolling concerns itself with the equities of dismissal for untimely filing caused by factors independent of the plaintiff. Accordingly, we must ask whether it would be unfair or unjust to allow the statute of limitations to act as a bar to [a plaintiff's] claim.

*Huynh v. Chase Manhattan Bank,* 465 F.3d 992, 1004 (9th Cir.2006). Thus, "[e]quitable tolling applies when the plaintiff is prevented from asserting a claim by wrongful conduct on the part of the defendant, *or* when extraordinary circumstances beyond the plaintiff's control made it impossible to file a claim on time,"*such as* its excusable ignorance of the statute of limitations.*Stoll v. Runyon,* 165 F.3d 1238, 1242 (9th Cir.1999) (emphasis added); *see also O'Donnell v. Vencor, Inc.,* 465 F.3d 1063, 1068 (9th Cir.2006) (applying the doctrine when "defendants created the situation which impeded" the plaintiff's filing of her claim).

Plaintiffs argue that the Court should grant equitable tolling because 24 Hour Fitness allegedly took actions "that have delayed and obstructed Plaintiffs having their claims heard in a collective action."Motion at 9. As Plaintiffs note, the Court in its November 28, 2006 Order referred to 24 Hour Fitness' "confusing, contradictory, and time-consuming strategic maneuvering."*See*Docket No. 66 at 10.

The Court, however, does not base its decision to toll the look-back period on the finding of any wrongdoing by 24 Hour Fitness. Rather, it does so because "it would be unfair or unjust to allow" persons employed by 24 Hour Fitness in California to collect damages for violations which occurred anytime between January 31, 1998 and October 31, 2005, while limiting other persons who happen to have been employed in states other than California to collect only for violations that occurred during a period that would begin, for most, more than five years later.[FN6]*Huynh,* 465 F.3d at 1004. This discrepancy would not be the result of any action by these Plaintiffs. Rather, it would be the result of the vagaries of the process by which the *Boyce* action

was settled, the competition which occurred between Plaintiffs' attorneys and the *Boyce* Attorneys during settlement mediation, and other factors outside of these Plaintiffs' control. Indeed, several Plaintiffs who have already opted into the instant action attempted to participate in the settlement discussion during their tenure as *Allen* claimants. *See* Background *Supra.*It would be unfair and unjust to exclude these Plaintiffs and others similarly situated from the same opportunity to recover for violations as those whose interests were better served by other attorneys.

> FN6. If the Court did not toll the statute of limitations, putative members of the class who have not yet opted in would be limited to collecting for violations which occurred, at earliest, on March 6, 2004.

### C. *Form of Opt-In Notice and Related Discovery*

*9 Plaintiffs and 24 Hour Fitness have each submitted competing arguments and examples regarding how the opt-in notice should be drafted and how the opt-in process should proceed, including related discovery. The parties have also indicated the possibility of resolving some of these issues through the meet and confer process. In light of this and given the Court's rulings above, the Court finds it would be in everyone's interest if the parties met, conferred, and sought to resolve as many of the disagreements between them as possible. The Court, therefore, orders the parties to so meet and confer and submit to the Court in ten calendar days from the date of this order: a joint proposed opt-in order which accords with the rulings above; a joint plan for related discovery and the process of notification; and briefing on relevant differences, if any, which still exist between the parties.

### IV. *CONCLUSION*

For the foregoing reasons, the Court GRANTS in part and DENIES in part Plaintiffs' Motion for Facilitated Notice Pursuant to 29 U.S.C. § 216(b). Ac-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2007 WL 707475 (N.D.Cal.)

**2007 WL 707475 (N.D.Cal.)**

cordingly, the Court: (1) CONDITIONALLY CER-TIFIES a FLSA collective class consisting of persons who worked for 24 Hour Fitness as a General Manager, Operations Manager, or Fitness Manager in states outside California; (2) EQUITABLY TOLLS the statute of limitations for all Plaintiffs to January 31, 1998; (3) ORDERS the parties to meet and confer regarding the opt-in notice and process and make the submissions described above within ten calendar days of this Order; and (4) SETS a further status conference on June 29, 2007, seven days before which the parties are required to file with the Court a joint status statement.

IT IS SO ORDERED.

N.D.Cal.,2007.
Beauperthuy v. 24 Hour Fitness USA, Inc.
Not Reported in F.Supp.2d, 2007 WL 707475 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 495705 (N.D.Cal.)
**2008 WL 495705 (N.D.Cal.)**

Page 1

**H**
Castle v. Wells Fargo Financial, Inc.
N.D.Cal.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Richard CASTLE, et al., Plaintiffs,
v.
WELLS FARGO FINANCIAL, INC., d/b/a Wells
Fargo Financial and Wells Fargo Financial Accept-
ance, and Does 1-50, Defendants.
**No. C 06-4347 SI.**

Feb. 20, 2008.

John F. Hyland, Peter Scott Rukin, Zachary R. Cin-
cotta, Rukin Hyland Doria & Tindall LLP, Bryan
Jeffrey Schwartz, Matthew C. Helland, Nichols
Kaster & Anderson, LLP, San Francisco, CA, Don-
ald H. Nichols, Paul J. Lukas, Rachhana T. Srey,
Nichols Kaster & Anderson, PLLP, Minneapolis,
MN, for Plaintiffs.
Jessie Ann Kohler, Winston & Strawn LLP, Los
Angeles, CA, Joan B. Tucker Fife, Winston &
Strawn LLP, San Francisco, CA, for Defendants.

**ORDER DENYING PLAINTIFFS' MOTION
FOR CONDITIONAL CERTIFICATION UN-
DER FLSA**

SUSAN ILLSTON, District Judge.
*1 On November 2, 2007, the Court heard argu-
ment on plaintiffs' motion for conditional certifica-
tion under the Fair Labor Standards Act, 29 U.S.C.
§ 216(b). After consideration of the parties' argu-
ments, the Court DENIES the motion for the reas-
ons set forth below.

**BACKGROUND**

Plaintiffs are current [FN1] and former employees of
Wells Fargo who work in four job categories: (1)
credit manager, (2) senior credit manager, (3) as-
sistant manager, and (4) loan processor. Plaintiffs
are classified as non-exempt employees, and thus
are entitled to be paid overtime.[FN2]SAC ¶ 33.
Plaintiffs allege that during the class period they
have worked in excess of 40 hours per week, but
that they have not been paid the appropriate over-
time compensation for all the hours worked in ex-
cess of 40. *Id.* ¶ 34.Plaintiffs also allege that "[b]y
failing to accurately record, report, and/or preserve
records of hours worked by Plaintiffs and the Col-
lective Class, Defendant has failed to make, keep,
and preserve records with respect to each of em-
ployees sufficient to determine their wages, hours,
and other conditions and practice of
employment."*Id.* ¶ 35.

