## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

MONTE RUSSELL, on behalf of himself and others similarly situated,

        Plaintiff,

    v.

WELLS FARGO AND COMPANY,

        Defendant.

Case No. C–07-3993-CW

**DECLARATION OF T. JOSEPH SNODGRASS IN SUPPORT OF PLAINTIFF'S MEMORANDUM IN SUPPORT TO STRIKE AND INVALIDATE DEFENDANT'S RULE 68 OFFERS**

# EXHIBIT O

Slip Copy
Slip Copy, 2008 WL 2492295 (N.D.Cal.)

**H**

Lee v. The Timberland Co.
N.D.Cal.,2008.
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.
David LEE, an individual, on behalf of himself and
on behalf of others similarly situated, Plaintiffs,
v.
THE TIMBERLAND COMPANY, a New Hamp-
shire corporation conducting business in the State
of California, and Does 1-100, Defendants.
**No. C 07-2367 JF.**

June 19, 2008.

Stephen Bryan Morris, Mark Clare Hinkley, Morris
and Associates, San Diego, CA, for Plaintiffs.
Fraser Angus McAlpine, Lindsay Erin Goines,
Akin Gump Strauss Hauer & Feld LLP, San Fran-
cisco, CA, for Defendants.

ORDER [FN1] GRANTING APPROVAL OF SET-
TLEMENT OF PLAINTIFF'S CLAIMS

FN1. This disposition is not designated for
publication    in    the    official
reporter.JEREMY FOGEL, District Judge.
*1 Plaintiff David Lee ("Lee") and Defendants
Timberland Retail, Inc., et al. ("Timberland") file
this joint motion for approval of settlement of Lee's
claims under the Fair Labor Standards Act
("FLSA") and entry of stipulated judgment. For
reasons set forth below, the motion will be GRAN-
TED.

## I. BACKGROUND

Plaintiff Lee was hired by Timberland in November
2001 as a sales associate in Timberland's Barstow,
California store. In 2004, Lee was promoted to Op-
erations Manager of the store. Though classified as

an "exempt manager," Lee alleges that his position
required him to spend eighty percent of his time do-
ing the duties of a sales associate.

In 2005, Lee was transferred to Timberland's Las
Vegas, Nevada store as a non-exempt assistant
manager. Approximately, six months later, Lee was
promoted to Operations Manager of the store. In
June 2006, Lee was transferred to Timberland's San
Jose store and promoted to Store Manager. Though
he again was classified as an "exempt manager,"
Lee alleges that this position required him to spend
seventy-five percent of his time doing the duties of
a sales associate. Lee contends that his positions,
and those of similarly situated employees, are im-
properly classified as "exempt" from overtime com-
pensation.

Lee alleges that his standard pay is set for an eight-
hour workday. However, he alleges that he
routinely worked sixty hours per week as a Store
Manager and Operations Manager without overtime
compensation. In addition, Lee was assigned to
travel out of town for months at a time to assist in
managing other stores. During these trips, Lee
worked fourteen to fifteen hours per day without
overtime compensation. Lee claims that Timberland
supplied him with time cards that were completed
in advance to show that he worked for only eight
hours per day. Lee further alleges that as both a
Store Manager and Operations Manager, he was ex-
pected to complete his managerial duties in one
hour during his workday and was instructed to pre-
pare schedules at home on his own time.

On May 1, 2007, Lee filed the instant action on be-
half of himself and similarly situated employees
pursuant to the Federal Labor Standards Act
("FLSA"), 29 U.S.C. § 216(b). Timberland denies
Lee's allegations and contends that Lee is not simi-
larly situated to the members of the class proposed
by the complaint. However, on September 19,
2007, this Court granted the parties' joint motion
for notice to potential class members.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

After an exchange of wage and work histories of potential class members, the parties have agreed to settle the dispute as to fourteen potential class members. On March 28, 2008, the parties filed the instant joint motion for approval of settlement and entry of stipulated judgment. The Court conducted a hearing on June 13, 2008 to discuss the validity of the proposed settlement. The Court approved the settlement on the condition that the parties provide the Court with additional data with respect to class members' wages and alleged overtime hours. Counsel provided such documentation shortly thereafter.

## II. LEGAL STANDARD

**\*2** The FLSA requires employers to pay their employees time and one-half for work exceeding forty hours per week. *See* 29 U.S.C. § 207(a)(1). However, the FLSA allows an overtime "exemption" for those "employed in a bona fide executive, administrative, or professional capacity." *See* 29 U.S.C. § 213(a)(1). An employee cannot waive his claims under the FLSA; thus, claims may be settled only under the supervision of the Secretary of Labor or a district court. *See Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1352-53 (11th Cir.1982); *Yue Zhou v. Wang's Restaurant,* 2007 WL 172308, \*1 (N.D.Cal.2007). The FLSA also requires that a settlement agreement include an award of reasonable fees. *See* 29 U.S.C. § 216(b) ("The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and the costs of the action").

As this Court previously has noted, "the proper procedure for obtaining court approval of the settlement of FLSA claims is for the parties to present to the court a proposed settlement, upon which the district court may enter a stipulated judgment only after scrutinizing the settlement for fairness." *Yue Zhou,* 2007 WL 172308, at \*1. In reviewing a proposed settlement, "a court must determine whether the settlement is a fair and reasonable resolution of a *bona fide* dispute." *Id.*

## III. DISCUSSION

The Court concludes that there is a genuine issue of material fact as to whether Lee and others similarly situated were exempt employees. Accordingly, judicial scrutiny of the fairness of the proposed settlement is proper in the instant case. The Ninth Circuit has held that "[i]f a settlement in an employee FLSA suit does reflect a reasonable compromise over issues, such as FLSA coverage or computation of back wages, ... the district court [may] approve the settlement in order to promote the policy of encouraging settlement of litigation. *Id.* at \*2;*see also Lynn's Food Stores, Inc.,* 679 F.2d at 1355. The supplemental briefing provided by Plaintiffs' counsel acknowledges that there were multiple legal issues to evaluate in this case, including Defendant's challenge to the classification of employees as exempt under the FLSA as well as the appropriateness of collective action. Plaintiffs' counsel further acknowledges the relative difficulty of proving precisely how many overtime hours actually were worked by each of the fourteen Plaintiffs. The Court finds that the proposed award of seventy percent of the gross claim alleged by each Plaintiff reflects a reasonable compromise with respect to these difficult issues. Accordingly, in the interest of justice and in furtherance of the policy of promoting settlement of litigation, the Court will approve the proposed settlement agreements for each Plaintiff.

## IV. ORDER

Good cause therefor appearing, IT IS HEREBY ORDERED that the motion for approval of settlement is GRANTED.

N.D.Cal.,2008.
Lee v. The Timberland Co.
Slip Copy, 2008 WL 2492295 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 2298046 (N.D.Cal.)

**H**

Yue Zhou v. Wang's Restaurant
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.
YUE ZHOU, et al., Plaintiffs,
v.
WANG'S RESTAURANT, Defendant.
**No. C 05-0279 PVT.**

Aug. 8, 2007.

Kurt A. Miller, Law Offices of Kurt Miller, Morgan
Hill, CA, for Plaintiffs.
Eric F. Hartman, San Jose, CA, for Defendant.

### ORDER RE INTERVENER'S MOTION FOR AT-
### TORNEYS FEES AND COSTS

PATRICIA V. TRUMBULL, United States Magistrate
Judge.
*1 On March 6, 2007, Defendant and Intervener Adam
Wang appeared for hearing on Intervener's motion for
attorneys fees and costs. Based on the briefs and argu-
ments submitted, and the file herein,

IT IS HEREBY ORDERED that Intervener's motion for
attorneys fees is GRANTED IN PART as discussed
herein.

### I. FAIR LABOR STANDARDS ACT

The Fair Labor Standards Act ("FLSA" or "Act") re-
quires employers to pay their employees time and one-
half for work exceeding forty hours per week. *See*29
U.S.C. § 207(a)(1). The Act provides an exemption
from overtime for persons "employed in a bona fide ex-
ecutive, administrative, or professional capacity."*See*29
U.S.C. § 213(a)(1). An "employer who claims an ex-
emption from the FLSA has the burden of showing that
the exemption applies."*Donovan v. Nekton, Inc.,* 703
F.2d 1148, 1151 (9th Cir.1983). Because the FLSA "is

to be liberally construed to apply to the furthest reaches
consistent with Congressional direction ... FLSA ex-
emptions are to be narrowly construed against ... em-
ployers and are to be withheld except as to persons
plainly and unmistakenly within their terms and
spirit."*Klem v. County of Santa Clara,* 208 F.3d 1085,
1089 (9th Cir.2000) (internal quotation marks and cita-
tions omitted).

An employee's claims under the FLSA is
non-waivable,FN1 and thus may not be settled without-
supervision of either the Secretary of Labor or a district
court. *See, e.g., Barrentine v. Ark.-Best Freight Sys.,
Inc.,* 450 U.S. 728, 740, 101 S.Ct. 1437, 67 L.Ed.2d 641
(1981); *See also, Lynn's Food Stores, Inc. v. United
States, et al.,* 679 F.2d 1350, 1352-53 (11th Cir.1982);
*see also*House Report No. 101-664.FN2The proper pro-
cedure for obtaining court approval of the settlement of
FLSA claims is for the parties to present to the court a
proposed settlement, upon which the district court may
enter a stipulated judgment only after scrutinizing the
settlement for fairness. *See Lynn's Food Stores, Inc.,*
679 F.2d at 1353;*see also Schulte, Inc. v. Gangi,* 328
U.S. 108, 113 n. 8, 66 S.Ct. 925, 90 L.Ed. 1114 (1946);
*Jarrard v. Southeastern Shipbuilding Corporation,* 163
F.2d 960, 961 (5th Cir.1947); and House Report No.
101-664.

> FN1. One district court has opined that there is
> a "trend" away from finding FLSA claims non-
> waivable. *See Martinez v. Bohls Bearing
> Equipment Co.,* 361 F.Supp.2d 608
> (W.D.Tex.2005). However, in that case the
> court, rather than relying on FLSA cases, relied
> on cases decided under theAge Discrimination
> in Employment Act of 1967 ("ADEA"), 29
> U.S.C. § 621 et seq. Moreover, it ignored the
> clear expression of congressional intent impli-
> cit in congress' decision to amend the ADEAto
> allow for the release of ADEA claims when
> certain strict requirements are met, without any
> changeto the non-waivability of FLSA claims.
> *See Older Workers Benefit Protection Act,* 29
> U.S.C. § 626(f). The legislative history makes

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

it clear that congress was well aware that courts at that time considered FLSA claims to be non-wavable. *See* House Report No. 101-664. In light of this awareness, and congress' action on the ADEA, congress' failure to make any amendments that would change the non-waivability of FLSA claims (such as by removing the date restriction from 29 U.S.C. § 253) evinces a congressional intent that FLSA claims continue to be non-waivable.

FN2. As used herein, "House Report No. 101-664" refers to House Report No. 101-664, P.l. 101-433, Older Workers Benefit Protection Act, H.R. Rep. 101-664, H.R.Rep. No. 664, 101st Cong., 2nd Sess.1990, 1990 WL 200383 (1990). This report reflects congress' continued intent that FLSA claims may not be waived or compromised without supervision of either the Secretary of Labor or a district court.

In reviewing the fairness of such a settlement, a court must determine whether the settlement is a fair and reasonable resolution of a *bona fide* dispute. *See, Lynn's Food Stores, Inc.,* 679 F.2d at 1355. "If a settlement in an employee FLSA suit does reflect a reasonable compromise over issues, such as FLSA coverage or computation of back wages, that are actually in dispute [,] ... the district court [may] approve the settlement in order to promote the policy of encouraging settlement of litigation." *Id.* at 1355.

Settlement of FLSA overtime claims cannot preclude an award of attorneys fees by the court. Because a court supervised settlement of FLSA overtime claims is ultimately reduced to a judgment,[FN3] under the FLSA an award of reasonable fees is mandatory. *See* 29 U.S.C. § 216(b) ("The court in such action *shall,* in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action"); *see also Fegley v. Higgins,* 19 F.3d 1126, 1134 (6th Cir.1994) (noting that under FLSA an award of reasonable fees is mandatory). Allowing parties to waive an award of fees would contravene Congress' intent that an FLSA claimant "should receive his full wages plus the penalty without incurring

any expense for legal fees or costs." *See Maddrix v. Dize,* 153 F.2d 274, 275-76 (4th Cir.1946). In any event, a FLSA plaintiff has no authority to waive his attorney's direct interest in an award of attorneys fees. *See Maddrix v. Dize,* 153 F.2d at 276 (noting that FLSA endows a plaintiff's attorney with a direct interest in the claim for attorneys fees).

FN3. Rule 54(a) of the Federal Rules of Civil Procedure defines "Judgment" as "a decree and any order from which an appeal lies." Thus, even without a document officially entitled "Judgment," the FLSA's mandatory attorneys fees provision is triggered anytime a settlement of FLSA claims results in a final appealable order of the court.

## II. DISCUSSION

*2 In the present case, the court has entered summary judgment in favor of Plaintiff Kuo, and has approved Plaintiff Zhou's settlement of his FLSA overtime claims against Defendant for $7,000.00. Under 29 U.S.C. Section 216(b) an award of reasonable attorney's fees is mandatory.

The court has carefully reviewed Intervener's documentation regarding the attorneys fees and costs requested, as well as Defendant's opposition arguments. Many of the hours spent were not necessary for the prosecution of this action, and thus the court is not including those hours in the fee award. In addition, although Intervener appears to have many years of experience filing and settling FLSA actions, he appears to have little experience conducting discovery and handling motions. Thus, the court is applying a reduced hourly rate of $210 for the portion of work with which Intervener seemed to have little experience. Also, for work that could have been done by a paralegal, the court is applying a reduced hourly rate of $125. The court is not awarding any fees incurred for work by Mr. Dal Bon because he was never retained by either plaintiff. With respect to work Intervener did solely for Zhou, the court is awarding fees for half of the time reasonably devoted to the work in order to reflect the fact that the result was a compromise of a *bona fide* dispute. With respect to work Intervener did

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

solely for Kuo, the court is awarding fees for all of the time reasonably devoted to the work because there was no settlement of a *bona fide* dispute. With respect to work that benefitted *both* Plaintiffs, the court is awarding fees for 75% of the time reasonably devoted to the work.

Finally, the court is not awarding fees for the work Intervener did to obtain this award of fees. While normally such fees are available, the unique circumstances of this case make such an award inappropriate. The purpose of including an award of fees for the time spent obtaining an award of fees is to ensure that the FLSA plaintiff does not have his award of overtime pay diminished by any fees he owes his attorney. Here, Plaintiffs both discharged Intervener before he performed work on the attorney's fees motion. Thus, there are no fees owed by Plaintiffs to Intervener for that work.

Based on the foregoing, the court awards fees of $19,116.65, summarized as follows:

**For 9/21/04 through 10/17/05:**

|  | Attorney rate | Paralegal rate |  |
|---|---|---|---|
| Solely for Zhou: | 8.45 x .5 = 4.23 x 250 = |  | $ 1,057.50 |
|  |  | 9.4 x .5 = 4.7 x 125 = | $ 587.50 |
| Solely for Kuo: | 3.0 x 250 = |  | $ 750.00 |
|  |  | 1.5 x 125 = | $ 187.50 |
| For both: | 26.45 x .75 = 19.84 x 250 = |  | $ 4,960.00 |

**For 10/17/05 through 2/17/06** (using reduced attorney rate of $210)

| For both: | 52.85 x .75 = 39.64 x 210 = |  | $ 8,324.40 |
|---|---|---|---|
| Solely for Zhou: | 30.95 x .5 = 15.475 x 210 = |  | $ 3,249.75 |

| Total = |  |  | $19,116.65 |

### III. COSTS

*3 In addition to attorney's fees, FLSA mandates an award of costs. The costs claimed by Intervener all appear reasonable, except for the costs attributed to "ethical consultations." Thus, the court awards $5,110.83 in costs to Intervener.

### IV. CONCLUSION

For all of the reasons discussed herein, the court awards to Intervener attorney's fees in the amount of $19,116.65 and costs in the amount of $5,110.83 for a total of $24,227.48.

N.D.Cal.,2007.
Yue Zhou v. Wang's Restaurant
Slip Copy, 2007 WL 2298046 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                   Page 1
Slip Copy, 2008 WL 754452 (N.D.Ga.), 13 Wage & Hour Cas.2d (BNA) 883

# H

Luna v. Del Monte Fresh Produce (Southeast), Inc.
N.D.Ga.,2008.

United States District Court,N.D. Georgia,Atlanta
Division.
Hector LUNA, Julian Garcia, Francisco Javier
Lorenzo, Santos G. Maldonado, Patricia Woodard
and Bartolo Nunez, Individually and on behalf of
all others similarly situated, Plaintiffs,
v.
DEL MONTE FRESH PRODUCE (SOUTHEAST),
INC., and Del Monte Fresh Produce N.A., Inc., De-
fendants.
**Civil Action No. 1:06-CV-2000-JEC.**

March 19, 2008.

Andrew H. Turner, Arlen S. Benjamin-Gomez,
Mary C. Bauer, Kristi L. Graunke, Montgomery,
AL, Elizabeth Joan Appley, Attorney at Law, At-
lanta, GA, for Plaintiffs.
Bradley E. Strawn, Latesa K. Bailey, Littler
Mendelson, P.C., Atlanta, GA, Courtney Blair
Wilson, Littler Mendelson, Miami, FL, Jacqueline
Elise Kalk, Littler Mendelson, Minneapolis, MN,
Kelly D. Reese, Littler Mendelson, P.C., Mobile,
AL, for Defendants.

### ORDER & OPINION

JULIE E. CARNES, District Judge.
\*1 This case is presently before the Court on de-
fendant Del Monte Fresh Produce N.A.'s
("DMNA") Motion for Summary Judgment [197],
defendant Del Monte Fresh Produce Southeast's
("DMSE") Motions for Summary Judgment [198],
[200], and [201], plaintiffs' Motion for Summary
Judgment with respect to DMSA [202], plaintiffs'
Motion for Summary Judgment with respect to
DMNE [203], plaintiffs' Motions to Strike and to
Determine the Validity of Defendants' Offers of
Judgment [199] and [216], and Attorney Mary
Bauer's unopposed Motion to Withdraw [229].

The Court has reviewed the record and the argu-
ments of the parties and, for the reasons set out be-
low, concludes that defendant DMNA's Motion for
Summary Judgment [197] should be **GRANTED;**
defendant DMSE's Motions for Summary Judgment
[198], [200], and [201] should be **DENIED;**
plaintiffs' Motion to Strike Defendants' Offers of
Judgment [199] should be **GRANTED;** plaintiffs'
Motion for Summary Judgment with respect to
DMSE [202] should be **GRANTED;** plaintiffs' Mo-
tion for Summary Judgment with respect to DMNA
[203] should be **DENIED;** plaintiffs' Motion to De-
termine the Validity of Defendants' Offers of Judg-
ment [216] should be **DENIED as moot;** and At-
torney Mary Bauer's unopposed Motion to With-
draw [229] should be **GRANTED.**

### BACKGROUND

Plaintiffs are migrant and seasonal agricultural
laborers who worked on defendant DMSE's Helena,
Georgia farms at various times during the 2003,
2004, 2005 and 2006 harvest seasons. (Second
Amended Compl. [106] at ¶ 1.) Plaintiffs were re-
cruited to work on DMSE's farms by third-party
farm labor contractors ("FLCs").(*Id.* at ¶ 3.)
Plaintiffs Luna, Garcia, and Lorenzo were recruited
from Mexico pursuant to the temporary agricultural
work visa program commonly known as the "H-2A
program." (*Id.* at ¶ 4.) Plaintiffs Maldonado, Wood-
ard and Nunez were recruited from within the
United States. (*Id.* at ¶ 5.)

Plaintiffs allege that DMSE: (1) failed to pay the
promised wage rate for all hours worked on its
Helena farms; (2) failed to reimburse plaintiffs for
costs that they incurred in order to work on the
farms; and (3) violated federal laws governing the
wages and working conditions of migrant and sea-
sonal agricultural workers. (*Id.* at ¶ 6.) They filed
this lawsuit as a class action on behalf of two dis-
tinct classes of workers: (1) H-2A guest-workers re-
cruited from Mexico; and (2) non-H-2A migrant

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and seasonal agricultural workers recruited from within the United States. (Second Amended Compl. [106] at ¶¶ 4-5.)

All of the plaintiffs assert claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA").(*Id.* at ¶ 7.) The H-2A workers also assert claims for. breach of contract. (*Id.*) The non-H-2A workers assert claims for breach of the Migrant and Seasonal Agricultural Workers Protection Act, 29 U.S.C. §§ 1801-1871 ("AWPA").(*Id.*) Plaintiffs assert these claims against DMSE as well as DMSE's parent corporation, DMNA.[FN1]

> FN1. DMSE is a wholly-owned subsidiary of DMNA (DMNA's Statement of Material Facts in Supp. of Summ. J. [197] at ¶ 5.)

**\*2** Liability under the AWPA and the FLSA is predicated on the existence of an employer-employee relationship.[FN2]*Patel v. Wargo,* 803 F.2d 632, 635. (11th Cir.1986). Defendants contend that plaintiffs were employed solely by the FLCs who recruited and directly hired plaintiffs. (Answer [112] at ¶¶ 3-4; Answer [113] at ¶¶ 3-4.) Because the employment issue is potentially dispositive of this case, the parties agreed to a bifurcated discovery schedule, with the first stage of discovery to be focused on the issue of defendants' status as plaintiffs' employer. (Scheduling Order [66].)

> FN2. The AWPA and the FLSA use the same definition of the term "employ." *See* 2.9 U.S.C § 203(g) and 29 U.S.C. § 1802(5). An entity that employs workers under the FLSA therefore necessarily employs the workers for purposes of the AWPA, and vice versa. *Antenor v. D & S Farms,* 88 F.3d 925, 929 (11th Cir.1996).

The parties have completed the first phase of discovery, and have filed cross-motions for summary judgment on the employment issue. (Pls.' Mots. for Summ. J. [202] and [203]; Defs.' Mots. for Summ. J.[197], [198], [200], and [201].) Plaintiffs have also filed a motion to strike and a motion to determine the validity of defendants' recent offers of judgment to several opt-in plaintiffs. (Pls.' Mot. to Strike [199] and Mot. to Determine Validity of Offers of J. [216].) All of these motions are presently before the Court.

### DISCUSSION

### I. *Summary judgment motions pertaining to DMSE*

#### A. Summary judgment standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). A fact's materiality is determined by the controlling substantive law.*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. (*Id.* at 249-50.)

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 4 77 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. (*Id.* at 322-23 (quoting Fed.R.Civ.P. 56(c)).)

The movant bears the initial responsibility of asserting the basis for his motion. (*Id.* at

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

323.)However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case."(*Id.* at 325.)After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating " 'specific facts showing that there is a genuine issue for trial.'" (*Id.* at 324.)While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."*Anderson*, 477 U.S. at 247-48 (1986).

*3 The parties have engaged in extensive discovery, and compiled a voluminous record of evidence, related specifically to the employment issue. They urge the Court to review the facts submitted and determine as a matter of law whether DMSE and/or DMNA.is an employer for purposes of the AWPA and the FLSA. (*See* DMNA's Mot. for Summ. J. [197] at 2 and Pls.' Mot. for Summ. J. [202] at 4.) The Eleventh Circuit has consistently held that "[a] determination of employment status under the FLSA and the AWPA is a question of law."*Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir.1996).*See also Charles v. Burton*, 169 F.3d 1322, 1329 (11th Cir.1999)(holding same). The underlying facts that are essential to the employment inquiry are not in dispute. Accordingly, summary judgment on this issue is proper.

## B. Employer liability under the AWPA and FLSA

It is undisputed that plaintiffs were directly hired and paid by the various FLCs who recruited them to work on DMSE's Helena farms. (Pls.' Consol. Statement of Material Facts in Supp. of Mot. for

Summ. J. ("PSMF") [204] at ¶ 59.) The FLCs were ostensibly independent contractors who functioned as plaintiffs' employers. (*Id.*) That fact does not, however, preclude DMSE's liability as an employer under the AWPA and the FLSA. *See Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1208-09 (11th Cir.2003).

Both the AWPA and the FLSA broadly define "employer" to include any entity that "suffers or permits" an individual to work. 29 U.S.C. § 203(g) and 29 U.S.C. § 1802(5). The "suffers or permits" standard gives rise to liability against an entity that, as a matter of economic reality: (1) jointly employs the workers supplied by the FLC; or (2) utilizes an FLC as an employee, rather than as an independent contractor. 29 C.F.R. § 500.20(h)(4)-(5) and 29 C.F.R. § 791.2(a).*See also Charles*, 169 F.3d at 1334 (holding that growers and labor contractor jointly employed farmworkers) and *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1328 (5th Cir.1985) (recognizing that where a grower employed a labor contractor, he necessarily employed the contractor's employees). The evidence in this case suggests that DMSE did both.

## C. DMSE "jointly employed" plaintiffs.

The Eleventh Circuit has identified seven factors that are relevant to the joint employment inquiry, including: (1) the putative employer's power, directly or through the FLC, to direct, control, or supervise the work; (2) the putative employer's power to hire or fire, modify the employment conditions, or determine the pay rates or methods of pay for the workers; (3) the degree of permanency and duration of the parties' relationship; (4) whether the workers perform skilled or unskilled work; (5) whether the workers perform a task that is an integral part of the putative employer's overall business; (6) whether the putative employer owned or controlled the premises where the work occurred; and (7) whether the putative employer undertook responsibilities ordinarily performed by employers. *Charles*, 169 F.3d at 1329. These factors are designed to help the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Court determine whether, as a matter of economic reality, plaintiffs were dependent on DMSE. *Id. See also Anterior,* 88 F.3d at 932 ("It is dependence that indicates employee status. Each [factor] must be applied with that ultimate notion in mind."). The undisputed evidence indicates that they were.

**1. *DMSE had substantial power to direct, control, and supervise the work of FLC workers.***

*\*4* This factor focuses on whether the putative employer takes an "overly active role" in overseeing the work performed by FLC workers. *Martinez-Mendoza,* 340 F.3d at 1209-10 (quoting *Aimable v. Long and Scott Farms,* 20 F.3d 434, 441 (11th Cir.1994)). An alleged employer engages in active oversight when it makes such decisions as: (1) whom a nd how many employees to hire; (2) whom to assign to specific tasks; (3) when work should begin or end each day; (4) when a particular field will be harvested or planted; and (5) whether a worker should be disciplined. *Id.* at 1210;*Charles,* 169 F.3d at 1329-30. Control is also exhibited when the employer provides the containers upon which piece rate earnings are based. *Charles,* 169 F.3d at 1330.

DMSE management instructed the FLCs on a daily basis regarding: how many workers were needed for specific tasks; how many workers should work in each field; which fields to work; how many workers to assign or reassign to specific lines or locations in the warehouse; which warehouse lines to run and at what speeds; and the days on which specific work would begin. (PSMF [204] at ¶¶ 210-11, 215-19, 302-03, 213-13, 317-22.) DMSE also provided the containers upon which the workers' piece rate earnings in certain crops were calculated.(*Id.* at ¶¶ 444-445.)

In addition, DMSE directly monitored and supervised the FLC workers throughout the workday. (*Id.* at ¶¶ 299, 325, 328-330.)DMSE General Manager Mike Kirby routinely walked through the warehouse for two to three hours each day to observe the progress of the work. (*Id.* at ¶ 331.)DMSE field supervisors similarly monitored the work being done in the fields. (*Id.* at ¶¶ 352-358.)When they observed problems with particular workers, DMSE managers or supervisors either directly confronted the worker or contacted the responsible FLC to address the problem.[FN3](PSMF [204] at ¶¶ 335, 360.)

> FN3. DMSE also established and enforced uniform work rules that were applicable to FLC workers, and required the FLCs and their employees to attend safety and sanitation trainings. (PSMF [204] at ¶¶ 252-57.)

DMSE attempts to rebut the above evidence with the testimony of various plaintiffs that they did not experience or observe any direct supervision by DMSE personnel. (*See* DMSE's Response to Pls.' Mot. for Summ. J. [211] at 49-51.) This testimony is immaterial. Whether plaintiffs were personally aware of it or not, there is undisputed evidence in the record that DMSE managers frequently monitored and supervised FLC workers. (*See* PSMF [204] at ¶¶ 331, 335, 352-360.) Moreover, for purposes of this factor, control and supervision "may be either direct or indirect."29 C.F.R. § 500.20(h)(5)(iv)(A).*See Charles,* 169 F.3d at 1330 ("[S]upervision is present whenever orders are communicated directly to the laborer or indirectly through the contractor."). The fact that DMSE may have generally effected supervision by speaking to the FLCs, rather than directly to the workers, "does not negate [DMSE's] apparent on-the-job control over the workers."*Hodgson v. Griffin & Brand of McAllen, Inc.,* 47.1 F.2d 235, 238 (5th Cir.1973).FN4

> FN4. Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**2. *DMSE had the power to hire and fire workers, and to modify the conditions of their employment.***

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*5** At the beginning of each season, DMSE required the FLCs to sign standardized "FLC Agreements" governing the services that the FLCs were to provide to DMSE. (PSMF [204] at ¶¶ 136-150.) DMSE presented the Agreements to the FLCs fully prepared, with jobs and corresponding pay rates and methods of payment (hourly or piece rate) already specified. (*Id.* at ¶ 150.)

DMSE's argument that the compensation rates in the FLC Agreements were only "estimates" of the amount that the FLCs should pay their workers is unpersuasive. (*See* DMSE's Response to PSMF [212] at ¶ 150.) The FLCs were not authorized to pay less than the specified rates and, as a practical matter, could not afford to pay more. (PSMF [204] at ¶ 147, 149.) Thus, with few exceptions, DMSE dictated the FLC workers' pay rates and method of payment through the standardized FLC Agreements. (*Id.* at ¶¶ 136-64.)

DMSE also retained and regularly exercised the right to approve employees selected to fill supervisory positions and positions involving dangerous equipment or machinery. (*Id.* at ¶ 141.) To that end, DMSE managers identified specific FLC workers whom they wanted to be helpers, drivers, and quality control individuals. (*Id.* at ¶¶ 220-225.) DMSE managers also occasionally identified employees whom they wanted removed from certain positions. (*Id.* at ¶¶ 228-229.) On at least one occasion, a DMSE manager suggested to an FLC that a particular worker should be fired because she was pregnant. (PSMF [204] at ¶ 228.) The FLC fired the employee based on her understanding of DMSE's preference. (*Id.*) In several other instances, DMSE laid off employees and then suggested that these individuals be hired by an FLC. (*Id.* at ¶¶ 233-40.) The FLCs generally complied with these requests because they viewed DMSE management as their "bosses." (*Id.* at ¶¶ 246-51.)

**3. *The relationship between DMSE and the workers was relatively permanent.***

Recognizing the inherently seasonal nature of most agricultural work, courts have generally found a sufficiently permanent relationship to indicate joint employment where labor contractors and their workers return to a farm year after year for a particular season of work, or where labor contractors supply their workers primarily to one grower during a specific harvest or planting period. *See United States v. Lauritzen,* 835 F.2d 1529, 1537 (7th Cir.1987)( "One indication of permanency ... is the fact that it is not uncommon for the migrant families to return year after year") and *Barrientos v. Taylor,* 917 F.Supp. 375, 384 (E.D.N.C.1996) ("the relationship is permanent to the extent that the migrants worked only for defendants during the season").

Rojas Harvesting was DMSE's primary labor contractor, and supplied the majority of workers used in DMSE's Helena operations. (PSMF [204] at ¶ 60.) Rojas provided laborers to DMSE from 2000 or 2001 until 2006. (*Id.* at ¶ 62.) From 2003 until the close of DMSE's operations in 2006, approximately 90% of Rojas business each year derived from work performed for DMSE. (*Id.* at ¶ 64.) In 2003, 2004, and 2005, Rojas supplied labor nearly year-round to DMSE.(*Id.* at ¶ 89.) This suggests a somewhat permanent and exclusive relationship between Rojas and DMSE.

**\*6** In addition, several of the plaintiffs testified that they returned to work for DMSE for multiple consecutive onion seasons, and that during those seasons they primarily worked for DMSE. Plaintiff Patricia Woodard worked exclusively for DMSE during each onion harvest season from April 2003 through June or July 2006. (*Id.* at ¶ 126.) Plaintiff Bartolo Nunez returned to DMSE's farms for the 2004, 2005, and 2006 onion harvests. (PSMF [204] at ¶ 127.) Opt-in plaintiffs George Allen, Sandreka Madison, Rosa Arias, and C.J. Mason also returned to DMSE's farms for multiple seasons. (*Id.* at ¶¶ 130-135.)

**4. *FLC workers performed unskilled work.***

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

DMSE concedes that plaintiffs generally performed unskilled work. (DMSE's Response to PSMF at ¶ 373; DMSE's Mem. in Supp. of Mot. for Summ. J. [200] at 15.) This factor thus weighs in favor of a joint employment relationship.*Charles,* 169 F.3d at 1332 ("The lower the worker's skill level, the lower the value and marketability of his/her services and the greater the likelihood of his/her economic dependence on the person utilizing those services.").

**5. *DMSE owned or leased the premises where the work occurred.***

DMSE also concedes that it owned or leased the land on which the work at issue was performed. (PSMF [204] at ¶¶ 438-39.) As the Eleventh Circuit explained in *Antenor:*"[A] business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors."*Antenor,* 88 F.3d at 937. Accordingly, this factor weighs in favor of joint employment. *Id. See also Charles,* 169 F.3d at 1333.

**6. *FLC workers performed tasks that are an integral part of DMSE's overall business.***

During the relevant, time period, DMSE was engaged in the business of growing and packaging fresh produce in the Helena, Georgia area. (PSMF [204] at ¶¶ 5, 21-24.) Plaintiffs and other FLC workers performed the planting, harvesting, and packing of DMSE's produce. This work clearly was integral to DMSE's operations and overall business. *See Charles,* 169 F.3d at 1333 ("picking of snap beans was integral to both harvesting and producing of snap beans").

**7. *DMSE undertook at least some responsibilities that are ordinarily performed by employers.***

Examples of tasks that are ordinarily performed by employers include: (1) preparing or making payroll records; (2) preparing or issuing paychecks; (3) paying FICA taxes; (4) providing workers' compensation insurance; (5) providing field sanitation facilities, housing, or transportation; and (6) providing tools, equipment, or materials required for the job. *Martinez-Mendoza,* 340 F.3d at 1214. The FLCs prepared their own payrolls and issued paychecks without assistance from DMSE. (DMSE's Statement of Undisputed Material Facts in Supp. of Summ. J. ("DMSE's SMF") [200] at ¶ 129.) The. FLCs also performed their own tax calculations and independently made these deductions. (*Id.* at ¶ 130.)In addition, the FLCs independently obtained liability and workers' compensation insurance. (*Id.* at ¶ 137.)

\*7 On the other hand, DMSE maintained labor camps in which it provided free housing to numerous FLC workers between 2003 and 2006. (PSMF [204] at ¶¶ 461-68.) DMSE paid for most costs associated with the housing, including major repairs, routine maintenance, and utility bills. (*Id.* at ¶¶ 472-73.)DMSE also' assisted Rojas in obtaining housing for workers for whom there was no room at the camps during the 2006 onion harvest season. (*Id.* at ¶ 469.)As part of these efforts, DMSE executed a contract addendum with subsidies for outside housing, and suggested to Ms. Rojas where she should look for worker housing. (*Id.*)

In addition, DMSE provided FLC workers with the majority of the tools, materials, and equipment that were essential to their work. (*Id.* at ¶¶ 440-47.)DMSE provided and serviced all the forklifts, tractors, and other field and warehouse machinery used in the Helena operations. (PSMF [204], at ¶ 442.) DMSE also provided the fuel required for the equipment. (*Id.* at ¶ 443.)DMSE further provided sacks in which field workers placed harvested onions, and all the bins and boxes used to harvest, load, and pack onions and other produce.(*Id.* at ¶¶ 444-45.)In the 2006 onion harvest season, DMSE arranged and paid for sanitation facilities on its Helena farms. (*Id.* at ¶ 453.)