> FN1. Although the proposed second
> amended complaint alleges that the case is
> brought on behalf of current and former
> employees, the named plaintiffs are all
> former employees. SAC ¶¶ 5-8. As the
> Court is granting plaintiffs' motion to file a
> second amended complaint, this order
> refers to that complaint.

> FN2. The parties refer to this as an "off the
> clock" case, as opposed to a "job classific-
> ation" case.

Plaintiffs seek conditional certification of a nation-
wide collective class under the FLSA. According to
defendants, the class includes approximately 14,000
individuals. In support of their motion, plaintiffs
have submitted 24 declarations by plaintiffs and pu-
tative class members describing their experiences
working at Wells Fargo. These declarants worked
in 28 of the 1000 branches nationwide, and in 8 of
the 48 states where Wells Fargo subsidiaries oper-
ate. Some of plaintiffs' declarants state that they re-
corded overtime hours worked, and that their man-
agers later altered their time records. Other declar-
ants state that they were told not to record overtime
hours, and that they were promised flex time in-
stead. Plaintiffs have also submitted deposition ex-
cerpts, and evidence regarding Wells Fargo's
"Webtime" program, which is a web-based applica-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

tion that non-exempt Wells Fargo employees use to enter timecard information.

Defendants oppose certification on numerous grounds, and have submitted 99 declarations from current and former Wells Fargo employees and managers. These declarations generally rebut plaintiffs' declarations. Defendants have also submitted copies of plaintiffs' declarants' time cards and pay records, which show that plaintiffs and the declarants were in fact paid for overtime on some occasions.

### DISCUSSION

Plaintiffs seek certification of a collective action for their claim under the FLSA for failure to pay overtime wages. Plaintiffs propose certification of the following opt-in class:

> All persons who are or have been employed by Defendant as credit manager, senior credit manager, assistant manager, or loan processor within the United States at any time three years prior to the filing of this Complaint, to the final disposition of this case.

SAC ¶ 15.

*2 Section 216(b) of the FLSA provides that one or more employees may bring a collective action "on behalf of himself or themselves and other employees similarly situated."29 U.S.C. § 216(b)."[P]laintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members."*Grayson v. K Mart Corp.,* 79 F.3d 1086, 1096 (11th Cir.) (internal citation and quotation omitted), *cert. denied,*519 U.S. 982, 117 S.Ct. 435, 136 L.Ed.2d 332 (1996). Plaintiffs bear the burden of demonstrating a "reasonable basis" for their claim of class-wide discrimination. *See id.* at 1097."The plaintiffs may meet this burden, which is not heavy, by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to

the contrary."*Id.* (internal citation and quotation omitted).

Defendant asserts that there are numerous individual issues that make certification inappropriate, and the Court agrees.[FN3]Plaintiffs have not identified a common policy or practice on a nationwide or statewide basis, and indeed the official written policy at Well Fargo is to pay overtime to non-exempt employees. Instead, plaintiffs allege that they have been denied overtime pay for "off the clock" hours worked under a variety of different circumstances. The declarations submitted by plaintiffs state, *inter alia,*

> FN3. Defendant has submitted numerous declarations contradicting the accounts set forth in plaintiffs' declarations. To resolve the instant motion, the Court need not resolve these factual disputes, and indeed it would be inappropriate to do so. *See In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,* 691 F.2d 1335, 1342 (9th Cir.1982). Here, even assuming that plaintiffs' declarations are accurate, those declarations describe a variety of different factual situations giving rise to plaintiffs' claims such that individual issues predominate.

*Daniel Beaston:* One of his managers enforced a "company policy" that allowed Beaston and his colleagues to record no more than 41 hours per week in the Webtime system, regardless of how much time he worked. Each of Beaston's managers told him (incorrectly) that he was a salaried employee who was not entitled to overtime pay. Beaston's manager required Beaston and his colleagues to work one Saturday per month for five hours, and instructed Beaston not to record these hours.

*Darius Brown:* Brown consistently worked over 40 hours per week, and he was not compensated for overtime hours. "I was told that the credit industry is a very sales-driven and demanding in-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

dustry which requires one to work over 40 hours in a week to make money and complete all of the necessary work associated with closing loans."One of Brown's managers "always instructed us to focus on the sales and work as many hours as it took to complete deals. Mr. Gundeara explained that we should not worry about the extra hours and that the sales would pay off. As a result, I did not record the extra hours I worked in the Webtime system, though Mr. Gundeara usually saw me working the overtime hours and I always made him aware when I worked overtime."Brown states that he can recall instances when his manager ordered pizza for him and his colleagues when they worked later into the evening, and that the manager "often tried to encourage us to work unpaid overtime by stating, 'Let's all stay late tonight to see who can complete the most deals.' "

**\*3** *Richard Castle:* Castle consistently worked over 40 hours per week."When I complained about denied overtime pay, my supervisor, Khaled El-Zahar, would agree to sign off on half an hour here, and a half an hour there of overtime, but not more. Nothing ever seemed to come of my complaints about denied overtime pay. It was my impression from my interactions with Mr. El-Zahar that his supervisor, Kevin Guglielmelli, who I believe was the District Manager, needed to make sure that the payroll costs were not too high.""The way it worked was that we (the credit managers) would log into the timekeeping system via the Internet. I observed that my colleagues and I usually would record the whole week at one time. If I reflected on my timesheet that I had stayed until 7:00 p.m. on a particular day, Mr. El-Zahar would sometimes question the entry, and he would tell me to just include, say, half an hour of overtime for the day. It was a negotiation about how much overtime I could be paid for the time I had worked."

*Camila Dizon:* While Dizon was at the Northridge branch, her manager "adjusted timekeeping records to reduce the amount of overtime claimed by employees."While Dizon was at the San Fernando branch, "if I tried to record more than 12 hours worked in a day (which occurred a few times a month), the 'Web time' program would show an error message and we would have to adjust the time yet again to reflect breaks that were non-existent in order to complete our time sheetsthough I had, in fact, worked more than 12 hours, and should have received double compensation for this time over 12 hours.""At the point when we entered our time, we or our managers would alter or override the hours recorded to reflect reduced hours that did not require special overtime or meal/rest period consideration.""Sometimes I would have to go to a customer's house to Notarize a loan and Ms. Quintenilla [the manager] would comment that she did not feel it should have taken me as long as it did, and that I should adjust my hours to reflect less time worked-rather than the actual time worked. I do not believe I was fully compensated for all of the overtime I worked-for example, I was not paid for the hours I worked through lunch and breaks, and was never paid double-time when I worked over 12 hours."