The evidence on this factor thus indicates that DMSE and its FLCs. each performed discrete tasks

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

routinely performed by an employer. Nevertheless, DMSE's provision of most of the tools, materials, and services critical to plaintiffs' work suggests that plaintiffs were economically dependent on DMSE. See *Charles,* 169 F.3d at 1333 n. 15 ("workers who use the services, materials or functions [provided by a putative employer] are in a very tangible way economically dependent on the entity performing these functions").

## 8. *Conclusion*

All of the relevant factors weigh in favor of joint employment, and the evidence in the record overwhelmingly suggests that plaintiffs were at least as economically dependent on DMSE as they were on their FLCs. Plaintiffs' motion for partial summary judgment as to DMSE [202] is therefore **GRANTED,** and DMSE's motions for summary judgment [198], [200], and [201] are **DENIED.**

## D. DMSE utilized Rojas Harvesting as an employee.

In addition to its status as a joint employer of plaintiff, DMSE also effectively employed its primary labor contractor. This fact offers additional support to grant plaintiffs' motion for summary judgment. Specifically, the evidence in the record further suggests that Letisia Rojas Salazar, DMSE's primary labor contractor, functioned as an employee of DMSE as opposed to an independent contractor.[FN5]The DOL has identified six factors that are relevant to determine whether an FLC is a bona fide independent contractor or an employee. 29 C.F.R. § 500.20(h)(4). These factors, which overlap substantially with the factors discussed above, include: (1) the nature and degree of the putative employer's control as to the manner in which the work is performed; (2) the putative employee's opportunity for profit or loss depending on his/her managerial skill; (3) the putative employee's investment in equipment or materials required for the task, or the putative employee's employment of other workers; (4)

whether the services rendered by the putative employee require special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the services rendered by the putative employee are an integral part of the putative employer's business.

> FN5. In 2001 or 2002, DMSE offered Ms. Rojas a position as DSME's primary labor contractor. (PSMF [204] at ¶ 63.) Ms. Rojas subsequently became, and at all relevant times was, the Rojas family member most actively involved in directing and overseeing Rojas Harvesting's provision of workers to DMSE. (*Id.* at ¶¶ 63, 69-70-73.)

*8 As discussed, DMSE retained and regularly exercised substantial control over the work performed by the FLCs. In addition, Rojas had a relatively permanent and exclusive relationship with DMSE, and the work performed by Rojas' FLC workers was unquestionably integral to DMSE's business. The evidence on these factors therefore suggests that Rojas functioned as an employee of DMSE. The remaining factors also support an employment relationship.

## 1. *Rojas had a limited opportunity for profit or loss based on her managerial skill.*

Rojas earned a profit on her work for DMSE by means of a standard surcharge specified in the FLC Agreements. (PSMF [204] at ¶¶ 136-149.) As noted, the FLC Agreements listed various jobs and their corresponding rates of pay, including whether payment would be made on an hourly or piece rate basis for specific jobs. (*Id.* at ¶¶ 142-146.)The total payment that Rojas received was calculated by applying a 32% surcharge to both hourly and piece rate work.(*Id.* at ¶¶ 144, 147.)The 32% surcharge was specifically calculated as a percentage necessary to cover the FLCs costs for insurance and employment taxes, as well as to provide some profit to the FLC. (*Id.* at ¶ 149.)As a practical matter, this arrangement provided very little if any opportunity

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

for Rojas to apply her "managerial skill" to increase profit.

Rojas' opportunity for loss was similarly limited, because she did not make any significant investment in work-related equipment or materials. DMSE owned or leased all of the land on which the work occurred, and supplied all of the heavy equipment and machinery used in its operations, including tractors, forklifts, fuel, fertilizers and pesticides, irrigation equipment, and the components of the warehouse packing lines. (*Id.* at ¶¶ 438-47.)DMSE also paid most of the costs associated with maintaining two labor camps primarily used for housing Rojas workers. (PSMF [204] at ¶¶ 461-66.) Rojas only provided plastic buckets, basic hand tools such as onion clippers, and a few vehicles in which workers were transported. (*Id.* at ¶¶ 440-47, 454.)Given the limited nature of her investment, Rojas' opportunity for loss was practically nonexistent. *See Haywood v. Barnes,* 109 F.R.D. 568, 588 (E.D.N.C.1986) (noting that the labor contractors' investment in "some light tools and a few scattered buses and trucks" was minimal in comparison with the grower's investment in land, housing, storage facilities, equipment, tools, and supplies)

### 2. *The vast majority of Rojas' workers primarily worked at DMSE's Helena operations.*

Although Rojas supplied some workers to farms other than DMSE, 90% of Rojas' business between 2003 and 2006 derived from work performed at DMSE's Helena operations. (PSMF [204] at ¶ 64.) In a succession of letters supporting Rojas' applications for H-2A workers, DMSE indicated its intent to utilize all of the H-2A workers requested by Rojas in 2003, 2004, 2005, and 2006. (*Id.* at ¶ 278-281.)The number of workers that Rojas supplied to other farms, and the amount of time those workers spent working on other farms, were insignificant compared to the workers supplied to, and time spent on, DMSE's Helena farms.

### 3. *Ms. Rojas had limited skills and training.*

*9 Ms. Rojas was 18 years old when DMSE offered her a position as its primary labor contractor. (*Id.* at ¶ 63.)Although she was experienced in farmwork when she accepted the labor contractor position, Rojas did not have any specialized training in agriculture or in farm labor contracting. (*Id.* at ¶ 78.)In fact, she dropped out of school in the ninth grade. (*Id.* at ¶ 78.)

Ms. Rojas was undoubtedly proficient in performing numerous duties for DMSE, including recruiting, hiring, training, and supervising workers. (*See* DMSE's Response to Pls.' Mot. for Summ. J. [211] at 40.) She also showed initiative in communicating with the DOL regarding contracting and housing matters, working with an accounting firm to prepare her payroll, and consulting with an agricultural firm regarding the H-2A recruitment process. (*Id.*) However, there is no evidence that she brought a particularly specialized set of skills to DMSE. *See Beliz,* 765 F.2d at 1328 (holding that a contractor who provided "routine supervision of the kind commonly given by foremen" was an employee of the grower).

### 4. *Conclusion*

All of the relevant factors suggest that Rojas functioned as DMSE's employee. Accordingly, DMSE necessarily employed Rojas' workers for purposes of the AWPA and the FLSA. *See Beliz,* 765 F.2d at 1328. For this additional reason, DMSE's motions for summary judgment [198], [200], and [201] are **DENIED,** and plaintiffs' motion for partial summary judgment with respect to DMSE [202] is **GRANTED.**

### II. *Summary judgment motions pertaining to DMNA*

Plaintiffs have named DMSE's parent corporation DMNA as a defendant in this litigation. DMNA is in the business of marketing and selling produce

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that it purchases from either its wholly-owned subsidiaries or from various third parties. (DMNA's Statement of Material Facts in Supp. of Summ. J. ("DMNA's SMF") [197] at ¶ 3.) In 1998, DMNA acquired Grimes Farm, an existing agricultural entity in Helena, Georgia. (*Id.* at ¶ 4.) At that time, DMSE was formed and incorporated, with its holdings containing the former Grimes Farm.(*Id.*) DMSE then became a wholly-owned subsidiary of DMNA. (*Id.* at ¶ 5.) DMSE and DMNA subsequently maintained a working relationship by which DMSE sold most of the produce it harvested to DMNA at a 3% markup. (*Id.* at ¶ 10.)

As discussed above, liability under the AWPA and the FLSA is premised on an employment relationship. *Patel,* 803 F.2d at 636. DMNA cannot be held liable to plaintiffs under the AWPA. AWPA and FLSA simply because its wholly-owned subsidiary employed plaintiffs. *Id.* Plaintiffs must instead prove that DMNA also jointly employed plaintiffs, or that there is an alternative basis for holding DMNA liable for the actions of its subsidiary. Plaintiffs have not met this burden.

## A. DMNA did not jointly employ plaintiffs.

Applying the seven-factor economic realities test described above, there is no evidence in the record to suggest that DMNA jointly employed plaintiffs.

### 1. *DMNA did not control, direct, or supervise plaintiffs.*

*10 DMNA was not at all involved in supervising either the FLCs or their employees. (DMNA's SMF [197] at ¶ 69.) Plaintiffs concede that DMNA personnel did not directly communicate with the FLC workers. (Pls.' Response to DMNA's SMF [208] at ¶ 69.) In addition, the FLCs testified that they had never communicated with DMNA or any member of its management. (DMNA's SMF [197] at ¶ 69.) There is thus no evidence that DMNA controlled or supervised the workers indirectly via the FLCs. The only evidence on this factor is that a small number

of DMNA employees visited DMSE's facilities on an infrequent basis for meetings with DMSE employees to discuss sales, production, accounting, and other issues. (DMNA's SMF [197] at ¶ 13; Pls.' Response to DMNA's SMF [208] at ¶ 13.) These activities do not rise to the level of "active oversight" of the work performed by the FLC workers. *See Aimable,* 20 F.3d at 440-41.

### 2. *DMNA did not have or exercise the right to hire, fire, or modify workers' employment conditions.*

There is no evidence that DMNA determined or had the power to determine plaintiffs' pay rates or payment method. While DMNA officers reviewed the FLC Agreements, they never altered the pay rates contained within them. (DMNA's SMF [197] at ¶ 63.) Instead, the pay rates and methods of pay were determined and approved by DMSE's General Manager. (*Id.* at ¶ 60.)Neither is there any. evidence that DMNA was at all involved in the recruitment, hiring or firing of any of the FLCs or their workers. (Pls.' Response to DMNA's SMF [208] at ¶¶ 65-66.) DMNA's limited involvement in DMSE's operations does not constitute indicia of joint employment under this factor. *See Beck v. Boce Group, L.C.,* 391 F.Supp.2d 1183, 1188-90 (S.D.Fla.2005) (finding that a parent corporation did not exercise control over the employees of its subsidiary, although the parent consulted with the subsidiary on employment matters and required distribution of an employee handbook).

### 3. *Plaintiffs did not have a permanent relationship with DMNA.*

The FLCs entered into contracts with DMSE, not DMNA. (DMNA's SMF [197] at ¶ 54.) There is no evidence that DMNA had any kind of relationship with plaintiffs or their FLCs, much less a relationship of such permanency or exclusivity to justify a finding of joint employment. *See Martinez-Mendoza,* 340 F.3d at 1212 (discussing permanency

factor).

### 4. *Plaintiffs performed unskilled work.*

As noted above, it is undisputed that plaintiffs' jobs were unskilled. This factor thus weighs slightly in favor of joint employment.

### 5. *Plaintiffs' jobs were not integral to DMNA's business.*

DMNA is in the business of marketing and selling produce that it purchases from either its wholly-owned subsidiaries or various third parties. (DMNA's SMF [197] at ¶ 3.) DMNA can and does purchase produce from a number of growers other than DMSE. (*Id.*) It is not dependent on produce purchased from DMSE.(*Id.* at ¶ 7.) Plaintiffs' work is therefore not indispensable or integral to DMNA's overall business. *Compare Antenor,* 88 F.3d at 937 (finding that farmworkers were "one small but indispensable part" of the growers' overall production process).

### 6. *DMNA did not own or control the premises on which the work occurred.*

**\*11** DMSE leased all of the fields, and owned the warehouse, in which plaintiffs worked.[FN6](DMNA's SMF [197] at ¶¶ 6-8.) There is no evidence that DMNA had any interest in these properties.

> FN6. The warehouse was marked with a sign reading "Del Monte Fresh Produce Southeast." (DMNA's SMF [197] at ¶¶ 7-8.)

### 7. *DMNA did not undertake any responsibilities commonly performed by employers.*

The Court found above that both DMSE and the FLCs performed some of the tasks that are ordinarily performed by employers, with the FLCs assuming responsibility for payroll functions and DMSE

providing housing, equipment, and tools. There is no evidence that DMNA undertook any of these responsibilities. *See Gonzalez-Sanchez v. Int'l Paper Co.,* 346 F.3d 1017, 1023 (11th Cir.2003) (holding that defendant did not jointly employ plaintiffs where there was no evidence that it issued paychecks, withheld taxes, or provided insurance, housing, transportation, or tools to plaintiffs).

### B. There is no other basis for holding DMNA liable.

Plaintiffs essentially concede that they cannot demonstrate a joint employment relationship under the test articulated above. (*See* Pls.' Response to DMNA's Mot. for Summ. J. [208].) However, plaintiffs suggest that DMNA should be held liable to plaintiffs because: (1) DMNA is the parent corporation of DMSE and exercised "substantial control" over DMSE's operations; (2) DMNA and DMSE constitute an integrated enterprise; and (3) DMSE was DMNA's agent with respect to plaintiffs. (*Id.*) These arguments are not persuasive.

The Eleventh Circuit repeatedly has indicated that the seven-factor joint employment analysis is the proper standard to determine FLSA and AWPA liability for multiple entities, including two related corporate entities. *See Martinez-Mendoza,* 340 F.3d at 1207-08;*Patel,* 803 F.2d at 637. In fact, the Patel Court specifically rejected the approach that plaintiffs recommend, stating: "There is no case holding that the individual entities which make up an enterprise should be jointly and severally liable for another entity's employees solely because they are members of the enterprise."*Patel,* 803 F.2d at 635. *See also Lane v. Capital Acquisitions and Mgmt. Co.,* 2007 WL 676019 at \*4 (S.D.Fla.2007)("Under the FLSA, courts apply the economic realities test to determine whether a parent is, in fact, a joint employer for. purposes of the FLSA.") and *Kaplun v. Lipton,* 2007 WL 707383 at \*3 (S.D.Fla.2007)("in order for all the corporate Defendants in this action to be liable for Plaintiffs overtime claim Plaintiff must establish their liabil-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ity as her employer through a joint employer analysis").

Moreover, the evidence does not support plaintiffs' alternative theories of liability, which all assume that DMNA exercised "substantial control" over DMSE. The evidence overwhelmingly suggests that DMSE conducted its business independently from DMNA. (DMNA's SMF [197] at ¶¶ 14-35.) DMNA's involvement in DMSE's daily operations was limited. (*Id.*) More importantly, DMNA had no involvement whatsoever with plaintiffs or the FLCs. *See Greason v. Se. R.R. Assoc. Bureaus,* 650 F.Supp. 1, 4 (N.D.Ga.1986)("For the agency theory, the claimant must show that one entity acted as the other's agent *with respect to employment practices.*") (emphasis added) and *Llampallas v. Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1244-45 (11th Cir.1998)(the integrated enterprise theory concentrates on the "degree of control an entity has over the adverse employment decision on which the [plaintiffs'] suit is based."). Accordingly, DMNA's motion for summary judgment [197] should be **GRANTED,** and plaintiffs' motion for partial summary judgment as to DMNA [203] should be **DENIED.**

### III. *Plaintiffs' motions to strike or determine the validity of defendants' offer of judgment*

**\*12** The named plaintiffs filed this action on behalf of themselves and other similarly situated migrant farmworkers. (*See* Amended Compl. [55].) Shortly after plaintiffs filed their amended complaint, they filed motions for class certification and for certification as an FLSA collection action. (Pls.' Mot. to Certify Class [73] and Mot. to Certify FLSA Collective Action [84].) Subsequently, 47 plaintiffs opted into the lawsuit. (Pls.' Br. in Supp. of Mot. to Strike [199] at 2.) Defendants have issued Rule 68 offers of judgment to 42 of the opt-in plaintiffs. (*Id.* at 6.) Plaintiffs move to strike or invalidate those offers. (Pls.' Mot. to Strike Offers of J. [199]; Pls.' Mot. to Determine Validity of Offers of J. [216].)

Pursuant to Rule 68, a defendant may make an offer of judgment to a plaintiff any time up to ten days prior to trial. FED.R.CIV.P. 68. If the plaintiff rejects the offer of judgment, and ultimately recovers less at trial than the amount specified in the offer, he must pay the defense costs incurred after the date of the offer. *Id.* Plaintiffs contend that defendants' offers are inappropriate in the context of an FLSA collective action. (Pls.' Mot. to Strike [199] at 7.) They seek judicial clarification of the issue because rejecting the offers may prejudice plaintiffs in the eventual assessment of costs. (*Id.*)

The Eleventh Circuit has held that FLSA claims may only be abridged or settled after a court reviews the proposed settlement to ensure that it is fair and reasonable. *Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1352-53 (11th Cir.1982). As the Court explained in *Lynn's Food:*

> There are only two ways in which back wage claims arising under the FLSA can be settled or compromised by employees. First, under section 216(c), the Secretary of Labor is authorized to supervise payment to employees of unpaid wages owed to them.... The only other route for compromise of FLSA claims is provided in the context of suits brought directly by employees against their employer under section 216(b) to recover back wages for FLSA violations. When employees bring a private action for back wages under the FLSA, and present to the district court a proposed settlement, the district court may enter a stipulated judgment after scrutinizing the settlement for fairness.

*Id.* at 1353.

Defendants have not presented its Rule 68 offers to the Court for approval, with good reason. At this stage in the litigation, there is absolutely no basis for determining whether the offers are fair and reasonable. The parties have not conducted any merits discovery or provided even an estimate as to the amount plaintiffs might be entitled to recover on their FLSA and AWPA claims. *See Yates v. Ap-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

plied *Performance Tech., Inc.,* 205 F.R.D. 497, 503 (S.D.Ohio 2002)(holding that it would be inappropriate to compel plaintiffs to accept an offer of judgment where it was unclear how much plaintiffs were owed) and *Rubery v. Buth-Na-Bodhaige, Inc.,* 494 F.Supp.2d 178, 181 (W.D.N.Y.2007) (noting that courts have "traditionally been wary of attempts by defendants to evade FLSA collective actions by making Rule 68 offers of judgment at the earliest possible time"). The amount specified in the offers appears to have been randomly selected.

**\*13** Defendants' settlement offers have not been, and at this stage in the litigation cannot be, reviewed or approved by the Court. The offers are thus invalid under *Lynn's Food.*Accordingly, the Court **GRANTS** plaintiffs' motion to strike defendants' Rule 68 offers [199] and **DENIES as moot** plaintiffs' motion to determine the validity of the offers [216]. Pursuant to this ruling, plaintiffs are not subject to the consequences of refusing the offers under Rule 68.

### *CONCLUSION*

For the foregoing reasons, the Court finds that defendant DMNA's Motion for Summary Judgment [197] should be **GRANTED;** defendant DMSE's Motions for Summary Judgment [198], [200], and [201] should be **DENIED;** plaintiffs' Motion to Strike Defendants' Offer of Judgment [199] should be **GRANTED;** plaintiffs' Motion for Summary Judgment with respect to DMSE [202] should be **GRANTED;** plaintiffs' Motion for Summary Judgment with respect to DMNA [203] should be **DENIED;** plaintiffs' Motion to Determine the Validity of Defendants' Offer of Judgment [216] should be **DENIED a s m oot;** and Attorney Mary Bauer's unopposed Motion to Withdraw [229] should be **GRANTED.**

SO ORDERED.

N.D.Ga.,2008.
Luna v. Del Monte Fresh Produce (Southeast), Inc.

Slip Copy, 2008 WL 754452 (N.D.Ga.), 13 Wage & Hour Cas.2d (BNA) 883

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 1635423 (C.D.Cal.)

**H**
Wang v. Chinese Daily News, Inc.
C.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,C.D. California.
WANG, et al.
v.
CHINESE DAILY NEWS, INC., et al.
**No. CV 04-1498 CBM.**

May 9, 2006.

Della Bahan, Peter Bibring, Bahan And Associates, Pasadena, CA, for Plaintiff.
Steven D. Atkinson, Mark T. Palin, Scott K. Dauscher, Atkinson, Andelson, Loya, Ruud & Romo, Cerritos, CA, for Defendant.

CIVIL MINUTES-GENERAL

MARSHALL, J.

DOCKET ENTRY

ORDER GRANTING Plaintiffs' Motion to Strike Defendants' Rule 68 Offers of Judgment

*JOSEPH LEVARIO*
Deputy Clerk
ATTORNEYS PRESENT FOR PLAINTIFFS:
N/A

PROCEEDINGS:

*N/A*
Court Reporter
ATTORNEYS PRESENT FOR DEFENDANTS:
N/A

**\*1** The matter before the Court is Plaintiffs' Motion to Strike Defendants' Rule 68 Offers of Judgment. This Court has certified a class pursuant to Fed.R.Civ.P. 23 and has also certified a collective action pursuant to the Fair Labor Standards Act. Defendants subsequently served Plaintiffs' counsel with 41 separate Fed.R.Civ.P. 68 offers of judgment, which obligate a party to accept the offer within ten days or risk having to pay opposing party's costs. After considering the parties' briefs and oral arguments, the Court hereby GRANTS Plaintiffs' motion, striking the Rule 68 offers, and declaring the offers to be void and unenforceable.

The Court finds that Defendants' Rule 68 offers to the named plaintiffs create an unresolvable conflict between class representative's fiduciary duty to the class and their own personal interest. The Court further finds that the Rule 68 offers made to individual absent class members create obligations that run contrary to the purpose of Rule 23 class actions, namely the achievement of judicial economy by allowing a class to proceed on a rep-

resentative basis. Finally, the Court finds that, in light of the facts of this case, the mandatory nature of Rule 68 conflicts with Rule 23's requirement that any settlement be approved by the Court after a hearing regarding the fairness of any settlement. *See Gay v. Waiters' and Dairy Lunchmen's Union Local No. 30,* 86 F.R.D. 500 (N.D.Cal.1980).

Accordingly, the Court GRANTS Plaintiffs' motion and strikes the individual Rule 68 offers made by Defendants. While Rule 68 offers may be compatible with the obligations imposed by Rule 23 under certain limited circumstances, this motion does not present such an instance.

IT IS SO ORDERED.

C.D.Cal.,2006.
Wang v. Chinese Daily News, Inc.
Not Reported in F.Supp.2d, 2006 WL 1635423 (C.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 238981 (N.D.N.Y.)

**C**

Christian v. R. Wood Motors, Inc.
N.D.N.Y.,1995.
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.
Thomas CHRISTIAN, Plaintiff,

v.

R. WOOD MOTORS, INC., Robert Wood, Jeffrey
Rosen, and Brian Bastian, Defendants.
**No. 91-CV-1348.**

April 21, 1995.

Shaw Currey Law Firm, George D. Patte, Jr.,
Ithaca, NY, for plaintiff; William R. Shaw, of coun-
sel.
Thaler & Thaler, Ithaca, NY, for defendants; Willi-
am J. Troy, III, of counsel.

### MEMORANDUM-DECISION AND ORDER

McCURN, Senior District Judge.

### *INTRODUCTION*

\*1 Plaintiff Thomas Christian brings this action un-
der Title VII, 42 U.S.C. § 2000e*et seq.,* against de-
fendants R. Wood Motors, Inc. and Robert
Wood,FN1 claiming, among other things, that he
was the subject of numerous racial epithets while
employed as a salesperson at the defendant corpora-
tion. In addition to his Title VII claims, plaintiff as-
serts six pendent state law claims. On April 6,
1995, the court heard oral argument regarding a
host of motions in this case, and it ruled on each.
As to plaintiff's motion to strike the Rule 68 Offer
of Judgment, the court granted that motion, indicat-
ing that it would issue a memorandum-decision and
order setting forth its reasons for so doing. Follow-
ing constitutes the court's decision in this regard.

### *BACKGROUND*

According to plaintiff Christian, no settlement ne-
gotiations had ensued prior to September, 1993. Be-
ginning with a demand letter from plaintiff dated
September 17, 1993, some settlement discussions
began to take place however. Of particular import-
ance for purposes of this motion is defendants' Of-
fer of Judgment made pursuant to Fed.R.Civ.P. 68.
That Offer is dated January 28, 1994, and indicates
that it was sent via certified mail, return receipt re-
quested. Affidavit of William J. Troy III (Feb. 9,
1995), exh. A thereto at 1. Plaintiff's counsel re-
ceived that Offer on January 31, 1994. Affidavit of
William R. Shaw (Jan. 30, 1995) at 4, ¶ 15. That
Offer is not lengthy, and bears repeating herein in
substantial part:

These defendants now make an offer to allow judg-
ment to be taken against them for the amount of
Thirty Seven Thousand Five Hundred and no/100
Dollars ($37,500.00) with costs as contemplated by
Rule 68 accrued up until the day this Offer is
served upon plaintiff's counsel of record. Pursuant
to Rule 68, plaintiff has ten(10) days after service
of this Offer to accept whereupon either defendants
or plaintiff may file this Offer and Notice of Ac-
ceptance together with proof of service and allow
the clerk of the court to enter judgment.

*Id.* (emphasis added). That Offer went on to state,
"It is significant to point out that Rule 68 provides
that if plaintiff does not recover substantially more
than the Offer of Judgment, then plaintiff will be li-
able for all costs incurred after the making of this
Offer." *Id.* at 2 (emphasis added).

Plaintiff's counsel received that Offer on January
31, 1994. Shaw Affidavit at ¶ 15. It was not until
December 30, 1994, almost one year later,
however, that plaintiff responded in writing, opin-
ing that such Offer was ambiguous. *Id.,* attachment
thereto. Plaintiff went on to inform defendants of
his belief "that 'costs' in this action should include
legal fees pursuant to Section 2000e-5(k) ...[,]"
FN2 but that based upon prior defense correspond-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ence as well as conversations with defense counsel he requested clarification as to whether "costs" included legal fees. *Id.* When plaintiff did not receive a direct response to that inquiry, he made the same inquiry on January 11, 1995: "Was it *your* intent on 1/28/94 to offer $37,500 *plus* costs *and legal fees* accrued to that date?" *Id.*, attachment thereto (emphasis in original). After not receiving a response to that inquiry, on January 31, 1995, approximately one month after the motion filing deadline of December 30, 1994, plaintiff filed the present motion to strike defendants' Rule 68 Offer of Judgment as ambiguous.

**\*2** Plaintiff claims that this Offer is ambiguous for four separate reasons. First he asserts that it is ambiguous because in addition to the Title VII claims, for which attorneys' fees are recoverable as part of costs, his amended complaint ("the complaint") includes pendent state law claims for which he believes attorneys' fees may or may not be recoverable. The second ambiguity claimed by plaintiff arises from the term "costs," as well as the phrase "with costs," as employed in defendants' Offer of Judgment. It is also plaintiff's position that this Offer is ambiguous because correspondence from defendants which both preceded and succeeded this Offer demonstrates that at that time defendants intended their Offer of $37,500 to be inclusive of attorneys' fees, whereas now they are claiming that they meant $37,500 plus accrued attorneys' fees. Fourth, the plaintiff suggests that an ambiguity can also be found because to this day defendants have refused to clarify their actual intent with respect to whether or not their Offer included attorneys' fees.FN3 For all of these reasons, the plaintiff asserts that there was no "meeting of the minds" with respect to that January 28, 1994 Offer and thus the court should strike the same as ambiguous. Alternatively, plaintiff seeks court modification of the Rule 68 Offer and an extension of time in which to either accept or reject the modified Offer.

Defendants succinctly respond that this motion is untimely and without merit in that their Rule 68 Of-

fer was clear and unambiguous, and thus the court should not strike it.

### *I Timeliness*

Before addressing the merits of plaintiff's motion to strike the Rule 68 Offer of Judgment, there are several procedural matters which must be addressed. The first is the timeliness of this motion-both in terms of the court's scheduling orders and under Rule 68 itself. As to the former, on September 15, 1994, the court conducted a telephone conference in this case. The minutes of that conference are memorialized on the docket sheet, wherein it specifically states that the "motion filing deadline" is set for December 30, 1994, "for any motions re piercing corporate veil, relief previously denied w/o prejudice in order of 1/25/94 & for summary judgment or partial summary judgment re extra [sic] acquired evidence doctrine." Docket Sheet at # 86 (emphasis added). Thus, on the face of it, the parties did not have permission to bring any motions other than those just enumerated, and this motion to strike the Rule 68 Offer was not the subject of the court's January 25, 1994 order. Therefore, plaintiff cannot avoid the express terms of the court's direction on September 15, 1994, by asserting that the present motion is of the nature contemplated for renewal under the court's earlier order.

From plaintiff's motion papers, it appears that he is arguing that because he inquired as to the meaning of the Rule 68 Offer before the expiration of the motion deadline, this motion is timely. Even assuming that this motion falls within the ambit of the court's September 15, 1994 direction for the filing of motions, simply making an inquiry within the appropriate time frame does not satisfy the court's direction that certain motions be filed by that date. Therefore, plaintiff's motion to strike the Rule 68 Offer is not timely under the court's direction for the filing of further motions in this case; nor does it fall into the category of motions to which the court extended the motion filing deadline. Consequently, were the court to strictly adhere to and enforce the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 238981 (N.D.N.Y.)

Case 1:07-cv-03993-CW    Document 58-16    Filed 09/11/2008    Page 22 of 101 Page 3

scheduling orders in this case, it would be forced to conclude that this motion is not timely thereunder.

**\*3** By the same token, however, in terms of the timeliness of this motion under Rule 68, the court in *Boorstein v. City of New York,* 107 F.R.D. 31 (S.D.N.Y.1985), reasoned that because "[p]ayment of costs happens only after the close of the suit through judgment or settlement[,]"'[t]he issue of whether a Rule 68 offer is valid is certainly not moot at the moment the offer's ten day pendency runs." *Id.* at 34 (emphasis added) (citation omitted). According to the *Boorstein* court, the validity of such an offer "may be determined after its ten day pendency since it affects attorneys' fees and costs awards." *Id.* (citations omitted). Thus, the *Boorstein* court considered plaintiff's motion to strike even though it was filed eleven days after the expiration of Rule 68's ten day time frame. *See also Klawes v. Firestone Tire & Rubber Co.,* 572 F.Supp. 116, 118 (E.D.Wis.1983) (court considered, without discussion, defendant's motion to strike Rule 68 offer filed some time during the spring or summer of 1982, although that offer had been filed months earlier, on December 18, 1981).

In the present case, plaintiff's delay in responding to defendants' Rule 68 Offer is troublesome. True, the delay here is significantly longer than those in *Boorstein* and *Klawes.* However, as Judge Motely reasoned in *Boorstein,* because "[t]he validity and effect of Rule 68 Offers is usually not determined until the close of the suit and the filing of attorney's fee applications," this court will proceed to decide the merits of plaintiff's motion to strike. *See Boorstein,* 107 F.R.D. at 34 (and cases cited therein).

The defendants attempt to distinguish *Boorstein* on its facts by noting that plaintiff's motion herein was brought long after service of the Offer of Judgment, as opposed to a mere eleven days after the expiration of Rule 68's ten day notification period, which was the situation in *Boorstein.* While that is true, defendants are conveniently ignoring the fact that, as just stated, the validity of a Rule 68 offer is usually not decided until the end of the litigation, in conjunction with an application for attorneys' fees. Thus, even though it would have been preferable for plaintiff to have brought this motion sooner, there is authority, albeit scant, for considering this motion despite its late filing.[FN4] Moreover, as will be more fully discussed herein, because of the grave consequences which result from rejection of a Rule 68 offer, that factor too augurs in favor of consideration of plaintiff's motion even though it was not promptly made.

There is one other procedural point which cannot be overlooked and that is plaintiff's alternative request that defendants' Rule 68 Offer be modified by the court with a concomitant extension of time in which to allow him to respond to the same. In a slightly different context, the court in *Bentley v. Bolger,* 110 F.R.D. 108 (C.D.Ill.1986), rejected the notion that a court may reconstitute a Rule 68 offer of judgment. In *Bentley* the court found that the defendant's offer of judgment was invalid, and therefore refused to allow plaintiff to accept only the valid portion of that offer. In so holding, the court rejected plaintiff's suggestion that the court imply in that offer an award of attorneys' fees. The court explained that "[s]uch a construction [implying attorney's fees] would contradict the Defendant's clear intent and would impose on the Defendant unexpected costs." *Id.* at 113. Further, reasoned the court, "the proposition that a court may reconstitute Offers of Judgment would seriously discourage defendants from making such offers by exposing defendants to the risk of liability not contemplated in their offers." *Id.* (citation omitted). Thus, the court in *Bentley* stated that "[t]he better rule is to void an invalid offer in its entirety." *Id.*

**\*4** On the other hand, in considering whether, from a procedural standpoint, a Rule 68 offer may be stricken from the record, the court in *Boorstein* found that "[e]ven though there is little precedent for motions to strike Rule 68 offers because of their substance, ... ambiguous offers should be clarified or stricken to further the purposes of Rule 68 and to protect the ability of parties to make reasonable de-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

cisions regarding the conduct of litigation." 107 F.R.D. at 34 (emphasis added). The court in *Boorstein* did not, however, clarify the "poorly worded" Rule 68 o ffer at issue therein. *Id.* at 35. Rather, that clarification was made by the offering defendants themselves, and plaintiff understood such clarification when he failed to timely respond to that offer. *Id.* The court therefore refused to strike that offer. Thus, *Boorstein* does not provide any support for plaintiff Christian's alternative request that the court clarify or modify defendants' Rule 68 Offer of Judgment. Indeed, as the court soundly reasoned in *Bentley,* if courts were to intervene in this Rule 68 process and reconstitute offers thereunder it would seriously discourage the making of such offers in the first instance, thus eroding the clear intent of that Rule which is to encourage settlements. Consequently, in the present case, if ultimately the court agrees with plaintiff and finds defendants' Rule 68 Offer ambiguous, it will simply grant plaintiff's motion to strike as suggested by the *Bentley* court.

## II. Ambiguity

Rule 68 provides, in relevant part:

At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued. If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs. If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer.

Fed.R.Civ.P. 68 (emphasis added). The Sixth Circuit in *Mallory v. Eyrich,* 922 F.3d 1273 (6th Cir.1991), aptly explained that "Rule 68 has several unique features that distinguish it from other means of compromise and settlement in civil litigation." *Id.* at 1277. Those unique features as identified by the *Mallory* Court are helpful to an understanding of the parties' respective positions on this motion and thus will be set forth herein.

The "primary distinction" between Rule 68 and other means of compromise and settlement is that Rule 68 is a cost-shifting provision. *Id.* That is, "a party defending against a claim may offer to have judgment of liability entered against it. If the adverse party rejects the offer of judgment, and if 'the judgment finally obtained by the offeree is not more favorable than the offer,' the offeree must pay the costs incurred after the offer was made." *Id.* at 1277-78 (quoting Fed.R.Civ.P. 68). Thus, Rule 68"in essence shifts the risk of going forward with a lawsuit to the complainant, who becomes exposed to the prospect of being saddled with the substantial expense of trial." *Id.* at 1278. Put more bluntly, " 'The possibility of substantial costs awards is the sword which encourages plaintiffs to settle.' " *Id.* (quoting *Hopper v. Euclid Manor Nursing Home, Inc.,* 867 F.2d 291, 295 (6th Cir.1989)).

**\*5** According to the Sixth Circuit, "[a] second distinct feature of Rule 68 is the lack of discretion that it leaves the district court judge in its implementation." *Id.* "This lack of discretion is particularly true in cases in which the offer of judgment has been rejected and the subsequent award to the plaintiff is less favorable that the offer." *Id.* "In these cases, the district court *must* award costs to the offeror." *Id.* (emphasis in original). Third, "Rule 68 judgments are self-executing." *Id.* at 1279. "[O]nce the parties agree on the terms of a Rule 68 judgment, the court has no discretion to withhold its entry or otherwise to frustrate the agreement." *Id.* It is this against this backdrop which plaintiff Christian's motion to strike must be viewed.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Plaintiff maintains that the present Rule 68 Offer is ambiguous because from his perspective it is unclear whether attorneys' fees were included as costs under the Offer. Plaintiff contends that the defendants use of the phrase "with costs accrued" created an ambiguity in that they should have indicated their intent as to the "meaning (or amount)" of that phrase. Memorandum of Law in Support of Motion to Strike Rule 68 Offer at 5. The plaintiff further contends that that phrase is ambiguous because in addition to the Title VII claims, for which attorneys' fees are recoverable as part of costs, there are pendent state law claims for which, in plaintiff's view, legal fees may or may not be recoverable. Plaintiff's second claimed ambiguity pertains to whether the phrase "with costs" means "inclusive of costs" or whether it means "plus costs." Plaintiff interprets that phrase as meaning that defendants intended to offer $37,500 inclusive of costs-not $37,500 plus an additional approximately $120,000 in accrued attorney's fees, which according to plaintiff is the amount of fees accrued as of the service date of this Offer.[FN5] *See* Shaw Affidavit at ¶¶ 18-24.