*Jonathan Nguyen:*"On average, I worked approximately 15 hours of overtime a week. Even though I recorded those hours, Mr. Rios [the manager] would tell me to change my hours in 'Webtime' to reflect a much lower number of overtime hours. I could usually record two or three hours of overtime, but not all of the hours I worked.""Mr. Rios and my district manager Chris Potts explained that the reason they did not want employees recording all of their overtime was that overtime would cut into the profitability of the branch. These managers explained that employees working overtime and taking breaks would cost the branch a great deal of money and would eventually negatively affect the overall profits of the branch in the long run.""When sales and production numbers were low, I was aware that Mr. Potts often instructed Mr. Rios to inform

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

all of the employees in my branch (via email or telephone call) that we would be required to work longer hours or work on the weekends in order to increase the number of sales."

**\*4** *Claudia Salazar:* Salazar's manager "explained that the District Manager only allotted a limited number of overtime hours each month to each branch. Thus, he explained that company's policy towards paying overtime was that employees were allowed to record a maximum of five hours of overtime per week ...."" The amount of overtime for which I would be compensated was not only based on the policy that I could only work five hours of overtime a week, but supposedly also depended on performance. For example, if Mr. Sontag considered my sales productivity to be too low, he would not allow me to record overtime hours until my sales numbers improved."

*Steve Simoulis:* "Each week, I worked approximately four hours of overtime for which I was never compensated. Specifically, in addition to the several nights per week that I worked, unpaid, past my scheduled finish time to complete a deal, I was not compensated for taking 'bank drops' (i.e. taking deposits to the bank) or dropping checks off at various vendors. These errands usually took approximately 10 to 20 minutes per day at least four times per week."" Whenever I recorded the hours I had actually worked during the week, including overtime and missed meal or rest periods, Ms. Latta [the manager] instructed me to remove the extra hours from the time sheet. If I did not, she explained that she would not approve my hours worked."" Whenever I questioned Ms. Latta about the company's overtime and meal/rest break policies generally, she never gave me a straight answer. She usually responded by telling me 'not to worry about it' and to 'get back to work.' Ms. Latta claimed it was the District Manager's 'policy' to deny us overtime and compensation for missed meal and rest periods."

*Steve Youmans:* "During my employment with

Wells Fargo Financial, Inc., my manager Sherry Jones enforced what she described as the 'company policy' that in order to leave the office by 6:00 p.m., my coworkers and I were required to have contacted at least eight individuals for potential loans, and to have completed two loan applications. Ms. Jones sent frequent emails or made phone calls to us enforcing this 'policy.' If we failed to meet these standards, which was often difficult to do, we were not allowed to leave the office until we had done so. We also came in on weekends, at least once a month, to work 4 hour shifts. We were not compensated for the time we worked after 6:00 p.m. or on weekends, which amounted to approximately 12 to 16 hours a month." Youmans' manager told him that "the company would not pay overtime to newer employees, regardless of how much we worked."" There were occurrences when I worked overtime and my manager 'contested' my time sheet or adjusted my hours herself to reflect only 40 hours a week."

*Lindsay Wise:* "I worked approximately four hours of overtime each week, often staying after work to close loans, plus several working lunches a month. However, Mr. Carter instructed my coworkers and I to not record more than 42 hours on our time sheets. He explained that it was the 'policy of the company' to only permit 42 hours a week to be recorded on our time sheets."

**\*5** If these plaintiffs are able to prove these assertions, as a matter of fact, they each have strong FLSA claims and are likely to prevail on an individual basis. However, the Court finds that plaintiffs have not identified any company-wide policy or practice to deny overtime and thus have failed to show that the various Wells Fargo employees are similarly situated for purposes of class certification. It is true that the declarants all state that they were not paid for some amount of overtime worked, and that they were pressured by their managers not to record overtime hours. However, the declarants describe differing "company policies."

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

For example, Claudia Salazar was told that it was "company policy" to pay a maximum of 5 overtime hours per week, while Lindsay Wise was limited to 2 hours of overtime per week and Daniel Beaston was allowed 1 overtime hour per week. Steve Youmans was told that new employees were not paid overtime hours. At the most, plaintiffs' evidence suggests differing "policies" or practices depending on the branch or the district, rather than on a nationwide basis.

The variety of different circumstances under which the declarants were allegedly required to work unpaid overtime also weighs against certification. Some employees were required to work on Saturdays, one employee was not paid for discrete tasks such as "bank drops," another employee's manager reduced her time spent notarizing documents, and another employee was not permitted to record overtime hours if her manager considered her sales productivity to be low. Resolution of plaintiffs' claims would require individualized determinations, and would necessitate testimony from individual employees and their supervisors about the schedules actually worked and whether managers were aware of the overtime hours worked. Plaintiffs' claims of altered time cards would similarly require class member-specific testimony and evidence regarding the circumstances surrounding the alterations, and defendant would be entitled to show that any alterations were made for legitimate reasons, which could differ for each class member.

Other courts have denied certification under the FLSA in "off the clock" cases, finding that individual issues predominate such that the employees are not similarly-situated. *See, e.g., Simmons v. T-Mobile USA, Inc.,* No. H-06-1820, 2007 WL 210008, *6, 2007 U.S. Dis. LEXIS 5002, *24-25 (S.D.Tex. Jan. 24, 2007) (denying certification because "this is a case involving claims of 'off the clock' unpaid overtime, where allegedly dozens (if not hundreds) of different low-level supervisors with wide management discretion in practice violate Defendant's clear, lawful written policies at

some or many of Defendant's more than one hundred different retail locations."); *Hinojos v. The Home Depot, Inc.,* No. 2:06-CV-00108, 2006 WL 3712944 (D.Nev. Dec.1, 2006) (denying certification of nationwide FLSA class alleging unpaid overtime hours and alteration of time cards because plaintiffs did "not point to a common policy or practice on a nationwide, or even statewide, basis" and "the need for individualized determinations to resolve the claims of each plaintiff"); *see also Lawrence v. Philadelphia,* No:03-CV-4009, 2004 WL 945139, *1, 2004 U.S. Dist. LEXIS 8445, *2 (E.D Pa. Apr. 29, 2004).

**\*6** The cases relied on by plaintiffs are factually distinguishable. The "job classification" cases in which exempt employees challenged their exempt status are much more amenable to collective treatment because there the plaintiffs are challenging class-wide policies regarding job classification, and evaluation of the plaintiffs' claims depends on common proof. *See, e.g., Beauperthuy v. 24 Hour Fitness USA, Inc.,* 2007 WL 707475 (N.D.Cal. Mar.6, 2007) (Conti, J.); *Gjurovich v. Emmanuel's Marketplace, Inc.,* 282 F.Supp.2d 91 (S.D.N.Y.2003); *Champneys v. Ferguson Enter. Inc.,* No: IP 02-535-C, 2003 WL 1562219, 2003 U.S. Dist. LEXIS 4589 (S.D.Ind. Mar. 11, 2003).