Defendants counter that the Offer of Judgment in this case was not ambiguous in that the $37,500 "with costs" was an offer for that amount plus attorneys' fees accrued to the date of service of that Offer. At oral argument, in response to questioning by the court, defense counsel stated that he was aware of $25,000 in attorneys' fees accrued by plaintiff's counsel as of that time. Defense counsel further indicated to the court that he was also aware of, or at least estimated, another $30,000 in plaintiff's attorneys' fees as of January 28, 1994.

In arguing that their $37,500 Offer was meant as a settlement of that amount plus an additional sum for reasonable attorneys' fees, the defendants rely heavily upon the Supreme Court's decision in *Marek v. Chesny,* 473 U.S. 1, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985), wherein the Court held that "the most reasonable inference is that the term 'costs' in Rule 68 was intended to refer to all costs properly

awardable under the relevant substantive statute or other authority." *Id.* at 9,105 S.Ct. at 3016. The Court further explained, "[i]n other words, all costs properly awardable in an action are to be considered within the scope of Rule 68 'costs.' " *Id.* Thus the Court reasoned, "absent congressional expressions to the contrary, where the underlying statute defines 'costs' to include attorney's fees, we are satisfied such fees are to be included as costs for purposes of Rule 68." *Id.* (citations omitted). Applying those rules to the case before it, the Court held that in that section 1983 action, because the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, provides that a prevailing party in a section 1983 action may be awarded attorneys' fees "as part of costs," such fees were subject to the cost-shifting provision of Rule 68 in *Marek.* Under *Marek* these defendants reason that because section 2000e-5(k), Title VII's attorney fee statute, specifically includes reasonable attorneys' fees as part of the costs thereunder,[FN6] their Offer of January 28, 1994 contemplated payment of attorneys' fees as part of the accrued costs in this action.

*6 The upshot of *Marek* is that "if the plaintiff in a civil rights action under § 1983 rejects an offer of judgment under Rule 68, proceeds to trial and wins a judgment less favorable than the offer, the defendant is not liable for the plaintiff's attorney fees, even though § 1988 awards to the prevailing party attorney fees as part of costs." *Mallory,* 922 F.2d at 1278. Fully aware that "[a]pplication of Rule 68 will require plaintiffs to 'think very hard' about whether continued litigation is worthwhile[,]" the Supreme Court went on to affirm that "that is precisely what Rule 68 contemplates." 473 U.S. at 11, 105 S.Ct. at 3017. The impact of *Marek* upon the present litigation is that if this court does not strike defendants' Rule 68 Offer, and if the plaintiff does not finally obtain a judgment more favorable than that Offer, then plaintiff's counsel will have to bear their own attorneys' fees incurred since January 28, 1994; fees to which they would have been entitled absent the Rule 68 Offer. *See id.*[FN7]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The Second Circuit, along with many other courts, has held that Rule 68 Offers of Judgment are to be construed according to ordinary contract principles. *Goodheart Clothing v. Laura Goodman Ent.,* 962 F.2d 268, 272 (2d Cir.1992) (and cases cited therein). Especially because of the claimed ambiguities by plaintiff Christian, several of those contract principles, as reiterated by the *Goodheart* Court are noteworthy:

If a writing, or the term in question, appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature.... On the other hand, if the term in question does not have a plain meaning it follows that the term is ambiguous.... Contract language is ambiguous if it is reasonably susceptible of more than one interpretation, and a court makes this determination by reference to the contract alone.... Conversely, contractual language is unambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.... Further, a court should interpret a contract in a way that ascribes meaning, if possible, to all of its terms.... Finally, interpretation of a contract generally is a question of law, subject to *de novo* review....

*Id.* at 272-273 (emphasis added) (internal quotations and citations omitted).

Applying these principles to the Offer of Judgment which is the subject of this motion, that Offer is clear on its face in one aspect, but not in another. After *Marek,* which was decided nearly ten years ago, it is undisputed "that the term 'costs' in Rule 68 was intended to refer to all costs properly awardable under the relevant substantive statute or authority." *Marek,* 473 U.S. at 9, 105 S.Ct. at 3106. In this Title VII case, the relevant attorney fee provision is found at 42 U.S.C. § 2000e-5(k), which contains language virtually identical to section 1988-the attorney fee provision under consideration in *Marek.* The Supreme Court has recog-

nized that "[t]he two statutes [sections 1988 and 2000e-5(k) ] are kindred; an interpretation of one informs the other." *Id.* (citing *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed. 295 (1975)). Indeed, in accordance with the plain language of section 2000e-5(k),[FN8] the Second Circuit has found that reasonable attorneys' fees are part of the costs recoverable under that statute. *See Lyte v. Sara Lee Corp.,* 950 F.2d 101, 103 (2d Cir.1991).[FN9] In light of the foregoing, there is little doubt that the costs referenced in defendants' Rule 68 Offer of Judgment encompassed attorneys' fees as well as other perhaps more traditional costs such as those enumerated in 28 U.S.C. § 1920. [FN10]

*7 Apparently in an effort to avoid the Court's plain holding in *Marek* and its obvious implications for this case, as mentioned earlier, plaintiff now contends that the Offer was ambiguous because, *inter alia,* it did not indicate the amount of those costs. The Court in *Marek* specifically rejected the view however that to be valid a Rule 68 Offer must itemize the respective amounts being tendered for settlement of the underlying claim and those being tendered for costs. *See*473 U.S. at 6, 105 S.Ct. at 3105. Thus, this court too declines to find an ambiguity in the present Offer based upon defendants' failure to differentiate between the amount intended for liability and that intended for costs; under *Marek* clearly they had no obligation to do so.

Plaintiff further asserts that the Offer is ambiguous because it is impossible to tell from that document whether in using the word "costs," defendants failed to take into account that while in a Title VII action costs include reasonable attorneys' fees, there are other pendent state law causes of action alleged herein for which, according to plaintiff, attorneys' fees may or may not be recoverable. This argument, to which defendants did not bother to respond, is equally unavailing. There are three factors which significantly undermine this argument. The first and perhaps most important factor is that, as just noted, in *Marek* the Supreme Court explicitly

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

held that there is no requirement when making a Rule 68 Offer that a defendant itemize the respective amounts being tendered for settlement of the underlying claims and those being tendered for costs. 473 U.S. at 6, 105 S.Ct. at 3015. Thus, by logical extension the defendants in this case had no obligation to specify in their Offer of Judgment that costs, which undoubtedly included attorneys' fees, meant a certain amount of those fees attributable to plaintiff's Title VII causes of action and a certain amount attributable to his pendent state law claims. Moreover, from a practical standpoint, it is hard to imagine how such a calculation could be done by plaintiff's own counsel, let alone defense counsel. Surely, for billing purposes plaintiff's counsel does not distinguish between plaintiff's various causes of action.

Second, in his complaint, plaintiff seeks attorneys' fees only in conjunction with his Title VII causes of action. Amended Complaint at 24, ¶ 1 and 25, ¶ 9. Therefore, it is illogical or at least unreasonable for the plaintiff to believe that defendants were offering him attorneys' fees beyond those sought in his complaint. Third, the court is aware of none, and plaintiff has not pointed to any case law or statute supporting the notion that attorneys' fees are separately recoverable under any of his various state law causes of action. For example, insofar as his claims under the New York State Executive Law are concerned, clearly no such fees are recoverable as a part thereof. *See Kump v. Xyvision, Inc.,* 733 F.Supp. 554, 562 (E.D.N.Y.1992) (and cases cited therein) ("[C]ourts have found that the Executive Law does not provide for the awarding of attorney's fees."); *see also Antonsen v. Ward,* 943 F.2d 198, 203 (2d Cir.1991) (describing plaintiff's Executive Law claim as a "nonfee" claim, as opposed to his Rehabilitation Act claim which the court described as "fee-related"); and *Chachra v. Katharine Gibbs School, Inc.,* 828 F.Supp. 176, 177 (E.D.N.Y.1993) (plaintiff conceded no legal basis for attorneys' fee claim under New York Executive Law § 296). For all of these reasons, the court rejects plaintiff's argument that the Offer is ambiguous as to the mean-

ing of costs because he is seeking recovery under Title VII, as well as under other pendent state law grounds.

*8 Relying upon various documents beyond the Offer of Judgment itself, plaintiff asserts that the $37,500 Offer was inclusive of attorneys' fees. Although, as plaintiff's counsel noted at oral argument, he did not need any clarification when that Offer was made because he thought that it was "clear" in that regard, plaintiff is now claiming an ambiguity. This purported ambiguity has emerged because defendants are asserting that their Offer meant $37,500 plus an additional sum payable for costs, which include attorneys' fees. Thus, it is plaintiff's position on this motion that the Offer is ambiguous because it is unclear whether "with costs" meant inclusive of attorneys' fees or plus attorneys' fees. This argument, although not without its weaknesses, is the most persuasive argument offered by plaintiff in favor of striking the January 28, 1994 Offer of Judgment.

Plaintiff relies upon two cases to support his view that the phrase "with costs" is inherently ambiguous. The first is *Kyreakakis v. Paternoster,* 732 F.Supp. 1287 (D.N.J.1990), wherein the court opined that "[t]he phrase 'with costs' is far more ambiguous than the Supreme Court's language [in *Marek* ] of 'recites that costs are *included.*' " [FN11] *Id.* at 1292 (quoting *Marek* ) (emphasis added). That court further opined that "[t]he word 'with', depending on its usage, can indicate accompaniment, combination or inclusion. It is not synonymous with 'including.' " *Id.* The second case relied upon by plaintiff is *Boorstein,* wherein the court observed that defendants use of the phrase "with costs," as opposed to "inclusive of attorney's fees *and* all costs accrued[ ]' " caused "confusion." 107 F.R.D. at 34 (quoting *Lyons v. Cunningham,* 583 F.Supp. 1147, 1151 (S.D.N.Y.1983)) (emphasis added).

Lastly, the plaintiff notes, with no analysis, that in *Lyte* the Second Circuit implicitly found that an accepted Rule 68 Offer for "$9,500 plus costs," en-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

titled the plaintiff to an award of attorneys' fees under section 2000e-5(k) beyond the $9,500 amount specified in that offer. Presumably plaintiff believes that the import of *Lyte* is that if a Rule 68 offer is intended to mean payment of a settlement amount in addition to the payment of attorneys' fees, it must so indicate by use of the word "plus." There was no issue in *Lyte* as there is in this case, however, as to what was intended by that offer. Rather the issue in *Lyte* turned on whether plaintiff was a "prevailing party," a necessary predicate to an award of attorneys' fees under section 2000e-5(k). Thus, in the court's opinion, *Lyte* provides no support for plaintiff's position that the phrase "with costs," as used in defendants' Offer of Judgment, is inherently ambiguous.

Defendants accurately respond that although the *Boorstein* court characterized the phrase "with costs" as creating confusion, it also explained that:

When referring to settlements or judgments, 'with' has been held to mean 'plus', whereas 'and' indicates that what follows is to be covered by the sum previously specified..... Defendants' offer specified judgment for $5,000.00 'inclusive of attroney's fees *with* costs.'... A reasonable literal interpretation of this offer could be that defendants offered $5,000.00 to cover damages to plaintiff and attorneys' fees, whereas 'costs' that defendants would pay to plaintiff would be determined at a later time.

**\*9** 107 F.R.D. at 34 ( citations omitted) (emphasis added by *Boorstein* court). Interestingly, ultimately the *Boorstein* court denied plaintiff's motion to strike the Rule 68 offer. The defendants also point out that their Offer tracked the language of Rule 68, and thus the court should not find an ambiguity here.

In addition to the just quoted portion of *Boorstein,* the Ninth Circuit's decision in *Erdman v. Cochise County, Arizona,* 926 F.2d 877 (9th Cir.1991), arguably provides further support for defendants' position that "with" means plus, although defendants do not rely upon this case. There, the Ninth Circuit

reversed the district court's decision to rescind an accepted Rule 68 offer. In *Erdman,* the offer failed "to recognize that 'costs in actions under 42 U.S.C. § 1983 automatically include attorney fees under 42 U.S.C. § 1988." *Id.* at 879. Thus, the offeror was obliged to pay a substantially larger award than anticipated, and consequently sought recision due to inartful drafting of that offer. The *Erdman* Court refused to rescind the offer, however, finding that the phrase "$7,500 with costs now accrued, ... entitles [plaintiff] to a reasonable attorney's fee award *in addition to* the lump sum named in the offer." *Id.* (emphasis in original) (footnote omitted). In reaching that conclusion the Ninth Circuit extended to Rule 68 offers of judgment an earlier ruling, made in the context of a consent decree, that a "waiver or limitation of attorney fees in settlements of § 1983 cases must be clear and unambiguous." *Id.* at 880.

To be sure, there is a remarkable similarity between the language of the *Erdman* offer and the Offer in the present case. In this court's view, however, *Erdman* does not compel a finding that defendants' January 28, 1994 Offer is unambiguous in its use of the phrase "with costs." The single most important distinction between *Erdman* and the present case is that the plaintiff there had actually accepted the offer, whereas obviously plaintiff Christian has not. Under those circumstances, in keeping with Rule 68's primary purpose of encouraging settlements, the Court was understandably reluctant to rescind defendant's Rule 68 offer therein.

Although it is a close call, resorting to principles of contract interpretation, as the court must, it is forced to conclude that defendants' January 28, 1994 Offer of Judgment is ambiguous. As mentioned at the outset, in determining whether an ambiguity exists, the court must look to the Offer alone. *Goodheart Clothing,* 962 F.2d at 272. Therefore, in the present case, there is no need for the court to examine other documents, as plaintiff suggests. Furthermore, although plaintiff urges that the court should determine defendants' intentions in making this Offer and plaintiff's understanding of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the same, at least one court has soundly observed that "[t]o subject Rule 68 offers to such collateral proceedings would undermine entirely the purpose of the rule." *SAS v. Trintex,* 709 F.Supp. 455, 458 (S.D.N.Y.1989). This court too declines to engage in such a collateral proceeding.

**\*10** Looking only at the January 28, 1994 Offer of Judgment, an ambiguity results because that Offer does not have a "definite and precise meaning, unattended by danger of misconception...." *Id.* at 272 (internal quotation and citation omitted). Further, in contrast to an unambiguous contract, there is a "reasonable basis for a difference of opinion" which arises from the phrase "with costs" as that phrase is employed in this particular Offer. *See id.* Despite the fact, as set forth above, that there is precedent for the proposition that "with" means plus, this particular Offer is susceptible of two equally plausible readings. For example, perhaps when defendants offered $37,500 "with costs" they actually meant "plus costs;" that is they would pay $37,500 to settle the underlying claim and an additional amount for reasonable attorneys' fees accrued to the service date of that Offer-the meaning defendants now urge. That construction seems to be consistent with the accrual language also found in the Offer in that the costs, separate and apart from the $37,500, were continuing to accrue until the date of service upon plaintiff's counsel. By the same token however, even with that accrual language, this Offer also could be read as intending a $37,500 cap; that is that the defendants intended to offer no more than $37,500 in *toto* to settle plaintiff's claim as well as the fees, and that is how plaintiff interprets this Offer. Thus, in the context of this particular case, the phrase "with costs" does not have a "definite and precise meaning."

In concluding that the Offer of Judgment at issue herein is ambiguous, the court is mindful that it should be reluctant to reach such a conclusion. *See Kyreakakis,* 732 F.Supp. at 1292 (and cases cited therein). Nonetheless, a Rule 68 offer, as with any contract, requires a meeting of the minds, which

was obviously lacking here. Defendants now strongly believe that they offered $37,500 plus costs, which included an additional unspecified amount for attorneys' fees, whereas plaintiff believes that the Offer of $37,500 was inclusive of attorneys' fees. Consistent with this requirement of mutual assent, the court in *Boorstein* wisely stated, "Because a Rule 68 offer has a binding effect when refused as well as when accepted, a party must also have a clear understanding of the terms of an offer in order to make an informed choice not to accept it." *Id.* at 34. *See also Arkla Energy Resources v. Roye Realty & Dev.,* 9 F.3d 855, 867 (10th Cir.1993) (defendant not entitled to invoke Rule 68 with an ambiguous offer "because the offeree must know what is being offered in order to be responsible for refusing the offer [ ]"); and *Said v. Virginia Com. Univ./Medical College,* 130 F.R.D. 60, 63 (E.D.Va.1990) ("Because of the difficulty of the choice that an offer of judgment requires a claimant to make, it is essential that he be able to discern with certainty what the precise terms of that offer are.").[FN12] Clearly no such understanding is evident from the present record, and thus the court refuses to enforce this Rule 68 Offer.

**\*11** In addition to the fact that defendants' Rule 68 Offer does not withstand contractual analysis, the court is concerned about the undeniably harsh result which would result from denial of this motion. In contrast to the usual final settlement offer, which is more akin to an ordinary contract in that it can either be accepted on its terms or rejected with the risk of receiving a lesser judgment at trial, "[a] Rule 68 offer of judgment, ..., presents a more draconian choice to the plaintiff: accept it on its terms, or go to trial and run the risk of obtaining a less favorable judgment *and* paying the defending party's post-offer costs." *Said,* 130 F.R.D. at 63 (emphasis in original). Given this choice, particularly in the context of civil rights litigation such as this, where under certain circumstances attorneys' fees are statutorily authorized, the court opines, without deciding, that any Rule 68 offer which does not intend to include attorneys' fees should clearly and unequi-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 238981 (N.D.N.Y.)

Case 7:07-cv-03993-CW    Document 58-16    Filed 09/11/2008    Page 29 of 101

vocally state as much. *See Erdman*, 926 F.2d at 880 (waiver or limitation of attorneys' fees in settlement of section 1983 action pursuant to Rule 68 must be clear and unambiguous).[FN13]

Before concluding, the court has a few additional observations. Although not necessary to finding an ambiguity, the court has also considered the extrinsic evidence in weighing the relevant equities of enforcing this Rule 68 Offer as drafted by defendants. In the court's opinion, from the contents of defendants' February 2, 1994 letter,[FN14] plaintiff easily could have been lulled into a false sense of security in believing that his initial interpretation of the Offer as being inclusive of attorneys' fees was an accurate view of defendants' intent in making their January 28, 1994 Offer. That is especially so given that defendants claim that they knew even then about the possibility of $75,000 in accrued attorneys' fees. Furthermore, taken as a whole, the record easily supports a finding that defendants' Offer is ambiguous; but once again, even without the record evidence, as already discussed, this Offer is also ambiguous standing alone.

The court hastens to add that in no way should its ruling here today be construed as a finding that all Rule 68 offers which track the language of that Rule are necessarily ambiguous. The court's finding of an ambiguity herein is limited to the unique facts of this case. In the court's opinion, though, as previously mentioned, when drafting a Rule 68 offer, the better and safer practice would be to refrain from using the phrase "with costs" unless that phrase is accompanied by clarification, particularly with respect to attorneys' fees. Thus, in light of the foregoing, the court hereby strikes as ambiguous the January 28, 1994 Offer of Judgment made be defendants R. Wood Motors, Inc. and Robert Wood.

To recapitulate with respect to all of the motions argued before the court on April 6, 1995:

1. Plaintiff's motion to strike defendants' Rule 68 Offer is GRANTED;

**\*12** 2. Motion by defendants R. Wood Motors, Inc. and Robert Wood to amend their answer to add an affirmative defense of after-acquired evidence as to all plaintiff's claims is GRANTED;

3. Motion by defendants R. Wood Motors, Inc. and Robert Wood for summary judgment on the basis of after-acquired evidence is WITHDRAWN;

4. Motion by plaintiff to disqualify law firm of Thaler & Thaler is DENIED;

5. Motion by plaintiff to compel further discovery with respect to Richard Thaler is DENIED;

6. Motion by plaintiff to compel completion of discovery is DENIED WITHOUT PREJUDICE TO RENEW;

7. Motion by plaintiff to strike various enumerated affirmative defenses is DENIED;

8. Motion by plaintiff for partial summary judgment seeking to pierce the corporate veil and to impose liability on defendant Robert Wood is DENIED;

9. Motion by defendants R. Wood Motors, Inc. and Robert Wood for summary judgment on issue of piercing the corporate veil and impose liability on Robert Wood is DENIED; and

10. Cross-motion by defendants R. Wood Motors, Inc. and Robert Wood to dismiss causes of action 4, 5, 6, 7 and 8 of amended complaint is WITHDRAWN.

IT IS SO ORDERED.

> FN1. Default judgments have been entered against the remaining two defendants, Brian Bastian and Jeffrey Rosen, with damages to be determined at trial.

> FN2. That statute is the attorney fee provision of Title VII.

> FN3. This argument warrants almost no

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.<br>Not Reported in F.Supp., 1995 WL 238981 (N.D.N.Y.)

Case 1:07-cv-03993-CW    Document 58-16    Filed 09/11/2008    Page 30 of 101

discussion. Plaintiff has offered no case authority, and the court is aware of none, holding that a contractual ambiguity may be premised solely upon a party's refusal to clarify their intent; and this court refuses to so hold here.

FN4. As an aside, the court points out that it gave the defendants similar latitude with respect to consideration of their motion to amend their answer to add an affirmative defense based upon after-acquired evid- ence.

FN5. At oral argument plaintiff's counsel indicated that the amount of accrued attor- neys' fees as of that date was $112,000. Regardless, what seems clear is that at least by plaintiff's estimation when the Rule 68 Offer was made in this case, his attorneys had accrued substantial legal fees, exceeding $100,000.

FN6. That statute provides, in relevant part:

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party ... a reas- onable attorney's fee as part of the costs ...

42 U.S.C. § 2000e-5(k) (West 1994).

FN7. *See also Ortiz v. Regan,* 980 F.2d 138, 141 (2d Cir.1992) (footnote omitted) (citing *Marek,*) ("Rule 68 permits a party defending against a claim to make a settlement offer and thereby avoid any liability for costs, in- cluding attorney's fees, incurred after the making of the offer."); *Adams v. Wolff,* 110 F.R.D. 291, 293 (D.Nev.1986) (quoting *Marek,* 473 U.S. at 14, 105 S.Ct. at 3019) ("What [*Marek* ] actually holds, ..., is best expressed in Justice Brennan's dissent,

'[A] prevailing civil-rights litigant entitled to fees under [42 U.S.C. § 1988] is *per se* barred by Rule 68 from recovering any fees for work performed after rejecting a settlement offer where he ultimately recov- ers less than the proffered amount in settle- ment.' " "In essence, then, *Marek* stands for the principle that Rule 68 cuts off an otherwise prevailing plaintiff from attor- ney fees he would have been entitled to un- der § 1988.")

FN8. *See supra,* n. 6.

FN9. *See also Bentley,* 110 F.R.D. at 112 (same).

FN10. That statute enumerates those costs which may be taxed as part of litigation, such as fees of various kinds. *See*28 U.S.C. § 1920 (West 1994).

FN11. In language of questionable clarity, the Supreme Court in *Marek* stated:

If an offer recites that costs are included or specifies an amount for costs, and the plaintiff accepts the offer, the judgment will necessarily include costs; if the of- fer does not state that costs are included and an amount for costs is not specified, the court will be obliged by the terms of the Rule to include in its judgment an additional amount which in its discre- tion, ..., it determines to be sufficient to cover the costs. In either case, however, the offer has *allowed* judgment to be entered against the defendant both for damages caused by the challenged con- duct and for costs. Accordingly, it is im- material whether the offer recites that costs are included, whether it specifies the amount the defendant is allowing for costs, or, for that matter, whether it refers to costs at all. So long as the offer does not implicitly or explicitly provide

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 238981 (N.D.N.Y.)

Case 1:07-cv-03993-CW    Document 58-16    Filed 09/11/2008    Page 31 of 101

that the judgment *not* include costs, a timely offer will be valid.

473 U.S. at 6, 105 S.Ct. at 3015 (emphasis in original) (citation omitted).

FN12. *Cf. Lish v. Harper's Magazine Foundation,* 148 F.R.D. 516, 519 (S.D.N.Y.1993) (footnote omitted) ("[W]here as here, a defendant is on notice that the plaintiff, with reason, interprets the offer differently, the defendant is not entitled to the benefits of Rule 68, unless he amends his offer to remove doubt as to its meaning.").

FN13. Without intending to challenge the veracity of defense counsel, if plaintiff had accepted the January 28, 1994 Offer of Judgment in this case, and then sought an additional sum for attorneys' fees, the court would not be surprised if defendants changed their tune, and instead argued that their Offer was not intended to include such additional sum. As the court in *Staples v. Wickesberg,* 122 F.R.D. 541 (E.D.Wis.1988), so aptly stated, "[i]t would be unfair to let those who extend the offers take advantage of any ambiguities depending on which interpretation best suits their present situation." *Id.* at 546 (citation omitted).

FN14. This letter was within the ten day time frame for acceptance of an Offer under Rule 68.

N.D.N.Y.,1995.
Christian v. R. Wood Motors, Inc.
Not Reported in F.Supp., 1995 WL 238981 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 5314916 (W.D.Wis.)

## H

Sjoblom v. Charter Communications, LLC
W.D.Wis.,2007.
Only the Westlaw citation is currently available.
United States District Court,W.D. Wisconsin.
Maurice James SJOBLOM, on behalf of himself
and a class of employees and/or former employees
similarly situated, Plaintiff,
v.
CHARTER COMMUNICATIONS, LLC, Charter
Communications (CCI), Inc. and Charter Commu-
nications, Inc., Defendants.
**No. 3:07-cv-0451-bbc.**

Dec. 26, 2007.

Michael J. Modl, Timothy D. Edwards, Axley
Brynelson, LLP, Robert Gingras, Gingras, Cates &
Luebke, S.C., Madison, WI, for Plaintiff.
Andrew J. Voss, Jacqueline Kalk, Littler Mendel-
son, Minneapolis, MN, Bradley Strawn, Lisa
Schreter, Littler Mendelson, Atlanta, GA, Harry W.
Wellford, Jr., Kimberly A. Yates, Littler Mendel-
son, P.C., St. Louis, MO, for Defendants.

### OPINION AND ORDER

BARBARA B. CRABB, District Judge.

**\*1** This is a civil action for monetary, declaratory
and injunctive relief under the Fair Labor Standards
Act, 29 U.S.C. §§ 201-219, and Wisconsin wage
and hour laws, Wis. Stat. chs. 103 and 104 and §§
109 .01-109.11. On October 5, 2007, plaintiff
moved for conditional certification of a collective
action under the Fair Labor Standards Act. 29
U.S.C. § 216(b). In response, defendants filed sev-
eral affidavits from their current employees in sup-
port of their argument that plaintiff is not similarly
situated to potential class members. Sixty-two affi-
davits were signed by potential class members. Dkt.
# s 47-108. Before the court is plaintiff's motion for
a protective order restricting communications
between defendants and potential class members.

Plaintiff contends that defendants improperly inter-
viewed their employees about the lawsuit under the
pretext of a training session and failed to inform the
employees of their potential interest in the current
lawsuit as opt-in plaintiffs. Plaintiff also asserts that
the court should strike the affidavits at issue, order
defendants to send corrective notice to potential
class members nationwide and award him reason-
able costs and fees for bringing the motion.

Because I agree that defendants acted improperly in
questioning their employees and by failing to in-
form them of their potential interests in this lawsuit,
I am granting plaintiff's motion in part. I am strik-
ing the 62 affidavits of potential class members
submitted by defendants. Defendants may not con-
tact potential class members without seeking prior
consent of this court and without fully disclosing
the nature of the lawsuit and the class member's po-
tential interest in it. I also agree that if a collective
action is conditionally certified, it will be necessary
to send some form of a corrective notice to the 62
potential class members who made declarations.
The court will address the specific content of the
notice if and when the class is certified. Finally, I
am denying plaintiff's requests for fees and costs
because there is no basis for such an award under
Fed.R.Civ.P. 37.

Before I address the parties' arguments, I will sum-
marize the relevant allegations contained in the af-
fidavits submitted in support of the motion for a
protective order and the documents attached to the
parties' briefs.

### ALLEGATIONS OF FACT

David Zrout and Matthew Tuescher are broadband
technicians for defendant Charter Communications,
LLC in Janesville, Wisconsin. Zrout averred that on
October 16, 2007, his employer told him to go to
Lake Lawn Lodge in Delavan, Wisconsin for train-
ing. Tuescher was told the same in mid-October

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2007. Other technicians from Janesville, Walworth and Beloit were present at the training. After 15 minutes of training, Zrout and Tuescher were asked to meet individually with Charter attorneys. Both men were told that an employee had filed a lawsuit against Charter and were asked to answer some questions. Zrout was questioned for an hour and a half to two hours, and Tuescher was questioned for one hour. Both men were asked the same questions repeatedly.

**\*2** Zrout and Tuescher averred that the attorney interviewing them did not have them sign a consent form or tell them that the lawsuit involved a potential class action; they possibly could be a class member based on the issues for which they were being interviewed; they may have the right to collect money in the future if the lawsuit was successful; or signing the statement could waive their right to participate in the lawsuit or receive money from defendants. Plaintiff later learned, *see* dkt. # 148, that both men actually did sign a witness disclosure form, which informed them of the following:

1. Our law firm represents Charter in a lawsuit, which is styled as a class and collective action, brought against it by a technician working out of one of Charter's locations.... If you choose to speak with us today the information you provide may be used by the Company to show that you are not similarly situated to the employee who has filed this action. In the lawsuit, the employee claims that he and other similarly situated employees have not been properly paid for all his working time, including overtime.

...

3. You have no obligation to talk to me. Your job will not be affected in any way whether you talk to me or not. Regardless of your decision, you will not be penalized in any way, nor will you receive any benefit from Charter based on any information you do or do not provide me. If I ask you a question that you do not wish to answer, just say so. You are free to end our discussion at

any time.

4. Please let me know if you are represented by an attorney in any way related to your employment. If you are, we should not speak further.

5. The information that you provide will be compiled with information from other interviews, and will be used by our firm to provide legal advice to the Company and to assist in its defense of the lawsuit. We believe that this makes our discussion confidential and privileged, and it is important that you do not repeat our discussion. However, if you are asked by an attorney representing the employee bringing the lawsuit to provide information about your job, you are free to do so or decline to do so. You are, of course, also free to retain your own attorney to advise you on these issues....

Dkt. # 150, Attachments 1 and 2. Each of the other employees who made a declaration after being interviewed by defendants at the October 2007 training session signed a similar consent form.

During his interview, Tuescher told Charter's attorney that he spent about 15 minutes every night at home organizing and securing his equipment but that he did not take the equipment into his house. Tuescher also told the Charter attorney that he usually came in about 30 minutes early every day to do paperwork, organize his truck, clean out and restock equipment and reconcile equipment before starting work on the clock. No one had ever required Tuescher to do this, but a few months ago, Charter told its employees not to do any work whatsoever before they were on the clock in the morning. Neither Tuescher nor Zrout used the word "nominal" during his interview and the term was not explained to them. Zrout told the Charter attorney that he was not represented by an attorney.

**\*3** After interviewing them, the Charter attorneys gave Zrout and Tuescher statements to sign. Both men looked quickly at the declaration prepared for them, assuming that it was accurate. Zrout and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Tuescher averred that they would not have signed the declaration had they been told that there was a potential class action from which they could collect money or that signing the declaration might constitute a waiver of their right to participate in the class action.

Defendants' attorney Jacqueline Kalk and other members of her law firm wrote a treatise entitled *Littler Mendelson on Employment Law Class Actions* (Lexis Nexis 2007). Appendix O of that treatise contains a sample witness consent form to use in employment law class actions when conducting a " 'blitz' campaign of affidavit gathering." Dkt. # 137, Exh. D. The sample form states in part: "The lawsuit is a class action and you are a potential class member ."It does not contain a provision requesting the witness to keep the discussion confidential and privileged. *Id.*

### DISCUSSION

Given that class actions present "opportunities for abuse as well as problems for courts and counsel in the management of cases," the Supreme Court has recognized the duty and broad authority that a district court has "to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties."*Gulf Oil Company v. Bernard,* 452 U.S. 89, 100 (1981). However, a district court's discretion is not unlimited. Any discovery limitations should be carefully drawn and balance the potential for abuse with the right of the parties to contact potential class members. *Id.* at 101 (requiring decision to be based on clear record and specific findings); *Williams v. Chartwell Financial Services, Ltd.,* 204 F.3d 748, 759 (7th Cir.2000). Abusive practices that district courts have considered sufficient to warrant a protective order include communications that coerce prospective class members into excluding themselves from the litigation; contain false, misleading or confusing statements; and undermine cooperation with or confidence in class counsel. *Cox Nuclear Medicine v. Gold Cup Coffee Services, Inc.,* 214 F.R.D. 696,

698 (S.D.Ala.2003) (collecting cases).

Plaintiff asserts that defendants questioned and obtained declarations from potential class members under the pretext of an employer-required training session. Defendants contend that they brought their employees to Lake Lawn for an actual training. This may be true, but defendants certainly had another purpose in mind and did not inform their employees of their intentions. Although the manner in which the employees were solicited for defendants' "blitz campaign of affidavit gathering" is cause for some concern, it alone would not justify limiting discovery. Similarly, the mere fact that the employment relationship is inherently coercive does not justify restricting defendants' communications with their employees. *McLaughlin v. Liberty Mutual Insurance Company,* 224 F .R.D. 294, 298 (D.Mass.2004). However, considering these factors along with defendants' less than full disclosure of the affiants' potential interest in this lawsuit, I am persuaded that a limitation on defendants' communication with potential class members is necessary.

**\*4** Although they apparently do not recall doing so, Zrout and Tuescher signed a consent form provided by defendants. The witness consent form appropriately informed employees of the lawsuit and that they were not represented by defendants' attorneys, had the right to refuse to be interviewed and could not be retaliated against for not participating in the interview. However, as plaintiff asserts, the consent form has two significant problems. First, although it advised potential class members that the lawsuit at issue was a class action, it did not notify them that they might be entitled to become a part of the lawsuit. It is not reasonable to infer that the mere mention of a class action would alert an employee to the possibility that he or she may be a class member entitled to recover money from defendants. Further, the notice did not mention that signing an affidavit might waive the affiant's right to become a named class member. Second, the statements concerning the privileged and confidential nature of the discussions are also misleading and somewhat coer-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

cive. Defendants have not asserted any basis for such assertions or for their request for confidentiality of potential class members, although confidentiality impedes fair and open discovery. I am persuaded that defendants did not merely overlook these issues. The sample consent form included in *Littler Mendelson on Employment Law Class Actions* states clearly that witnesses should be informed that they may be potential class members and it does not include a statement concerning confidentiality or privilege.

After balancing the potential for abuse with defendants' right to contact potential class members, I find justification for some limitations on defendants' communications with potential class members. Until the court reaches a final decision on certification and any resulting opt-in period is completed, defendants are to obtain prior consent of this court if they wish to communicate with potential class members. They should be prepared to inform the court of the method and content of their desired communications. Whether plaintiff will be entitled to have a representative present is a decision the court will make on a case-by-case basis. The court may be satisfied that defendants' proposed communication is not coercive and sufficiently informs potential class members of their rights. For example, defendants might choose to present potential class members with a written questionnaire that has been pre-approved by the court.

Because the affidavits at issue were not executed in a proper manner and with full disclosure to the affiants, I am striking them. *See* dkt. # s 47-108. I also agree that if the court conditionally certifies a collective action, at a minimum some form of a corrective notice will have to be sent to the 62 potential class members who made declarations. The court will address the specific content of the notice if and when the class is certified.

**\*5** Finally, I am not awarding plaintiff attorneys' fees or costs for bringing the motion. Rule 37 supports only the reimbursement of fees and costs resulting from a failure to disclose, admit or obey a

court order related to discovery; it does not support a grant of fees and costs for bringing a motion for sanctions based on pre-filing activity. Fed.R.Civ.P. 37(a)(5), (b) and (c); *Maynard v. Nygren,* 332 F.3d 462, 470-71 (7th Cir.2003). Further, I do not find it necessary to impose sanctions under this court's inherent powers. *Maynard,* 332 F.3d at 470-71. The relief ordered by the court should be sufficient to address plaintiff's concerns.