Of the "off the clock" cases in which classes have been conditionally certified, *Wilks v. Pep Boys,* 2006 WL 2821700 (M.D.Tenn. Sept.26, 2006), is the most analogous to the instant one. In that case, the plaintiffs alleged that Pep Boys had an unwritten company-wide policy of "shaving" off overtime hours from employees' time records. The court conditionally certified a nationwide class, and later denied the defendant's motion to decertify and granted partial summary judgment in favor of the plaintiffs. Notably-and in contrast to the instant case-in *Wilks*"the defendant's own submissions indicate that its stores' time-keeping and overtime practices were dictated at the national level, rather than in each different locality."*Id.* at *6. The *Wilks* court noted, "[t]he demonstration of an allegedly

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

improper practice that existed throughout the defendant's stores distinguishes this case from many of the otherwise factually similar cases cited by the defendant."*Id.*

The other cases cited by plaintiffs are also distinguishable. In *Heckler v. DK Funding LLC,* 502 F.Supp.2d 777 (N.D.Ill.2007), the plaintiff employees all worked at one location. In *Burch v. Qwest Communications International, Inc.,* 500 F.Supp.2d 1181 (D.Minn.2007), the plaintiffs claimed that they were required to perform a standard set of job duties before and after their shifts for which they were not paid. The *Burch* court found that class members were similarly situated because of the "allegation of an identical task that all potential class members had to perform before 'punching in' for work, like the requirement in this case that all employees had to boot up their computers before logging into their telephones."*Id.* at 1188;*see also Sherrill v. Sutherland Global Services, Inc.,* 487 F.Supp.2d 344 (W.D.N.Y.2007) ( conditionally certifying class where plaintiffs alleged they were required to arrive early to work to perform certain unpaid tasks before beginning of shift). Unlike *Burch* or *Sherrill,* plaintiffs here are not claiming that they are subject to a company-wide policy requiring them to routinely perform certain tasks "off the clock." Instead, plaintiffs allege that they have been required to work unpaid overtime in a variety of different factual circumstances.

**\*7** Because the Court concludes that conditional certification is inappropriate for the reasons set forth above, the Court need not address defendant's other grounds for opposing certification. In addition, the Court does not address the parties' evidentiary objections, nor does the Court address defendant's objections to plaintiffs' form of class notice.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES plaintiff's motion for conditional certification. (Docket No. 189).

**IT IS SO ORDERED.**

N.D.Cal.,2008.
Castle v. Wells Fargo Financial, Inc.
Slip Copy, 2008 WL 495705 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                   Page 1
Slip Copy, 2006 WL 2850035 (N.D.Cal.), 71 Fed. R. Evid. Serv. 493
**2006 WL 2850035 (N.D.Cal.)**

**H**

Doe v. Texaco, Inc.
N.D.Cal.,2006.

United States District Court,N.D. California.
Jane DOE I-V, and John Doe I-IV, Plaintiffs,
v.
TEXACO, INC., Texaco Petroleum Co., and Chevron Corp., Defendants.
**No. C06-02820 WHA.**

Oct. 5, 2006.

Cristobal Bonifaz, John Christopher Bonifaz, Law Offices of Cristobal Bonifaz, Conway, MA, Paul Lindsey Hoffman, Schonbrun Desimone Seplow Harris & Hoffman, Venice, CA, Terry Collingsworth, Thomas Joseph Cmar, Derek J. Baxter, Natacha Thys, International Labor Rights Fund, Washington, DC, for Plaintiffs.
Robert A. Mittelstaedt, Natausha A. Wilson, Jones Day, San Francisco, CA, Louis K. Fisher, Michael J. Kolis, Thomas F. Cullen, Jr., Washington, DC, for Defendants.

### ORDER DENYING PLAINTIFFS' MOTION AND RENEWED MOTION TO PROCEED WITH ACTION USING PSEUDONYMS

WILLIAM ALSUP, District Judge.

### INTRODUCTION

**\*1** In this action alleging vast ecological and health damage from the dumping of oil-production byproducts into the Amazon rainforest, the nine Ecuadorian plaintiffs seek to continue their action using pseudonyms rather than disclosing their identities. Defendants oppose this motion, saying it hinders their ability to mount a defense.

### STATEMENT

Plaintiffs filed their original complaint pseudonym-

ously on April 25, 2006, and filed their amended complaint on July 28, 2006. Plaintiffs allege that by unlawfully dumping oil-drilling byproducts in the Oriente region of the Ecuadorian rainforest, defendants Texaco, Inc. ("Texaco"), Texaco Petroleum Co. ("Texpet"), and Chevron Corp. ("Chevron") caused cancer in plaintiffs and increased their risk of cancer. Plaintiffs allege defendants Texaco and Texpet are liable because of their own acts and/or omissions while they allege defendant Chevron is liable as a successor-in-interest. Plaintiffs alternatively allege that Chevron is liable because Texaco and Texpet are their alter-egos. After amending their original complaint, plaintiffs now assert claims of negligence, international or reckless infliction of emotional distress, and battery.

In both their original and amended complaints, plaintiffs state that they brought the action anonymously "due to fear of retaliation, including physical retaliation, against themselves and their families for their commencement of this action."Plaintiffs base this fear on the lawlessness of the region of the Oriente rainforest where they live, "such that if their identities and addresses are disclosed publicly, Plaintiffs would become likely targets for violence and/or harassment from any number of local actors with a political, economic, or emotional stake in this controversy."Plaintiffs cite four potential sources of harassment in the instant motion (Amd.Compl.¶ 17).[FN1]

> FN1. Pursuant to the May 2006 order, plaintiffs have refiled their motion to proceed pseudonymously. The order allowed plaintiffs to refile their original motion and give notice to defendants unless they could satisfy the *ex parte* requirements of Civil Local Rule 7-10. The order also required plaintiffs to submit evidence to support their factual contentions.