## ORDER

IT IS ORDERED that plaintiff's motion for a protective order is GRANTED in part and DENIED in part:

1. Before contacting or communicating with potential class members in this action, defendants shall obtain this court's approval of the method and content of the proposed communication;

2. Plaintiff's request that the court strike the 62 affidavits submitted by defendants in support of their opposition to the motion for conditional certification is GRANTED. The clerk is directed to strike docket numbers 47 through 108 from the court record;

3. Ruling on plaintiff's request for corrective notice is RESERVED until a final decision is made on conditional certification; and

4. Plaintiff's request for fees and costs is DENIED.

W.D.Wis.,2007.
Sjoblom v. Charter Communications, LLC
Slip Copy, 2007 WL 5314916 (W.D.Wis.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 704933 (D.Kan.)

▷
Geer v. Challenge Financial Investors Corp.
D.Kan.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Kansas.
Jeffrey A. GEER and Gerald Labouff, on behalf of
themselves and other past and present employees
similarly situated, Plaintiffs,
v.
CHALLENGE FINANCIAL INVESTORS CORP,
d/b/a CFIC Home Mortgage and Challenge Mort-
gage, et al., Defendants.
**No. 05-1109-JTM.**

March 14, 2006.

Boyd A. Byers, Sophie K. Counts, Foulston Siefkin
LLP, Wichita, KS, for Plaintiffs.
Alan R. Pfaff, Donald N. Peterson, II, Withers,
Gough, Pike, Pfaff & Peterson LLC, Wichita, KS,
for Defendants.

*MEMORANDUM AND ORDER*

MARTEN, J.
**\*1** This matter comes before the court on the de-
fendants' Motion to Dismiss (Dkt. No. 27). Defend-
ants argue that their offers of settlement to the then-
named plaintiffs provide a basis for dismissing this
action. Plaintiffs advance several responses, includ-
ing: 1) the offer of judgment does not apply to the
named plaintiffs in a Rule 23 class action; 2) the of-
fer of judgment does not exceed the amounts that
may be recovered; 3) the collective action had
already been certified when the defendants filed an
offer of judgment; and 4) the offer of judgment to
two plaintiffs does not moot the entire FLSA col-
lective action. After reviewing the parties' argu-
ments, the court denies as moot defendants' motion.

I. BACKGROUND

On April 20, 2005, plaintiff Jeffrey A. Geer

("Geer"), a former CFIC loan officer in Wichita,
Kansas, filed a complaint alleging a collective ac-
tion pursuant to Section 216(b) of the Fair Labor
Standards Act ("FLSA"), 29 U.S.C. § 201*et seq.* On
May 15, 2005, plaintiffs filed a Motion to Facilitate
and Expedite Section 216(b) Notice to other poten-
tial plaintiffs.

On June 17, 2005, Gerald LaBouff, a former CFIC
loan officer in Houston, Texas, filed a Consent to
Opt In and Participate as Party Plaintiff.

On September 19, 2005, defendants filed an offer
of judgment to Jeffery Geer in the amount of
$8,500 plus costs and reasonable attorneys' fees,
which defendants allege exceeds any judgment
plaintiff could hope to recover.

On October 17, 2005, the court granted plaintiffs'
Motion to Facilitate and Expedite Section 216(b)
Notice.

On October 27, 2005, defendants filed an offer of
judgment to Gerald LaBouff in the amount of
$8,500 plus costs and reasonable attorneys' fees,
which defendants allege exceeds any judgment
plaintiff could hope to recover. Subsequently on the
same date, defendants filed a Motion to Reconsider
the Court's Order Granting Plaintiffs' Motion to Ex-
pedite Section 216(b) Notice.

Plaintiffs filed a Motion for Leave to File Amended
Complaint on November 9, 2005. The proposed
Amended Complaint attached to plaintiffs' support-
ing Memorandum alleges Rule 23 class action
claims under ERISA based on defendants' systemic
refusal to allow eligible employees to participate in
the 401(k) plan. The court granted the motion on
March 1, 2005.

After the filing of the parties' briefs, counsel for
plaintiff notified the court that Tiffany Jackson had
consented to opting in and participating as party
plaintiff.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

## II. STANDARD OF REVIEW

Defendants advance their claim of dismissal pursuant Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction while plaintiffs advance their arguments under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. The court finds that this case is more appropriately analyzed under Fed.R.Civ.P. 12(b)(1).*SeeVogel v. American Kiosk Management,* 371 F.Supp.2d 122, 128 (D.Conn.2005) (applying Fed.R.Civ.P. 12(b)(1) to determine whether a case or controversy survives an offer of judgment). Federal courts are courts of limited jurisdiction and may exercise jurisdiction only when specifically authorized to do so. *Castaneda v. INS,* 23 F.3d 1576, 1580 (10th Cir.1994).Article III, Section 2 of the Constitution limits federal court jurisdiction to cases involving actual "controversies." "[I]t is well settled that federal courts may act only in the context of a justiciable case or controversy."*Benton v. Maryland,* 395 U.S. 784, 788, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *Liner v. Jafco, Inc.,* 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964)."A court lacking jurisdiction must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking."*Scheideman v. Shawnee County Bd. of County Comm'rs,* 895 F.Supp. 279, 280 (D.Kan.1995) (citing *Basso v. Utah Power and Light Co.,* 495 F.2d 906, 909 (10th Cir.1974)); Fed.R.Civ.P. 12(h)(3). The party seeking to invoke a federal court's jurisdiction sustains the burden of establishing that such jurisdiction is proper. *Id.* When federal jurisdiction is challenged, the plaintiff bears the burden of showing why the case should not be dismissed. *Jensen v. Johnson County Youth Baseball,* 838 F.Supp. 1437, 1439-40 (D.Kan.1993).

## III. ANALYSIS

**\*2** Federal Rule of Civil Procedure 68 provides that "a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued."Fed.R.Civ.P. 68. Where a defendant makes a Rule 68 offer of judgment and it is accepted, the case is settled and there is no longer a controversy. In cases where a plaintiff rejects an offer of judgment that would fully compensate the plaintiff, the case may still be mooted. *See Gresiz v. Household Bank (Illinois),* 176 F.3d 1012, 1015 (7th Cir.1999) (equating an offer of settlement to a default judgment that eliminates a legal dispute upon which federal jurisdiction can be based). As Chief Judge Richard Posner stated, "you cannot persist in suing after you've won."*Id.* The courts have noted that "Rule 68 provides an additional inducement to settle when there is a strong likelihood 'that the plaintiff will obtain a judgment but the amount of recovery is uncertain." ' *Vogel,* 371 F.Supp.2d at 126 (citing *Delta Air Lines, Inc. v. August,* 450 U.S. 346, 352, 101 S.Ct. 1146, 67 L.Ed.2d 287 (1981)). "The offer of judgment rule 'prompts both parties to a suit to evaluate the risks and costs of litigation, and to balance them against the likelihood of success upon trial on the merits." ' *Id.* (citing *Marek v. Chesny,* 473 U.S. 1, 5, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985)).

Courts have recognized fundamental distinctions between the application of Rule 68 to collective actions filed pursuant to FLSA and class actions filed pursuant to Fed.R.Civ.P. 23. *SeeVogel,* 371 F.Supp.2d at 127-128. This stems from the difference in the two types of actions:

There is a fundamental, irreconcilable difference between the class action described by Rule 23 and that provided for by FLSA § 16(b). In a Rule 23 proceeding a class is described; if the action is maintainable as a class action, each person within the description is considered to be a class member and, as such, is bound by judgment, whether favorable or unfavorable, unless he has "opted out" of the suit. Under § 16(b) of FLSA, on the other hand, no person can become a party plaintiff and no person will be bound by or may benefit from judgment unless he has affirmatively "opted into" the class;

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that is, given his written, filed consent.

*Mackenzie v. Kindred Hospitals East, L.L.C.,* 276
F.Supp.2d 1211, 1216 (M.D.Fla.2003) (citing
*LaChapelle v. Owens-Illinois, Inc.,* 513 F.2d 286,
289 (5th Cir.1975)).*See*29 U.S.C. § 216(b) ("no em-
ployee shall be a party plaintiff to any such action
unless he gives his consent in writing to become
such a party and such consent is filed in the court in
which such action is brought."). Based on the dif-
ferent framework of collective actions, courts per-
mit Rule 68 offers to stand against FLSA plaintiffs
because they present only their own claims. *Vogel,*
371 F.Supp.2d at 128. Unlike in a Rule 23 class ac-
tion, an offer of judgment to an FLSA plaintiff will
not adversely affect the rights of others. *MacKen-
zie,* 276 F.Supp.2d 1211, 1217 (M.D.Fla.2003).

*\*3 In *MacKenzie,* the magistrate judge recommen-
ded entering a judgment based on defendant's offer
of judgment because "plaintiff had failed to identify
any similarly situated individual who had expressed
interest in filing a written consent to join [the] law-
suit as required by the FLSA."*MacKenzie,* 276
F.Supp.2d at 1213. Where there are other similarly
situated individuals who have filed written consent
to join in the suit, the court will dismiss the case for
want of jurisdiction. *Reed v. The TJX Companies,
Inc.,* No. 04C1247, 2004 WL 2415055, at \*2
(N.D.Ill. Oct.27, 2004). The *Reed* court was partic-
ularly concerned with defendant's ability to pur-
posefully moot an action between the time of filing
and notification by offering settlements before oth-
ers could opt in. *Id.* at \*3. At such an early stage of
litigation where discovery had not been undertaken,
the court was reluctant to allow "defendants to bar
the courtroom door."*Id.* Similarly, the court in
*Reyes* disapproved of a defense strategy of provid-
ing an offer of judgment to an initial plaintiff as a
means of barring the claim from proceeding as to
all similarly situated plaintiffs. *Reyes v. Carnival
Corp.,* No. 04-21861, 2005 U.S. Dist. LEXIS
11948, at \*9-10 (S.D.Fla. May 25, 2005). The court
noted that such an approach violated the policies
behind FLSA and permitted defendant to evade a

collective action by making an offer of judgment at
the earliest possible time. *Id.* at \*10-11.

After reviewing the briefs and subsequent develop-
ments in this case, the court finds that dismissal is
not appropriate. First, after defendant's offer to two
plaintiffs, the court received notice of a third
plaintiff who has not received an offer of settle-
ment. While it is possible that an offer may be ex-
tended to her, her presence moots the issue of dis-
missal. *SeeMacKenzie,* 276 F.Supp.2d at 1213.
Second, defendants extended $8,500 plus costs and
attorney fees as the appropriate judgment. The
court is uncertain whether this amount constitutes
full judgment. In their brief, defendants do not de-
scribe how they adduced $8,500 as full judgment.
Although defendants do not have to prepare an
itemized, detailed accounting, the court requires
more than a parties' blanket claim of full judgment.
*Marek v. Chesny,* 473 U.S. 1, 105 S.Ct. 3012, 87
L.Ed.2d 1 (1985); *Olds v. National Capital Man-
agement, Ltd.,* Civ.A. No. 87-2589-0, 1988 WL
130622, at \*1 (D.Kan.1988). As expected, plaintiffs
argue that the offers are not sufficient. They also
add that the ERISA claims in their amended com-
plaint would entitle them to more. As a result, the
court cannot conclude that the offers constitute full
judgment.

Finally, the issue most troubling to the court is the
procedural loop that Rule 68 creates for FLSA
plaintiffs. It is possible for defendants to continue
making offers of judgments to plaintiffs who opt in
and then ask the court to consider dismissal based
on the lack of subject matter jurisdiction. At the
same time, plaintiffs may continue to introduce new
plaintiffs whose presence will moot the issue of dis-
missal. Through the motion to dismiss, the court
will be drawn into the parties' tussle over jurisdic-
tion. Plaintiffs offer one alternative-that the condi-
tional certification of this action should be the point
at which the court will no longer consider the mo-
tion to dismiss based on offers of judgments.
However, plaintiffs cite no authority for this asser-
tion. Although nothing in the rules prevents the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

parties from engaging in tactics to moot the case early on, this court is reluctant to allow defendants to bar the courtroom doors so early in the litigation.

**\*4** IT IS ACCORDINGLY ORDERED this 14th day of March 2006, that the court denies defendants' Motion to Dismiss (Dkt. No. 27).

D.Kan.,2006.
Geer v. Challenge Financial Investors Corp.
Not Reported in F.Supp.2d, 2006 WL 704933 (D.Kan.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 1
Slip Copy, 2006 WL 2290517 (S.D.Fla.)

▷
Guerra v. Big Johnson Concrete Pumping Inc.
S.D.Fla.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. Florida.
Larry GUERRA, Plaintiff,
v.
BIG JOHNSON CONCRETE PUMPING INC., a
Florida Corporation, Defendant.
**No. 05-14237-CIV.**

June 28, 2006.

Richard Bernard Celler, Celler Legal Group, Fort
Lauderdale, FL, for Plaintiff.
Lee James Baggett, Lewis Mortell & Lewis, Stuart,
FL, for Defendant.

*ORDER DENYING DEFENDANT'S MOTION TO
DISMISS*

MARTINEZ, J.
*1 THIS CAUSE came before the Court upon De-
fendant's Motion to Dismiss (D.E. No. 27), filed on
*January 4, 2 006.*Plaintiff has brought suit filing a
collective action complaint alleging violations of
the Fair Labor Standards Act ("FLSA"), as
amended by 29 U.S.C. § 216(b). Defendant has
filed a motion to dismiss for lack of subject matter
jurisdiction under Federal Rule of Civil Procedure
12(b)(1). This motion is fully briefed and ripe for
adjudication. For the reasons stated herein, this mo-
tion is denied.

I. Relevant Factual and Procedural Background

On August 9, 2005, Plaintiff Larry Guerra
("Guerra") filed a collective action complaint al-
leging violations of the FLSA by Defendant. (D.E.
No. 1). Guerra seeks recovery of overtime com-
pensation, minimum wages, unpaid wages, and at-
torney's fees. Guerra seeks recovery for overtime
compensation alleging that Defendant Big Johnson

Concrete Pumping, Inc., ("Big Johnson Concrete")
failed to comply with 29 U.S.C. §§ 201-209 be-
cause Guerra worked overtime for Big Johnson
Concrete but never received overtime compensa-
tion. Guerra also alleges that the failure to provide
him with overtime compensation was willful and
thus, he seeks liquidated damages pursuant to the
FLSA. Guerra next seeks recovery of minimum
wages alleging that Big Johnson Concrete failed to
comply with Article X, Section 24 of the Florida
Constitution because in his final paycheck he was
paid $5.15 per hour in violation of Article X, Sec-
tion 24 of the Florida Constitution, which sets the
minimum wage at $6.15 per hour. Guerra also seeks
recovery of unpaid wages alleging that he and Big
Johnson Concrete had an agreement that he would
be paid $19.00 per hour for all non-overtime hours
he worked but in his final paycheck Big Johnson
Concrete unilaterally reduced his pay to $5.15 per
hour. Guerra also states in the Complaint that
"[t]his action is intended to include each and every
laborer employed by Defendant over the last three
years within the State of Florida who likewise was
subjected to the illegal pay practices described
above."(D.E. No. 1 at 2).

On November 21, 2005, Guerra filed a Motion for
an Order Permitting Court Supervised Notice to
Employees of their Opt-In Rights. (D.E. No. 17).
Big Johnson Concrete responded to this motion and
also filed a motion to strike the affidavits Guerra at-
tached to his motion for an order permitting court
supervised notice. (D.E. No. 19). On January 3,
2006, Defendant made an offer of judgment to
Guerra under Federal Rule of Civil Procedure 68
(D.E. No. 27, Ex. 1). The next day, Big Johnson
Concrete filed its motion to dismiss for lack of sub-
ject matter jurisdiction. (D.E. No. 27). Magistrate
Judge Lynch granted Plaintiff's Motion for an Order
Permitting Court Supervised Notice to Employees
of their Opt-In Rights on May 17, 2006 contingent
upon the District Court's ruling on the motion to
dismiss, and denied Defendant's motion to strike af-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

fidavits filed in support of Plaintiff's motion. (D.E. No. 46). The Court now considers Defendant's Motion to Dismiss (D.E. No. 27).

## II. Analysis

**\*2** Big Johnson Concrete has moved for the dismissal of Guerra's Complaint arguing that this Court lacks subject matter jurisdiction. Attacks on subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) come in two forms, "facial and factual." *Lawrence v. Dunbar,* 919 F.3d 1525, 1528-29 (11th Cir.1990). In considering a facial attack, a court examines the complaint to determine if the " 'plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations of his complaint are taken as true for purposes of the motion." ' *Id.* (quoting *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir.1980)). In considering a factual attack, a Court examines " 'the existence of subject matter jurisdiction in fact irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." ' *Id.* (quoting *Menchaca,* 613 F.2d at 511). Because the Court's power to hear the case is in question when subject matter jurisdiction is challenged in a factual attack, the Court is free to weigh the evidence and satisfy itself that jurisdiction exists. *Id.* (quoting *Williamson v. Tucker,* 645 F.2d 404, 412 (5th Cir.1981)). Here, Defendant Big Johnson Concrete is asserting a factual attack on this Court's subject matter jurisdiction. Big Johnson Concrete specifically argues that this Court lacks subject matter jurisdiction because in an offer of judgment made pursuant to Federal Rule of Civil Procedure 68, Guerra was offered everything he seeks in his individual claim. In addition, at the time the offer of judgment was made, another employee, Domingo Vidales had filed a Notice of Consent to Join. Defendant states that an offer of judgment was also made to Vidales for his entire claim. (D.E. No. 27 at n. 1). The Court, however, finds Big Johnson Concrete's motion to be without merit and it will not dismiss this case for lack of subject matter jurisdiction.

Article III, § 2, cl. 1, of the United States Constitution r equires that a "plaintiff ... make out a 'case and controversy' b etween himself and the defendant; that is, the plaintiff must allege 'a distinct and palpable injury to himself' such as to 'warrant his invocation of federal-court jurisdiction." ' *Nat'l Wildlife Fed. v. Dep't of Interior,* 616 F.Supp. 889, 889 (D.D.C.1984) (emphasis deleted) (quoting *Warth v. Seldin,* 422 U.S. 490, 498-501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).*See also Al Najjar v. Ashcroft,* 273 F.3d 1330, 1335 (11th Cir.2001) (stating that "Article III of the Constitution limits the jurisdiction of the federal courts to the consideration of 'cases' and 'controversies." '). If there is no case and controversy, the Court must dismiss a plaintiff's claim as moot. *See Nat'l Advert. Co. v. City of Miami,* 402 F.3d 1329, 1332 (11th Cir.2005) (stating that "[b]y its very nature, a moot suit 'cannot present an Article III case and controversy and the federal courts lack subject matter jurisdiction to entertain it." ') (quoting *Coral Springs St. Sys., Inc. v. City of Sunrise,* 371 F.3d 1320, 1327 (11th Cir.2004)).*Al Najjar,* 273 F.3d at 1335 (stating that "[i]f events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then case is moot and must be dismissed."). A claim generally becomes moot when a defendant fully satisfies a plaintiff's claim for relief from an offer of judgment. *See Rand v. Monsanto,* 926 F.2d 596, 597-98 (7th Cir.1991) ("Once the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate and a plaintiff who refuses to acknowledge this loses outright, under Fed.R.Civ.P. 12(b)(1), because he has no remaining stake.") (internal citation omitted). Here, Defendant has argued that because its offer of judgment offered Plaintiff his entire relief FN1 requested that his claim is now moot and should be dismissed. This Court disagrees finding that because Plaintiff filed a collective action and because he filed a motion to issue opt-in notice to similarly situated employees, which has been granted, it would be inappropriate to grant Defendant's motion to dismiss.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN1. Plaintiff has argued that the motion to dismiss should not be granted because Defendant did not offer him the entire relief requested. Specifically, Plaintiff argues that he requested "declaratory and other non-monetary relief," which Defendant's offer of judgment did not address. (D.E. No. 28 at 1). However, upon examination of the Complaint there is no request for declaratory or non-monetary relief. Plaintiff calls attention to the first paragraph of the Complaint where he states that he "brings this action for unpaid overtime compensation, and other relief under the Fair Labor Standards Act," arguing that the vague and general statement that he was requesting "other relief" includes a request for declaratory and other non-monetary relief. The Court finds that in examining the phrase "other relief" it in no way meets even the liberal standards under Federal Rule of Civil Procedure 8 of stating "a demand for judgment for the relief the pleader seeks," in the context of a request for declaratory or other non-monetary relief. Therefore, the Court rejects this argument.

*3 The Eleventh Circuit has never addressed the issue of the effect of an offer of judgment made to a Plaintiff in a FLSA collective action. This Court, however, finds the reasoning of several other courts which have been reluctant to dismiss a FLSA collective actions after an offer of judgment has been made to be persuasive. *See Geer v. Challenge Fin. Investors Corp.,* No. 05-1109-JTM, 2006 WL 704933 at *3 (D.Kan.2006); *Reyes v. Carnival Corp.,* No. 04-21861-CIV-GOLD, 2005 U.S. Dist. LEXIS 11948, at (S.D.Fla. May 25, 2005); *Reed v. TJX Co.,* No. 04C1247, 2004 WL 241055, at *2 (N.D.Ill.2004).[FN2] In this case, Magistrate Judge Lynch has already granted the Plaintiff's Motion for an Order Permitting Court Supervised Notice to Employees of Their Opt-In Rights contingent upon this Court's ruling on this motion to dismiss. *See* (D.E. No. 46). In conditionally granting this motion

the Court noted that "the Affidavit of Mr. Vidales shows that at least one other co-worker desires to join the suit, thereby raising the Plaintiff's contention beyond one of pure speculation."*Id.* at 8. Magistrate Judge Lynch also found that "Plaintiff's allegations and affidavits show that he was denied full compensation, that other hourly paid laborers of the same employer were denied full compensation in the same manner, and that there is interest amongst them to join this lawsuit."*Id.* at 10.Thus, Magistrate Judge Lynch found that Plaintiff's collective action was due to be certified. *Id.* The Court agrees with these conclusions and finds it would be inappropriate to find that Plaintiff's claim is moot when a live controversy exists as there is sufficient evidence of other similarly situated individuals in the record to certify the collective action.

> FN2. The Court notes that Defendant has cited *MacKenzie v. Kindred Hospitals East, L.L.C.,* 276 F.Supp.2d 1211 (M.D.Fla.2003) where the Court did dismiss a pending FLSA collective action after an offer of judgment was made; however, this Court finds *MacKenzie* distinguishable. In *Mackenzie,* the Court specifically noted that "the plaintiff has not satisfied the prerequisites for court facilitation of notice and the record lacks an evidentiary basis to designate this matter as a collective action or to compel from the defendant the confidential information of proposed potential plaintiffs."276 F.Supp. at 1220. In this case, there is an evidentiary basis to designate this matter as a collective action.

The Court acknowledges that Defendant has made an offer of judgment to Plaintiff Guerra and to Mr. Vinales who at this time is the only other employee who has filed a notice of consent to join. However, at this time, no notice has been issued for the other potential plaintiffs and there is no guarantee that Defendant will offer full relief to any future persons who file notices of consent to join. The Court also

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

expresses the same concern as the court in *Geer* and notes that "[i]t is possible for defendants to continue making offers of judgments to plaintiffs who opt in and then ask the court to consider dismissal based on the lack of subject matter jurisdiction."*Geer,* at *3. However, this would create a "procedural loop" for FLSA plaintiffs and this Court like the *Geer* court is "reluctant to allow defendants to bar the court room doors" at this point in the litigation when no answer has been filed, and when notice has not been issued to the other potential plaintiffs. *See id.*Furthermore, allowing Defendant's offers of judgment to moot this case is contrary to the broad remedial purpose of the FLSA and the specific purpose of section 216(b),[FN3] which is to reduce the number of multiple suits filed against the same employer. *See Prickett v. DeKalb County,* 349 F.3d 1294 (11th Cir.2003) (stating that "Congress' purpose in authorizing § 216(b) class actions was to avoid multiple lawsuits where numerous employees have allegedly been harmed by a claimed violation or violations of the FLSA by a particular employer" and that the "FLSA is a remedial statute" which is construed liberally); *Braunstein v. Eastern Photographic Laboratories,* 600 F.2d 335 (2d Cir.1979) (noting the "broad remedial purpose" of the FLSA in a different context). Therefore, it is hereby:

> FN3.Section 216(b) permits the filing of collective FLSA actions.

*4 ORDERED AND ADJUDGED that

1. Defendant's Motion to Dismiss (D.E. No. 27) is DENIED.

2. Plaintiff's Motion for Leave to File Surreply to Defendant's Motion to Dismiss (D.E. No. 32) is DENIED.[FN4]

> FN4. The Court requires no further briefing or clarification on the issue Plaintiff asked to address in this motion. *See supra* note 1.

DONE AND ORDERED.

S.D.Fla.,2006.
Guerra v. Big Johnson Concrete Pumping Inc.
Slip Copy, 2006 WL 2290517 (S.D.Fla.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                              Page 1
Slip Copy, 2005 WL 4891058 (S.D.Fla.)

▷
Reyes v. Carnival Corp.
S.D.Fla.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. Florida.
Richard REYES, on behalf of himself and similarly
situated employees of defendant, Plaintiffs,
v.
CARNIVAL CORPORATION, Defendant.
**No. 04-21861-CIV.**

May 25, 2005.

Steven Frederick Grover, Jonathan Leon Gaines,
Miramar, FL, for Plaintiffs.
Andrew L. Rodman, Guilleramo W. Perez, Robert T.
Kofman, Stearns Weaver Miller Weissler Alhadeff &
Sitterson, P.A., Miami, FL, for Defendant.

*ORDER ON DEFENDANT'S MOTION TO DISMISS
AND PLAINTIFF'S OMNIBUS MOTION FOR CONDI-
TIONAL CERTIFICATION OF COLLECTIVE ACTION*

GOLD, J.
**\*1** THIS CAUSE is before the Court upon Defendant's
Motion to Dismiss for Lack of Subject Matter Jurisdic-
tion [DE 15], filed January 7, 2005, and Plaintiff's Om-
nibus Motion for Conditional Certification of Collective
Action [DE 14], filed December 22, 2004. Both parties
filed opposition briefs [DE 16, 22] and reply briefs [DE
20, 23]. Oral argument was held on March 4, 2005.
Upon a review of the parties' arguments and relevant
case law and statutes, I conclude that Defendant's Mo-
tion should be denied and Plaintiff's Motion should be
granted in part and denied in part.

*Facts*

Plaintiff Richard Reyes ("Reyes" or "Plaintiff") was
employed by Defendant Carnival Corporation
("Carnival" or "Defendant") for approximately eighteen
weeks, from April 8, 2002 to August 16, 2002, as a Per-
sonal Vacation Planner ("PVP"). PVPs promote cruises

and obtain bookings from consumers. Reyes alleges that
he did not receive any overtime pay while employed as
a PVP, nor did any of his fellow PVPs, despite the fact
that they frequently worked over sixty hours a week.
Accordingly, Plaintiff's complaint seeks unpaid over-
time compensation under the Fair Labor Standards Act
of 1938, 29 U.S.C. § 201, *et seq.* ("FLSA"). Plaintiff
seeks relief on behalf of himself and on behalf of a class
of similarly situated PVPs.

Defendant has filed a motion to dismiss for lack of sub-
ject-matter jurisdiction. Plaintiff has filed an omnibus
motion seeking to conditionally certify this case as a
collective action, to compel production by Defendant of
a complete list of employees of a defined class and their
contact information, and to authorize Plaintiff's counsel
to mail a court-approved notice to all such persons
about their right to opt into this collective action. I will
address Defendant's motion first and Plaintiff's motion
second.

## I. SUBJECT-MATTER JURISDICTION

*Standard of Review*

Under Federal Rule of Civil Procedure 12(b)(1), the
"plaintiff bears the burden of establishing that the court
has jurisdiction."*Rosner v. United States,* 231 F.Supp.2d
1202, 1205 (S.D.Fla.2002) (citing *Menchaca v.
Chrysler Credit Corp.,* 613 F.2d 507 (5th
Cir.1980)).FN1 The Eleventh Circuit has stated that
"because a federal court is powerless to act beyond its
statutory grant of subject matter jurisdiction, a court
must zealously insure that jurisdiction exists over a
case."*Smith v. GTE Corp.,* 236 F.3d 1292, 1299 (11th
Cir.2001) (citations omitted).

> FN1. All Fifth Circuit decisions prior to Octo-
> ber 1, 1981 are binding precedent on the Elev-
> enth Circuit. *See Bonner v. Prichard,* 661 F.2d
> 1206, 1209 (11th Cir.1981).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Motions to dismiss under Rule 12(b)(1) fall into two categories: "facial" or "factual attacks." *Morrison v. Amway Corp.,* 323 F.3d 920, 925 n. 5 (11th Cir.2003) (citation omitted). Facial attacks are based on the allegations in the complaint, and the court takes these allegations as true in deciding whether to grant the motion. *Id.* Factual attacks rely on evidence outside the pleadings. *Id.* In the case before the Court, Defendant has asserted a lack of subject matter jurisdiction on the basis of facts outside of pleadings, making this jurisdictional attack a factual one. *Id.*

### Analysis

**\*2** Carnival has moved to dismiss the complaint for lack of subject matter jurisdiction on the basis that an offer of judgment has been made to the Plaintiff for more than complete relief which renders the case moot. On January 4, 2005, Carnival served on Plaintiff an offer of judgment under Federal Rule of Civil Procedure 68, offering Plaintiff $4,275.00, plus interest, costs, and reasonable attorneys' fees to be determined by the Court. Carnival contends that this offer of judgment offers Plaintiff more than he could recover if her were to prevail at trial, based upon Plaintiff's own Rule 26 damages computation of $2,700. See Plaintiff's Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a). Carnival argues that even though Plaintiff has not accepted its offer of judgment, the offer nevertheless renders moot any case or controversy, depriving the Court of subject matter jurisdiction.

Plaintiff argues in opposition that Plaintiff has not accepted the offer of judgment, that the offer of judgment does not provide full relief to him, and that because other plaintiffs have opted in to this suit since the offer of the judgment was made, the offer of judgment does not address their claims which remain live and pending. Plaintiff argues that the offer of judgment does not offer complete relief because it is based on the estimates in Plaintiff's initial Rule 26(a) disclosures, which are made only based upon the information then reasonably available, prior to the completion of discovery and without access to Carnival's complete wage and hour records concerning the Plaintiff that would allow for a more ac-

curate estimation of his damages. Plaintiff also argues in opposition that, as a matter of policy, Carnival should not be allowed to frustrate the purpose of the FLSA's collective action provision by making a hasty offer of judgment to the named plaintiff before damages can be determined with any degree of certainty.

Rule 68 governs offers of judgment. That Rule states:

At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued. If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment. An offer not accepted shall be deemed withdrawn and evidence thereof is not admissible except in a proceeding to determine costs. If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the of- fer.

Fed. R. Civ. Proc. 68. Because a case becomes moot when the parties lack a legally cognizable interest in the outcome of the litigation, *see City of Erie v. Pap's A.M.,* 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000), at least one court has dismissed a complaint as moot as the result of an offer of judgment made under Rule 68 for the full damage amount. *See Mackenzie v. Kindred Hospitals East, L.L.C.,* 276 F.Supp.2d 1211 (M.D.Fla.2003) (dismissing plaintiff's FLSA claims as moot after the employer made an offer of judgment). In *Mackenzie,* the plaintiff did not dispute that the defendant's offer was for more than the maximum amount of damages he could possibly recover under the FLSA, and the plaintiff did not argue that he could obtain any additional relief. *Id.* at 1218.Furthermore, in *Mackenzie,* no other individual asserted a claim or interest in the case. *Id.* Accordingly, the court held that the controversy was no longer live and dismissed the case for lack of subject matter jurisdiction.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*3** I conclude that the instant case is distinguishable from *Mackenzie* for several reasons. First, the plaintiff in this case disputes that Carnival's offer is for more than the maximum amount of damages he could recover under the FLSA. Carnival based its offer on the Plaintiff's estimate as provided in his initial disclosure under Rule 26. The parties dispute whether Plaintiff has been provided all the documents in Carnival's possession regarding the number of hours Plaintiff actually worked. Indeed, the Plaintiff's Rule 26 disclosure states that it is merely a preliminary estimate due to incomplete records in the possession of the Plaintiff. Since the Plaintiff has rejected Carnival's offer and there is no basis for me to conclude that the offer of judgment is definitively for more than the Plaintiff could recover at trial, I conclude that a live controversy remains pending. Second, two other persons, Natasha Brooks and Guillermo Perez, have opted in to this suit, and Carnival has not made offers of judgment to them. Carnival argues that the Court had already lost subject matter jurisdiction before those persons opted in because the offer of judgment had already been made. While Brooks and Perez did indeed opt in after the offer of judgment was made, the Court did not "lose" subject matter jurisdiction in the interim; the initial Plaintiff, Reyes, had not accepted the offer and it is unclear whether sufficient time had passed for Reyes to ascertain whether the offer of judgment was fair or complete. There is no Eleventh Circuit precedent regarding the exact moment a case becomes moot after the making of a qualified offer of judgment, but at the very least, a court cannot lose jurisdiction before the parties themselves can ascertain whether they retain a legally cognizable interest in the outcome of the litigation. *See City of Erie v. Pap's A.M.,* 529 U.S. 277, 287, 120 S.Ct. 1382, 1390, 146 L.Ed.2d 265 (2000) (explaining that a case becomes moot when it is "impossible for the court to grant any effectual relief whatever to the prevailing party"); *see also Taylor v. CompUSA, Inc.,* 2004 WL 1660939, at \*3 (N.D.Ga. June 29, 2004) ("As the parties are still in the process of determining the correct amount of damages, the Court finds that the matter is still in dispute and dismissal of Plaintiffs' claims would be inappropriate at this time."). Accordingly, two other persons opted in to this suit and no offer of judgment has been made to them, thus a live

controversy remains.

Finally, it is important to note that the defense strategy of providing an offer of judgment to the initial plaintiff in a FLSA collective action in order to bar the case from proceeding as to all similarly situated plaintiffs violates the very policies behind the FLSA. *See, e.g., Reed v. TJX Companies, Inc.,* 2004 WL 2415055 (N .D. Ill. Oct 27, 2004) (denying motion to dismiss for lack of subject matter jurisdiction). The FLSA was enacted to ensure that every employee receives "a fair day's pay for a fair day's work."*A.H. Phillips v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945). The FLSA requires that employees be paid a minimum wage for their work, and that employees working more than forty hours per week receive overtime compensation for all hours over forty at a rate of 1.5 times their regular pay. *See*29 U.S.C. § 207(a)(1), (e); 29 C.F.R. § 778.108. Given the relatively small amounts of money at issue in an individual case seeking overtime compensation, Congress included provisions in the FLSA to encourage litigation, including 29 U.S.C. § 216(b), the "collective action" provision, which allows an action to be brought "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."*Id.*

**\*4** Permitting a defendant to evade a collective action by making an offer of judgment at the earliest possible time defeats the purpose of the collective action mechanism. In *Reed,* the plaintiff brought suit against his employer under the FLSA for deprivation of overtime compensation. *Reed v. TJX Companies, Inc.,* 2004 WL 2415055 (N.D. Ill. Oct 27, 2004). The plaintiff argued that the employer made its offer in bad faith, simply to pay off the named representative of a potential class action and thereby to defeat the formation of the class. The court concluded that the plaintiff was correct:

Reed asserts that TJX Co.'s defense strategy creates a virtually unwinnable situation for plaintiffs in collective or class action lawsuits. Defendant makes an offer of "judgment" to Plaintiff, then alleges that the action is moot. Plaintiff therefore must either pursue discovery very early in the case, when a court likely will deem it premature, or seek class certification and/or notice before discovery, which runs the risk of harming the in-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

terests of those as-yet undiscovered class members. In cases where there are statutory ceilings on recoverable damages, such a strategy may be effective and yet still protect the interests of a plaintiff. In a situation such as the instant case, where there are no statutory caps on damages and where substantial discovery may be necessary before damages can be determined with any degree of certainty, such a strategy allows defendants to bar the courtroom door. This court finds such a result inappropriate at this early stage in litigation.

*Id.* at *3 (internal citations omitted).