Plaintiffs state that if their identities were revealed they "would face a risk of intimidation and harass-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2850035 (N.D.Cal.), 71 Fed. R. Evid. Serv. 493
**2006 WL 2850035 (N.D.Cal.)**

Case 4:07-cv-03993-CW    Document 36    Filed 07/25/2008    Page 118 of 125    Page 2

ment from rogue elements of the Ecuadorian military."They also allege that their fear is credible because four prominent players in similar litigation, two lawyers and two indigenous leaders, have petitioned the Organization of American States' Inter-American Commission on Human Rights for protection. The other case, the *Lago Agrio* litigation, was brought originally as two cases in the Southern District of New York in 1993 and 1994. The district court consolidated the two cases, and subsequently dismissed them on *forum non conveniens* grounds. The *Lago Agrio* case is currently pending before an Ecuadorian court (Bonifaz Decl. ¶ 5-11). Plaintiffs similarly "face a risk of intimidation and harassment from the Frente for the Defense of the Amazon (the "Frente")." Plaintiffs fear that the Frente will harass them if they knew their identities. Lastly, plaintiffs cite the potential danger of Colombian paramilitary and other criminal groups kidnapping them for ransom. Plaintiffs propose a protective order that would only allow defense counsel to learn the identities of the plaintiffs (Br. at 6, 7).

\*2 Defendants assert that plaintiffs have not carried their requisite burden in seeking to use pseudonyms, since they have not presented sufficient admissible evidence to support their motion to proceed pseudonymously. Specifically, defendants challenge the number and content of plaintiffs' declarations-only four of the nine filed declarations, in contrast to the eight declarations filed in opposition to defendants' motion to dismiss, and the fact that the substantive portions of the four submitted declarations are identical. They also argue that Mr. Bonifaz's entire declaration should be stricken. They challenge the basis for his statements in the declaration, as well as his use of newspaper articles to support his statements. They argue that the newspaper articles are hearsay, and are thus inadmissible for the truth of the matters asserted. Finally, defendants argue that the prejudice to defendants and the public's interest in knowing plaintiffs' identities outweigh plaintiffs' speculative concerns about potential threats.

## ANALYSIS

Before this order evaluates whether plaintiffs have presented sufficient evidence to justify the use of pseudonyms, it will address defendants' admissibility concerns-whether the Bonifaz declaration, offered in support of plaintiffs' motion, must be stricken under Civil Local Rule 7-5(b) for containing inadmissible evidence. Defendants also challenge the substantive nature of plaintiffs' declarations, but plaintiffs' use of identical language is not grounds for striking their declarations.

### 1. MUST THE BONIFAZ DECLARATION BE STRICKEN TO THE EXTENT IT CONTAINS INADMISSIBLE EVIDENCE?

While plaintiffs try to dismiss defendants' arguments in its opposition to the renewed motion to proceed pseudonymously as "red herring admissibility issues," the rules governing admissibility of evidence are intrinsic to our judicial system and are very important. Civil Local Rule 7-5(b) mandates that declarations only contain facts and conform as much as possible to FRCP 56(e). FRCP 56(e) requires that declarations be based on personal knowledge and contain only admissible evidence. Civil Local Rule 7-5(b) additionally states that declarations must avoid conclusions and argument. Any statement made must specify the information or belief the declarant bases his or her statement upon. If the declaration is not in compliance, the declaration may be stricken either in part or in whole. Civ. L.R. 7-5(b). While Mr. Bonifaz may have some personal knowledge of the situation due to his prior work in the region, declarations may only contain admissible facts. One question is whether the newspaper articles he offers to support his statements are admissible as evidence or whether they are inadmissible as hearsay.[FN2]

> FN2. There is also the question of whether the declarations Mr. Bonifaz makes are based on his personal knowledge or rather on information and belief. This order will

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Case 4:07-cv-03993-CW    Document 36    Filed 07/25/2008    Page 119 of 125

Slip Copy, 2006 WL 2850035 (N.D.Cal.), 71 Fed. R. Evid. Serv. 493
**2006 WL 2850035 (N.D.Cal.)**

not reach that argument because, as explained below, plaintiffs fail to carry this burden even assuming all of the evidence they present is admissible.

## A. Admissibility of Newspaper Articles.

Plaintiffs defend their use of the newspaper articles under Federal Rules of Evidence 803(8), 902(6), and 807. *First,* they argue that newspaper articles fall within the public records exception of Rule 803(8). Plaintiffs cite Rule 902(6) for their proposition that the articles fall within this exception. Rule 902(6), however, is irrelevant to this assertion because Rule 902 concerns the authentication of written materials. Simply because newspaper articles do not need authentication does not mean they automatically fall within the Rule 803(8) public records exception. The Rule 803(8) exception is reserved for documents that detail the activities of an office or agency, or are matters observed pursuant to a duty imposed by law requiring that party report those matters (although police reports do fall outside this exception, and police officers are required to testify in court to what is stated in their reports). Newspaper articles do not fall anywhere within this definition.

*3 Plaintiffs' only other argument is that these articles fall within the residual-hearsay exception.[FN3] Rule 807 permits a court to allow statements into evidence not specifically covered by Rule 803 or 804 when the statements have equivalent circumstantial guarantees of trustworthiness. The court must make three determinations if it is to allow an exception like this. *First,* the statement must be offered as evidence of a material fact. *Second,* the statement must be more probative on the point for which it is offered than any other evidence which the proponent could procure through reasonable efforts. *Third,* the general purposes of the rule of evidence and the interests of justice must best be served by admission of the statement into evidence.

FN3. Plaintiffs' citation to Federal Rules of

Evidence 803(24) in their reply to defendants' opposition to plaintiffs' motion to proceed pseudonymously is incorrect. Federal Rule of Evidence 803(24) became its own rule, Rule 807, in 1997.

Here, the newspaper articles are being offered as evidence of a material fact: Whether plaintiffs have an objectively reasonable fear of retaliation for filing this lawsuit. With regard to the second inquiry, whether newspapers are more probative of the situation than other evidence that could be procured through reasonable efforts, plaintiffs could have submitted declarations from their own plaintiffs, or from individuals in the Oriente region testifying to these events. Furthermore, plaintiffs' attorneys could have contacted the *Lago Agrio* attorneys and asked for declarations from them stating what the *El Comercio* article stated-that they have contacted the Inter-American Commission on Human Rights seeking protection because they fear for their lives (Bonifaz Decl., Exh. D). This is reasonable, especially considering that attorney Bonifaz worked on the case and presumably has a professional relationship with those attorneys. In our country, newspapers are famously unreliable. *See Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 619 (1974). We have no reason to believe they are more accurate in South America. The hearsay rule is crucial to our judicial system because it protects the opportunity for cross-examination before one can assess the credibility or reliability of that witness's testimony. It would thwart the purposes of that rule and the interests of justice to allow these newspaper articles to be entered into evidence for the truth of the matters asserted. Because plaintiffs' newspaper articles do not fall within any exception to the hearsay rule, they are stricken from the Bonifaz Declaration as required by Civil Local Rule 7-5(b).