For the reasons described herein, I conclude that Defendant's motion to dismiss for lack of subject matter jurisdiction should be DENIED.

## II. CONDITIONAL CERTIFICATION OF COLLECTIVE ACTION

### *Standard of Review*

Opt-in class actions on behalf of similarly situated plaintiffs are provided by the opt-in class mechanism under 29 U.S.C. § 216(b).Section 216(b) states in relevant part that "[a]n action ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."*Id.* Moreover, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."*Id.*

Section 216(b) collective actions differ from class actions provided by Federal Rule of Civil Procedure 23. "In a Rule 23 class action, each person who falls within the class definition is considered to be a class member and is bound by the judgment, favorable or unfavorable, unless he has opted out. By contrast, a putative plaintiff must affirmatively opt into a § 216(b) action by filing his written consent with the court in order to be considered a class member and be bound by the outcome of

the action."*Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1216 (11th Cir.2001) (citations omitted).

*5 The Eleventh Circuit Court of Appeals has stated that "[t]o maintain an opt-in class action under § 216(b), plaintiffs must demonstrate that they are 'similarly situated." ' *Id.* at 1217 (citations omitted). "[P]laintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members." ' *Id.* (quoting *Grayson v. K Mart Corp. .,* 79 F.3d 1086, 1096 (11th Cir.1996)) (citations omitted). The " 'similarly situated requirement' [of § 216(b) ] is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance)." *Id.* at 1219 (quoting *Grayson,* 79 F.3d at 1095).

In *Hipp,* the Eleventh Circuit provided district courts within the Circuit with valuable guidance in adjudicating motions such as Plaintiff's, stating that "we will clarify the meaning of § 216(b)'s 'similarly situated' requirement in this circuit." *Id.* at 1217.In that case, the Eleventh Circuit suggested that district courts use what was described as a "two-tiered approach in making the similarly situated determination. Under this approach, during the early stages of litigation, the district court would have evaluated the case under a lenient standard and likely would have granted preliminary certification of an opt-in class. The court would then have re-evaluated the similarly situated question at a later stage, once discovery produced more information regarding the nature of Plaintiffs' claims."*Id.* at 1217-18.In discussing the specifics of this two-tiered approach, the *Hipp* court quoted language from *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1213-14 (5th Cir.1995), in which the Fifth Circuit stated that "[t]he first determination is made at the so-called 'notice stage.' At the notice stage, the plaintiff has the burden of demonstrating a reasonable basis for the claim of classwide discrimination. *See Grayson v. K Mart Corp.,* 79 F.3d 1086, 1096 (11th Cir.1996). The plaintiff's burden is "not heavy," and is met by "making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary."*See id.* at 1096-97.The affidavits must indicate that there are other employees who

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

are "similarly situated" with respect to their job require-
ments and to their pay provisions, and that these em-
ployees desire to opt in. *See Dybach,* 942 F.2d at
1567-68;*see also Harper v. Lovett's Buffet,* 185 F.R.D.
358, 362-64 (M.D.Ala.1999) (court conditionally certi-
fied a class of all hourly employees at the defendant's
restaurant where plaintiff provided affidavits stating
that the amount the servers were paid, that they were re-
quired to do additional jobs for which they received no
additional compensation, that these servers received W-
2s and check stubs that falsely stated tips not received,
and that management would clock out employees
without their knowledge)."If the district court
'conditionally certifies' the class, putative class mem-
bers are given notice and the opportunity to 'opt-in.'
The action proceeds as a representative action
throughout discovery."*Hipp,* 252 F.3d at 1218. At the
second stage, which is "typically precipitated by a mo-
tion for 'decertification' by the defendant usually filed
after discovery is largely complete and the matter is
ready for trial,"'"the court has much more information
on which to base its decision, and makes a factual de-
termination on the similarly situated question."*Id.*

*6 The Eleventh Circuit concluded that "[t]he two-
tiered approach to certification of § 216(b) opt-in
classes described above appears to be an effective tool
for district courts to use in managing these often com-
plex cases, and we suggest that district courts in this cir-
cuit adopt it in future cases."*Id.* at 1219.The Eleventh
Circuit stressed that it was not mandating that the two-
tiered approach be adopted, given that "[t]he decision to
create an opt-in class under § 216(b), like the decision
on class certification under Rule 23, remains soundly
within the discretion of the district court ."*Id.* It did,
however, endorse the two-tiered approach as an
"effective tool" for district courts to use in making their
§ 216(b) determinations. *Id.; see also Cameron-Grant v.
Maxim Healthcare Servs., Inc.,* 347 F.3d 1240, 1242 n.
2 (11th Cir.2003) ("Since Hipp, the district courts in our
circuit have utilized the two-tiered approach."); *see,
e.g., Stone v. First Union Corp.,* 203 F.R.D. 532, 537
(S.D.Fla.2001).

*Analysis*

Plaintiff has submitted the affidavit of named plaintiff
Reyes [DE 14, Exh. D] in support of the motion for
conditional certification. Plaintiff's affidavit sets forth
the time period during which he worked at Carnival, the
hours he worked each week, and his hourly pay. He also
claims to be familiar with other similarly-situated Per-
sonal Vacation Planners ("PVP"), and claims that Car-
nival did not pay any overtime to any of these PVPs. He
claims that during the four months that he worked for
Carnival, first in the Miami location and then in
Miramar, there were approximately one hundred and
fifty (150) PVPs, many of whom worked over sixty
hours per week without receiving overtime pay and
would be interested in joining this litigation. Plaintiff
also states that the PVP position had a high turnover
rate, thus the actual number of PVPs may be signific-
antly higher.

At least two PVPs-Natasha Brooks and Guilleramo W.
Perez-have filed notices of consent to opt-in. [DE 17,
19]. Attached as exhibits to Plaintiff's reply brief are af-
fidavits by Brooks and Perez in which both individuals
state that they were employed by Carnival as PVPs,
worked over forty hours per work on a regular basis,
and received no overtime pay. Both individuals state
that Carnival told them that it was Carnival's policy not
to provide overtime pay to PVPs.

I conclude that Plaintiff's affidavit, in combination with
the opt-in notices and affidavits of Brooks and Perez
which confirm the allegations in Plaintiff's affidavit,
contains sufficiently detailed allegations to demonstrate
a reasonable basis for the Plaintiff's claim of classwide
discrimination and demonstrate interest of other PVPs
to opt-in. The affidavits appear to be based upon per-
sonal knowledge, observation, and experience, thus they
are not "conclusory" as alleged by Carnival. The allega-
tions that other PVPs did not receive overtime pay ap-
pears to be based upon the affiants' knowledge of the
position of PVP and of Carnival's employment policies
with respect to that position. At this stage in the pro-
ceedings, it is reasonable to infer that this knowledge
forms a sufficient basis for the affiants' allegations that
other PVPs were treated similarly.

*7 While Plaintiff has met his initial burden, the parties

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

also dispute whether Plaintiff is "similarly situated" to the class of PVPs as defined by the Plaintiff.[FN2]The Plaintiff bears the burden of establishing that he and the class he wishes to represent are similarly situated. *See Grayson,* 79 F.3d at 1096. Ordinarily, this burden is not heavy and may be met by detailed allegations supported by affidavits. *Id.* at 1097.The Eleventh Circuit has stated that the "similarly situated" requirement is "more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance) ... [and] that a unified policy, plan, or scheme of discrimination may not be required to satisfy the more liberal 'similarly situated' requirement of § 216(b)...."*Grayson,* 29 F.3d at 1095.I explained the implications of this standard in *Stone:*

> FN2. Carnival proposes that the motion either be denied on this basis, or that the Court re-define the proposed class so that it bears a more rational relationship to Plaintiff's claims. [DE 16 at 14-15, n. 10].

Accordingly, that the plaintiffs are "similarly situated" may be established even if the transactions or occurrences are not identical. *Grayson* so holds when it quotes *Sperling v. Hoffmann-La Roche* for the proposition that, "[P]laintiffs need show only 'that their positions are similar, not identical,' to the positions held by the putative class members."*Grayson,* 79 F.3d at 1096 (quoting *Sperling v. Hoffmann-La Roche,* 118 F.R.D. 392, 407 (D.N.J.1988), aff'd in part and appeal dismissed in part, 862 F.2d 439 (3rd Cir.1988), aff'd, *Hoffmann-La Roche, Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989)). Moreover, by implication, not all questions of law or fact must be common; rather, it is enough if some questions of law or fact are common to all parties, even if such questions do not predominate. *See Grayson,* 79 F.3d at 1096 (quoting *Flavel v. Svedala Indus. Inc.,* 875 F.Supp. 550, 553, which states, "The 'similarly situated' requirement, in turn, is considerably less stringent than the requirement of [Rule 23(b)(3) ] that common questions 'predominate,' or presumably, the Rule 20(a) requirement that claims 'arise out of the same action or occurrence.' ").

*Stone,* 203 F.R.D. at 541.

No one factor is dispositive in the assessment of whether Plaintiff is similarly situated to the sought-after class. In *Stone,* a collective action for age discrimination brought pursuant to the Age Discrimination in Employment Act, I stated:

The factors enunciated in *Grayson* and *Hipp* to assist in this analysis include: (1) whether the plaintiffs all held the same job titles (applicable in both *Grayson,* 79 F.3d at 1090, and *Hipp,* 252 F.3d at 1219); (2) whether the plaintiffs worked in different geographical locations (a factor held to be "nonconclusive" in *Hipp,* 252 F.3d at 1219); (3) the extent to which the claimed discrimination occurred during different time periods and by different decision makers (*cf., Alexander,* 207 F.3d at 1324); (4) whether plaintiffs have provided "statistically significant" evidence of [unlawful conduct] (*Grayson,* 79 F.3d at 1097); (5) whether the Plaintiffs all alleged similar, though not identical [unlawful] treatment (*Hipp,* 252 F.3d at 1219); (6) whether the plaintiffs have sufficiently pled and supported by affidavits, depositions, and the like that Defendant's decision makers have articulated and manifested a clear intent to [engage in unlawful conduct] (*Grayson,* 79 F.3d at 1097-99); and (7) whether the Defendant took steps to implement its plan ...(*Id.*). Obviously, each case must be reviewed on its pertinent facts to determine whether these, or other factors, are relevant to measure the nature and degree of "similarity."

**\*8** *Id.* at 542-43.

In this case, Plaintiff seeks to represent a class of PVPs employed at any time from January 1, 2002 to the present; precisely, Plaintiff seeks to represent "each and every person ... who was employed by Defendant, performed any services on Defendant's behalf, and/or performed any services which benefitted Defendant in any way, at any time from January 1, 2002 through the present, and who was classified and/or described by Defendant as a 'vacation planner' and/or 'personal vacation planner,' or the like."[DE 14 at 1-2]. Considering the factors as I enunciated them in *Stone,* I conclude that Plaintiff has met the standard for demonstrating

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that he is "similarly situated" to his class. Reyes seeks to represent a class of persons with the same title.[FN3]Reyes seeks to represent PVPs in his group, headquartered in Miami, Florida.[FN4]Reyes states in his affidavit that he worked alongside other PVPs, that many of them worked overtime, including over sixty (60) hours per week, that working overtime was inevitable because of sales quotas that PVPs were required to meet, and that Carnival did not pay overtime pay to any PVPs. [DE 14, Exh. D]. Reyes's affidavit is corroborated by the affidavits of Brooks and Perez, both of whom stated that it was Carnival's stated policy to pay PVPs base pay plus incentive award payments for bookings, but not to pay overtime pay to PVPs. [DE 20, Exh. C, D]. All three individuals have submitted pay statements which corroborate their affidavits. Thus it appears from the affidavits and pay statements submitted that it was Carnival's stated, official policy to deny overtime pay to PVPs. This is precisely the type of "similar, though not identical" treatment for which opt-in collective actions were intended. *Hipp*, 252 F.3d at 1219.

> FN3. The phrase "or the like" is unnecessary and potentially expands the class beyond persons of the same title as Reyes; accordingly, I will strike that phrase from the definition of the opt-in class. Furthermore, I note that the class is limited to persons of the same title, paid in the same manner as the Plaintiff. The class *does not* include reservation sales agents who are paid under a different incentive structure.

> FN4. This geographic limitation is not evident from the description of the class provided in the first two pages of Plaintiff's motion, but is evident from his affidavit, which speaks only to the policies and employees that were part of his group. It appears from Plaintiff's affidavit that he seeks only to represent PVPs that were part of his group. Accordingly, I will limit Plaintiff's opt-in class to PVPs employed out of the Miami headquarters. In any event, this geographic factor was not held to be "nonconclusive" in *Hipp*. 252 F.3d at 1219.

Defendant argues that this class is defined too broadly since Plaintiff was employed for only nineteen weeks, from April 8, 2002 through August 16, 2002. Defendant argues that "whether the alleged violations occurred during the same time period" is a dispositive factor to be considered in the "similarly situated" analysis. [DE 16] (citing *Smith v. Tradesmen Int'l, Inc.,* 289 F.Supp.2d 1369, 1372 (S.D.Fla.2003); *Mackenzie v. Kindred Hosps. East, LLC,* 276 F.Supp.2d 1211, 1221 (M.D.Fla.2003)). With respect to the time period in question, Reyes was in fact employed as a PVP from April 2002 through August 2002, Brooks was employed as a PVP from November 2001 until July or August 2002, and Perez was employed as a PVP for approximately a year and a half, in 2001 and 2002. Plaintiff seeks to represent a class of PVPs employed at any time from January 1, 2002 to the present. I conclude that based upon the affidavit testimony of Brooks and Perez, which corroborates Reyes's affidavit, that there is no reason to believe that PVPs employed starting January 1, 2002 are not "similarly situated" to Reyes in any significant way. *See, e.g., Heagney v. European American Bank,* 122 F.R.D. 125, 128 (E.D.N.Y.1988) ("The workers may have left their jobs at different times via different procedural mechanisms, but the alleged unity of the discriminatory scheme they faces overwhelms those differences.") (citation omitted). Because Reyes alleges that his denial of overtime pay was a matter of official company policy, and because Reyes has submitted evidence that this policy has existed since before January 1, 2002, in the interest of judicial economy (which motivated the enactment of § 216(b) in the first instance), I conclude that the class proposed by Reyes meets the requisite standard. In so concluding, I bear in mind that the certification of this collective action is *conditional* at this stage in the proceedings, and consideration will be given once more to Defendant's arguments upon Defendant's motion for decertification, at which time I will have a more complete record on which to base a decision. *Hipp*, 252 F.3d at 1218. But given that Plaintiff's burden is "not heavy," *Grayson,* 79 F.3d at 1096, it has been met in this case.

III. COMPELLED PRODUCTION OF A CLASS LIST

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*9** In Plaintiff's Omnibus Motion, Plaintiff moves to compel expedited production by Defendant, within fifteen (15) days of this order, of a complete list of *"each and every person-and their last-known home addresses, telephone numbers, e-mail addresses, and social security numbers-who was employed by Defendant, performed any services on Defendant's behalf, and/or performed any services which benefitted Defendant in any way, at any time from January 1, 2002 through the present, and who was classified and/or described by Defendant as a "vacation planner" and/or "personal vacation planner" or the like."*(hereinafter "the Proposed Class"). As I stated earlier in this order, I will require that the Proposed Class be amended so as to reflect a geographic limitation to persons employed out of Miami and/or Miramar, and will strike the phrase "or the like" from the definition of the Proposed Class. The only basis for Defendant's opposition to this motion was Defendant's belief that Plaintiff failed to meet the "similarly situated" requirement of § 216(b). Because I conclude that the Proposed Class should be conditionally certified, Plaintiff's motion to compel production of contact information is GRANTED.[FN5]

> FN5. Plaintiff's request for Defendant to provide Plaintiff's counsel with the list both by hard copy and electronically-in an Excel spreadsheet with each person listed alphabetically from "A" to "Z" and with each person's last-known home address, telephone number, e-mail address, and social security number in a separate field corresponding with each name is GRANTED.

## IV. AUTHORIZATION TO MAIL NOTICES TO THE PROPOSED CLASS

Plaintiff seeks authorization to mail a Court-approved Notice to members of the Proposed Class about their right to opt into this collective action by filing a Consent to Join Lawsuit. Plaintiff has submitted a proposed Notice and proposed Consent form as exhibits to his Omnibus Motion [DE 14, Exh. A, B]. I prefer that the parties stipulate to the use of a Notice and Consent form, now that I have ruled upon Plaintiff's motion to conditionally certify the opt-in class. Accordingly, the parties are hereby ORDERED to meet and attempt to reach a stipulation as to the Notice and Consent form on or before June 16, 2005. The parties shall file a Status Report regarding the Notice and Consent form on or before June 16, 2005.

## V. CONCLUSION

For the reasons stated in this Order, it is hereby ORDERED AND ADJUDGED that:

1. Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction [DE 15] is DENIED.

2. Plaintiff's Omnibus Motion for Conditional Certification of Collective Action [DE 14] is GRANTED IN PART and DENIED IN PART.

3. This action is hereby CONDITIONALLY CERTIFIED as a collective action under the Fair Labor Standards Act.

4. Defendant SHALL PRODUCE to Plaintiff, on or before June 16, 2005, a complete list of each and every person-and their last-known home addresses, telephone numbers, e-mail addresses, and social security numbers-who was employed by Defendant out of its Miami or Miramar locations, performed any services on Defendant's behalf, and/or performed any services which benefitted Defendant in any way, at any time from January 1, 2002 through the present, and who was classified and/or described by Defendant as a "vacation planner" and/or "personal vacation planner."

**\*10** 5. Defendant SHALL PRODUCE the aforementioned list both by hard copy and electronically-in an Excel spreadsheet with each person listed alphabetically from "A" to "Z" and with each person's last-known home address, telephone number, e-mail address, and social security number in a separate field corresponding with each name.

6. The parties are hereby ORDERED to meet and attempt to reach a stipulation as to the Notice and Consent form on or before June 16, 2005. The parties SHALL FILE a Status Report regarding the Notice and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Consent form on or before June 16, 2005.

7. The parties SHALL FILE a Revised Joint Scheduling Report (Appendix A) on or before June 9, 2005.

DONE AND ORDERED.

Pursuant to the Court's Order Requiring Compliance with Local Rule 16.1, the parties have agreed to the following deadlines:

*JOINT CONFERENCE REPORT*

*APPENDIX I*

| | DATE | ACTION |
|---|---|---|
| By | | Opt-in cut off date, assuming preliminary |
| | | certification is granted and notice is |
| | | approved. |
| By | | Counsel for both parties shall prepare and serve |
| | | detailed discovery plans. |
| | | Each plan shall include a detailed time line for the |
| | | submission of, and response to, written |
| | | interrogatories, admissions, production of |
| | | documents, and the like in accordance with the |
| | | Federal Rules of Civil Procedure and the Local |
| | | Rules of this District. Each plan shall include a |
| | | proposed time schedule for the taking of depositions |
| | | of non-expert witnesses and tentative dates for |
| | | further expert witness discovery. |
| By | | Counsel for the parties shall confer in an effort to |
| | | resolve any disputes relative to the discovery plans. |
| | | Any such resolution shall be in |

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2005 WL 4891058 (S.D.Fla.)

writing and signed by

each party and shall constitute an amendment to the

each discovery plan. If both plans are agreed to, an

order to that effect shall be submitted for signature

by the Judge. Any subsequent disagreements shall be

resolved in accordance with the procedures

highlighted below.

By Each party shall file any objection to the other

party's discovery plan specifying the grounds for the

objection and the remedy requested.

By The objections shall be referred to the Magistrate

Judge and a hearing held to resolve any pending

objections. The Magistrate Judge's order shall

adopt the final discovery plan. Any proposed

amendment to the order shall first be discussed

by the parties. If agreed to, an order to that

effect shall be given to the Magistrate Judge for

signature. If not agreed to, the parties shall set a

conference call with the Magistrate Judge to

discuss the disputed matter before filing any

motions for protection or enforcement. Such

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

motions shall only be filed after all efforts for

resolution by the Magistrate Judge have been

exhausted.

By      All non-dispositive pretrial motions (including

motions pursuant to Fed.R.Civ.P. 14, 15, 18

through 22, and 42 motions) shall be filed. Any

motion to amend or supplement the pleadings filed

pursuant to Fed.R.Civ.P. 15(a) or 15(d) shall

comport with S.D.Fla.L.R. 15.1 and shall be

accompanied by the proposed amended or

supplemental pleading and a proposed order as

required. Prior to filing any non-dispositive

motion, counsel for the moving party shall

confer, or make reasonable effort to confer, with

counsel for the opposing party in a good faith

effort to resolve the matter, and shall include in

the motion a statement certifying that this has

been done.

By      Plaintiff shall furnish opposing counsel with a

written list containing the names and addresses of all

*expert* witnesses intended to be called at trial and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

|  | only those expert witnesses listed shall be permitted |
|  | to testify. |
| By | Defendant shall furnish opposing counsel with a |
|  | written list containing the names and addresses of all |
|  | expert witnesses intended to be called at trial and |
|  | only those expert witnesses listed shall be permitted |
|  | to testify. |
| By | All expert reports and summaries are to be |
|  | exchanged per S.D.Fla.L.R. 16.1 K. This date shall |
|  | supercede any other date in Local Rule 16.1 K. |
| By | All expert discovery shall be completed. |
| By | All non-expert discovery shall be completed. |
| By | Defendant shall file any motion to decertify the |
|  | members of the opt-in class. Any such motion shall |
|  | be accompanied by a memor- andum of law which |
|  | addresses, at a minimum, the fol- lowing issues: (i) |
|  | whether an evidentiary hearing is required on the |
|  | motion or may the motion be de- cided based on |
|  | affidavits and discovery of re- cord? (ii) what is the |
|  | legal standard to be applied on the "similarly |
|  | situated" issue under 11th Circuit case law, or if no |

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

case is on point, what is the applicable law in other

circuits? (iii) who bears the burden of proof on class

certification, or decertification, at this stage of the

proceedings? (iv) If class decertification is granted

what goes forward to trial relative to the opt-in

plaintiffs? (v) If decertification is denied, should the

case be bifurcated in two stages, namely, a liability

and a remedial phase? (vi) In the liability phase, what

defense(s) is the Defendant permitted to raise? (vii)

If the jury determines against the Plaintiffs in the

liability phase based on the "pattern and practice"

theory, what additional rights, if any, does the

named Plaintiff, and/or the opt-in plaintiffs, have to

go forward with alternative individual theories under

the *McDonnell Douglas* test or otherwise? (viii) In

the remedial stage, what relief is permitted to the

named Plaintiff and individual plaintiffs? In other

words, will each plaintiff have a "mini-trial" as to

their requested relief, and, if so, what defenses may

the Defendant raise at this stage [given any already

raised and decided against at the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

liability stage]?

If no motion is filed by the Defendants, then the

Defendant's shall nonetheless file their legal

memorandum addressing the matters raised by items

(iv) through (vii) above, by the date indicated.

By     Plaintiffs shall file their response to the motion for

decertification, if any, and/or to the legal matters

raised by the court in this order and by the

Defendant in its memorandum.

By     Defendants shall file their reply.

By     The court will hold an evidentiary hearing and/or

oral argument on any motion to decertify the class.

This date may need to be adjusted depending on

whether an evidentiary hearing is held.

In the event no motion for decertification is filed, the

court shall hold oral argument on the pending legal

matters addressed by the parties.

By     The court shall rule on the decertification motion, if

any, and set forth the procedures to be followed for

the trial of the cause. Dispositive motions then may

be filed based on those procedures.

By     All dispositive pretrial motions and memoranda of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

law must be filed, including as to both the liability

and remedial stage. If any party moves to strike

an expert affidavit filed in support of a motion

for summary judgment [for reasons stated in

*Daubert v. Merrill Dow Pharmaceuticals, Inc,* 509

U.S. 579, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)

and *Kumho Tire Company, Ltd. v. Carmichael* 526

U.S. 137, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ],

the motion to strike shall be filed with that

party's responsive memorandum. In the event

that a *Daubert* motion must be determined

before the dispositive motions are ruled on, the

court shall establish procedures and dates after

conferring with the parties.

By                                        Mediation shall be completed.

By                                        Pretrial Stipulation and *Motions in Limine.* The

joint pretrial stipulation shall be filed pursuant to

S.D.Fla.L.R. 16.1(E). In conjunction with the Joint

Pretrial Stipulation, the parties shall file their

motions in limine.

On                                        Pretrial Conference will be held.

On                                        Trial.

S.D.Fla.,2005.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Reyes v. Carnival Corp.
Slip Copy, 2005 WL 4891058 (S.D.Fla.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2007 WL 118877 (S.D.Ind.)

## C

Mares v. Caesars Entertainment, Inc.
S.D.Ind.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. Indiana,New Albany Division.
Guadalupe (Robert) MARES, Plaintiff,
v.
CAESARS ENTERTAINMENT, INC., Harrah's Entertainment, Inc., Harrah's Operating Company, Inc., Caesars World Inc., Roman Entertainment Corporation of Florida, Caesars Riverboat Casino, LLC, f/k/a RDI/Caesars Riverboat Casino, LLC f/k/a Harco Entertainment Company, LLC, Defendants.
**No. 4:06-cv-0060-JDT-WGH.**

Jan. 10, 2007.

Lawrence L. Jones, II, Robert Gregg Hovious, Tachau Maddox Hovious & Dickens PLC, Louisville, KY, for Plaintiff.
Dustin D. Stohler, Todd M. Nierman, Littler Mendelson PC, Indianapolis, IN, Rick D. Roskelley, Littler Mendelson, Las Vegas, NV, for Defendants.

**Entry on Plaintiffs' Motion to Certify Collective Action Status (Doc. No. 29) and Motion for Approval of Proposed Class Notice (Doc. No. 31)FN1**

> FN1. This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.JOHN DANIEL TINDER, United States District Court Judge.

**\*1** Plaintiff Guadalupe "Robert" Mares brings this action against Defendants under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201-219, purportedly on behalf of himself and a class of others similarly situated. He alleges that the Defendants willfully violated the FLSA by failing to pay wages due including minimum wages for each hour worked and overtime pay for mandatory, off-the-clock, pre-shift meetings and other alleged mandatory on-duty time. He seeks permanent injunctive relief and damages. Mr. Mares requests certification of a collective action under the FLSA and approval of a proposed class notice. Defendants oppose the requests.

### I. BACKGROUND

Plaintiff Guadalupe "Robert" Mares has been employed as a security officer by Defendant Caesars Riverboat Casino, LLC f/k/a RDI/Caesars Riverboat Casino, LLC f/k/a Harco Entertainment Company, LLC ("Caesars") at its Caesars Indiana Glory of Rome casino gambling facility in Elizabeth, Indiana, from October 12, 1998 until at least August 2006. (Mares Aff. ¶ 4 ; Answer ¶ 1 0.) He alleges that the Defendants own and operate 39 casino gambling facilities in the United States. (Compl.¶ 5.) Defendants deny this allegation, except they admit that Caesars owns a casino in Indiana (Answer ¶ 5) and that Harrah's Operating Company, Inc. owns a casino in Reno, Nevada (Winter Aff. ¶ 4). According to Defendants, the remaining Defendants are holding companies only. (Winter Aff. ¶ 5.)

Mr. Mares alleges that during most of his tenure at Caesars, Caesars willfully violated the FLSA in various ways. (Mares Aff. ¶ 5.) FN2 First, according to Mr. Mares, all security officers at Caesars were required to attend pre-shift meetings of approximately fifteen minutes duration before being allowed to clock-in for their scheduled shift and, until recently, they were not compensated for their attendance at such meetings. (*Id.* ¶¶ 6-10.)Mr. Mares claims that in 2006, after Caesars learned of the possibility of this lawsuit, the security officers were notified that the pre-shift meetings were not mandatory (*id.* ¶ 10), but to "remember who writes

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 118877 (S.D.Ind.)
Not Reported in F.Supp.2d, 2007 WL 118877 (S.D.Ind.)

Case 4:07-cv-02393-CW    Document 58-16    Filed 09/11/2008    Page 61 of 101    Page 2

your evaluations" (*id.* ¶ 11), which left him under the impression that the meetings were still mandatory (*id.* ¶ 12).

> FN2. Mr. Mares asserts that "the Defendants" have willfully violated the FLSA and makes other such statements presumably regarding all Defendants. But for reasons discussed *infra,* the focus is on what happened at Caesars's facility in Elizabeth.

It is also alleged that during the relevant time Caesars has required all security officers to be "on-duty" and to respond to customer inquiries from the time they arrive on the premises until the time they reach the pre-shift meetings. (Mares Aff. ¶ 13.) The officers are prohibited from talking on their cellular phones or engaging in other personal activity as they walk from Caesars's parking garage until they reach the area designated for the pre-shift meetings. (*Id.* ¶ 14.) The security officers are expressly told that they are on-duty from "car-to-car," which means they are on-duty from the time they leave their vehicles before their scheduled shift until they return to their vehicles after their scheduled shift. (*Id.* ¶ 15.) Mr. Mares alleges that he has not been compensated for the "car-to-car" duty time and, based on conversations with other security officers, he believes they have not been compensated either. (*Id.* ¶ 1 5.) It is his understanding, based on conversations with others, that the uncompensated pre-shift meetings and "car-to-car" duty time was the policy, practice, or both, at other Caesars-owned facilities. (*Id.* ¶ 17.)

*2 Approximately thirteen other current or former employees of the Defendant(s) have filed opt-in authorization forms in this case. Plaintiffs request certification of a collective action for the following:

Current and former security officers (including emergency medical technicians) who currently work or previously worked at any of the Defendants' casino gambling facilities at any time from April 20, 2003 until the present, and who were not paid for all time worked **and** were not paid over-

time wages for work in excess of forty (40) hours per week.

(Pl.'s Mot. Certify Collective Action 1) (emphasis added). Mr. Mares contends that the members of this class are similarly situated to those persons who already have opted into this action.

## II. MOTION TO CERTIFY COLLECTIVE ACTION

The FLSA provides that an action may be maintained "by any ... employee[ ] for and in behalf of himself ... and other employees similarly situated" for damages from an employer who has failed to pay overtime as required under the Act. 29 U.S.C. § 216(b). Such an action is known as a collective action. *See Harkins v. Riverboat Servs., Inc.,* 385 F.3d 1099, 1101 (7th Cir.2004). A collective action serves the ends of avoiding a multiplicity of duplicate actions and promoting the FLSA's broad remedial goals. *See generally Hoffmann-LaRoche, Inc. v. Sperling,* 493 U.S. 165, 172-74 (1989). A collective action differs from a Rule 23 class action. Potential plaintiffs in a collective action must join the action by "opting in," whereas, a class action includes any potential plaintiff who does not "opt out." 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."); Fed.R.Civ.P. 23(a).

To implement the opt-in provision, the court has the discretion to facilitate notice to potential plaintiffs to a FLSA collective action. *See Hoffmann-LaRoche, Inc. v. Sperling,* 493 U.S. 165, 169 (1989); *Woods v. N.Y. Life Ins. Co.,* 686 F.2d 578, 580 (7th Cir.1982) (stating that the court in a FLSA collective action has a "modest duty and power ... to regulate the content and distribution of the notice to potential class members"). Authorization of notice serves the interests noted above and promotes the efficient resolution of the case. *See Hoffmann-LaRoche,* 493 U.S. at 172-74.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

When deciding whether to certify a collective action, the court considers the evidence to determine whether the representative plaintiff has made an initial threshold showing that he is similarly situated to the employees whom he seeks to represent. *Coan v. Nightingale Home Healthcare, Inc.,* No. 1:05-cv-0101-DFH-TAB, 2005 WL 1799454, at *1 (S.D. Ind. June 29, 2005); *Carter v. Indianapolis Power & Light,* No. 1-02-cv-1812-SEB-VSS, 2003 WL 23142183, at *3 (S.D.Ind. Dec. 23, 2003). This is a "relatively modest" showing. *Coan,* 2005 WL 1799454, at *1;*see also Carter,* 2003 WL 23142183, at *3. Neither the FLSA, the Supreme Court, nor the Seventh Circuit has provided guidance on how the court is to determine whether the representative plaintiff is "similarly situated" to the potential plaintiffs. However, district courts in the Seventh Circuit have adopted a two-step approach. *See, e.g., Austin v. CUNA Mut. Ins. Soc'y,* 232 F.R.D. 601, 605 (W.D.Wis.2006); *Veerkamp v. U.S. Sec. Assocs., Inc.,* No. 1:04-cv-0049-DFH-TAB, 2005 WL 775931, at *2 (S.D.Ind. Mar. 15, 2005). This approach is as follows:

*3 In the first step ... the plaintiff must demonstrate a reasonable basis for believing that [ ]he is similarly situated to potential class members. If the plaintiff makes this showing, the court conditionally certifies a class, authorizes notice and the parties conduct discovery. At the close of discovery, the defendant may make a motion for decertification, at which point the court examines in detail the evidence and arguments submitted by the parties on the question of similar situation. If the court finds that any of the opt-in plaintiffs are not similarly situated to the representative plaintiff, it may dismiss them without prejudice. Also, the court may decertify the entire class if none of the class members are similarly situated. However, if the plaintiff demonstrates that the class members are similarly situated, the case proceeds to trial as a class action.

*Austin,* 232 F.R.D. at 605. The court applies this approach in this case.

In support of the request for an expansive collective action as to all Defendants and a "company-wide" policy, the Plaintiffs offer Mr. Mares's conclusory assertion that "based upon conversations with others" he believes similar policies and practices were in effect at other Caesars-owned facilities. (Mares Aff. ¶ 17.) The Plaintiffs also point to the existence and settlement of a 1999 lawsuit by Caesars Palace security officers against the casino's parent-not a defendant here-in U.S. District Court in Nevada, *Abernathy v. Starwood Hotels & Resorts Worldwide, Inc.,* 2:990cv00788-LRH-PA. As well, they rely on the assertions of Stanley Marchand, a former security officer at a Caesars casino in Gulfport, Mississippi. None of this suffices to carry the Plaintiffs' modest burden of showing sufficient similarity to *all* members of the broad class they seek to represent.

Courts have required plaintiffs to offer admissible evidence to support their claims that those they wish to represent are similarly situated. *See, e.g., Harrison v. McDonald's Corp.,* 411 F.Supp.2d 862, 866-67 (S.D.Ohio 2005) (striking inadmissible hearsay from affidavits supporting motion for collective action); *McElmurry v. U.S. Bank Nat'l Ass'n,* No. CV-04-642-HU, 2005 WL 2078302, at *11 (D.Or. July 29, 2005) (stating plaintiffs must support their claims that others are similarly situated with admissible evidence); *Richards v. Computer Sciences Corp.,* No. 3-03-CV-00630(DJS), 2004 WL 2211691, at *1-2 (D.Conn. Sept. 28, 2004) (striking portions of affidavits submitted in support of motion to proceed as a collective action that contained inadmissible hearsay or were unsupported by personal knowledge). Unsupported allegations are insufficient to establish that the putative plaintiffs are similarly situated. *Threatt v. Residential CRF, Inc.,* 1:05CV117 WCL, 2005 WL 4631399, at *5 (N.D.Ind. Aug. 31, 2005); *McElmurry,* 2005 WL 2078302, at *11.

Mr. Mares's understanding based on alleged conversations with unidentified persons is insufficient to establish personal knowledge as to the policies

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and practices in effect at Caesars-owned facilities other than the one at which he has worked. Neither the mere existence of the Nevada lawsuit nor its settlement sufficiently substantiates the allegations against each Defendant or as to a "company-wide" practice.[FN3]Not every suit is meritorious and a lawsuit may be settled for any number of reasons not all of which necessarily include admission of liability on the part of the defendant. As well, there is little, if any, overlap in time between the alleged violations in this case-Plaintiffs seek to notify security officers who worked from April 20, 2003 to the present-and *Abernathy v. Starwood*-a case filed in 1999 and resolved in 2003. Even if there is a sufficient connection between the Defendants in *Abernathy* and those here, unlawful practices at an earlier time need not establish the same unlawful practices at a later date. While Mr. Marchand states that he was never paid for attending pre-shift meetings, he does not express any views about whether the other security officers employed at the same casino as he were paid for such meetings. (The casino was destroyed by Hurricane Katrina in August 2005 and no longer exists.) In the court's view, a single employee's experience is insufficient to warrant the conclusion that other employees had similar experiences. Thus, the focus will be on what Mr. Mares's employer, Caesars, allegedly did or failed to do at the facility where Mr. Mares worked-the casino facility in Elizabeth, Indiana.