## 2. MAY PLAINTIFFS USE PSEUDONYMS IN THIS ACTION?

The Ninth Circuit does allow the use of pseud-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2850035 (N.D.Cal.), 71 Fed. R. Evid. Serv. 493
**2006 WL 2850035 (N.D.Cal.)**

Case 4:07-cv-03993-CW    Document 36    Filed 07/25/2008    Page 120 of 125    Page 4

onyms in unusual cases where concealing a party's identity is necessary to protect that party from "harassment, injury, ridicule, or personal embarrassment."*United States v. Doe,* 655 F.2d 920, 922 n. 1 (9th Cir.1981); *Does I thru XXIII v. Advanced Textile,* 214 F.3d 1058, 1068 (9th Cir.2000). The use of pseudonyms is reserved for the rare cases because of two reasons. One, the use of fictitious names runs afoul of FRCP 10(a); FRCP 10(a) mandates that all names of the parties be included in a complaint. Two, the public and the parties have the common law right to know the identity of the parties in a judicial proceeding.*Advanced Textile* sets the controlling legal standard for "a district court's discretionary decision to permit a party to proceed anonymously."*Advanced Textile,* 214 F.3d at 1067, 1068.

**\*4** Courts must employ a balancing test in determining whether plaintiffs should be allowed to use pseudonyms. "... [A] party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity."In determining the need for anonymity, the district court should evaluate: (1) the severity of the threatened harm; (2) the reasonableness of the anonymous party's fears; and (3) the anonymous party's vulnerability to such retaliation. The court must consider the precise prejudice such a motion would work on defendants at each stage of the proceedings. The balance may change at different points of the proceeding. Additionally, the court is to determine how the public's interest in the case would best be served. *Advanced Textile,* 214 F.3d at 1068, 1069.

In *Advanced Textile,* the plaintiffs were factory workers in Saipan, the main island in the Northern Mariana Islands. About half of the factory workers in Saipan were non-resident foreign workers, recruited in their home countries. They were induced into signing specific employment contracts that, among other things, required the employee to return to his/her home country when his/her employment ended. The plaintiffs' class action lawsuit was against defendant factories for violations of the Fair Labor Standards Act. The plaintiffs had filed declarations of garment workers detailing the particular risks they faced if their identities were disclosed. Managers had been actively trying to dissuade their workers from speaking with lawyers and being involved in the lawsuit. The workers were threatened with "various reprisals, including termination, blacklisting, deportation, and closing the factory. There is also testimony that employers made oblique threats of physical harm to employees who complained about working conditions."*Advanced Textile,* 214 F.3d at 1063, 1065.

The Ninth Circuit held that the named plaintiffs in the action had demonstrated "an objectively reasonable fear of extraordinarily severe retaliation," and that the plaintiffs could proceed under pseudonyms at least until the district court ruled on the plaintiffs' motion for notice to potential class members. The court thoroughly analyzed each factor relevant in the balancing test. *First,* the court held that the threat of economic harm was a cognizable form of retaliation, and that the threatened economic harm was sufficiently severe. *Second,* the plaintiffs' fears were objectively reasonable as specific threats had been made against them. The plaintiffs had been "interrogated about, warned against, and threatened for making complaints about their working conditions by defendants and recruiting agents. Threats ran the gamut...." There was additionally evidence to suggest that the Chinese government would carry out these threats in China after the Chinese workers in Saipan were returned to their countries. *Third,* the plaintiffs were vulnerable to retaliation by the defendants because the defendants had the power to terminate the plaintiffs at will and have them deported almost immediately. *Fourth,* there was no prejudice to the defendants in allowing the plaintiffs to proceed pseudonymously at the current stage of the proceedings-although the court did state that "it may be necessary [at a later point] to reveal plaintiffs' identities to defendants so that defendants

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

may refute [certain claims]."*Fifth*, the public's interest was satisfied by allowing the plaintiffs to proceed pseudonymously because the public had an interest in not chilling employees' willingness to challenge violations of their rights by their employers. *Advanced Textile*, 214 F.3d at 1063, 1070, 1073.

### A. Severity of the Threatened Harm.

**\*5** Here, the harm is not specific. Plaintiffs fear an alleged "risk of intimidation and harassment from rogue elements of the Ecuadorian military."They make allegations that the Ecuadorian military, acting for defendant Chevron, "will subject them to violence and harassment" similar to that suffered by the two attorneys and two indigenous leaders in the *Lago Agrio* litigation. Plaintiffs similarly face "a risk of intimidation and harassment from the Frente ... a militant organization...." They also "would face a substantial risk of kidnapping for ransom and other violence from Colombian paramilitaries and other criminal groups that operate freely in the Oriente" (Br. at 6, 7).

Plaintiffs, however, do not cite any specific harm other than the "substantial risk of kidnapping" by Colombian paramilitary and criminal groups. Plaintiffs have not cited any *specific* threats made against them.[FN4]"The insinuation is that the harm would be quite severe although plaintiffs never state this explicitly.

> FN4. While plaintiffs assert that they do not need to prove they face a danger of physical injury (Br. at 8), their quote skips an important phrase. The Ninth Circuit was referring to the fact that they found the threat of economic harm through deportation, arrest and imprisonment sufficient-that was why those plaintiffs did not need to prove a danger of physical injury. Here, however, plaintiffs presumably argue they face risks of physical harm. It is precisely because they have not made any specific

allegations of any specific threats that it is difficult to evaluate the severity of any threatened retaliation.

### B. Reasonableness of the Fear.

Plaintiffs must show that their fears are objectively reasonable. Here, plaintiffs do not cite any objective reasons for this fear in their declarations. The declarations, which come from only four of the nine plaintiffs, are identical in their content. Each plaintiff states: "I wish ... instead of using my name in all legal pleadings a pseudonym be used as I fear that poorly informed persons might threaten me or do me harm. The people of this region live in a state of complete suffering and constant danger due to the petroleum pollution and no one can prevent what they might do to me."These declarations do not rise to the level of the *Advanced Textile* declarations where workers mentioned specific threats made against them. Plaintiffs make circuitous references to vague threats that appear to be based more on where they live than any specific threats made against them.

Furthermore, it is unclear why the Frente would want to harm plaintiffs. While plaintiffs' counsel refers to problems between himself and the Frente leading to their parting ways-opposing counsel in the *Lago Agrio* litigation misstating Mr. Bonifaz's position, in an allegedly malicious fashion (Bonifaz Supplemental Decl. ¶ 3)-and new counsel taking over the *Lago Agrio* litigation, it does not necessarily follow that the Frente would harm plaintiffs. Any problems the Frente have are with Mr. Bonifaz, not plaintiffs. The reasons for this potential harassment are not clear, even with this alleged defamation of Mr. Bonifaz's character. Plaintiffs are no longer bringing a class action suit and thus represent no threat to the Frente's hopes of becoming the trustee of any settlement fund from the *Lago Agrio* litigation.