> FN3. Plaintiffs claim Starwood owned Defendant Caesars World, Inc. (Pls.' Mem. Supp. 3.)

**\*4** The Defendants argue that other than Caesars, they are improper parties since Mr. Mares was not employed by them and they except for Harrah's Operating Company, Inc. employed no one within the putative class. Because the court has determined that the collective action should be properly limited to the Caesars facility in Elizabeth, Indiana, it need not reach this issue now. Whether any defendant is a proper party may be addressed through a dispositive motion. Notice will be limited to security of-

ficers who worked at Caesars's facility in Elizabeth.

The Defendants contend that the Plaintiffs cannot prove a FLSA violation. They suggest that Caesars voluntarily paid security officers for a meal period and properly offset the paid meal period against the pre-shift activities. A court, however, must be careful not to evaluate the merits of the case when determining whether to give notice to other employees. *See Hoffmann-La Roche,* 493 U.S. at 174 (indicating that courts considering certification "must be scrupulous to respect judicial neutrality ... [and] must take care to avoid even the appearance of judicial endorsement of the merits of the action"); *Coan,* 2005 WL 1799454, at \*1 (quoting *Hoffmann-LaRoche* ). Were it beyond cavil that the Plaintiffs could not prove their claims, then it would be senseless to inform others of their right to join a doomed case. That is not this case. The matters regarding offsetting will need to be addressed after further discovery.

In arguing that a nationwide collective action would be inappropriate, the Defendants appear to concede that the security officers at Caesars's casino in Elizabeth, Indiana, are similarly situated to the Plaintiffs. The Defendants write: "Plaintiff Mares and the opt-in plaintiffs are homogeneous.... All of the existing Plaintiffs work or worked at the same property and reported to the same Security Director. The existing Plaintiffs exhibit commonality of circumstances with one another...." (Defs.' Opp'n Pls.' Mot. Certify Collective Action Status 12-13.) However, the Defendants then argue that even conditional certification of a class of security officers who worked at Elizabeth would be inappropriate because individual factual inquiries regarding their meal breaks will predominate. As stated, the matter of offsetting pre-shift activities by meal breaks relates to the merits of Plaintiffs' claims and the court should not delve into the merits at this stage, *see Coan,* 2005 WL 1799454, at \* 1-particularly because the outcome may not be as clear as the Defendants suggest it is. The Defendants submitted the affidavit of Tom Hill, Caesars's Director of Se-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

curity, who states that since about April 2000, security officers have received a paid half hour meal break each shift. (Hill Aff. ¶ 2.) However, the Plaintiffs submitted what appears to be the Caesars Indiana Team Member Handbook, dated October 1, 1998, which contains a provision indicating: "It is not necessary to clock out for meal breaks. This is deducted automatically from your daily time."(Pls.' Reply, Ex. E at 8.) They also submitted what appears to be the Team Member Handbook, dated January 1, 2004, which refers to "a paid 30 minute meal break ."(*Id.,* Ex. D at 5.) These exhibits raise a permissible inference that the 30 minute meal breaks were unpaid at least until January 1, 2004. Defendants argue that Plaintiffs' assertions that meal breaks were unpaid before that date are not based on any personal knowledge, but merely on the employment policies. The Defendants do not dispute that the policies are as reflected in the exhibits tendered. So the court will take these exhibits into account at this stage in deciding whether the Plaintiffs have made the minimal showing required for conditional certification.

**\*5** The court finds that Mr. Mares has carried his burden of making the relatively modest threshold showing that he is similarly situated to at least some of the employees whom he seek to represent, namely, current and former security officers who work or worked at the Caesars casino gambling facility in Elizabeth, Indiana, from April 20, 2003 until the present and who were not paid for all time worked and/or were not paid overtime wages for work in excess of forty hours per week.[FN4]While the decision in *Dudley v. Texas Waste Systems, Inc.,* No. Civ.A. SA-05-CA-0078, 2005 WL 1140605, at \*2 (W.D.Tex. May 16, 2005) (denying motion for collective action where analysis of improper lunch break adjustments would require individual testimony whether each driver regularly took lunch breaks or worked through lunch and needed to be compensated), may suggest a different conclusion, that decision seems to hinge on an evaluation of the merits of that case. As stated, district courts should be careful not to evaluate the merits

of the claims at the initial certification stage. *See Coan,* 2005 WL 1799454, at \*1.

> FN4. Plaintiffs' motion states "... who were not paid for all time worked *and* were not paid overtime ..." (Pls.' Mot. Certify 1) (emphasis added). However, the use of "and" is an apparent oversight or typographical error. Given the Plaintiffs' allegations, they must have intended to use "and/or." So the court substitutes this language on its own.

Defendants have pointed to *Reich v. Homier Distributing Co.,* 362 F.Supp.2d 1009 (N.D.Ind.2005), and *Pfaahler v. Consultants for Architects, Inc.,* No. 99 C 6700, 2000 WL 198888 (N.D.Ill. Feb. 8, 2000), among others, to support their argument that conditional certification is improper where the court must undertake fact intensive determinations. However, the factual inquiries in those cases involved the specific job duties of the potential plaintiffs; here, there is no allegation that any of the security officers had different duties. It also appears that more extensive discovery may have been undertaken in some of the cited cases than has been conducted here. *See, e.g., Holt v. Rite Aid Corp.,* 333 F.Supp.2d 1265, 1274 (N.D.Ala.2004) (referring to the "extensive evidence" on the issue of whether the potential class members are similarly situated). And if individual matters tend to predominate, the certification at this stage is conditional and subject to a motion for decertification. The court and parties will be better able to ascertain whether individual questions will predominate after further discovery. Thus, the court finds that notice to security officers employed at Caesars casino in Elizabeth, Indiana, within the relevant time is appropriate. Therefore, the motion to certify collective action is **GRANTED IN PART.**

### III. MOTION FOR APPROVAL OF PROPOSED CLASS NOTICE

Defendants make no objection to the Plaintiffs' pro-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

posed notice which is attached as Exhibit A to the motion for approval of proposed class notice. The form of notice and opt-in authorization form meet the court's approval, with the few modifications noted below.

As to the Notice:

1. Notice shall be sent to the following:

Current and former security officers (including emergency medical technicians) who currently work or previously worked at the casino gambling facility of Caesars Riverboat Casino, LLC (f/k/a RDI/Caesars Riverboat Casino, LLC f/k/a Harco Entertainment Company, LLC) in Elizabeth, Indiana, at any time from April 20, 2003 until the present, and who were not paid for all time worked **and/or** were not paid overtime wages for work in excess of forty (40) hours per week.

**\*6** 2. In Section II, the sentence "The Court has not yet made any decision or finding on whether Plaintiffs' claims have merit." shall be in bold type.

3. The deadline for opting-in and returning the Consent Form will be sixty (60) days from the date of mailing of the Notice by Plaintiffs' counsel.

As to the Opt-In Authorization Form, so it is consistent with the Notice, the last sentence shall state that the deadline is the date the form is returned and postmarked.

Plaintiffs' counsel shall mail the Notice as soon as practicable after receiving the list of employee names and addresses from the Defendants.

## IV. CONCLUSION

The motion to certify a collective action (Doc. No. 29) is **GRANTED IN PART** and the motion for approval of a proposed class notice (Doc. No. 31) is **GRANTED IN PART** consistent with the above. This certification is conditional. Following the close of discovery, the Defendants may seek decer-

tification.

The Plaintiffs' request that the court order the Defendants to produce a list of the class members, including full name and last known mailing address for each, is **GRANTED.**Defendants shall produce to Plaintiffs' counsel within twenty days of the date of this entry a list of those employees within the class described above, including full name and last known mailing address for each.

S.D.Ind.,2007.
Mares v. Caesars Entertainment, Inc.
Not Reported in F.Supp.2d, 2007 WL 118877 (S.D.Ind.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 1
Slip Copy, 2008 WL 2264555 (N.D.Cal.)

Bretana v. International Collection Corp.
N.D.Cal.,2008.
Only the Westlaw citation is currently avail-
able.NOT FOR CITATION
United States District Court, N.D. California,
San Jose Division.
Cris Jao BRETANA, on behalf of himself and all
others similarly situated, Plaintiff,
v.
INTERNATIONAL COLLECTION CORPORA-
TION, a California corporation, Charles D.
Hendrickson, individually and in his official capa-
city, Luigi Cioppa, individually and in his official
capacity, and Franklin Jay Love, individually and in
his official capacity, Defendants.
**No. C 07-5934.**

June 2, 2008.

Fred W. Schwinn, San Jose, CA, O. Randolph
Bragg, Horwitz, Horwitz & Associates, Chicago,
IL, for Plaintiff.
Larry Rothman, Law Offices of Larry Rothman,
Orange, CA, for Defendants.

ORDER [FN1] DENYING MOTION TO DISMISS
AND GRANTING MOTION TO STRIKE

> FN1. This disposition is not designated for
> publication and may not be cited.JEREMY
> FOGEL, District Judge.

## I. BACKGROUND

*1 Named Plaintiff Cris Jao Bretana ("Bretana")
filed the original complaint in this action on
November 26, 2007. The original complaint asser-
ted claims pursuant to the Fair Debt Collection
Practices Act ("FDCPA") and the Rosenthal Fair
Debt Collection Practices Act ("RFDCPA") against
International Collection Corporation ("ICC"), a
California corporation engaged in the business of

debt collection, as well as two "employee[s],
agent[s] officer[s] and/or director[s]" of ICC:
"Charles D. Hendrickson ("Hendrickson") and
Luigi Cioppa ("Cioppa"). Franklin Jay Love
("Love"), a "debt collector" also was named as a
defendant. On February 14, 2008, Bretana amended
his complaint to assert class action claims.

The First Amended Complaint ("FAC") contains
the following allegations. On October 17, 2005,
Bretana incurred a financial obligation to Harrah's
Casino in Reno, Nevada. This debt was incurred
primarily for personal, family or household pur-
poses. On December 1, 2006, Defendants sent
Bretana a collection letter signed by Cioppa in an
attempt to collect the debt owed to Harrah's. This
letter contained the following language:

> Our attorneys have advised us that under Califor-
> nia law 1719 Civil Code, states [sic] that unless
> cash or certified funds in the amount of your NSF
> check(s) plus the cost of $25.00 for each returned
> item is received by us in 30 days from the date of
> this letter, we are entitled to recover for our cli-
> ent, the amount of the check(s), plus treble dam-
> ages up to $1500.00 for each bad check. If suit is
> filed, you will also be responsible for interest,
> court costs and service for the process fees. The
> court may also award us attorney fees.

FAC, Exh. 1. Bretana received a second letter dated
December 28, 2006, which stated that he owed
$1,500.00 in principal and $179.58 in interest. The
second letter also stated "WE WOULD LIKE TO
REMIND YOU THAT THIS DEROGATORY IN-
FORMATION COULD STAY ON YOUR CRED-
IT REPORT FOR SEVERAL YEARS."FAC, Exh.
2. A third letter, dated January 9, 2007, offered
Bretana a "final opportunity" to satisfy his debt be-
fore a lawsuit was filed. The third letter stated that
Bretana owed $1,500.00 in principal, $1,500.00 in
treble damages and $184.51 in interest. Bretana did
not make any payment in response to the third let-
ter, and ICC initiated an action against him in Sac-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ramento Superior Court.

Bretana argues that Defendants violated the FD-CPA and the RFDCPA by attempting to collect treble damages pursuant to Cal Civil Code § 1719 because Defendants are not entitled to collect such damages in connection with a debt incurred in Nevada. Specifically, he alleges that Defendants misrepresented the character, amount or legal status of the debt; misrepresented the compensation that lawfully may be received; attempted or threatened an action that legally cannot be taken; threatened to communicate credit information regarding the debt that was known to be false; falsely represented entitlement to interest in addition to a check fee; falsely represented that they were entitled to attorney's fees; and attempted or threatened to collect interest, fees or other charges that are not expressly authorized by the agreement creating the debt or otherwise permitted by law. Bretana seeks to represent two classes: (1) all persons who were sent at an address in California a letter from Defendants in the form of the letter dated December 1, 2006, regarding an alleged debt on a dishonored check or marker written outside the state of California and allegedly due to Harrah's Casino Hotel in Reno, Nevada and incurred for personal, family or household purposes during the one year period prior to November 26, 2006; and (2) all such persons who were mailed a letter in the form of the letter dated January 9, 2007, during the same time period.

**\*2** On March 6, 2008, Defendants filed a motion to dismiss and also served Bretana with an Offer of Judgment pursuant to Fed. R. Civ. Pro. 68. On March 14, 2008, Bretana filed a motion to strike the offer of judgment or in the alternative to certify the class.

### II. LEGAL STANDARD

For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen,* 395 U.S. 411,

421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *North Star International v. Arizona Corporation Commission,* 720 F.2d 578, 581 (9th Cir.1983); *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986); *Beliveau v. Caras,* 873 F.Supp. 1393, 1395 (C.D.Cal.1995). Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections,* 66 F.3d 245, 248 (9th Cir.1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp,* 90 F.3d 386, 393 (9th Cir.1996). Factual allegations must be enough to raise the right to relief above the speculative level on the assumption that all of the complaint's allegations are true. *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).

The Court may strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."Fed.R.Civ.P. 12(f). Motions to strike generally will not be granted unless it is clear that the matter to be stricken could not have any possible bearing on the subject matter of the litigation. *LeDuc v. Kentucky Central Life Ins. Co.,* 814 F.Supp. 820, 830 (N.D.Cal.1992). Allegations "supplying background or historical material or other matter of an evidentiary nature will not be stricken unless unduly prejudicial to defendant."*Id.* Moreover, allegations that contribute to a full understanding of the complaint as a whole need not be stricken. *Id.*

### III. DISCUSSION

#### 1. Motion to Dismiss

Defendants argue that this action should be dismissed because a debt collector may not be held liable for a FDCPA violation if the violation was unintentional and resulted from a bona fide

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The bona fide error defense is a "narrow exception" to strict liability under the FDCPA. *Clark v. Capital Credit & Collection Servs., Inc.,* 460 F.3d 1162, 1177 (9th Cir.2005).15 U.S.C. § 1692k(c) provides:

> FN2. Bretana argues that the bona fide error defense may not be asserted in a motion to dismiss and that Defendants seek to have the Court treat their motion as one for summary judgment. "[A]ffirmative defenses, even though not appearing on the face of the compliant, may be established upon motion to dismiss ... when, by affidavits, depositions and admissions, a set of undiputed facts is revealed upon which the moving party is entitled to summary judgment as a matter of law."*Suckow Borax Mines Cosol. v. Borax Consol.,* 185 F.2d 196, 205 (9th Cir.1950). Defendants have filed the necessary affidavits. Accordingly, the Court will consider Defendants' bona fide error defense.

A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

"[T]he bona fide error defense applies almost exclusively to clerical errors which somehow manage to slip through procedures designed to catch them .... " *Irwin v. Mascott,* 112 F.Supp.2d 937, 959 (N.D.Cal.2000). Defendants assert that Bretana's claims should be dismissed because "[t]he alleged claim is substantially based upon the fact that a lawsuit was brought against the Plaintiff in the wrong venue," Motion to Dismiss at 2, and that filing error was an unintentional mistake. In support, Hendrickson has filed a declaration stating that Bretana's ICC file information inaccurately listed Bretana's residence as located in Sacramento rather than Santa Clara. Hendrickson also states that the lawsuit instruc-

tions in the letter mailed to Bretana are based on the file information. By separate declaration, Love states that ICC provided him with a Sacramento address and he filed a lawsuit accordingly. Both Hendrickson and Love state that this type of error is extremely rare.

**\*3** While Defendants' apparent error in selecting the venue for their collection action may be excusable under the bona fide error exception, Bretana has alleged additional conduct with respect to which the error is immaterial, i.e., that Defendants violated the FDCPA and the RFDCPA by seeking and miscommunicating about the availability of damages pursuant to California law for a debt incurred in Nevada. Accordingly, Defendants have not shown that their efforts to collect treble damages pursuant to Cal. Civil Code § 1719 are excusable under the bona fide error exception. Because Bretana's factual allegations otherwise are sufficient Defendants' motion to dismiss will be denied.

## 2. Motion to Strike

Defendant's Rule 68 offer specifies the following amounts: Principal: $1,000; Costs: $550; Attorney Fees: $2,501.00. The total amount of this offer is $4,051. Bretana moves to strike the offer in light of his class action allegations. He contends that he is not at liberty to accept Defendant's offer because he is the representative plaintiff of a named class, and to enter judgment would encourage a "race to payoff" of named plaintiffs in early litigation. *See Liles v. American Corrective Counseling Servs., Inc.,* 201 F.R.D. 452, 455 (S.D.Iowa 2001).

While Defendants acknowledge that some courts have refused to allow the use of a Rule 68 offer to forestall a pending class action before the plaintiff has moved for certification, they nonetheless ask the Court to consider whether Bretana filed his amended complaint within ten days of their Rule 68 offer. The docket reflects that Bretana's motion to strike was filed eight days after Defendants filed their offer. The moving papers specifically request

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that class certification with briefing stayed until
discovery is completed. Accordingly, the motion to
strike will be granted.

### IV. ORDER

Good cause therefor appearing, IT IS HEREBY
ORDERED that Defendants' motion to dismiss is
DENIED, and Bretana's motion to strike is GRAN-
TED.

N.D.Cal.,2008.
Bretana v. International Collection Corp.
Slip Copy, 2008 WL 2264555 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                      Page 1
Slip Copy, 2007 WL 512789 (E.D.Pa.)


# H

Strausser v. ACB Receivables Management, Inc.
E.D.Pa.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Arthur STRAUSSER, et al.,
v.
ACB RECEIVABLES MANAGEMENT
**No. Civ.A.06 5109.**

Feb. 12, 2007.

James A. Francis, Francis & Mailman, PC, David
A. Searles, Donovan Searles, LLC, Philadelphia,
PA, for Arthur Strausser and Nelson Luzzetti.
Richard J. Perr, Fineman Krekstein & Harris, P.C.,
Philadelphia, PA, for ACB Receivables Manage-
ment, Inc.


*ORDER*

ONEILL, J.
*1 Plaintiffs Arthur Strausser and Nelson Luzzetti
filed a class action complaint on November 17,
2006 against ACB Receivables Management, Inc.
alleging violations of the Fair Debt Collection Prac-
tices Act, 15 U.S.C. § 1692 (2007) ("FDCPA").
Plaintiffs seek actual and statutory damages for the
two named plaintiffs and the class, which will be
comprised of similarly situated individuals in
Pennsylvania and New Jersey. Defendant filed its
answer on January 26, 2007. Plaintiffs have not yet
filed a motion for class certification.

On January 22, 2007, defendant tendered Offers of
Judgment Pursuant to Rule 68 of the Federal Rules
of Civil Procedure to Arthur Strausser and Nelson
Luzzetti. The offers consisted of judgment in favor
of Strausser for $2,000.00 and Luzzetti for
$1500.00 plus reasonable costs and attorneys' fees
for both. The offers also provided:

In accordance with Rule 68, if this Offer of Judg-
ment is not accepted by Plaintiff and the judgment

finally obtained by Plaintiff, exclusive of costs and
attorney's fees, is not more favorable than this Of-
fer, Plaintiff must pay his costs and attorney's fees
incurred after the date of this Offer, as well as De-
fendant's costs and attorney's fees incurred after the
date of this offer.

Now before me is plaintiffs' Motion to Strike Offer
of Judgment and defendant's response thereto.

I will grant plaintiffs' motion following the guid-
ance of the Court of Appeals in *Weiss v. Regal Col-
lections,* 385 F.3d 337 (3d Cir.2004). In that case,
the Court reviewed an Rule 68 Offer of Judgment
for the maximum statutory relief available to a rep-
resentative plaintiff in a class action suit. The Dis-
trict Court had dismissed the action, but the *Weiss*
Court reversed and remanded. The Court first noted
that, "[U]nder traditional mootness principles, an
offer for the entirety of a plaintiff's claims will gen-
erally moot the claim.... [A] class action may be
dismissed when the named plaintiff's claim is
rendered moot before filing a motion for class certi-
fication."*Id.* at 345.The Court then reasoned that
"allowing the defendants here to 'pick off' a repre-
sentative plaintiff with an offer of judgment less
than two months after the complaint is filed may
undercut the viability of the class action procedure,
and frustrate the objectives of this procedural
mechanism for aggregating small claims."*Id.* at
344;*see also Roper v. Consurve, Inc.,* 578 F.2d
1106, 1110 (5th Cir.1989) ("Indeed, were it so easy
to end class actions, few would survive."). The
Court did not specifically decide whether the Offer
of Judgment should be stricken.

My colleague, Chief Judge Bartle, recently has ex-
plained how *Weiss* applies in cases where an Rule
68 Offer is made before a motion for class certifica-
tion is filed. *See Zeigenfuse v. Apex Asset Mgmt.,
L.L.C.,* 2006 WL 3742773, at *3 (E.D.Pa. Dec.14,
2006).[FN1] That opinion reasoned:

> FN1. Defendant argues that *Zeigenfuse* vi-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

olates 28 U.S.C. §§ 2071 and 2072 because it effectively creates a new rule of procedure inconsistent with the existing rules. I disagree. The Court of Appeals has already addressed this issue, noting that the conflict between Rules 23 and 68"frustrate[s] Congress's explicit directive that the FD-CPA be enforced by private attorney generals acting in a representative capacity."*Weiss,* 285 F.3d at 345.

Here the defendant is attempting to apply Rule 68, which fits for individual actions, to undermine a putative class action. Instead of forcing the named representative to accept the carrot of full individual relief which cannot be done under *Weiss,* defendant is threatening the stick, that is, imposing costs against plaintiff if she is unsuccessful. Either way, a defendant is attempting to "pick off" the named representative. Whichever approach a defendant takes under Rule 68, the purpose is to dampen the efforts of the putative representative in pursuing the class action, if not to cause her to withdraw. It is an attempt to inject a conflict of interest between her and those she seeks to represent. The use of Rule 68 to shift the risk of costs is simply a more indirect and perhaps somewhat more subtle means to undermine Rule 23 and the procedural and substantive benefit it affords.

*2 *Id.* at *3. Judge Bartle then concluded, "Rule 68 cannot be invoked to shift costs where a plaintiff has filed a class action complaint unless the motion for class certification is unduly delayed."I agree with this reasoning and will grant plaintiffs' motion to strike.[FN2]

> FN2. Defendant also argues that granting plaintiffs' motion would require an advisory opinion from this court because defendant has not attempted to recover costs on its Rule 68 offers. I disagree; this opinion is not based on a hypothetical set of facts. If I allow the offers to stand, plaintiffs will be forced to either accept the offer and render the entire class claim

moot or reject the offer and face responsibility for defendant's attorneys fees.

AND NOW, this 12th day of February, 2007, it is hereby ORDERED that plaintiffs' motion to strike defendant's Offers of Judgment Pursuant to Rule 68 of the Federal Rules of Civil Procedure is GRANTED.

E.D.Pa.,2007.
Strausser v. ACB Receivables Management, Inc.
Slip Copy, 2007 WL 512789 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1403007 (N.D.Ill.)

**H**

Ladegaard v. Hard Rock Concrete Cutters, Inc.
N.D.Ill.,2001.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Sean LADEGAARD, et al. Plaintiffs,
v.
HARD ROCK CONCRETE CUTTERS, INC., et al.
Defendants.
**No. 00 C 5755.**

Nov. 9, 2001.

MEMORANDUM OPINION AND ORDER

LEFKOW, District J.

*1 Presently before the court is plaintiffs' motion to strike defendants' fourth affirmative defense (which asserts the defense of release as to certain potential class members), void the releases, and require defendants to send a court-approved notice to all potential class members indicating that the releases are void. Plaintiffs attach a copy of the release and letter that defendants sent to individual potential class members. The letter states, in part:

It has come to our attention that there has been a claim that some employees have not been paid properly, including for time spent in safety meetings.

We believe that the Company has fairly and properly compensated employees for all hours worked. Nevertheless, we want to be sure that all employees are satisfied with their experience at the Company. We therefore have decided to offer you some additional compensation for your work at the Company.

To that end, we have sent you the enclosed agreement. As you can see, it provides that you be paid a sum of money in return for signing a release....

(*See* Pls.' Mem. in Supp. of Mot., Ex. A.) The at-

tached release states:

RELEASE

This Release is entered into between _____ ("Employee"), and Hard Rock Concrete Cutters, Inc. and its owners (collectively, the "Company").

Within fourteen days of Employee's execution and delivery of this Release, the Company will pay Employee the sum of $___, less applicable tax withholdings.

In return, Employee fully releases, acquits, and forever discharges the Company from any and all charges, actions, causes of actions, claims, grievances, damages, costs, expenses, attorneys' fees or any other liability relating to claims for overtime or straight-time compensation under the Fair Labor Standards Act, the Illinois Minimum Wage Law, and/or the Illinois Wage Payment and Collection Act through the date of the execution of this Release. Employee does not release any other claims against the Company, such as claims for workers' compensation.

Employee acknowledges and understands that:

- if Employee signs this Release, Employee will have given up any right to sue or be any part of any suit for back wages under the laws described above;

- Employee has the right to consult an attorney before executing this Release;

- Employee does not have to sign this Release, and the Company will treat and regard Employee the same way whether or not Employee signs this Release; and

- Employee is entering into this Agreement knowingly, voluntarily, and with full knowledge of its significance. Employee has not been coerced, threatened, or intimidated into signing this Agree-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ment.

If this release is held invalid or unenforceable, Employee will tender back to the Company the payment made in consideration for this Release.

(*Id.*)

## DISCUSSION

On a motion to strike, "the court may order stricken from any pleading any insufficient defense ...."Fed.R.Civ.P. 12(f)."Affirmative defenses will be stricken only when they are insufficient on the face of the pleadings."*Heller Fin., Inc. v. Midwhey Powder Co.,* 883 F.2d 1286, 1294 (7th Cir.1989) (citation omitted)."Ordinarily, defenses will not be struck if they are sufficient as a matter of law or if they present questions of law or fact."*Id.* (citation omitted). Plaintiffs argue that the defense should be stricken because the releases are void as a matter of law in that (1) the releases were sent in conjunction with notice to the class, and notice is within the purview of the court; (2) waiver of claims is prohibited under the Fair Labor Standards Act ("FLSA"), Illinois Minimum Wage Law ("IMWL"), and Illinois Wage Payment and Collection Act ("IWPCA"); and (3) the releases were obtained through misrepresentation or coercive threat of economic sanctions.

**\*2** Plaintiffs' first argument is unavailing. For support, plaintiffs rely on a minute order in *O'Brien v. Encotech Constr. Servs., Inc.,* No. 00 C 1155, in which Judge Gottschall prohibited defendant in that case from soliciting or accepting further releases because the court had not had the opportunity to determine whether the notice accompanying the release was fair. (Minute Order, October 6, 2000.) Similarly, in this case, after plaintiffs made an emergency motion to restrain defendants' communications with potential class members, this court resolved the motion by noting, on the record, defendants' agreement not to contact potential class members about the suit pending disposition of the

motion for class certification. (*See* Minute Order, 00 C 5755, October 5, 2000.) Although Judge Gottschall, in her October 6 order, recognized that defendant's conduct in sending out the letter and releases threatened the court's ability to handle notice to the class in an accurate and fair manner, on a later motion by plaintiff in *O'Brien,* she did not invalidate the releases for that reason. *See O'Brien v. Encotech Constr. Servs., Inc.,* 203 F.R.D. 346, 2001 WL 1181236, \*2 (N.D.Ill. Sept. 19, 2001) (noting that in general a party in class litigation may attempt to settle with individual potential class members) (citing *In re Painewebber Ltd. Partnerships Litig.,* 147 F.3d 132, 137 (2d Cir.1998)). Therefore, plaintiffs' first argument fails. Plaintiffs' third argument, that the releases are void because they were obtained by misrepresentation or threat, is also unavailing at this stage. Releases can "be proved invalid through 'clear and convincing evidence' that the agreements were products of 'fraud, duress, mutual mistake or unconscionability." ' *O'Brien,* 2001 WL 1181236 at \*2 (quoting *Gavery v. Altheimer and Gray,* 1996 WL 521400, \*3 (N.D.Ill. Sept. 11, 1996)). Plaintiffs admit, however, that the "methods, promises, and coercion utilized to obtain the 'Releases' are presently unknown as Defendants have not responded to any discovery" ' (*see* Pls.' Mem. at 2), and plaintiffs' assertion that they "have established that the 'Release' has gross legal misrepresentations," *id.* at 5, does not, without more, suffice to meet plaintiffs' burden that the releases were obtained by fraud or duress.

Plaintiffs' second argument has merit, however. Plaintiffs argue that waivers of FLSA, IMWL and IWPCA claims are void as a matter of public policy. Defendants rightly concede that the releases are void as a matter of law as to the FLSA claims. *See* Defs.' Resp. at 5, n. 1 ("Defendants do not assert that any class members have released FLSA claims[.]").*See Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697 (1945); *Walton v. United Consumer Club, Inc.,* 786 F.2d 303, 306 (7th Cir.1986) ("Courts ... have refused to enforce wholly private settlements" of FLSA claims.) (citation omitted); *O'Brien,* 2001

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

WL 1181236 at *2 (same). Defendants contend, however, that the releases are valid as to the IMWL and IWPCA claims and request that the court sever the invalid portion and/or give effect to the remaining portion of the agreements, namely, the release of the IMWL and IWPCA claims.

*3 Plaintiffs argue that the releases are invalid as to the IMWL and IWPCA claims as well as the FLSA claim. The IMWL prohibits employers from employing persons "for a workweek of more than 40 hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate of not less than 1 1/2 times the regular rate at which he is employed."820 ILCS 105/4a (1999). Plaintiffs point to language in the IMWL, which states

[i]t is against public policy for an employer to pay to his employees an amount less than that fixed by this Act. Payment of any amount less than herein fixed is an unreasonable and oppressive wage, and less than sufficient to meet the minimum cost of living necessary for health. Any contract, agreement or understanding for or in relation to such unreasonable and oppressive wage for any employment covered by this Act is void

820 ILCS 105/2, and contend that the releases are a contract for an "unreasonable and oppressive wage" because they are for less than that required by the IMWL and, as such, are void. The IWPCA provides that employers must pay "every employee all wages earned during the [payroll] period"820 ILCS 115/3 (1999), and prohibits deductions from wages or final compensation unless the deductions meet one of the enumerated conditions for deductions found at 820 ILCS 115/9. IWPCA regulations set forth the method by which an employer must provide notice of disputed deductions to the employee, *see*56 Ill. Admin. Code § 300.930, and prohibit an employer from using the "[a]cceptance by an employee of a disputed paycheck [as] ... evidence that the employee has agreed to the deduction in question."*Id.* at § 300.920.[FN]Plaintiffs assert that the unpaid wages they seek to recover under the IWPCA do not fit in-

to any one of the permitted deduction exceptions, that defendants did not avail themselves of the sole method for withholding deductions, that acceptance of a disputed paycheck is not evidence of agreement to the deduction and, as such, any agreement about the unpaid wages (i.e. in the form of the release) is void. Plaintiffs further contend that, as a general matter, the IMWL and IWPCA represent social legislation intended to provide minimum standards to employees and that because these statutes embody the public interest, they cannot, as a matter of law, be waived. (*See* Pls.' Mem. in Supp. of Mot. at 4-5) (analogizing to the Supreme Court's analysis of the nonwaivable nature of FLSA claims in *Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697, 704 (1945)).

> FN1. Although not cited by plaintiffs, 820 ILCS 115/9 (which was amended July 20, 2001 but did not change the portion quoted below) also states (similar to § 300.920) that:
>
> In case of a dispute over wages, the employer shall pay, without condition and within the time set by this Act, all wages or parts thereof, conceded by him to be due, leaving to the employee all remedies to which he may otherwise be entitled as to any balance claimed. The acceptance by an employee of a disputed paycheck shall not constitute a release as to the balance of his claim and any release or restrictive endorsement required by an employer as a condition to payment shall be a violation of this Act and shall be void.

Although Judge Gottschall concluded in *O'Brien* that releases of the IMWL and IWPCA claims were not void as a matter of law and therefore invalidated only the portion of the release pertaining to the FLSA claims, *see O'Brien,* 2001 WL 1181236, at *3, this court respectfully disagrees. The court agrees with *O'Brien* that under Illinois law, which both parties concede applies to the determination of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

whether the releases are void, it is a general rule that "[p]ublic policy favors the peaceful and voluntary resolution of claims and when there has been such resolution, a presumption of its validity is created."*Blaylock v. Toledo, Peoria & Western R.R. Co.,* 43 Ill.App.3d 35, 356 N.E.2d 639, 641 (3d Dist.1976); *see also O'Brien,* 2001 WL 1181236 at *2 (quoting *Gavery,* 1996 WL 521400, at *2) (quoting *Blaylock, supra* ).[FN2] However, while recognizing the freedom to contract, it is also the rule in Illinois that agreements that are contrary to public policy as reflected in the laws of the state or have a "tendency to injure the public welfare" are unenforceable. *Holstein v. Grossman,* 246 Ill.App.3d 719, 616 N.E.2d 1224, 1229 (1st Dist.1993) (citation omitted)."The question of whether a contract is enforceable under considerations of public policy is a conclusion of law and turns on the particular facts and circumstances of each case ."*Id.* (internal citations omitted.) "The overriding objective in interpreting a statute is to ascertain and give effect to the intent of the legislature. To ascertain the legislature's intent, we first look to the plain language of the statute. In addition to the language chosen by the legislature, the court should consider the reason for the law, the evil to be remedied, and the purpose to be obtained thereby."*See People ex. rel. the Dep't of Labor v. K. Reinke, Jr. and Co.,* 319 Ill.App.3d 721, 746 N.E.2d 12, 15 (1st Dist.2001) (internal citations omitted).

> FN2. The court in *O'Brien* then reasoned that it was "an open question whether, in the context of the IMWL, plaintiffs' wages were unreasonable or oppressive within the meaning of the law or whether, in the context of the IWPCA, defendants' practices violated the IWPCA or failed to fall within an exception created by the Act," and noting that plaintiffs failed to cite any judicial or statutory language prohibiting private settlements of the state law claims, held that the releases under the IMWL and IWPCA were not invalid as a matter of

law. *O'Brien,* 2001 WL 1181236 at *3. This court is not aware whether the plaintiffs in *O'Brien* had presented the court with the argument, as they have here, that the public policy underlying the IMWL and IWPCA, like the FLSA, bars the releases.

**\*4** Although the statutory language cited by plaintiffs indicating that agreements under the IMWL for an "unreasonable and oppressive wage" are void, 820 ILCS 105/2, and that "[a]cceptance by an employee of a disputed paycheck [is not] ... evidence that the employee has agreed to the deduction in question," § 300.920, supports plaintiffs' position that the releases at issue are void as a general matter, the language does not expressly so provide.[FN3] Moreover, as observed by both plaintiffs and defendants there is a dearth of case law either invalidating or upholding a release under either of these statutes.[FN4]Where there is "an absence of Illinois decisions dealing with a particular labor law issue, federal decisions dealing with a substantially similar law, while not controlling, may be helpful and relevant."*Bernardi v. Village of North Pekin,* 135 Ill.App.3d 589, 482 N.E.2d 101, 102 (3d Dist.1985) (citing, *inter alia, Bd. of Governors v. Rothbardt,* 98 Ill.App.3d 423, 424 N.E.2d 742 (4th Dist.1981)).

> FN3. Notably, however, the provision not cited by plaintiff in 820 ILSC 115/9, *supra* note 2, does appear to expressly forbid release of IWPCA claims.

> FN4. The court found one case in which a plaintiff had argued that under the language of IWPCA, 820 ILCS 115/9 (*see supra* note 2), the release he signed was void as a matter of law. However, the court did not decide the issue, instead finding that plaintiff had not adequately alleged a claim under IWPCA. *See Hurd v. Wildman, Harrold, Allen and Dixon,* 303 Ill.App.3d 84, 707 N.E.2d 609, 613-14 (1st Dist.1999).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1403007 (N.D.Ill.)