No harm came to the plaintiffs in the *Lago Agrio* litigation, as far as this record shows. If those named plaintiffs have been able to live their lives

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2850035 (N.D.Cal.), 71 Fed. R. Evid. Serv. 493
**2006 WL 2850035 (N.D.Cal.)**

Case 4:07-cv-03993-CW    Document 36    Filed 07/25/2008    Page 122 of 125    Page 6

freely, without being harmed by rogue elements of the Ecuadorian military or kidnapped by Colombian groups seeking a high ransom, then it follows that there is no reason why a different fate would befall these nine plaintiffs when the seventy-three plaintiffs who are indigenous inhabitants of the Oriente region in the *Lago Agrio* litigation have not suffered any retaliation. Assuming that plaintiffs' evidence (the newspaper articles) on the petition by the *Lago Agrio* attorneys to the Inter-American Commission on Human Rights is admissible, the evidence shows threats made against the two attorneys involved and the two indigenous leaders involved in *that* litigation-and against the public faces of the litigation, not the other *Lago Agrio* plaintiffs. Plaintiffs have submitted no evidence of what threats were made against those attorneys and whether those threats were reasonable and/or would be applicable to this situation with these plaintiffs.

### C. Plaintiffs' Vulnerability to Retaliation.

\*6 Accepting that plaintiffs live in a lawless region of the Amazon, it does not follow that the risks of living there are any greater by virtue of their involvement in this litigation.

### D. Prejudice to Defendants.

The Court must evaluate the precise prejudice pseudonymous plaintiffs would work on defendants at each stage of the proceedings. The balance may change at different points of the proceedings. The Ninth Circuit has noted this type of motion may impermissibly prevent defendants from mounting a defense.*Advanced Textile,* 214 F.3d at 1069. Here, plaintiffs have not asserted enough to establish a need for anonymity. This cannot outweigh the prejudice such an order would work on defendants, even at this stage of the proceedings. It certainly would not as the instant action moves forward, when defendants will need to mount a defense to plaintiffs' claims.

### E. How the Public's Interest in the Matter Would Best Be Served.

FRCP 10(a) requires that all complaints list the names of the parties. The purpose of this rule is not simply administrative, it is "to apprise the parties of their opponents, and it protects the public's legitimate interest in knowing all the facts and events surrounding court proceedings."*Doe v. Rostker,* 89 F.R.D. 158, 160 (D.Cal.1981). When anyone-local or foreign-invokes the potential power and authority of a United States District Court, the public has a legitimate right to know on whose behalf their institutions are being used, unless good cause to do otherwise is shown. Such good cause has not been shown in this case.

### CONCLUSION

For the reasons stated above, plaintiffs' motion and renewed motion to proceed with action using pseudonyms is **DENIED.**By October 13, 2006, plaintiffs must refile the complaint to identify themselves. This order does not authorize any other amendments.

### IT IS SO ORDERED.

N.D.Cal.,2006.
Doe v. Texaco, Inc.
Slip Copy, 2006 WL 2850035 (N.D.Cal.), 71 Fed. R. Evid. Serv. 493

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2001 WL 1335809 (D.Or.), 144 Lab.Cas. P 34,351
**2001 WL 1335809 (D.Or.)**

▷
Ballaris v. Wacker Silttronic Corp.
D.Or.,2001.

United States District Court, D. Oregon.
Michael BALLARIS, Plaintiff
v.
WACKER SILTTRONIC CORPORATION, a For-
eign Corporation, Defendant.
**No. 00-1627-KI.**

Aug. 24, 2001.

A.E. Bud Bailey a nd James Dana Pinney ( Bailey,
Pinney & Associates, LLC), Tualatin Oregon, for
Plaintiff.
John F. Neupert and J. Michael Porter (Miller Nash
LLP), Portland, Oregon for Defendant.
KING, District J.
*1 Plaintiff, Michael Ballaris, is a former employee
of the defendant, Wacker Siltronic Corporation
("Wacker"). Plaintiff brings this action alleging that
Wacker had a policy and practice of denying its
workers required overtime wages, requiring its
workers to conduct preparatory and concluding
activities while "off the clock," and altering em-
ployee time records in order to reduce its obligation
to pay overtime wages. Plaintiff alleges that he and
other hourly workers at Wacker were not paid for
their overtime work and that Wacker's failure to
pay overtime wages constitutes a willful violation
of the Fair Labor Standards Act, *29 U.S.C. § § 201*
et seq. ("FLSA"). Plaintiff further alleges that
Wacker's failure to pay overtime wages violates the
Employee Retirement Income Security Act, *29
U.S.C. § § 1001* et seq. ("ERISA"), and Oregon
wage laws, including O.R.S. 652.020 and 652.140.

Before the court is plaintiff's Motion to Allow No-
tice to All Employees of Their Opt-In Rights (#
26). The court understands this motion to be one
seeking approval of notice to similarly situated per-
sons of their right to "opt-in" to a collective action
as to plaintiff's claims under the FLSA, pursuant to

*29 U.S.C. § 216* (b). For the reasons set forth be-
low, and subject to the restrictions set forth below, I
grant the motion for approval of notice to similarly
situated persons. In so doing, I certify a collective
action under the FLSA, but only for the purposes of
notice and discovery.

DISCUSSION

The FLSA allows for a type of class action, known
as a "collective action," for employees who are
"similarly situated" to the plaintiff(s) and who file a
consent in writing with the court (i.e., "opt in" to
the case).*29 U.S .C. § 2 16* ( b).[FN1] I f employees do
not opt in by filing a written consent, they are not
bound by the outcome of the collective action and
may bring a subsequent private action. *EEOC v.
Pan Am. Work Airways, Inc., 897 F.2d 1499, 1508
n. 11* (9th Cir.), cert. denied, *111 S.Ct. 55 (1990).*

> FN1. The statute provides in pertinent part:
>
> > An action...may be maintained against
> > any employer...in any Federal or State
> > court of competent jurisdiction by any
> > one or more employees for and in behalf
> > of himself or themselves and other em-
> > ployees similarly situated. No employee
> > shall be a party plaintiff to any such ac-
> > tion unless he gives his consent in writ-
> > ing to become such a party and such
> > consent is filed in the court in which
> > their action is brought.