Case 4:07-cv-03993-CW    Document 58-16    Filed 09/11/2008    Page 76 of 101    Page 5

The Supreme Court's analysis in *Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697 (1945), finding that FLSA claims are nonwaivable is instructive. The FLSA is substantially similar to the IMWL in requiring a minimum wage and maximum hours. *See* 29 U.S.C. §§ 206-07. In *Brooklyn Sav. Bank,* the Court was asked to determine whether a party's written waiver of his right to liquidated damages under the FLSA barred a subsequent action to recover those damages. The Court noted the general rule that "[w]here a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate."*Id.* at 704.Noting that the question of whether a private right created by federal statute may be waived depends on the intention of Congress as manifested in the statute, *id.* at 705, the Court reviewed the statutory language, the legislative reports and debates for that intent. Finding that the question had not been "specifically considered and resolved by Congress," the Court "resort [ed] to a broader consideration of the legislative policy behind [the liquidated damages] provision as evidenced by its legislative history and the provisions in and structure of the [FLSA]."*Id.* at 705-06.It found that the legislative history of the FLSA

... show[ed] an intent on the part of Congress to protect certain groups of the population from substandard wages and excessive hours ... [and t]he statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required compulsory legislation to prevent private contracts on their part which endangered national health and efficiency ....

*Id.* at 706.In light of this purpose, the Court concluded that to allow waiver of statutory wages by agreement or waiver of the employee's right to liquidated damages "would nullify the purposes of the Act."*Id.* at 707;*see also Barrentine v. Arkansas-Best Freight Sys., Inc.,* 450 U.S. 728, 740 (1981)

("This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act."); *Walton,* 786 F.2d at 306 (The FLSA "is designed to prevent consenting adults from transacting about minimum wages and overtime pay. Once the Act makes it impossible to agree on the amount of pay, it is necessary to ban private settlements of disputes about pay. Otherwise the parties' ability to settle disputes would allow them to establish subminimum wages.") (citing *Lynn's Food Stores, Inc. v. United States,* 697 F.2d 1350, 1352 (11th Cir.1982)).

**\*5** The intent of the Illinois legislature as manifested in the legislative policy section of the IMWL indicates that releases of claims under the IMWL would frustrate its purpose. The legislative policy section of the IMWL provides in full:

The General Assembly finds that the existence in industries, trades or business, or branches thereof, including offices, mercantile establishments and all other places of employment in the State of Illinois covered by this Act, of conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency and general well-being of workers, leads to labor disputes, and places burdens on the State, and all other subordinate political bodies thereof, to assist and supply necessary moneys and goods to workers and their families to aid them to exist on a minimum budget for their needs, and thus places an unnecessary burden on the taxpayers of this State. Therefore, it is the policy of this Act to establish a minimum wage standard for workers at a level consistent with their health, efficiency and general well-being; to safeguard such minimum wage against the unfair competition of wage and hour standards which do not provide such adequate standards of living; and to sustain purchasing power and increase employment opportunities.

It is against public policy for an employer to pay to his employees an amount less than that fixed by this Act. Payment of any amount less than herein fixed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1403007 (N.D.Ill.)
Not Reported in F.Supp.2d, 2001 WL 1403007 (N.D.Ill.)

Case 4:07-cv-03993-CW   Document 58-16   Filed 09/11/2008   Page 77 of 101 Page 6

is an unreasonable and oppressive wage, and less than sufficient to meet the minimum cost of living necessary for health. Any contract, agreement or understanding for or in relation to such unreasonable and oppressive wage for any employment covered by this Act is void.

820 ILCS 105/2. Not only is the language of the first paragraph of this section strikingly similar to the language found in the "Congressional finding and declaration of policy" section of the FLSA, 29 U.S.C. § 202(a),[FN5] but the purpose of the IMWL as set forth by Illinois courts is similar to that of the FLSA. *Compare Reinke,* 319 Ill.App.3d 721, 746 N.E.2d at 16 ("Section 2 of the Minimum Wage Law states that the legislature was concerned about the existence of 'conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency and general wellbeing of workers.' 820 ILCS 105/2 (West 1998). Section 2 further stated that those conditions imposed upon taxpayers the 'unnecessary burden' to assist workers. 820 ILCS 105/2(West 1998).") *with Barrentine,* 450 U.S. at 739 ("The principal congressional purpose in enacting the [FLSA] was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.' ") (quoting 29 U.S.C. § 202(a)). *See also DeWig v. Landshire, Inc.,* 281 Ill.App.3d 138, 666 N.E .2d 1204, 1208 (3d Dist.1996) (Breslin, J., dissenting) (noting similar purposes underlying Section 2 of the IMWL and Section 202 of the FLSA). Similarly, although the IWPCA contains no "legislative policy" section, it has been held that "enforcing the public policy underlying the IWPCA inures to the benefit of Illinois workers and taxpayers in precisely the way that the IMWL does." *People ex. rel Martin v. Lipkowitz,* 225 Ill.App.3d 980, 589 N.E.2d 182, 185 (3d Dist 1992) (noting that the purpose of the IWPCA "is to ensure employees receive all earned benefits upon leaving their employer and the evil it seeks to remedy is the forfeiture of any of those be-

nefits" and "[a]n employer's denial of benefits earned by its employees burdens the State financially and socially, such as by decreasing the tax base and potentially depleting State assistance funds") (internal quotation omitted); *see also Mueller Co. v. Dep't of Labor,* 187 Ill.App.3d 519, 543 N.E.2d 518, 521 (4th Dist.1989)).

> FN5. (a) The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce. That Congress further finds that the employment of persons in domestic service in households affects commerce. (b) It is declared to be the policy of this chapter, through the exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power. 29 U.S.C. § 202(a)

*6 Finally, like the United States Supreme Court, the Illinois Supreme Court has recognized that where the right in question is conferred for the benefit of the public at large rather than solely for the private benefit of individuals, the right is nonwaivable. *See Recht v. Kelly,* 82 Ill. 147, 1876 WL

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1403007 (N.D.Ill.)

Case 1:07-cv-03293-CW    Document 58-16    Filed 09/11/2008    Page 78 of 101

10157, *1 (Ill.1876) (holding that an agreement to forego the benefit of a statute exempting property from levy and sale where the owner was the head of household was void because "[l]aws enacted from considerations of public concern, and to subserve the general welfare, cannot be abrogated by mere private agreement"), and like the United States Supreme Court's recognition in *Brooklyn Sav. Bank* that the FLSA embodies a public right, Illinois courts have recognized that both the IMWL and the IWPCA involve public rights. *See Reinke,* 319 Ill.App.3d 721, 746 N.E.2d at 16 ("We believe a section 12(b) [IMWL] action asserts a right belonging to the general public.... The legislature likely believed an action by a State agency to enforce compliance with a wage law involved a public right ...."); *Martin v. Schwartz Oil,* 203 Ill.App.3d 903, 561 N.E.2d 201, 203 (1990) ("The purpose of the IMWL is to ensure adequate wage standards for the benefit of both workers and the taxpayers, and a violation of the law is a breach of public policy.... The State has a clear and definite interest in enforcing this policy."); *see Lipkowitz,* 225 Ill.App.3d 980, 589 N.E.2d at 185 (IWPCA). Indeed, the fact that both the IMWL and IWPCA authorize the Director of the Illinois Department of Labor to enforce actions under their respective statutes and to expend State resources to enforce the statutes [FN6]"expresse[s the legislature's] intent to benefit the public generally."*See Lipkowitz,* 225 Ill.App.3d 980, 589 N.E.2d at 185.

> FN6.*See* IMWL, 820 ILCS 105/12(b) & 11(d), and IWPCA, 820 ILCS 115/11.

Thus, based on the similar purposes of the FLSA and IMWL (and IMWL and IWPCA) the judicial recognition that these statutes involve public rights, the long history of United States Supreme Court interpretation of the FLSA prohibiting release of such claims, and the Illinois common law rule that laws enacted to serve a public concern cannot be abrogated by mere private agreement, of which the legislature is presumed to be aware, *see Fink v. Ryan,* 174 Ill.2d 302, 673 N.E.2d 281, 285 (Ill.1996)

("Where statutes are enacted after judicial opinions are published, it must be presumed that the legislature acted with knowledge of the prevailing case law .") (quotation omitted), the court concludes that it would be against the public policy of the IMWL and IWPCA to permit the parties to release their claims thereunder, unless expressly allowed by these statutes. However, the express language of the IMWL and IWPCA, set forth *supra,* if not explicit, is at least implicitly consistent with the public policy prohibiting private releases.[FN7]

> FN7. Defendants also point to language in the IMWL, 820 ILCS 105/12(a), not cited by plaintiffs, that "any agreement between [an employee] and his employer to work for less than such wage is no defense to [an] action" and argue that such language "must mean that an employer and employee cannot agree prospectively that an employee will work for less than minimum wage or will waive payment of overtime compensation. It does not mean that, in face of a claim or dispute, the parties cannot settle their disputes without filing a claim in court."(*See* Defs.' Resp. at 7-8 n. 2). For the reasons set forth in the text, the court rejects defendants' argument. Nevertheless, the letter and release at issue here do not even purport to refer to a disputed claim of the particular employee signing the release (they also do not set out an agreement between the individual employee and defendant as to the amount of time worked and the amount paid for that time). The release is general and "releases ... the Company from any and all ... claims ... or any other liability relating to claims for overtime or straight-time compensation ... through the date of the execution of the release,"and the letter is addressed to "All Field Forces" and references a general "claim that some *employees* have not been paid properly, including time spent in safety meetings" a pparently in reference to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the class action. (*See* Pls.' Mem. in Supp. of Mot., Ex. A.) (Emphasis added.)

Defendants only argument countering the public policy is that unlike the FLSA, which expressly provides for a means by which employers can settle with and obtain releases from employees via the United States Department of Labor pursuant to section 16(c) of the FLSA,[FN8] the IMWL does not contain an equivalent provision,[FN9] and, therefore, the Illinois legislature must not have meant to prohibit employers from entering into private settlements with its employees. *See* Defs.' Resp. at 7-8 (citing, *inter alia, Walton,* 786 F.2d at 306).[FN10] Prior to the enactment of section 16(c) of the FLSA, the only recognized way to settle claims with an employee was through a court-approved stipulated settlement. *See generally Walton,* 786 F.2d at 306;*Lynn's Food Stores,* 679 F.2d at 1353 (citing *Schulte, Inc. v. Gangi,* 328 U.S. 108, 66 S.Ct. 925, 928 n. 8 (1946)).

> FN8."The Secretary is authorized to supervise the payment of the unpaid minimum wages or the unpaid overtime compensation owing to any employee or employees under section 206 or section 207 of this title, and the agreement of any employee to accept such payment shall upon payment in full constitute a waiver by such employee of any right he may have under subsection (b) of this section to such unpaid minimum wages or unpaid overtime compensation and an additional equal amount as liquidated damages...."29 U.S.C. § 216(c).

> FN9. Neither the IMWL nor the IWPCA contains a provision for release of claims after approval by the Illinois Department of Labor, although the legislature has included such a provision with respect to the Illinois Workers Compensation Act, 820 ILCS 305/23.

> FN10. In *Walton,* the Seventh Circuit, in describing the scheme under the FLSA,

stated that "a prohibition of settlement ensures costly litigation, even though the parties might be able to compromise their dispute without subverting the principles of the [FLSA]" and noted that "Section 16(c) creates the possibility of a settlement, supervised by the Secretary [of Labor] to prevent subversion, yet effective to keep out of court disputes that can be compromised honestly."786 F.2d at 306.

\*7 The court concludes that even if the legislature did not include an equivalent provision in the IMWL and IWPCA this does not *ipso facto* mean that the legislature meant to open the doors to all private settlements and releases. Rather, in light of the public policy behind the IMWL and IWPCA and the strong interests in protecting the equality of bargaining positions between employer and employee, the opposite conclusion is warranted, namely, that the legislature was aware of the implications attendant in limiting the means by which parties could settle, even if limiting it only to court-approved settlements. *Cf. Brooklyn Sav. Bank,* 324 U.S. at 713 ("Failure to provide a method of waiving claims under the [FLSA] can support contrary inferences, that such waivers were to be allowed or that the provisions of the Act state a settled policy which cannot be modified by private contracts. We are of the opinion that the legislative history and provisions of the Act support a view prohibiting such waiver."And even though "in individual cases, hardship may result, the restriction will enure to the benefit of the general class of employees in whose interest the law is passed, and so to that of the community at large.") (internal citation and quotation omitted). In any event, both the IMWL and the IWPCA provide for the Director of the Illinois Department of Labor to enforce actions under these respective statutes, the IMWL specifically permits the Director to "supervise payment of the unpaid minimum wages and unpaid overtime compensation,"*see*820 ILCS 105/12(b),[FN11] and, it appears that, in at least one case, a payment under the "supervision" provision of the IMWL led to the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

release of the employee's claims.[FN12]

FN11. The Director is authorized to supervise the payment of the unpaid minimum wages and the unpaid overtime compensation owing to any employee or employees under Sections 4 and 4a of this Act and may bring any legal action necessary to recover the amount of the unpaid minimum wages and unpaid overtime compensation and an equal additional amount as punitive damages, and the employer shall be required to pay the costs. Any sums thus recovered by the Director on behalf of an employee pursuant to this subsection shall be paid to the employee or employees affected. Any sums which, more than one year after being thus recovered, the Director is unable to pay to an employee shall be deposited into the General Revenue Fund. 820 ILCS 105/12(b).

FN12.*See Ecker v. Big Wheels, Inc.,* 136 Ill.App.3d 651, 483 N . E.2d 639, 641-42 (4th Dist.1985) (affirming district court where an employee had requested the DOL collect his claim, employee accepted payment and district court held that the acceptance of amount determined by DOL constituted an accord and satisfaction and "released the claims").

Because releases under the IMWL and IWPCA as well as the FLSA are void as a matter of law, the court grants plaintiffs' motion to void the releases and strike defendants' fourth affirmative defense.

## NOTICE

The plaintiffs also request that the court order a court-approved notice to each person who received a release stating that the release is void in its entirety, that signing it does not prohibit participation in this litigation and defendants cannot retaliate against anyone for participating in the

Federal Rule of Civil Procedure 23(d) provides that in the conduct of class actions, "the court may make appropriate orders: ... requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, ...."Fed.R.Civ.P. 23(d). Communications that contain incorrect information are particularly a subject of "a curative notice from the court, at the expense of those at fault."*See* MANUAL FOR COMPLEX LITIGATION § 30.24 (3d ed.1995). Moreover, "[i]f improper communications occur, curative action may be necessary, such as extending deadlines for opting out ... or voiding improperly solicited opt outs."*Id.* Because the letter and release sent out by defendants contained incorrect information as to the ability to waive the claims at issue in this lawsuit, the court grants plaintiffs' request. *Id.; cf. Georgine v. Amchem Prods., Inc.,* 160 F.R.D. 478, 498-502 (E.D.Pa.1995) (second notice and opt-out period to rectify misleading communications warranted even though class was already certified).

FN13. This court already approved a notice with respect to the FLSA claims that a release does not bar the FLSA suit. *See* Notice of Lawsuit Alleging Violation of Wage and Hour Requirements of Fair Labor Standards Act, December 15, 2000.

## CONCLUSION

**\*8** For the reasons stated above, the court GRANTS plaintiffs' motion to strike defendants' fourth affirmative defense, void the releases, and require notice be sent regarding the void releases [# 57]. The court orders the parties to prepare a notice for court approval informing all potential plaintiffs who have been provided a release that such release is unenforceable in its entirety and otherwise advising them of the opportunity to participate in the lawsuit. A status hearing is set for November 26, 2001 at 9:30 a.m.

N.D.Ill.,2001.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Ladegaard v. Hard Rock Concrete Cutters, Inc.
Not Reported in F.Supp.2d, 2001 WL 1403007
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2415055 (N.D.Ill.)

▷

Reed v. TJX Companies, Inc.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
Brian REED, on behalf of himself and all other Plaintiffs similarly situated known and unknown Plaintiff,
v.
THE TJX COMPANIES, INC., d/b/a Marshalls Defendant.
**No. 04 C 1247.**

Oct. 27, 2004.

John William Billhorn, Billhorn Law Firm, Chicago, IL, for Plaintiff.
Rebecca Pratt Bromet, Seyfarth Shaw, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

COAR, J.
\*1 Before this Court is Defendant's Federal Rule of Civil Procedure 12(b)(1) Motion to Dismiss.

I. Facts

Plaintiff Brian Reed (hereinafter "Plaintiff" or "Reed") worked as an hourly sales associate and merchandise processing coordinator at Marshalls discount clothing store from July 2002 until his termination in August 2003. Marshalls is owned by The TJX Companies, Inc. (hereinafter "Defendant" or "TJX Co.").

Reed brings this lawsuit under the Fair Labor Standards Act, 29 U.S.C. § 201*et seq.,* the Portal-to-Portal Act, 29 U.S.C. § 251*et seq.,* the Illinois Minimum Wage Law, 820 ILCS 105/1*et seq.,* and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1*et seq.* He alleges that during his tenure at Marshalls, he was required to clock in and out during his lunch break, but to continue working without pay for that time. Moreover, he asserts that because of this practice, he sometimes worked in excess of forty hours per work week, without receiving appropriate compensation.

II. Analysis

Defendant moves this court to dismiss Plaintiff Reed's action for lack of subject matter jurisdiction. In late March 2004, Defendant offered Reed $500 to settle this lawsuit. Defendant bases this motion to dismiss on its assertion that its offer of $500 fully satisfies Reed's claim, thereby eliminating any actual case or controversy between the parties as required by Article III of our Constitution. Reed denies this assertion and argues that TJX Co.'s offer does not satisfy his claim fully. Moreover, Reed alleges that TJX Co. made its offer in bad faith, simply to pay off the named representative of a potential class action and thereby to defeat the formation of the class. Defendant provides supplementary material to explain how it arrived at the amount it offered Reed as settlement of his claims. Nichols Decl. Defendant also alleges that Reed has not disputed TJX Co.'s calculation of damages. This is incorrect. Reed asserts that TJX Co.'s supplementary material regarding its method of calculating the proposed settlement amount is incomplete. Specifically, Reed alleges that TJX Co. based its calculations on declarant Rachel Nichols' unsupported statement that she "identified all of [Reed's] time reports that reflected that his time report had been edited."Nichols Decl. ¶ 13. TJX Co. does not clarify how Ms. Nichols identified that a particular time report had been edited nor how she determined that other time reports had not been edited. In addition, Reed argues that his claim asserts that he was asked to clock in and out for a lunch break while he continued, in actuality, to work. In those situations, his time report would show no "editing," but he would have continued to work without pay and, in some

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

instances, exceeded a 40-hour work week. Defendant has offered no indication that it took such circumstances into account in its calculations nor has it offered any indication of how it might make such a determination. As such, Reed has and does dispute that TJX Co.'s $500 offer would compensate him fully for his claims. It is not for this court to engage in extensive fact determination at this preliminary stage of litigation. To attempt to determine whether TJX Co.'s offer of $500 fully compensates Reed for his claim would require just such a far-reaching and supposition-laced inquiry.

**\*2** Defendant relies on a decision from the Middle District of Florida to support its contention that this Court should dismiss the instant action.*MacKenzie v. Kindred Hospitals East, L.L.C.,* 276 F.Supp.2d 1211 (M.D.Fla.2003). The decisions of other districts provide persuasive indications of how other peer courts have interpreted similar legal questions, but this Court is not bound to follow the Middle District of Florida or any other sister court. In the instant case, this Court finds the *MacKenzie* decision distinguishable and therefore declines to adopt its reasoning. In *MacKenzie,* the magistrate judge issued a report and recommendation, which was adopted by the district court, finding that defendant's offer compensated plaintiff "in full for his alleged damages."*MacKenzie,* 276 F.Supp.2d at 1213. In support of his finding that the offer rendered plaintiff's claim moot, the magistrate emphasized that plaintiff "has failed to identify any similarly situated individual who has expressed an interest in filing a written consent to join this lawsuit."*Id.* In the case at bar, however, the court cannot determine that TJX Co.'s offer fully compensates plaintiff for his damages. Furthermore, unlike the plaintiff in *MacKenzie,* Reed has identified two similarly situated individuals who have filed written consents with this court to join this lawsuit.

The other cases on which Defendant relies likewise are inapposite. The first Seventh Circuit case cited by Defendant, *Greisz v. Household Bank (Ill.), N.A.,* 176 F.3d 1012 (7th Cir.1999), arises under the Truth in Lending Act ("TILA"), in which there is a statutory-cap on plaintiff's potential recovery. The second, *Holstein v. City of Chicago,* 29 F.3d 1145 (7th Cir.1994), addresses an alleged due process violation under the municipal code provisions for car towing, in which the amount of plaintiff's claim was limited to his damages from the ticket and towing fees. *Id.* at 1147. Under these cases, when a defendant makes a Rule 68 offer equal to the statutory cap or the amount of damages claimed by plaintiff, there is nothing further a plaintiff can recover.[FN1] As Judge Posner noted in *Greisz,*"You cannot persist in suing after you've won."*Greisz,* 176 F.3d at 1015. Reed's cause of action, however, is not subject to a statutory cap. Therefore, this court cannot compare TJX Co.'s settlement offer against the statutory language and determine that there is nothing more Reed might be entitled to recover. It is not clear in this case, as it was in *Greisz,* that Reed has "won." Moreover, in keeping with the standard of review on motions to dismiss, it is not unreasonable to infer that Reed will be able to show he is entitled to more than $500 in back pay and overtime. Defendant argues, however, that *Holstein* should control the case at bar, because "once the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate, and a plaintiff who refuses to acknowledge this loses outright, under Federal Rule of Civil Procedure 12(b)(1), because he has no remaining stake."*Holstein,* 29 F.3d at 1146. Without disputing this principle, this Court is unable to find that TJX Co. has offered to satisfy Reed's entire demand or that there is no dispute over which to litigate.

> FN1. TJX Co. also cites an unpublished case from this court, *Letellier v. First Credit Services, Inc.,* No. 00 C 6316, 2001 U.S. Dist. LEXIS 10288 (N.D.Ill. July 20, 2001), in support of its motion to dismiss. A careful reading of *Letellier,* followed by a review of *Greisz,* would suggest caution to a party seeking to rely on these cases. Each involved putative class actions brought by the same attorney, whose per-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2415055 (N.D.Ill.)
Not Reported in F.Supp.2d, 2004 WL 2415055 (N.D.Ill.)

Case 4:07-cv-03993-CW    Document 58-16    Filed 09/11/2008    Page 84 of 101    Page 3

formance is criticized harshly. Each also involved a class action lawsuits under statutes with statutory recovery caps, defendants who made a Rule 68 offer of at least the statutory maximum, and bumbling or disingenuous conduct by plaintiff's attorney. None of these circumstances has been alleged in the instant case.

*3 Of particular concern in this case is the ability of defendant purposefully to moot the class action complaint between the time of filing and class notification or certification. *See, e.g., Crisci v. Shalala,* 169 F.R.D. 563, 568 (S.D.N.Y.1996); *Goetz v. Crosson,* 728 F.Supp. 995, 1000 (S.D.N.Y.1990). Reed asserts that TJX Co.'s defense strategy creates a virtually unwinnable situation for plaintiffs in collective or class action lawsuits. Defendant makes an offer of "judgment" to Plaintiff, then alleges that the action is moot. Plaintiff therefore must either pursue discovery very early in the case, when a court likely will deem it premature, or seek class certification and/or notice before discovery, which runs the risk of harming the interests of those as-yet undiscovered class members. In cases where there are statutory ceilings on recoverable damages, such a strategy may be effective and yet still protect the interests of a plaintiff. *See, e.g., Greisz,* 176 F.3d 1012; *Holstein,* 29 F.3d 1145. In a situation such as the instant case, where there are no statutory caps on damages and where substantial discovery may be necessary before damages can be determined with any degree of certainty, such a strategy allows defendants to bar the courtroom door. This court finds such a result inappropriate at this early stage in litigation.

III. Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss is denied.

N.D.Ill.,2004.
Reed v. TJX Companies, Inc.
Not Reported in F.Supp.2d, 2004 WL 2415055

(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 1660939 (N.D.Ga.)

# H

Taylor v. CompUSA, Inc.
N.D.Ga.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Georgia, Atlanta
Division.
Robin TAYLOR, Michael K. Bell, Terry McLaurin
Sr., and James L. Powell, on behalf of themselves
and all those similarly situated who consent to rep-
resentation, Plaintiffs,
v.
COMPUSA, INC., Defendant.
**No. CIVA1:04CV718-WBH.**

Filed March 12, 2004.
June 29, 2004.

represented by Allan Leroy Parks, Jr., Andrew Yan-
cey Coffman, David F. Walbert, Parks Chesin &
Walbert, 75 Fourteenth Street, N.E., Atlanta, GA,
Lead Attorney, Attorney to be Noticed, Larry Allen
Pankey, Miles McGoff & Moore, Atlanta, GA,
Lead Attorney, Attorney to be Noticed, for Robin
Taylor, Plaintiff.
represented by Allan Leroy Parks, Jr., Andrew Yan-
cey Coffman, David F. Walbert, Larry Allen Pan-
key, (See above for address), Lead Attorney, Attor-
ney to be Noticed, for Michael K. Bell, Plaintiff.
represented by Allan Leroy Parks, Jr., Andrew Yan-
cey Coffman, David F. Walbert, Larry Allen Pan-
key, (See above for address), Lead Attorney, Attor-
ney to be Noticed, for Terry McLauaurin, Sr.,
Plaintiff.
represented by Allan Leroy Parks, Jr., Andrew Yan-
cey Coffman, David F. Walbert, Larry Allen Pan-
key, (See above for address), Lead Attorney, Attor-
ney to be Noticed, for James L. Powell, on behalf
of themselves and all those similarly situated who
consent to representation, Plaintiff.
represented by Ann Marie Painter, Baker & McK-
enzie, Dallas, TX, Lead Attorney, Attorney to be
Noticed, Charlotte Kaye McClusky, Littler Mendel-
son, Atlanta, GA, Lead Attorney, Christine E.
Howard, Fisher & Phillips, Atlanta, GA, Lead At-

torney, Attorney to be Noticed, Dudley Cecile
Rochelle, Littler Mendelson, Atlanta, GA, Lead At-
torney, E. Jewelle Johnson, Fisher & Phillips, At-
lanta, GA, Lead Attorney, Attorney to be Noticed,
Ronald E. Manthey, Baker & McKenzie, Dallas,
TX, Lead Attorney, Attorney to be Noticed, for
Compusa, Inc., Defendant.

## ORDER

HUNT, J.
*1 Before the Court are Plaintiffs' Motion for Con-
ditional Certification, for Defendant to Disclose
Names and Addresses of Similarly Situated Em-
ployees, and for Approval of Notice to Potential
"Opt-In" Plaintiffs [6]; Plaintiffs' Motion for Leave
to File Amended Complaint [18]; Defendant Com-
pUSA, Inc.'s ("CompUSA") Motion to Dismiss
[20]; Plaintiffs' Motion to Strike Amended Answer
[21]; CompUSA's Motion for Leave to File
Amended Answer [31]; CompUSA's Emergency
Motion for the Court to Issue Cease and Desist Or-
der [34-1] and to Impose Fees or Sanctions [34-2];
and Plaintiffs' Motion for Leave to File Sur-Reply
[44].

## BACKGROUND

On March 12, 2004, four named Plaintiffs, on be-
half of themselves and others similarly situated,
filed this Fair Labor Standards Act ("FLSA") case
against Defendant CompUSA. CompUSA owns and
operates approximately 225 retail computer supply
stores throughout the United States. Plaintiffs,
former commercial sales representatives ("CSRs")
for CompUSA, claim that they were regularly re-
quired to work more than 40 hours per week
without being paid overtime. Plaintiffs allege that
prior to February 1, 2004, CompUSA intentionally
mischaracterized CSRs as exempt from overtime
pay under the FLSA. According to Plaintiffs, this
mischaracterization occurred as part of a company-
wide policy that affected CSRs at all CompUSA

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1660939 (N.D.Ga.)

Case 1:07-cv-03993-CW    Document 58-16    Filed 09/11/2008    Page 86 of 101    Page 2

locations. On February 1, 2004, CompUSA changed its policy and now defines CSRs as non-exempt employees subject to overtime pay. As of the date of this Order, nine current or former CompUSA commercial sales employees have filed notices of consent to participate as Plaintiffs ("opt-in Plaintiffs") in this action.

On April 13, 2004, Plaintiffs moved for conditional certification of this action as a collective action under the FLSA, disclosure of the names and addresses of all persons employed by CompUSA as CSRs between March 12, 2001 and the present, and approval of their proposed notice to potential opt-in employees. Approximately one month later, CompUSA filed a motion to dismiss the action as moot in light of an offer of full relief to Plaintiffs. Most recently, on June 8, 2004, CompUSA filed an emergency motion for the Court to issue a cease and desist order to prevent Plaintiffs and their counsel from communicating with potential plaintiffs. In addition to these substantive motions, Plaintiffs and CompUSA seek leave of Court to file amended pleadings.

## DISCUSSION

### I. Motion for Leave to Amend Complaint

Pursuant to Federal Rule of Civil Procedure 15(a),FN1 Plaintiffs move to amend their complaint to assert a claim for retaliation under the FLSA by named Plaintiff James L. Powell, and to correct the misspelling of named Plaintiff Terry McLaurin's name in the caption of the case. Plaintiffs were unable to include the retaliation claim in the original complaint because Powell had not yet been terminated. CompUSA does not oppose the motion. As the proposed amendments will not prejudice CompUSA or delay the case, Plaintiffs' motion for leave to amend is GRANTED. The First Amended Complaint attached to the motion shall be deemed filed and served upon CompUSA as of the date of this Order.

FN1.Rule 15(a) provides that "a party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served ... otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."Fed.R.Civ.P. 15(a).

### II. Motion to Strike Amended Answer

*2 Plaintiffs move to strike CompUSA's Amended Answer and Affirmative Defenses because CompUSA did not obtain leave of Court or Plaintiffs' consent as required by Rule 15(a).FN2 CompUSA contends that the amendment should be allowed because the amended answer was filed within the deadlines set forth in the Joint Preliminary Report and Discovery Plan, and Plaintiffs have suffered no prejudice. A review of the docket reveals that CompUSA has now filed a motion for leave to file the amended answer, and Plaintiffs have not opposed that motion. Accordingly, Plaintiffs' motion to strike is DENIED AS MOOT. Furthermore, as the proposed amendments will not prejudice Plaintiffs or delay the case, CompUSA's motion for leave to amend is GRANTED. The Amended Answer and Affirmative Defenses attached to the motion shall be deemed filed and served upon Plaintiffs as of the date of this Order.

FN2. CompUSA seeks to correct an incomplete response, amend a previously asserted defense, and add a defense based on lack of subject matter jurisdiction in light of its offer of relief to Plaintiffs.

### III. Motion to Dismiss

CompUSA moves for the dismissal of Plaintiffs' claims on the ground that its offer of full relief to Plaintiffs renders the case moot and deprives the Court of subject matter jurisdiction. On or around April 2, 2004, CompUSA submitted a written offer to Plaintiffs, through their counsel, to provide full

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1660939 (N.D.Ga.)

Case 1:07-cv-02993-CW    Document 58-16    Filed 09/11/2008    Page 87 of 101    Page 3

relief to each Plaintiff for the amount of overtime pay claimed "based on an affidavit from each [Plaintiff] stating the number of hours worked each week during their employment up until the contested pay practice stopped in February 2004."CompUSA also offered to pay liquidated damages and reasonable attorneys' fees.[FN3] Along with the offer letter, CompUSA forwarded time records for Plaintiffs' review. Since the motion to dismiss was filed, CompUSA has extended the same offer to five of the opt-in Plaintiffs.[FN4]Most recently, it appears that CompUSA has extended more formal Rule 68 offers of judgment to the named Plaintiffs.[FN5]

> FN3. Section 216(b) of the FLSA permits employees in a private action to recover their unpaid overtime compensation, an additional equal amount as liquidated damages, a reasonable attorney's fee, and costs. 29 U.S.C. § 216(b).
>
> FN4. Additional notices of consent have been filed since briefing closed on the motion to dismiss. It is not clear whether CompUSA has made similar offers to these opt-in Plaintiffs.
>
> FN5. Rule 68 provides, in relevant part: "At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued ... If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer."Fed.R.Civ.P. 68. According to Plaintiffs, CompUSA has not extended Rule 68 offers to the opt-in Plaintiffs.

Plaintiffs rejected CompUSA's April 2 offer and now argue that dismissal is inappropriate because the offer falls short of full relief, and discovery is required to resolve all disputes regarding the number of unpaid overtime hours. Plaintiffs assert that, notwithstanding the fact that no dollar amount has been specified, the offer does not represent full relief because CompUSA conditioned its offer on a confidentiality clause and non-admission of liability. In reply, CompUSA represents that it does not seek to impose a confidentiality agreement on Plaintiffs, and it will stipulate to the entry of judgment on a non-admission basis. CompUSA also asserts that it has identified all existing documents that reflect the hours worked by Plaintiffs, how much they were paid, and the manner in which they were paid.

As a general rule, settlement of the plaintiff's claims moots the action because the plaintiff no longer has a legally cognizable interest in the outcome. *SeeCameron-Grant v. Maxim Healthcare Services, Inc.,* 347 F.3d 1240, 1244 (11th Cir.2003); *Mackenzie v. Kindred Hospitals East, LLC,* 276 F.Supp.2d 1211, 1218 (M.D.Fla.2003). Several district courts have held that an offer of judgment of full relief, even if rejected, renders the action moot. *SeeMackenzie,* 276 F.Supp.2d at 1219 (FLSA collective action); *Wiskur v. Short Term Loans, LLC,* 94 F.Supp.2d 937 (N.D.Ill.2000) (Truth in Lending Act class action); *Ambalu v. Rosenblatt,* 194 F.R.D. 451 (E.D.N.Y.2000). In *Ambalu,* a case relied on by CompUSA, the plaintiff filed a class action alleging violations of the Fair Debt Collection Practices Act. Before the class was certified, the defendant offered the plaintiff the maximum amount of damages to which he was entitled under the statute. Because the offer represented all that the plaintiff could hope to recover, the court concluded that plaintiff had no remaining stake in the outcome of the case. Consequently, the court entered judgment as offered by the defendant. *Ambalu,* 194 F.R.D. at 453.

**\*3** In a more analogous FLSA overtime case, however, a district court denied a motion to compel the plaintiffs to accept offers of judgment because the amount of overtime pay owed to each plaintiff

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1660939 (N.D.Ga.)

Case 1:07-cv-03993-CW    Document 58-16    Filed 09/11/2008    Page 88 of 101    Page 4

remained in dispute. *Yates v. Applied Performance Technologies, Inc.,* 205 F.R.D. 497, 502-03 (S.D.Ohio 2002). In *Yates,* the plaintiffs rejected sum certain offers because the defendants refused to provide them with supporting payroll and time sheet records. In holding that it would be inappropriate to compel acceptance of the offers, the court noted that the parties had not reached a consensus about the number of overtime hours, and none of the plaintiffs had made a demand for a sum certain. *Id.* at 503.The court distinguished *Ambalu,* where the plaintiff's demand was for a sum certain and the offer was equal to the demand. *Id.* at 502.

Similarly, Plaintiffs in this case have not made sum certain demands, and it is clear that the parties have not yet reached a consensus on the amount of overtime pay owed to each Plaintiff.[FN6]As the parties are still in the process of determining the correct amount of damages, the Court finds that the matter is still in dispute and dismissal of Plaintiffs' claims would be inappropriate at this time. Therefore, CompUSA's motion to dismiss is presently DENIED.

> FN6. Moreover, the Court is unaware of the content of the Rule 68 offers, and it is unclear whether such offers have been extended to the opt-in Plaintiffs.

IV. Emergency Motion for Cease and Desist Order

CompUSA moves the Court to prevent Plaintiffs and/or their counsel from issuing unauthorized notice to potential plaintiffs. The motion was filed after CompUSA discovered that an e-mail message was sent by "Former CompUSA Commercial Sales Representatives" to 27 CompUSA employees on June 4, 2004, notifying them of the action and their right to opt-in. On June 17, unidentified former CSRs sent another message to potential plaintiffs entitled "Press Release: Federal Class Action Labor Lawsuit Filed Against CompUSA."CompUSA contends that the messages are inappropriate because they contain misleading and factually inaccurate statements, and Plaintiffs' motion for conditional

certification and approval of notice is still pending before the Court. CompUSA seeks a restriction on "written materials that are broadcast in an indiscriminate manner such as by wide-spread e-mails."