This district and a number of other courts have held
that the full extent of procedural restrictions that
apply to class actions, pursuant to Fed.R.Civ.P. 23,
do not apply to certification of a class under Sec-
tion 216(b) of FLSA. See *Daggett v. Blind Enter-
prises of Oregon, et al. 1996 U.S. Dist. LEXIS
22465,*No. 95-421-ST p. 9 (D.Or. April 18,
1996)("I am persuaded that FRCP 23 does not ap-
ply to a § 2 16(b) c lass action."); *Jackson v . New
York Tel. Co., 163 F.R.D. 429, 432 (S.D.N.Y.1995)*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

(holding that Fed.R.Civ.P. 23 should not be applied at the preliminary notice stage of an ADEA class action brought under Section 216(b) of FLSA).

The procedural protections of Fed.R.Civ.P. 23 are generally not necessary for a § 216(b) collective action because of that statute's opt-in requirement. As Judge Stewart explained it Daggett:

A plaintiff who opts in presumably has decided that the benefits of joining the class outweigh any benefits of bringing an individual action... There is no need for the court to determine whether a class action is the most efficient method to proceed because each individual plaintiff has already concluded that a sufficiently common issue of fact or law exists and that he or she will be adequately represented. In addition, the due process protections of FRCP 23 are not as crucial when absent class members are not bound by the judgment.

*2 Daggett at 10.

Along these lines, the "similarly situated" standard under Section 216(b) is less stringent than the requirement under Fed.R.Civ.P. 23(b)(3) that common questions of law or fact predominate over questions affecting only individual members. *Church v. Consolidated Freightways, Inc., 137 F.R.D. 294, 306 (N.D.Cal.1991);* see also *Wertheim v. State of Arizona, 1993 U.S. Dist. LEXIS 21292, 1993 WL 603552,* *1 (D.Ariz. Sept. 30, 1993)*("The requisite showing of similarity of claims under the FLSA is considerably less stringent than the requisite showing under Rule 23 of the Federal Rules of Civil Procedure"). In fact, the Eleventh Circuit has held that the similarly situated requirement is more flexible than the requirements of Fed.R.Civ.P. 20 (joinder) and 42 (severance).*Grayson v. K Mart Corp., 79 F.3d 1086, 1096* (11th Cir.), cert. denied, *117 S.Ct. 435 (1996).* As such, the claims and positions of employees need not be identical in order to meet the lower standards of § 216(b).Id.

In *Thiebes v. Wal-Mart Stores, Inc., 1999 U.S. Dist. LEXIS 18649,* *6-7 (D.OR 2001), this court out-

lined the standard that applies in determining if a collective action is appropriate:

"For prospective plaintiffs to be similarly situated, there must be a factual nexus which binds them together as victims of an alleged policy or practice."*Wyatt v. Pride Offshore, Inc., 1996 U.S. Dist. LEXIS 13335, 1996 WL 509654,* *2 (E.D.La. Sept. 6, 1996);* see also *Realite v. Ark Restaurants Corp., 7 F.Supp.2d 303, 306 (S.D.N.Y.1998)* (plaintiffs can show that potential class members are similarly situated "by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs were victims of a common policy or plan that violated the law."); *Wertheim, supra* ("All that need be shown by the plaintiff is that some identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA").

In this case, plaintiff alleges that Wacker's policy requiring workers to change into and out of their plant uniform and clean room suit while off the clock, as well as Wacker's practice of adjusting employee time sheets so as to limit overtime hours, constituted a specific scheme that resulted in consistent under-compensation of all Wacker employees working in clean rooms.

The affidavits submitted by the plaintiff, together with the allegations of the Amended Complaint, are sufficiently specific regarding how the alleged policies and practices are manifested and how they generally affect those employees working in Wacker's clean rooms. See *Bonilla v. Las Vegas Cigar Company, 61 F.Supp.2d 1129, 1139 n. 6 (D.Nev.1999)* (noting that plaintiffs bear the burden of showing that they are similarly situated, but that it "is a lenient burden for plaintiffs to meet, and can be supported by affidavits"). Plaintiff Ballaris and Julie Duncan, another former Wacker employee, both assert in their affidavits that Wacker's workplace policies necessitated their working off the clock. In particular, they allege that Wacker did not

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

compensate them for the time required to change into and out of their plant uniforms and clean suits, and that Wacker required them to be "on the floor" for debriefing before the start of their scheduled shift. Mr. Ballaris and Ms. Duncan further allege that on those instances where Wacker employees did clock in prior to the start of the shift, Wacker supervisors altered the time cards.

*3 I acknowledge that employees in the clean room in Fab 1 did not have to change into the plant uniform while some or all of the employees in the clean rooms of Fab 2 were required to make that change. I also realize that there is a discrepancy on whether workers in some of the clean rooms punch in before or after changing into their bunny suits. I think the overriding factor at this stage of the litigation is that all of the employees in the proposed class must change into and out of bunny suits. Classes can be adjusted after discovery if necessary. Consequently, I approve the class as:

all hourly employees of the defendant having been assigned to work in clean rooms of Wacker Siltronic corporation in Portland, Oregon, from November 27, 1997 to November 27, 2000.

In addition to the employee affidavits, the plaintiffs have submitted documents detailing the findings of the Oregon Bureau of Labor and Industries (Affidavit of A.E. Bud Bailey In Support of Motion to Allow Notice to Present and Former Employees of Wacker Siltronic Corporation, Exhibits B-E). Given defendant's concern that consideration of these documents could result in unfair prejudice, and because the affidavits of Mr. Ballaris and Ms. Duncan alone are sufficient to certify the collective action, I will not rely on the BOLI documents at this time.

I find that plaintiff's burden has been met and thereby grant the motion to allow notice to similarly situated persons. I emphasize, however, that I am certifying the collective action only for notice and discovery purposes. I am not holding at this time that all members of the proposed class who

will be sent notices are, in fact, similarly situated to plaintiffs. Far too little discovery has been taken for me to make such a determination now. Furthermore, should discovery reveal that plaintiffs are not similarly situated to some or all of the persons who may choose to opt in, I may later decertify the class or divide the class into subgroups, if appropriate. Reservation of this right to subdivide or decertify members of the class should alleviate defendant's concern, expressed in its response to the plaintiff's motion, that the proposed notice targets too large a class. Plaintiff's reply suggests a notice that addresses some of the defendant's concerns. I will allow a revised notice to be sent after September 4, 2001. This gives the parties time to reach a final agreement on the form of the notice. If the parties are unable to reach agreement, I am available to assist via a telephone conference.

### CONCLUSION

Subject to the above qualifications, plaintiffs motion to allow notice to all employees of the opt-in rights (# 26) is granted.

IT IS SO ORDERED.

D.Or.,2001.
Ballaris v. Wacker Silttronic Corp.
Not Reported in F.Supp.2d, 2001 WL 1335809 (D.Or.), 144 Lab.Cas. P 34,351

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.