Plaintiffs contend, correctly, that they are not required to rely on court-facilitated notice to notify potential opt-in plaintiffs of the action. *SeeMackenzie,* 276 F.Supp.2d at 1221 .n. 6;*Tucker v. Labor Leasing, Inc.,* 872 F.Supp. 941, 949 (M.D.Fla.1994) (noting that "[section] 216(b) does not require parties to obtain judicial approval before seeking to locate other 'similarly situated' persons ... it is not the court's role to prohibit plaintiffs from attempting to gather these consents") (citations omitted). As the Court has not yet prescribed a particular form of notice or placed restrictions on Plaintiffs' contact with potential class members, the Court finds that sanctions against Plaintiffs are unwarranted. However, the Court is troubled by the fact that the messages contain factual and legal conclusions that may mislead potential plaintiffs as to their eligibility to participate in the action and the extent of CompUSA's potential liability.[FN7]Therefore, until the Court rules on the motion for conditional certification and approval of notice, Plaintiffs shall not include such unqualified, misleading statements in their communications with potential plaintiffs.

> FN7. For example, the June 4 message includes the following statements: (1) "If you are a past or present Commercial Sales Representative before March 1, 2004 you are entitled to join this lawsuit;" (2) "The position of Commercial Sales Representative was not a qualified exempt position ... CompUSA reclassified the position to hourly nonexempt position but that did not excuse CompUSA from obligations to pay all overtime to all such classified employees for the last 3 years;" and (3) "If you worked any hours over 8 in any day, without the required (2) fifteen minute rest breaks, and on weekends without being paid for those hours you are entitled to be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1660939 (N.D.Ga.)
Not Reported in F.Supp.2d, 2004 WL 1660939 (N.D.Ga.)

Case 1:07-cv-03993-CW     Document 58-16     Filed 09/11/2008     Page 89 of 101     Page 5

paid for all of your unpaid overtime hours plus damages and interest."The June 17 message also states that "CompUSA management deliberately implemented a corporate wide policy that encouraged or implicitly forced hundreds of Commercial Sales Representatives to work thousands of uncompensated hours."These statements are presented as conclusions rather than as Plaintiffs' contentions.

V. Hearing

**\*4** The Court will hear from counsel regarding the issues raised in Plaintiffs' Motion for Conditional Certification, Disclosure of Names and Addresses of Similarly Situated Employees, and Approval of Notice. The Court will also hear from counsel regarding the status of the Rule 68 offers of judgment and the possibility of expedited discovery to determine the amount of Plaintiffs' damages. The hearing will take place at 10:00 a.m. on Wednesday, July 7, 2004.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Conditional Certification, for Defendant to Disclose Names and Addresses of Similarly Situated Employees, and for Approval of Notice to Potential "Opt-In" Plaintiffs [6] REMAINS PENDING; Plaintiffs' Motion for Leave to File Amended Complaint [18] is GRANTED; CompUSA's Motion to Dismiss [20] is presently DENIED; Plaintiffs' Motion to Strike Amended Answer [21] is DENIED AS MOOT; CompUSA's Motion for Leave to File Amended Answer [31] is GRANTED; CompUSA's Emergency Motion for the Court to Issue a Cease and Desist Order [34-1] is GRANTED IN PART and DENIED IN PART; CompUSA's Motion to Impose Fees or Sanctions [34-2] is DENIED; and Plaintiffs' Motion for Leave to File Sur-Reply [44] is summarily GRANTED. The Clerk is DIRECTED to file the First Amended Complaint and the Amended Answer and Affirmative Defenses as of the date of this Order.

It is so ORDERED

N.D.Ga.,2004.
Taylor v. CompUSA, Inc.
Not Reported in F.Supp.2d, 2004 WL 1660939 (N.D.Ga.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 849525 (S.D.Ind.)

▷
Gibson v. Aman Collection Service, Inc.
S.D.Ind.,2001.
Only the Westlaw citation is currently available.
United States District Court, S.D. Indiana, Indiana-
polis Division.
Melissa A. GIBSON, individually and on behalf of
all others similarly situated, Plaintiff,
v.
AMAN COLLECTION SERVICE, INC., a South
Dakota corporation, Defendant.
**No. IP 00-1798-CT/G.**

May 23, 2001.

ENTRY ON PLAINTIFF'S MOTION TO STRIKE
DEFENDANT'S RULE 68 OFFER OF JUDG-
MENT [FN1]

> FN1. Though this Entry is a matter of pub-
> lic record and is being made available to
> the public on the court's web site, it is not
> intended for commercial publication either
> electronically or in paper form. The reason
> for this caveat is to avoid adding to the re-
> search burden faced by litigants and courts.
> Under the law of the case doctrine, the rul-
> ing or rulings in this Entry will govern the
> case presently before this court. *See, e.g.,*
> *Tr. of Pension, Welfare, & Vacation*
> *Fringe Benefit Funds of IBEW Local 701*
> *v. Pyramid Elec.,* 223 F.3d 459, 468 n. 4
> (7th Cir.2000); *Avitia v. Metro. Club of*
> *Chicago, Inc.,* 49 F.3d 1219, 1227 (7th
> Cir.1995). However, a district judge's de-
> cision has no precedential authority and,
> therefore, is not binding on other courts, on
> other judges in this district, or even on oth-
> er cases before the same judge. *See, e.g.,*
> *Howard v. Wal-Mart Stores, Inc.,* 160 F.3d
> 358, 359 (7th Cir.1998) ("a district court's
> decision does not have precedential author-

> ity"); *Malabarba v. Chicago Tribune Co.,*
> 149 F.3d 690, 697 (7th Cir.1998) ( "district
> court opinions are of little or no authorita-
> tive value"); *United States v. Articles of*
> *Drug Consisting of 203 Paper Bags,* 818
> F.2d 569, 571 (7th Cir.1987) ("A single
> district court decision ... has little preced-
> ential effect. It is not binding on the cir-
> cuit, or even on other district judges in the
> same district."). Consequently, though this
> Entry correctly disposes of the legal issues
> addressed, this court does not consider the
> discussion to be sufficiently novel or in-
> structive to justify commercial publication
> of the Entry or the subsequent citation of it
> in other proceedings.TINDER.

**\*1** On November 20, 2000, named Plaintiff,
Melissa A. Gibson, filed a class action complaint
against Defendant, Aman Collection Service, Inc.
("Aman"), alleging that Defendant's collection
practices violate the Fair Debt Collection Practices
Act, 15 U.S.C. § 1692, *et seq.* On or about Decem-
ber 29, 2000, pursuant to Rule 68 of the Federal
Rules of Civil Procedure, Defendant offered to al-
low judgment to be entered against it in the amount
of one-thousand one dollars plus costs and reason-
able attorney's fees. Thereafter, on January 8, 2001,
Gibson filed a motion to strike Defendant's offer of
judgment and, also on that date, filed a motion for
class certification. Gibson's motion to strike is cur-
rently before the court.

Analysis

Gibson moves to strike Defendant's offer of judg-
ment on the ground that it is inappropriate in the
context of a class action. Gibson argues that the of-
fer of judgment (a) conflicts with the settlement re-
quirements contained in Rule 23(e) of the Federal
Rules of Civil Procedure and (b) creates a conflict
between Gibson, the class representative, and the
putative class members.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Defendant responds that because its offer of judgment was made before Gibson filed her motion for class certification, pursuant to Seventh Circuit precedent, its offer is valid and effective. Defendant relies upon *Greisz v. Household Bank (Illinois), N.A.,* 176 F.3d 1012 (7th Cir.1999), *Holstein v. City of Chicago,* 29 F.3d 1145 (7th Cir.1994) and *Wiskur v. Short Term Loans, LLC,* 94 F.Supp.2d 937 (N.D.Ill.2000). These cases, critically, however, are not procedurally identical to this case, as Defendant mistakenly contends, and are therefore not controlling. In *Greisz,* the offer of judgment was made after the class certification motion had been denied. In *Holstein,* the offer of judgment was made and expired before any class certification motion was filed.[FN2] Also in *Wiskur,* the offer of judgment had expired prior to the motion for class certification. Here, however, although the offer of judgment was made prior to the motion for class certification, the offer had not yet expired when Gibson moved for class certification. *See*FED.R.CIV.P. 6(a). Therefore, none of these cases cited by Defendant address the exact issue faced by this court, which is what should result when a class certification motion is filed after an offer of judgment is made but before that offer expires.

> FN2. Although the court did not comment whether it would have made a difference in the outcome, the Seventh Circuit explicitly stated that the named plaintiff "did not even move for class certification prior to the evaporation of his personal stake."*Holstein,* 29 F.3d at 1147.

This court has identified two cases which have addressed the exact issue in front of this court. In a well reasoned "Order" dated October 25, 2000, Judge Gottshall relied upon Judge Conlon's reasoning in *Janikowski v. Lynch Ford, Inc.,* No. 98 C 8111, 1999 WL 608714 (N.D.Ill. Aug.5, 1999), *aff'd on other grounds,*210 F.3d 765 (7th Cir.2000), in deciding that the defendant's Rule 68 offer of judgment was not valid where the named plaintiff

moved for class certification during the ten-day pendency of the offer of judgment. *See Asch v. Teller, Levit & Silvertrust, P.C.,* No. 00 C 3290 (N.D.Ill. Oct.25, 2000).[FN3] In that case, Judge Gottschall opined,

> FN3. The court notes that this opinion is unpublished. However, it can be accessed from the internet at the Northern District of Illinois' web site, and a copy was attached as Exhibit A to Gibson's reply brief. The court cites to this opinion in an effort to give credit where credit is due.

**\*2** Allowing the plaintiffs the kind of retaliatory strike seen here and in *Janikowski,* where the plaintiff can avoid the Rule 68 offer by moving for class certification during its pendency, adds an appropriate degree of symmetry to the oft-observed asymmetrical bite of Rule 68. Nor does it run afoul of the express language of the Rule. It has the additional salutary effect of taking away the incentive for a defendant to make a Rule 68 offer before either party has had a reasonable opportunity to evaluate the case; it restores Rule 68 to the role it should have-a means of facilitating and encouraging settlements, rather than a clever device for gaining an advantage by racing to the courthouse. *Id.* at 4-5. Judge Gottschall also correctly recognized that allowing class action defendants to use Rule 68 in this way would result in few class actions being filed without accompanying class certification motions which would have the effect of increasing inefficiency in the management of class actions. *Id.* at 4.

In *Janikowski,* the case upon which Judge Gottschall relied in *Asch,* the court concluded that because the "motion for class certification was pending during the ten days allotted by Rule 68 for acceptance or denial of the offer[,]" the named plaintiff "could not consider a settlement offer made to her personally."*Janikowski,* 1999 WL 608714, at \*2. Defendant argues that the *Janikowski* case is inopposite here because the class certification motion there was filed before the Rule

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

68 offer of judgment was made. Defendant's argument, as is evident by the court's language quoted above, is in error. In *Janikowski,* two motions for class certification were filed. (See *Janikowski* docket sheet attached to Defendant's Brief in Opposition as Exhibit 3, at entries 14 and 36.) The first motion was denied. (See id. at entry 30.) Subsequently, the defendant made a Rule 68 offer of judgment. (See id. at entry 36.); *see Janikowski,* 1999 WL 608714, at *2. During the ten-day pendency of that offer of judgment, the named plaintiff renewed her motion for class certification. *See id.* It was the second class certification motion that the court considered when granting the named plaintiff's motion to strike the offer of judgment. *See id.*

This court agrees with the conclusions reached in *Asch* and *Janikowski.* The court finds Judge Gottschall's reasoning to be persuasive. Moreover, that reasoning is all the more persuasive here where it was perfectly clear from the language of Gibson's complaint that class certification would be sought. Defendant, by submitting its offer of judgment, raced to the courthouse in an effort to put Gibson in a tactical trick bag.

Also, the court recognizes that a Rule 68 offer of judgment conflicts with the requirements of Rule 23(e), which governs class action settlements, and could lead to conflict between the named plaintiff and the represented class.

*3 Rule 23(e) provides:

A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

FED.R.CIV.P. 23(e). By its very language, Rule 23(e) requires that the court approve any class action settlement. Therefore, it would be impermissible for Gibson, the class representative, to accept an offer of judgment made to her in her individual capacity absent court approval. *See Martin v.*

*Mabus,* 734 F.Supp. 1216, 1222 (S.D.Miss.1990) ("[T]he procedures described by rule 68 for making an offer of judgment are literally inapplicable because rule 23(e) requires that court approval be obtained in order for a case to be dismissed or compromised.") (citing *Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30,* 86 F.R.D. 500, 502-03 (N.D.Cal.1980)); *accord Janikowski,* 1999 WL 608714, at *2.

Finally, the court recognizes that a conflict of interest could exist between Gibson and the represented class members were Gibson forced to choose between exposure to risk, i.e., her own self-interest, and her fiduciary duty to the potential class. *See Gay,* 86 F.R.D. at 502-03 ("[T]he representative as offeree would be forced to balance his personal liability for costs against the prospects of sharing with the class in any recovery. His evaluation of the offer would therefore be tinged by self-interest and would tend to differ from that of absent class members.") (quoted in *Janikowski,* 1999 WL 608714, at *2);*see also Marek v. Chesny,* 473 U.S. 1, 35 n. 49, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985) (Brennen, J., dissenting) ("[T]he Advisory Committee recently has cautioned, in the class-action context '[an] offeree's rejection would burden a named representative-offeree with the risk of exposure to heavy liability [for costs and expenses] that could be recouped from unnamed class members.... [This] could lead to a conflict of interest between the named representatives and other members of the class.'") (quoting Advisory Committee's Note to Proposed Amendment to Rule 68). All of these additional reasons lend further support to the appropriateness of granting Gibson's motion to strike.

For the foregoing reasons, Plaintiff's motion is GRANTED. The offer of judgment is STRICKEN and is therefore of no effect.

ALL OF WHICH IS ORDERED this 23rd day of July 2001.

S.D.Ind.,2001.
Gibson v. Aman Collection Service, Inc.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 849525
(S.D.Ind.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.R.D.                                                          Page 1
Not Reported in F.R.D., 1992 WL 442898 (N.D.Cal.), 25 U.S.P.Q.2d 1304

**H**

MUSHROOM ASSOCIATES, et al., Plaintiffs, v.
MONTEREY MUSHROOMS, INC., et al., Defendants.
N.D.Cal.,1992.

United States District Court,N.D. California.
MUSHROOM ASSOCIATES, et al., Plaintiffs,
v.
MONTEREY MUSHROOMS, INC., et al., Defendants.
**No. C-91-1092 BAC (PJH).**

Aug. 21, 1992.

HAMILTON
**\*1** The plaintiffs' motions to compel discovery were
heard on July 31, 1992. David J. Brezner and Laura
L. Kulhanjian appeared for the plaintiffs. Louis M.
Lupin appeared for the defendants. Having heard
the parties I arguments and read their briefs, this
court orders as follows.

I. INTRODUCTION.

The plaintiffs allege that the defendants have infringed their patent. The patent at issue, U.S. Patent
No. 4,407,832 ("the 1832 patent") covers technology used in the processing of mushrooms.

As part of discovery for their case, the plaintiffs
propounded requests for production of documents
to defendant Max Beauvais ("Beauvais") that included Request for Production No. 8 of the
plaintiffs' second set of requests for production
seeking prosecution histories of all patent applications relating to the processing of mushrooms filed
by Beauvais since 1980. In addition, Request No. 1
of the plaintiffs' third set of requests for production
of documents requires the production of prosecution histories of patent applications filed by
Beauvais. Beauvais has refused to produce such
documents.

The plaintiffs also propounded a fourth and fifth set
of requests for production. The defendants have not
objected to the substance of the requests but they
have objected that the requests were not timely
served because they call for a response beyond the
discovery cut-off date imposed by Judge Caulfield.

The plaintiffs seek an order compelling the defendants to respond to these requests for production.

II. DISCOVERY OF PROSECUTION HISTORIES.

The plaintiffs' Request for Production No. 8 of the
plaintiffs' second request for production of documents requests Beauvais to produce:

All patent applications and corresponding prosecution histories RELATING to the processing of
mushrooms filed since 1980 which list Mr.
Beauvais as either the sole inventor or as a joint inventor.

(Kulhanjian Declaration, May 15, 1992, Ex. F.)

The plaintiffs explain in their moving papers that
"prosecution histories" refers to the communications between an inventor and the patent examiner.
The patent examiner reviews the patent application
for compliance with the patent laws. The plaintiffs
argue that such prosecution histories are relevant to
their claim of willful infringement of the 1832 patent in that the defendants had notice of the 1832
patent as a result of information supplied by the
patent examiner.

The plaintiffs move to compel production of documents as a result of third party discovery that
showed Beauvais had filed a patent application
("the '110 application") relating to mushroom processing. The '110 application was filed in July of
1982. The prosecution history of the '110 application refers specifically to the 1832 patent.
(Kulhanjian Declaration, May 15, 1992, Ex. I.) Yet,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

in his response to Request No. 8, Beauvais did not include documents pertaining to the '110 application. To ensure compliance with Request No. 8, the plaintiffs ask that Beauvais be compelled to produce the prosecution history of the '110 application, and any other patents that Beauvais has filed since 1980 that pertain to mushroom processing that the plaintiffs have not discovered.

**\*2** Request No. 1 of the plaintiffs' third request for production of documents requests Beauvais to:

Produce all DOCUMENTS identified or referred to in response to Plaintiff Is Second Set of Interrogatories to Max Beauvais.

(Kulhanjian Declaration, May 15, 1992, Ex. P.)

The plaintiffs' second set of interrogatories asks for the facts supporting the defendants' answer to the second amended complaint. Because the second amended complaint alleges willful infringement, the plaintiffs argue that notice of the 1832 patent is an issue in this litigation, in turn making the '110 application a document referred to by the facts supporting the defendants' answer to the allegation of willful infringement. consequently, the plaintiffs argue that the '110 application falls within those documents requested by Request No. 1. To ensure full compliance with Request No. 1, the plaintiffs move to compel production of the entire '110 patent application, or to compel the defendants to give their permission to the plaintiffs to obtain the file from the U.S. Patent and Trademark office, or to compel the defendants to admit that Beauvais had knowledge of the 1832 patent as early as February 13, 1984.

With respect to patent applications in general, the defendants argue that prosecution histories other than that of the 1832 patent simply are not at issue in this litigation and should not be discoverable.

The defendants cite *Key Technology, Inc. v. Simco/Ramic Corp.,* 137 F.R.D. 322 (D.Or.1991) to support their argument that discovery should not be

compelled with respect to patent applications that are not the subject of the underlying litigation. In that case, the district court refused discovery of abandoned patent applications on the basis that any admissions made in the requested documents would be irrelevant to Simco/Ramic's defense of invalidity. *Id.* at 324-325. However, the court noted that such discovery was relevant to the issue of willful infringement and would allow discovery during the damages portion of the bifurcated trial. Thus, *Key Technology* does not create an absolute bar to discovery of patent applications which are not the subject of the underlying litigation.

Turning to the '110 application, the plaintiffs have demonstrated a sufficient connection to the 1832 patent to justify discovery. The fact that one portion of the '110 prosecution history refers to the 1832 patent makes the '110 prosecution history relevant to this litigation.

With respect to all other patent applications pertaining to mushroom processing, assuming any exist, this court finds that the plaintiffs' request satisfies the broad definition of relevance established in the federal rules. The fact that the '110 application makes reference to the 1832 patent suggests that other patent applications concerning the processing of mushrooms might also refer to the 1832 patent. Furthermore, the discovery is limited to patent applications pertaining to mushroom processing, the same subject of the 1832 patent. Because such discovery may lead to admissible evidence concerning the issue of willful infringement, Beauvais must comply with the requests for production or give the U.S. Patent and Trademark Office authorization allowing the plaintiffs to view and copy such files.

**\*3** The defendants further argue that with respect to the '110 application, the plaintiffs already have the information they need as a result of the third party discovery. The plaintiffs clearly only have a portion of the '110 prosecution history. Access to the complete prosecution history is necessary to determine if any other references to the 1832 patent occurred.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

As to compelling an admission by the defendants that they had knowledge of the 1832 patent as early as 1984, the defendants argue that they should not be compelled to admit notice of the 1832 patent when the prosecution history is derived largely from information supplied by the patent examiner, not admissions made by Beauvais. This court agrees with the defendants and will restrict its order to compelling production of documents by the defendants.

At the hearing, the defendants suggested that they would obtain the prosecution history of the '110 application from the patent examiner and turn over any portions that refer to the 1832 patent. This court rejects the defendants' offer to filter the prosecution history of the '110 application for all references to the 1832 patent. The prosecution history of the '110 patent is sufficiently relevant such that the plaintiffs should have access to the entire file, free of the defendants' censure. Of course, such information will be subject to the protective order already in effect in this case.

III. TIMELINESS OF PLAINTIFFS FOURTH AND FIFTH REQUESTS FOR PRODUCTION OF DOCUMENTS.

Pursuant to Local Rule 230-6, Judge Caulfield imposed a discovery cut-off date of Sunday, May 3, 1992. Local Rule 230-6 requires service of discovery requests so that responses be due before the cut-off date. Should responses be due after the cut-off date, then those discovery requests, 11 ... will not be enforceable except by order of the court for good cause shown.11 Local Rule 230-6.

A. *Fourth request for production of documents,*

The plaintiffs served their fourth request for production of documents by fax and mail on march 31, 1992.

The plaintiffs argue that service by fax satisfies the service requirements of Fed.R.Civ.P. 5(b) which al-

lows for service by leaving a copy in a conspicuous place in the attorney's office. Assuming service by fax is appropriate, then responses to the fourth request would be due by Thursday, April 30, 1992, prior to the discovery cut-off date.

Service by mail allows the defendants three additional days to respond. Fed.R.Civ.P. 6(e). Mail service would therefore require a response by Sunday, May 3, 1992, the discovery cut-off date set by Judge Caulfield. The defendants argue that when a response due 30 days after service lands on a Sunday, then the response will be due on the following Monday. Fed.R.Civ.P. 6(a). This would make the defendants' response due on Monday, May 4, 1992, one day after the discovery cut-off. Consequently, the defendants argue that their response was due after the discovery cut-off and therefore no response was required.

*4 The defendants further argue that Fed.R.Civ.P. 6(a) applies only to computations of time periods, not to deadlines fixed by the court. The plaintiffs, on the other hand, argue that Fed.R.Civ.P. 6(a) should apply equally to fixed deadlines which fall on the weekend as well as computations of time periods. If so, the Sunday discovery cut-off date in this case would be deemed to fall on Monday, May 4, 1992, making the plaintiffs' fourth request for production timely.

At the outset, this court holds that service by fax is not sufficient to satisfy Fed.R.Civ.P. 5(b). *Salley v. Board of Governors, University of N.C.,* 136 F.R.D. 417, 420 (M.D.N.C.1991). In light of the issues raised by service by fax as discussed in *Salley,* it is more appropriate for the Advisory Committee on the Federal Rules to outline the use of facsimile transmissions in the context of modern litigation. Until that time, and in the absence of a stipulation by the parties, this court will not allow service by fax to satisfy Fed.R.Civ.P. 5(b).

Pursuant to Fed.R.Civ.P. 6(a) and (b), this court finds that the defendants' responses to the fourth request for production of documents were not due un-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

til May 4, 1992. However, the plaintiffs have persuasively argued that Fed.R.Civ.P. 6(a) should also be applied to a court imposed deadline falling on a weekend. In support of their position, the plaintiffs cite *Byrd v. City of Fayetteville,* 110 F.R.D. 71, 72 (E.D.N.C.1986), *aff'd,* 819 F.2d 1137 (4th Cir.1987), which held that Fed.R.Civ.P. 6(a) applied to a motions deadline imposed by the court that fell on a Sunday. Additionally, there is no prejudice to the defendants who had more than 30 actual days to respond to the request. Moreover, nothing in the record suggests that Judge Caulfield specifically intended that the deadline be Sunday as opposed to a weekday. Consequently, the discovery cut-off date imposed by Judge Caulfield should be treated as falling on Monday, May 4, 1992. Because the defendants' responses were due on the discovery cut-off date, the plaintiffs, request for production was timely served. The defendants must respond to the plaintiffs' fourth request for production of documents.

### B. *Fifth request for production of documents,*

The plaintiffs personally served their fifth request for production of documents on April 2, 1992, making the defendants response due on May 2, 1992, a Saturday. Pursuant to Fed.R.Civ.P. 6(a), their response would be due Monday, May 4, 1992. As previously argued by the defendants, this would require a response beyond the discovery cut-off of May 3, 1992 imposed by Judge Caulfield.

As decided above, the discovery cut-off in this case should be deemed as falling on Monday, May 4, 1992. The defendants' responses were due on the day of discovery cut-off, making the request for production timely. Consequently, the defendants must respond to the plaintiffs' fifth request for production of documents.

### IV. CONCLUSION.

*5 Based on the foregoing, the plaintiffs, notion to compel production of documents satisfying Request

for Production No. 8 of their second set of requests for production and Request for Production No. I of their third set of requests for production is GRANTED. Beauvais must produce the prosecution history of the I 110 application and the prosecution histories of any other patent applications pertaining to the processing of mushrooms filed since 1980. In the alternative, Beauvais may give authorization to the U.S. Patent and Trademark Office allowing the plaintiffs to view and copy the relevant prosecution histories. The plaintiffs' motion to compel production of documents pertaining to their fourth and fifth sets of requests for production is GRANTED. Production must occur within 30 days of this order.

IT IS SO ORDERED.

### ORDER RE: DEFENDANTS' MOTIONS TO COMPEL DISCOVERY

The defendants' motions to compel discovery were heard on July 31, 1992. David J. Brezner and Laura L. Kulhanjian appeared for the plaintiffs. Louis M. Lupin appeared for the defendants. Having heard the parties' arguments and read their briefs, this court orders as follows.

### I. INTRODUCTION.

The plaintiffs' allege that the defendants have infringed their patent. The patent at issue, U.S. Patent No. 4,407,832 ("the '832 patent") covers technology used in the processing of mushrooms.

On May 13, 1992, the defendants filed their motions to compel. Originally scheduled for June 26, 1992, the hearing was postponed at the parties' request. At the outset, their motions covered three general areas of discovery. Through meet and confer sessions occurring after the filing of the motions, the parties were able to narrow the scope of the motions. At this point, three specific disputes are before this court: 1) Whether the plaintiffs should be required to give a more detailed definition of the term, "heat stable,", further requiring the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

plaintiffs to provide supplemental answers to Interrogatory Nos. 8, 12, 14, and 18; 2) To what extent should the defendants be allowed discovery of documents to which Andrew Ferguson ("Ferguson") had access; and 3) To what extent have the plaintiffs waived the attorney-client privilege with respect to foreign patent prosecutions and the prosecution of the '832 patent by their response to the defendants' defense of inequitable conduct.

## II. DISCUSSION.

### A. *Supplemental answers to interrogatories.*

#### 1. *Interrogatory Nos. 8 and 14.*

Defendants' Interrogatory Nos. 8 and 14 rely on a definition of the term "heat stable." The plaintiffs' initial response to these interrogatories essentially directed the defendants to the '832 patent. In the briefing for this motion, the plaintiffs further explained the meaning of "heat stable" as it applies to this litigation. The discussion explains that "heat stable" means that certain particulates do not coagulate during the heat processing of mushrooms. During the hearing on this motion, the plaintiffs agreed to stipulate to their discussion of "heat stable" contained in their opposition as a further definition of that term.

This court is convinced that the discussion in the plaintiffs' opposition provides a sufficient definition of "heat stable," thereby satisfying the inquiries posed by Interrogatory Nos. 8 and 14.Based on the discussion stipulated to by the plaintiffs, no further answer to these interrogatories is required.

#### 2. *Interrogatory No. 12.*

Interrogatory No. 12 asks the plaintiffs to identify the properties of AVICEL CL-611 referred to at column 9, lines 9-14 of the '832 patent. The plaintiffs' initial response referred the defendants to the '832 patent and to other unidentified industry sources. Unsatisfied with this response, the defendants seek a supplementary answer which specifically identifies those properties, particularly in light of the definition of "heat stable." The plaintiffs essentially rest on their contention that such information is available from industry sources, specifically from FMC, the manufacturer of the AVICEL CL-611.

This court finds that the plaintiffs must provide a further answer to this interrogatory. The answer should list each property of AVICEL CL-611 implicit in the discussion made by the '832 patent, even if that means simply extracting the information directly from the FMC product description. By doing this, the defendants will not be required to guess exactly what the plaintiffs were referring to in the '832 patent. Such certainty is the goal of liberal discovery established by the federal rules.

#### 3. *Interrogatory No. 18.*

Interrogatory No. 18 requests all facts upon which the plaintiffs' counsel told Richard L. Neeley, counsel for the defendants, that rice starch used by the defendants accomplished the same results by the same means as those discussed in the '832 patent. The plaintiffs initially objected to this interrogatory on the grounds that it sought information protected by the attorney-client privilege and the work product doctrine. However, in their opposition to this motion, the plaintiffs provided further explanation of the statement made by their counsel to Mr. Neeley.

This court finds that the discussion in their opposition is a sufficient further answer to this interrogatory. Consequently, the plaintiffs must make a further answer to Interrogatory No. 18 that incorporates the discussion found in its opposition dated July 17, 1992 at p.9. The plaintiffs must also make a further investigation into the facts of this assertion and supplement their answer accordingly as they agreed to do in their opposition. (Plaintiffs' Opposition, July 17, 1992, p.9:20-22.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

## B. *Ferguson discovery.*

Ferguson is a co-inventor of the '832 patent. He has also been designated as an expert for purposes of testimony in this litigation.

The defendants move to compel production of all documents to which Ferguson has had access, regardless of whether such documents were used in the formulation of his expert testimony.[FN1] In essence, the defendants argue that all documents pertaining to the '832 patent to which Ferguson has had access during the life of the patent are part of any testimony he would give, even if such documents were not actually reviewed for the purpose of his testimony. At the hearing, the plaintiffs agreed to produce all documents upon which Ferguson will rely for his testimony as well as all documents that he considered but will not rely upon for his testimony. The defendants object to this production because they are concerned that the word "considered" is open to abuse.

> FN1. Technically, under the provisions of Fed. R. Civ. P. 26(b)(4)(A), the defendants would have to obtain the permission of the court to seek any expert discovery beyond interrogatories. However, the plaintiffs have apparently consented to allowing some document production, leaving the issue of the scope of such discovery.

*Bio-Rad Laboratories, Inc. v. Pharmacia, Inc.* 130 F.R.D. 116 [14 USPQ2d 1924] (N.D.Cal. 1990), cited by the defendants, is not at odds with the plaintiffs' position. In that case, the court held that an expert could be *deposed* as to facts and opinions developed in preparation for a case without seeking permission from the court pursuant to Fed. R. Civ. P. 26(b)(4)(A)(ii).*Id.* at 125. That court did not hold that a blanket waiver occurs as to all privileged documents that an employee doubling as an expert witness has had access to during the course of his employment. *Intermedics, Inc. v. Ventritex, Inc.,* 139 F.R.D. 384 (N.D.Cal. 1991) is also consistent with the plaintiffs' position. In that case, the court

held that a party could discover protected communications made by an attorney to an expert witness. The court did not address the issue of an employee receiving a privileged communication before being designated an expert witness. It confined its analysis to communications made in anticipation of litigation.

[3] This court is persuaded by the position taken by the plaintiffs. The defendants shall have access to all documents considered by Ferguson, whether rejected or relied upon. "Considered" applies to all documents Ferguson reviewed in preparation for his expert testimony. However, privileged documents that Ferguson has had access to during the life of the '832 patent, but not considered by him as a basis for his expert testimony, shall remain privileged, and not discoverable. In sum, this court finds that the naming of an employee as an expert does not result in a blanket waiver of all privilege with respect to every document that the employee has had access to during the course of his employment. The waiver only applies to those documents which the employee considered when formulating his expert testimony.

## C. *Discovery of patent prosecutions.*

As part of their defense to this infringement action, the defendants assert that the '832 patent is unenforceable due to the plaintiffs' alleged inequitable conduct. Specifically, the defendants allege that the prosecution of a Spanish patent prior to the '832 patent without notification to the U.S. Patent Office constitutes the withholding of material information. In their opposition to the defendants' motion for summary judgment on this issue, the plaintiffs submitted declarations by Ferguson and William A. Wright, the attorney who conducted the prosecution of the '832 and related patents, denying knowledge of the materiality of the Spanish patent or any intent to deceive the U.S. Patent and Trademark Office.

The defendants argue that the submission of these

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

declarations injects the particular person's state of mind into the litigation, effectively waiving all privileges pertaining to prosecution histories of the '832 patent and all related foreign patent prosecutions. The plaintiffs acknowledge the waiver of some portion of the attorney-client privilege, but dispute the scope of such a waiver. Their position is that by submitting the two declarations, they have only waived the attorney-client privilege as to three issues: 1) communications relevant to the issuance of the Spanish patent; 2) the alleged materiality of the Spanish patent to the United States prosecution; and 3) the alleged intent on the part of either the inventors or attorney Wright. (Plaintiffs' Opposition, July 17, 1992, p.4:23-25.) At the hearing on this motion, the plaintiffs agreed to produce their complete Spanish prosecution file. However, they maintained their position that there has not been a complete waiver of the attorney-client privilege with respect to documents pertaining to the prosecution of the '832 patent or other foreign patent applications.

The parties cite no direct authority that would guide this court in its determination of the scope of the waiver in this context. Consequently, this court must extract principles from other cases that will lead it to an equitable resolution of this issue.

When a party voluntarily waives the attorney-client privilege, the waiver extends to all communications pertaining to the subject matter of the communication. *In Re Sealed Case,* 676 F.2d 793, 809 (D.C.Cir. 1982). In this case, the subject matter of the waiver is the intent of the inventors and Mr. Wright with respect to their representations before the U.S. Patent and Trademark Office and whether they knew that the Spanish patent was material to the '832 patent application.

[4] This court finds that communications initiated during the prosecution of the '832 patent are relevant to these two issues. Rarely will there be direct evidence of a party's intent to deceive or mislead the U.S. Patent and Trademark Office. *Halliburton Co. v. Schlumberger Technology Corp.,* 925 F.2d 1435, 1442 [17 USPQ2d 1834] (Fed. Cir. 1991).

Such intent must frequently be determined from the facts and circumstances of the patent prosecution. Furthermore, in determining the materiality of prior art, one must know the scope of the patent being prosecuted. Consequently, all communications pertaining to the '832 patent prosecution fall within the subject matter of the inventors' and Mr. Wright's intent as well as their knowledge of the materiality of the Spanish patent to the '832 patent.

With respect to other foreign patent prosecutions, this court finds that the plaintiffs have also waived their attorney-client privilege. Such prosecutions fall within the subject matter of the materiality of the Spanish patent to the '832 patent due to the foreign patents' similarity to the Spanish patent. The plaintiffs must produce any documents previously withheld as privileged that pertain to the prosecution of foreign patents similar to the Spanish patent.

III. CONCLUSION.

Based on the foregoing, the defendants' motion to compel further answers to interrogatories is GRANTED. The plaintiffs must stipulate to contents of their opposition brief as being responsive to enumerated interrogatories. The plaintiffs must also supplement those interrogatories affected by the new definition of "heat stable."

The defendants' motion to compel production of documents relating to Ferguson's expert testimony is DENIED. The plaintiffs need only produce those documents that Ferguson considered.

Finally, the defendants' motion to compel production of previously withheld documents is GRANTED. The plaintiffs must produce all attorney-client communications pertaining to the Spanish patent prosecution, the '832 patent prosecution, and all other foreign patent prosecutions based on the same technology as the Spanish patent.

Compliance with this order must occur within 30 days.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

IT IS SO ORDERED.

N.D.Cal.,1992.
Mushroom Associates v. Monterey Mushrooms, Inc.
Not Reported in F.R.D., 1992 WL 442898
(N.D.Cal.), 25 U.S.P.Q.2d 1304

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.